IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APOTEX, INC. and APOTEX CORP.,<br><br>Defendants. | Civil Action No. 07-278 |

**NOTICE OF PENDENCY OF ALLEGAN'S MOTION BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION TO TRANSFER RELATED PATENT ACTIONS UNDER 28 U.S.C, § 1407**

TO THE HONORABLE COURT, AND TO ALL PARTIES AND THEIR COUNSEL:

PLEASE TAKE NOTICE that on May 25, 2007, Plaintiff/Counterclaim Defendant ALLERGAN, INC. ("Allergan") sent for filing, via Federal Express, a motion with the Judicial Panel on Multidistrict Litigation seeking to transfer the three actions listed below to the United States District Court for the District of Delaware for coordinated or consolidated pretrial proceedings:

**The Delaware Litigation**:

*Allergan, Inc. v. Apotex, Inc. and Apotex Corp.*

United States District Court for the District Court of Delaware

Case No.: 07-278

**The California Litigation**:

*Allergan Inc. v. Exela PharmSci, Inc., Exela PharmSci, PVT, Ltd., Paddock Laboratories, Inc. and PharmaForce, Inc.*

United States District Court for the Central District of California, Western Division

Case No.: CV07-01967 R (RCx)

**The Virginia Litigation**:

*Exela PharmSci, Inc. v. Allergan, Inc.*

United States District Court for the Eastern District of Virginia

Case No.: 1:07-cv-00338-TSE-TCB

In accordance with Rule 5.2(b) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, attached hereto as Exhibits A through G are true and correct copies of the following documents submitted by Allergan to the MDL Panel:

Exhibit 1: Allergan, Inc.'s Motion to Transfer Pursuant to 28 U.S.C. § 1407 (With Attached Schedule of Actions);

Exhibit 2: Brief in Support of Allergan, Inc.'s Motion to Transfer Pursuant to 28 U.S.C. § 1407;

Exhibit 3: Declaration of Juanita R. Brooks in Support of Allergan, Inc.'s Motion to Transfer Pursuant to 28 U.S.C. § 1407;

Exhibit 4: Exhibits to Declaration of Juanita R. Brooks in Support of Allergan, Inc.'s Motion to Transfer Pursuant to 28 U.S.C. § 1407;

Exhibit 5: Allergan, Inc.'s Corporate Disclosure Statement;

Exhibit 6: Allergan, Inc.'s Transmittal Letter by Juanita R. Brooks to the Clerk of the MDL Panel; and

Exhibit 7: Proof of Service.

Dated: May 25, 2007

FISH & RICHARDSON P.C.

By: /s/ William J. Marsden, Jr.
William J. Marsden, Jr. (#2247)
919 N. Market Street, Suite 1100
Wilmington, DE 19899-1114
Telephone: (302) 652-5070
Facsimile: (302) 652-0607

Of Counsel:

Jonathan E. Singer
Michael J. Kane
Deanna J. Reichel
FISH & RICHARDSON P.C.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

Juanita Brooks
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Attorneys for Plaintiff ALLERGAN, INC.

10738246.doc

**CERTIFICATE OF SERVICE**

I hereby certify that on May 25, 2007, a true and correct copy of NOTICE OF PENDENCY OF ALLEGAN'S MOTION BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION TO TRANSFER RELATED PATENT ACTIONS UNDER 28 U.S.C. § 1407 was caused to be served on the attorneys of record at the following addresses as indicated:

**BY FEDERAL EXPRESS**
APOTEX, INC
c/o Welsh & Katz, Ltd.
Attn: Robert B. Breisblatt
120 S. Riverside Plaza, Ste 2200
Chicago, IL 60606

**BY HAND DELIVERY**
APOTEX CORP.
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

*/s/ William J. Marsden, Jr.*
William J. Marsden, Jr. (#2247)

# Exhibit A

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE BRIMONIDINE | ) | MDL Docket No. ________________ |
| PATENTS LITIGATION | ) | |

---

**ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

---

Allergan, Inc. ("Allergan") respectfully moves this Panel, pursuant to 28 U.S.C. § 1407 to consolidate for pre-trial proceedings three nearly identical patent lawsuits filed in three jurisdictions. Allergan respectfully requests that all pending actions be transferred to the District of Delaware, to be consolidated with the action pending there and heard in front of the Honorable Judge Gregory M. Sleet who has previously presided over litigation involving the same technology, products, and patents.

In support of this motion, Allergan avers that:

1. All of the defendants seek approval by the Food and Drug Administration ("FDA") to sell generic copies of Allergan's ALPHAGAN® P products before Allergan's patents relating to those products expire.

2. All of the actions here contain allegations that these generic drug companies are infringing Allergan's patents relating to its ALPHAGAN® P products, as well as allegations by the generic drug companies that those same patents are invalid, unenforceable and not infringed.

3. All of the actions here are in their infancy, with no discovery having been commenced to date, other than one deposition relating to jurisdiction.

4. Allergan is the holder of approved New Drug Applications ("NDAs") No. 21-262 and 21-770 for 0.15% and 0.10% brimonidine tartrate ophthalmic solutions, respectively, sold under the ALPHAGAN® P trademark.

5. In conjunction with those NDAs, Allergan has listed with the FDA five patents (the "Listed Patents") that cover various aspects of the approved formulations of ALPHAGAN® P 0.15% and 0.10%. The Listed Patents are United States Patents Nos. 5,424,078, ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), 6,673,337 ("the '337 patent"), and 6,641,834 ("the '834 patent").

6. Over the past several months, Allergan has received notice of three separate applications for generic versions of one or more of Allergan's ALPHAGAN® P products. These applications have resulted in three separate lawsuits: one in Delaware, one in California and one in Virginia. By way of this motion, Allergan seeks to have these three actions, and any further actions related to potential generic versions of Allergan's ALPHAGAN® P products, consolidated for discovery and pre-trial proceedings before the Honorable Gregory M. Sleet in the District of Delaware.

7. Allergan has previously litigated a case regarding a proposed generic version of one of Allergan's ALPHAGAN® P products in front of Judge Sleet. In 2004, Allergan, Inc. and its subsidiary, Allergan Sales, Inc. sued Alcon, Inc., Alcon Laboratories, Inc. and Alcon Research Ltd. for patent infringement in the United States District Court for the District of Delaware regarding the Alcon defendants' proposed generic version of Allergan's ALPHAGAN® P 0.15% product. *See Allergan, Inc. and Allergan Sales, LLC. v. Alcon, Inc., Alcon Laboratories, Inc., and Alcon Research Ltd.*, Civil Action No. 04-968-GMS (D. Del.). ("Alcon Litigation"). That case was assigned to Judge Sleet.

8. Two of the Listed Patents, the '834 patent and the '337 patent, were patents-in-suit in the Alcon Litigation, while others of the Listed Patents were related to that action. For example, during claim construction hearings, the Court in the Alcon Litigation considered extensively the '210 patent. Alcon defended the action on both non-infringement and invalidity grounds.

9. The Alcon litigation settled the day that a bench trial was to begin in front of Judge Sleet. However, prior to that, Judge Sleet had ruled on summary judgment motions, considered discovery motions, rendered a detailed claim construction ruling, and concluded pre-

trial proceedings. The Court maintained jurisdiction over the parties and the case for purposes of enforcing the settlement reached by the parties.

10.   On April 30, 2007, Allergan received a letter, dated April 26, 2007, signed on behalf of Apotex, Inc. ("Apotex"). The letter stated that Apotex had filed ANDA Nos. 78-479 and 78-480 with the FDA also seeking approval to market generic versions of Allergan's ALPHAGAN® P products, both the 0.15% and 0.10% formulations, before the expiration of the Listed Patents. The letter alleged: (1) that the Listed Patents were invalid and/or unenforceable and (2) that, even if valid and/or enforceable, at least some of the claims of the Listed Patents would not be infringed by Apotex's generic versions of Allergan's ALPHAGAN® P products.

11.   Because the filing of this ANDA was an act of patent infringement under 35 U.S.C. § 271(e)(2), Allergan brought suit against Apotex Inc. and its wholly-owned American subsidiary, Apotex Corp., for infringement of each of the Listed Patents on May 21, 2007, in the United States District Court for the District of Delaware ("the Delaware Action").

12.   On February 13, 2007, Allergan received a letter signed on behalf of a company known as Exela PharmSci, Inc. ("Exela U.S."), stating that it had allegedly filed Abbreviated New Drug Application No. 78-590 with the FDA for approval to market a generic version of ALPHAGAN® P before the expiration of the listed patents. The letter alleged: (1) that the Listed Patents were invalid or unenforceable and (2) that, even if valid and enforceable, the claims of the Listed Patents would not be infringed by the proposed generic version of Allergan's ALPHAGAN® P product.

13.   The Exela U.S. letter did not disclose the formulation of the product for which ANDA 78-590 had been filed. Accordingly, Allergan was unable to assess infringement of all of

the Listed Patents based on the letter. And while Allergan has tried to obtain access to ANDA 78-590 from Exela U.S., to date, it has not seen this application.

14.     Because the filing of ANDA 78-590 was an act of patent infringement under 35 U.S.C. § 271(e)(2), on March 26, 2007, Allergan brought suit against Exela U.S. and its related Indian company, Exela PharmSci Pvt., Ltd. ("Exela India") for infringement in the Central District of California (the "California Action"). The case has been assigned to the Honorable Manuel L. Real. Because it did not have a copy of the ANDA, which is not a public document, Allergan initially sued under only the '834 patent, though it reserved the right to sue under its remaining four Listed Patents.

15.     Exela U.S. and Exela India moved to dismiss the California action for lack of personal jurisdiction. Through a deposition to address the jurisdictional claims made by Exela U.S. and Exela India, Allergan learned that one or more of the Exela entities are agents for other, more substantial generic drug companies with respect to ANDA 78-590. These other companies are Paddock Laboratories, Inc. of Minnesota ("Paddock") and PharmaForce, Inc. ("PharmaForce") of Ohio. Allergan also learned that the real party in interest with respect to ANDA 78-590 is Paddock Laboratories, which has fully indemnified PharmaForce and Exela U.S. with respect to any activities relating to ANDA 78-590, including the cost of litigation.

16.     Based on this information, Allergan amended its complaint in the California Action on April 26, 2007, to add Paddock and PharmaForce as defendants. Thereafter, Exela U.S. and Exela India withdrew their motion to dismiss.

17.     On May 10, 2007, the defendants in the California Action answered Allergan's amended complaint. In addition, the defendants counterclaimed that each of the Listed Patents were invalid, not infringed, and/or unenforceable.

18. On May 24, 2007, Allergan replied to defendants counterclaims. As Allergan still does not have ANDA 78-590, Allergan alleged a precautionary infringement claim for the remaining four Listed Patents pursuant to *Hoffman-LaRoche, Inc. v. Invamed, Inc.*, 213 F.3d 1359 (Fed. Cir. 2000). Accordingly, all five Listed Patents are at issue in the California Action.

19. During the jurisdictional dispute in the California Action, on April 6, 2007, Exela U.S. filed a declaratory judgment action in the Eastern District of Virginia (the "Virginia Action") alleging that each of the Listed Patents are invalid, not infringed or unenforceable.

20. With the exception of a deposition to address jurisdictional issues in the California Action, no discovery has taken place in any of the pending actions.

21. All three pending actions involve common questions of law and fact. All have at issue the same five Listed Patents that all six defendants are alleging are invalid.

22. All three actions were brought under the procedures set forth in the Drug Price Competition and Patent Term Restoration Act of 1984 (also referred to as the "Hatch-Waxman Act"). 21 U.S.C.A. §355 *et seq*. (2004) and 35 U.S.C. § 271 (e)(2).

23. Discovery in all three actions is expected to involve the same witnesses and the same documents relating to the making of the patented inventions as well as the development and testing of the brimonidine formulations.

24. Extensive expert discovery on the issues of infringement and validity of the five Listed Patents is expected. That discovery, including expert reports and expert depositions, will be more efficient and uniform if these actions are consolidated for pretrial discovery.

25. Transfer and consolidation of these actions in front of the Honorable Gregory M. Sleet, who has prior experience with these patents and this technology, will prevent duplicative

discovery and inconsistent pre-trial rulings, conserve judicial resources, minimize the inconvenience to the parties and the witnesses, and reduce the cost of litigation.

26. Allergan has no way of knowing whether or not there are additional ANDAs that have been filed with the FDA. It is possible that Allergan will receive additional Paragraph IV letters in the near future resulting in additional cases involving ALPHAGAN® P and the Listed Patents. Should there be additional litigation, Allergan will likewise seek to consolidate those cases.

Therefore, Allergan respectfully requests this panel consolidate and transfer the California, Virginia, and Delaware Actions to the Honorable Gregory M. Sleet of the United States District Court for the District of Delaware for pre-trial proceedings.

Dated: May 24, 2007

FISH & RICHARDSON P.C., P.A.

By: [signature]

Juanita R. Brooks
12390 El Camino Real
San Diego, CA 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099

Counsel for Plaintiff/Declaratory Judgment Defendant
ALLERGAN, INC.

10737326.doc

**Before the Judicial Panel on Multidistrict Litigation**
**MDL-________ – In re Brimonidine Patents Litigation**

**SCHEDULE OF ACTIONS**

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiff:**<br>Allergan, Inc.<br>**Defendants:**<br>Apotex Inc.; Apotex Corp. | D. Delaware | 07-278 | Gregory M. Sleet*** |
| **Plaintiff:**<br>Allergan, Inc.<br>**Defendants:**<br>Exela PharmSci, Inc.; ExelaPharmSci PVT, Ltd.; Paddock Laboratories, Inc.; and PharmaForce, Inc.<br>**Counterclaimant Plaintiffs:**<br>Exela PharmSci, Inc.; ExelaPharmSci PVT, Ltd.; Paddock Laboratories, Inc.; and PharmaForce, Inc.<br>**Reply Counterclaimant Plaintiffs**<br>Allergan, Inc. | C.D. California (Western Division) | 07-1967 R | Manuel L. Real |
| **Plaintiff:**<br>Exela PharmSci, Inc.<br>**Defendant:**<br>Allergan, Inc. | E.D. Virginia (Alexandria Division) | 1:07-0338 | T.S. Ellis, III |

*** These cases have yet to be officially assigned by the Court, however pursuant to the Delaware District Court's Local Rules, Allergan has filed a notice of related cases indicating that Judge Sleet has presided over a case involving these patents and this technology before. Therefore, it is expected that these actions will be assigned to Judge Sleet.

# Exhibit B

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

IN RE BRIMONIDINE PATENTS LITIGATION ) MDL Docket No. ________________
)

---

**BRIEF IN SUPPORT OF ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE, PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

---

**Table of Contents**

**Page**

I. INTRODUCTION ........................................................................................................1

II. FACTUAL AND LEGAL BACKGROUND ........................................................................2

A. These Cases Are Brought Under the Hatch-Waxman Act, Which Is a Compromise Between the Interests of Pioneer and Generic Drug Manufacturers ........................................................................................................2

B. Allergan's ALPHAGAN® P Products and the Patents-in-Suit ..............................4

C. From August, 2004 until March, 2006, Allergan Litigated a Previous Hatch-Waxman Patent Infringement Case Involving the '834 and '337 Patents And ALPHAGAN® P in the United States District Court for the District of Delaware ........................................................................................................5

D. The Ongoing Litigations – Allergan Has Sued Apotex in Delaware for its Generic Copies of Both ALPHAGAN® P Products, and Has Sued Paddock, et al in California for Their Generic Copy of the ALPHAGAN® P 0.15% Product ........................................................................................................6

1. The Delaware Litigation Against Apotex ..................................................6
2. The California Litigation Against Paddock, et al. and Exela U.S.'s Forum-Shopping Declaratory Judgment Action in Virginia .......................7

III. ARGUMENTS AND AUTHORITIES ..........................................................................10

A. Hatch-Waxman Patent Infringement Cases are Particularly Appropriate for § 1407 Transfer and Consolidation ..............................................................10

B. These Cases Should Be Transferred Because They Present Common Questions of Fact and Law ....................................................................11

C. These Cases Should Be Transferred and Consolidated For the Convenience to the Parties and Witnesses ....................................................................13

D. Transfer and Consolidation of These Cases Is Necessary for the Just and Efficient Conduct of the Actions ............................................................14

1. Discovery Will Be Expedited Through Transfer and Consolidation .........14
2. Transfer and Consolidation Will Promote Consistency in Pretrial Rulings ........................................................................................................15
3. Transfer and Consolidation Will Accommodate Tag-Along Actions .......15
4. Judicial Resources Will Be Conserved Through Transfer and Consolidation in Delaware ........................................................................16

IV. CONCLUSION ........................................................................................................17

# Table of Authorities

**Page(s)**

**FEDERAL CASES**

*In re Acacia Media Techs. Corp. Patent Litigation*, 360 F. Supp. 2d 1377 (J.P.M.L. 2005)....12

*In re Air Crash Disaster Near Chicago, Illinois, On May 25, 1979*, 476 F. Supp. 445 (J.P.M.L. 1979)....14

*Andrx Pharms., v. Biovail Corp.*, 276 F.3d 1368 (Fed. Cir. 2002)....3

*Astrazeneca AB v. Mutual Pharm. Co.*, 221 F. Supp. 2d 528 (E.D. Pa. 2002)....4

*In re Buspirone Patent Litigation*, MDL No. 1410 (J.P.M.L 2001)....11

*In re CBS Color Tube Patent Litigation*, 329 F. Supp. 540 (J.P.M.L. 1971)....12

*Calder v. Jones*, 465 U.S. 783 (1984)....8

*In re Columbia University Patent Litigation*, 313 F. Supp. 2d 1383 (J.P.M.L. 2004)....12, 15

*In re Gabapentin Patent Litigation*, MDL No. 1384 (J.P.M.L Feb. 5, 2001)....11

*In re Gas Meter Antitrust Litigation*, 464 F. Supp. 391 (J.P.M.L. 1979)....16

*Hoffman La-Roche, Inc. v. Invamed, Inc.*, 213 F.3d 1359 (Fed. Cir. 2000)....10

*In re MLR, LLC Patent Litigation*, 269 F. Supp. 2d 1380 (J.P.M.L. 2003)....12, 13

*In re Mailblocks, Inc., Patent Litigation*, 279 F. Supp. 2d 1379 (J.P.M.L. 2003)....12

*Markman v. Westview Instruments*, 517 U.S. 370 (1996)....15

*In re Metoprolol Succinate Patents Litigation*, MDL No. 1620 (J.P.M.L. Aug. 9, 2004)....11

**Table of Authorities (Cont.)**

**Page(s)**

*In re Mirtazapine Patent Litigation*, MDL No. 1445 (J.P.M.L. Apr. 23, 2002) ..... 11

*In re Molinaro/Catanzo Patent Litigation*, 380 F. Supp. 794 (J.P.M.L. 1974) ..... 12, 13, 16

*In re Nabumetone Patent Litigation*, MDL No. 1238 (J.P.M.L. 1998) ..... 11

*In re Omeprazole Patent Litigation*, MDL No. 1291 (J.P.M.L Aug.12, 1999) ..... 11

*In re Rivastigmine Patents Litigation*, MDL No. 1661 (J.P.M.L. Feb. 16, 2005) ..... 11

*In re Smith Patent Litigation*, 407 F. Supp. 1403 (J.P.M.L. 1976) ..... 12

*In re Triax Co. Patent Litigation*, 385 F. Supp. 590 (J.P.M.L. 1974) ..... 12

*In re Vernitron Securities Litigation*, 462 F. Supp. 391 (J.P.M.L. 1978) ..... 10

**FEDERAL STATUTES AND REGULATIONS**

21 C.F.R. § 314.94(a)(12)(i)(A) ..... 3

21 C.F.R. 314.95(c)(6) ..... 4

21 U.S.C. § 271(j)(5)(B)(iii) ..... 4

21 U.S.C. § 355(b)(1)(F) ..... 3, 5

28 U.S.C. § 1407 ..... 1, 4, 10, 17

35 U.S.C. § 156 ..... 3

35 U.S.C. § 271(e)(1) ..... 3

35 U.S.C. § 271(e)(2) ..... 4

**LEGISLATIVE HISTORY**

H.R.Rep. No. 98-857 (1984), 1984 U.S.C.C.A.N. 2647 ..... 11

**TREATISES**

15 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3863 (3d ed. 2004) ..... 14

## I. INTRODUCTION

Allergan, Inc. ("Allergan") respectfully submits this Memorandum in support of its motion pursuant to 28 U.S.C. § 1407 to transfer so that the following three pending patent litigations can be consolidated for coordinated pretrial proceedings:

- *Allergan, Inc. v. Apotex Inc. and Apotex Corp.*, CA No. 07-278 (D. Del.)
- *Allergan, Inc. v. Exela PharmSci, Inc., ExelaPharmSci PVT, Ltd., Paddock Laboratories, Inc., and PharmaForce, Inc.*, CV07-01967 R (C.D. Cal.)
- *Exela PharmSci, Inc. v. Allergan, Inc.*, 1:07CV338 (E.D. Va.).

Economy and efficiency are best served if the actions – now pending in the districts of Delaware, Virginia and California – are consolidated for pretrial proceedings in the United States District Court for the District of Delaware before the Honorable Judge Gregory M. Sleet, who has previously presided over litigation involving the same technology, the same products, and the five related patents.

All of the defendants have each asked the Food and Drug Administration ("FDA") for approval to sell generic copies of Allergan's ALPHAGAN® P products before the patents protecting those products expire. In each of the actions, Allergan has alleged that the generic defendants are infringing one or more of those patents and each generic defendant is contending that the patents are invalid, unenforceable, and/or not infringed.

All of the actions are in their infancy, with no discovery having taken place, other than one deposition regarding jurisdiction. When discovery does commence, Allergan anticipates having to produce the same documents in each action. Allegan also anticipates that the same Allergan inventors will be deposed in each action, and that the same experts for Allergan will be providing opinions. Coordination of these efforts is necessary in order to avoid duplicative discovery, conserve judicial resources, prevent inconsistent pretrial rulings and promote the just and efficient conduct of all three actions and any tag-along actions that might follow.

Delaware is the logical district for consolidation. One of the actions is presently pending in that district and a previous action involving these same products and patents has already been litigated in that district before the Honorable Gregory M. Sleet. Accordingly, Allergan respectfully requests that the panel transfer these actions to the Delaware District Court for further proceedings. In addition to allowing for the efficient administration of the current cases, transfer under Section 1407 will provide a ready forum for any other actions that might be filed that relate either to these ANDAs or any other ANDAs or other generic drug applications for Allergan's ALPHAGAN® P products.

## II.     FACTUAL AND LEGAL BACKGROUND

### A.     These Cases Are Brought Under the Hatch-Waxman Act, Which Is a Compromise Between the Interests of Pioneer and Generic Drug Manufacturers

In the past three months, Allergan has received notice of three different applications for generic versions of Allergan's ALPHAGAN® P products. These applications have spawned three separate lawsuits to date, with the potential for more if further generic applications are filed. The currently pending lawsuits and their status are listed below:

| Case Captions | Court | Civil Action No. and status |
|---|---|---|
| Allergan, Inc. v. Apotex Inc. and Apotex Corp. | United States District Court for the District of Delaware | CA No. 07-278 Complaint filed and served May 21, 2007 |
| Allergan, Inc. v. Exela PharmSci, Inc., ExelaPharmSci PVT, Ltd., Paddock Laboratories, Inc., and PharmaForce, Inc. | United States District Court for the Central District of California – Western Division | CV07-01967 R Parties to submit joint report of initial early meeting by June 22, 2007 |
| Exela PharmSci, Inc. v. Allergan, Inc. | United States District Court for the Eastern District of Virginia – Alexandria Division | 1:07CV338 Initial Pretrial Conference scheduled for June 27, 2007 |

Each of these cases relates to claims and defenses governed by the Hatch-Waxman Act and its amendments. The Hatch-Waxman Act is a compromise between the interests of pioneer and generic drug manufacturers that provides a more rapid and cost-effective pathway to market

generic drug products by eliminating the need to perform the expensive and lengthy clinical trials required of pioneer drug manufacturers. *Andrx Pharms., v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). In return, the pioneer manufacturers are guaranteed certain periods of exclusivity for their products, separate and apart from any patent rights they may hold. *Id.* The Act also contains fundamental changes to the patent system, in that generic companies are provided a "safe harbor" from a patent infringement charge for certain activities related to the process of seeking approval for their proposed products. *See, e.g.*, 35 U.S.C. §§ 156, 271(e)(1). This "safe harbor" allows the generic companies to undertake activities that otherwise might be patent infringement in order to submit to the FDA an application for approval of their proposed generic copy without any liability to the pioneer patent holder. As a consequence, the FDA can then be in a position to approve the proposed generic product immediately upon patent expiration.

To identify which patents may be at issue, the Hatch-Waxman Act requires pioneer manufacturers like Allergan to submit a list of all patents that cover their approved drugs. *See* 21 U.S.C. § 355(b)(1)(F). These patents are then published in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" – more commonly known by the color of its cover, "the Orange Book."

When an ANDA is submitted to the FDA, the generic applicant must provide a certification to the FDA regarding each patent that is listed in the Orange Book. 21 C.F.R. § 314.94(a)(12)(i)(A). If the generic manufacturer is seeking approval to market its generic copycat drug before the expiration of the pioneer manufacturer's patents, the generic company must certify to the FDA that the patent(s) listed in the Orange Book are invalid or will not be infringed by the manufacture, use, or sale of the drug for which the ANDA is submitted, and notify the pioneer company in writing that such a certification was made. See 21 U.S.C. § 355 (j)(2)(A)(vii)(IV); 21 C.F.R. 314.95(c)(6). This notification is referred to as a "Paragraph IV letter," after the statutory subsection where the requirement is found. *Id.* The purpose of a Paragraph IV letter is to provide notice to the innovator company and sufficient information for

it to determine whether the patents would be infringed by the generic applicant's copycat products. *See, e.g., Astrazeneca AB v. Mutual Pharm. Co.*, 221 F. Supp. 2d 528, 533-34 (E.D. Pa. 2002).

The statute provides just 45 days from the receipt of the Paragraph IV letter for innovators to make their assessment and to bring suit under 35 U.S.C. § 271(e)(2). *See* 21 U.S.C. § 271(j)(5)(B)(iii). If the pioneer manufacturer brings suit within that 45-day time period, the FDA is prohibited from approving the generic drug company's ANDA for up to thirty months or until certain conditions occur. *Id.* This time period is frequently referred to as the "30-month stay." This stay gives pioneer manufacturers like Allergan an opportunity to seek redress in Court without the fear that, in the interim, the generic company will flood the market with its infringing copycat drug and thereby destroy the market for the pioneer drug.

**B.    Allergan's ALPHAGAN® P Products and the Patents-in-Suit**

Allergan is a leader in the development of pharmaceutical treatments for glaucoma, investing well in excess of a hundred million dollars annually in research and development. (Declaration of Juanita R. Brooks in Support of Allergan, Inc.'s Motion For Transfer of Actions to the District of Delaware Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings, Exh. A; hereinafter "Brooks Decl.") ALPHAGAN® P is a leading treatment for open-angle glaucoma, a potentially blinding disease that affects almost 70 million people and is the second leading cause of blindness worldwide. [*Id.*]

The active ingredient in ALPHAGAN® P is brimonidine tartrate ("brimonidine"), which, while very effective, can cause significant side effects, including allergic conjunctivitis. Allergan originally sold brimonidine as ALPHAGAN®, which had a relatively high incidence of these side effects. ALPHAGAN® contained 0.2% brimonidine.

In 1997, Allergan set out to design a new brimonidine product that provided the same or better efficacy as ALPHAGAN®, but with reduced side effects and overall better tolerability. The result of Allergan's development efforts was ALPHAGAN® P, which Allergan originally

marketed with a 0.15% concentration of brimonidine, but which Allergan also now sells with a 0.10% concentration of brimonidine. In clinical studies, ALPHAGAN® P had comparable efficacy to ALPHAGAN®, but with a forty percent reduction in allergies. (Brooks Decl. Exh. B.) Fewer allergies means that a wider range of patients may take the drug, and those who already are taking it are more likely to avoid these painful side effects. Because of this significant additional patient benefit, Allergan was awarded a three-year market exclusivity period by the FDA for each of the ALPHAGAN® P products, above and beyond that which Allergan had received for ALPHAGAN®. *See* 21 U.S.C. § 355(c)(3)(E)(iii)-(iv).

Allergan also received several patents for the innovations underlying its ALPHAGAN® P products, including four of the patents currently involved in these cases: U.S. Patent Nos. 6,641,834 (the "'834 patent"); 6,562,873 (the "'873 Patent"); 6,627,210 (the "'210 Patent"); and 6,673,337 (the "'337 Patent"). The fifth patent, U.S. Patent No. 5,424,078 (the "'078 Patent") covers the unique preservative used in each of the products. All five patents are listed in the Orange Book as related to both of Allergan's ALPHAGAN® P products.

Although each of these patents covers a different aspect of the ALPHAGAN® P products, all but one (the '078 patent) are related. Several have a common prosecution history before the United States Patent Office, and four share a common written description. With one exception (the '078 patent), the patents all have common inventors.

### C. From August, 2004 until March, 2006, Allergan Litigated a Previous Hatch-Waxman Patent Infringement Case Involving the '834 and '337 Patents And ALPHAGAN® P in the United States District Court for the District of Delaware

On July 6, 2004, Allergan received a Paragraph IV notice letter from the large ophthalmic drug manufacture, Alcon, Inc. ("Alcon"). That letter stated that Alcon had filed an application with the FDA seeking approval to sell a generic version of Allergan's ALPHAGAN® P 0.15% product. The letter alleged that all five patents listed in the Orange Book and at issue in the currently-pending actions in Delaware, California and Virginia were invalid, not infringed or both.

After review of Alcon's letter and application, which Alcon had provided to inside and outside counsel for Allergan under conditions of confidentiality, Allergan brought suit in the United States District Court for the District of Delaware for infringement of the '834 and '337 patents. The case was assigned to the Honorable Gregory M. Sleet.

Over the course of the next 18 months, the action against Alcon proceeded. The Court supervised a 10-month discovery period, held a *Markman* hearing to construe the claims of the two patents-in-suit in June, 2005, and ruled on multiple summary judgment motions. The Court also resolved multiple motions *in limine* and conducted a full set of pre-trial proceedings, including a lengthy pre-trial conference. While ultimately the case settled, this settlement did not occur until the morning of opening statements of the scheduled bench trial, after all pre-trial submissions had been made and ruled upon. And while the settlement terms remain confidential, the Court's dismissal of the action pursuant to the settlement provided that the District of Delaware maintained exclusive jurisdiction over the parties and the subject matter for purposes of enforcing the settlement. (Brooks Decl. Exh. C.)

**D.    The Ongoing Litigations – Allergan Has Sued Apotex in Delaware for its Generic Copies of Both ALPHAGAN® P Products, and Has Sued Paddock, et al in California for Their Generic Copy of the ALPHAGAN® P 0.15% Product**

**1.    The Delaware Litigation Against Apotex**

On April 30, 2007, Allergan received another Paragraph IV letter from a generic drug manufacturer seeking to manufacture a generic version of Allergan's ALPHAGAN® P products. The letter was signed by Apotex, Inc., a large Canadian generic pharmaceutical company. Apotex, Inc.'s American arm is known as Apotex Corp. Apotex Corp. is a Delaware corporation.

Apotex's Paragraph IV letter stated that it had filed two ANDAs with the FDA, seeking approval to market either (or both of) Allergan's ALPHAGAN® P products. The letter alleged that all five patents listed by Allergan in the Orange Book were invalid, unenforceable, and/or would not be infringed by the commercial, manufacture, use or sale of Apotex's proposed

formulations. (Brooks Decl. Exh. D.) And while the original letter did not contain a full list of ingredients of the proposed formulation, later correspondence from counsel for Apotex provided this information.

Based on this information, and on the information contained in Apotex's Paragraph IV letter, Allergan filed suit for infringement of all five patents in the District of Delaware on May 21, 2007 (the "Delaware Action"). Allergan has filed a Notice of Related Cases with the District of Delaware relating it to the previous ALPHAGAN® P litigation in front of Judge Sleet, and informing the Court of the other, pending actions discussed below.

**2. The California Litigation Against Paddock, et al. and Exela U.S.'s Forum-Shopping Declaratory Judgment Action in Virginia**

Two months prior to the Apotex Paragraph IV letter, on February 12, 2007, Allergan received yet another Paragraph IV letter from a company identifying itself as "Exela PharmSci, Inc." ("Exela U.S."). In that letter, Exela U.S. claimed that it had filed an ANDA for a generic copy of Allergan's 0.15% ALPHAGAN® P product and that it intended to engage in the "commercial manufacture, use or sale" of the proposed generic drug. (Brooks Decl. Exh. E.) The letter also claimed that the formulation for which Exela U.S. had allegedly filed its ANDA did not infringe any of Allergan's patents, but that the patents were invalid, in any event. The letter made these non-infringement claims without identifying any of the ingredients of the formulation beyond brimonidine and three additives, contrary to the purpose of a Paragraph IV letter.

Upon investigation, Allergan was unable to obtain any significant information about the ANDA allegedly filed by Exela U.S. (While ANDAs largely copy pioneer manufacturers' information, ANDAs are not public documents.) Despite repeated written requests, Exela U.S. refused to provide access to any information from the ANDA, except under very restrictive conditions. The principal restriction would have barred access by Allergan's chief intellectual property counsel, the person ultimately responsible for these cases and the same person who has been qualified on protective orders for over 20 years. Exela also noted that even this restrictive

offer would not warrant that any of the information would be "accurate or complete." (Brooks Decl. Exh. F.) To date, Allergan has not obtained a copy of the ANDA from Exela U.S., or even a list of the formulation's ingredients.

Likewise, Allergan was unable to find out any significant information about Exela U.S. itself. In contrast to Alcon and Apotex, which are substantial generic drug companies with significant assets, Exela U.S. appeared to be no more than a shell company taking its name from a small Bangalore, India company with the same name, Exela PharmSci Pvt., Ltd. ("Exela India"). For example, the Paragraph IV letter listed a cellular telephone as Exela U.S.'s phone number and the Virginia Secretary of State listed Exela U.S.'s founder's house as the company's operating address. (Brooks Decl. Exh. G.) As far as Allergan could tell, Exela U.S. owned no property, had no manufacturing facilities and no ability to sell prescription drugs whatsoever. It thus appeared to Allergan that Exela U.S. had been set up specifically for forum-shopping purposes, because Exela U.S., such as it was, had no presence anywhere outside of Virginia. And while Allergan suspected that there must be a "real party in interest" behind the ANDA—because the Exela companies had no apparent ability to actually make, market or sell a drug—Allergan had no way of proving it.

Accordingly, on March 28, 2007, Allergan filed suit against the two Exela entities, Exela U.S. and Exela India, alleging infringement of the one patent—the '834 patent—about which Exela U.S.'s letter actually contained enough information to determine infringement, but specifically reserving the right to sue on the other four patents relating to ALPHAGAN® P. While Allergan would have preferred to file the case in Delaware because of the familiarity of Judge Sleet with the subject matter, as a precaution, Allergan filed the case in the Central District of California, relying on *Calder v. Jones*, 465 U.S. 783 (1984), as a basis for personal jurisdiction. The case was assigned to The Honorable Manuel L. Real, United States District Judge.

Just as Allergan had suspected, the Exela entities then put their forum-shopping strategy into action. On April 6, Exela U.S. filed suit in the Eastern District of Virginia (the "Virginia

Action") for a declaration of invalidity and/or non-infringement of all five patents Allergan had listed in the Orange Book, not just the one patent asserted by Allergan in California. (Brooks Decl. Exh. H.) The case was assigned to The Honorable Thomas S. Ellis III, United States District Judge. According to Exela U.S.'s declaratory judgment complaint, Allergan had "improperly" filed suit in California because Exela U.S. was only subject to jurisdiction in Virginia. (*Id.*) In tandem with the declaratory judgment filing, the Exela entities then moved to dismiss the California action on April 16, 2007. (Brooks Decl. Exh. I.)

With their motion to dismiss, the Exela entities submitted declarations making various claims about their companies. Allergan then took a deposition of the founder of Exela U.S., Dr. Phanesh Koneru, the person who sent the Exela U.S. Paragraph IV certification to Allergan.

At that deposition, the Exela entities' strategy was exposed, demonstrating the truth behind Allergan's suspicions. While the deposition remains under seal at Exela's request, Dr. Koneru generally testified that neither Exela entity would make, use or sell any generic version of ALPHAGAN® P. Indeed, Dr. Koneru testified that he was Exela U.S.'s only employee. Rather, the "real party in interest" behind the ANDA was Paddock, which has fully indemnified Exela. (Brooks Decl. Exh. J.) Paddock is a substantial generic drug company that sells products across the United States. (Brooks Decl. Exh. K.) It is unquestionably subject to jurisdiction in Delaware. Dr. Koneru also testified that Paddock intended to employ PharmaForce, Inc., a Delaware company whom Paddock has also indemnified, to manufacture the drug. (Brooks Decl. Exh. L.) Exela's role in all of this? Almost none, beyond acting as a front to try to steer litigation to Virginia and collecting royalties and milestone payments as Paddock and PharmaForce's agent.

After Allergan uncovered this scheme, Allergan amended its California complaint to add as a defendant the real-party-in-interest, Paddock, as well as Paddock's contract manufacturer, PharmaForce. Their scheme exposed, the Exela entities then quietly withdrew their motion to dismiss on April 30, 2007. No hearing on the motion was held.

On May 10, 2007, the now four defendants in the California action, including the real-party-in-interest Paddock, counterclaimed for declarations of non-infringement, unenforceability, and invalidity of all five patents. On May 24, 2007, Allergan replied to this counterclaim, alleging a precautionary case of infringement under the four remaining patents it had listed in the Orange Book pursuant to *Hoffman La-Roche, Inc. v. Invamed, Inc.*, 213 F. 3d 1359 (Fed. Cir. 2000).

Since filing its counterclaims on reply, Allergan has asked defendants in California to agree to transfer and consolidation of the California action in Delaware. Allergan has also asked Exela to dismiss its duplicative action in Virginia. To date, common counsel for the California defendants has not responded to either of Allergan's requests. Accordingly, Allergan moves the MDL panel to transfer and consolidate the pending cases to the Honorable Judge Gregory M. Sleet in the United States District Court in Delaware.

## III. ARGUMENTS AND AUTHORITIES

### A. Hatch-Waxman Patent Infringement Cases are Particularly Appropriate for § 1407 Transfer and Consolidation

Section 1407 of Title 28 authorizes the transfer and consolidation of multidistrict actions when three factors are met: (1) "one or more common questions of fact are pending in different districts;" (2) a transfer would serve "the convenience of parties and witnesses;" and (3) a transfer would "promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a); *see also In re Vernitron Secs. Litig.*, 462 F.Supp. 391, 394 (J.P.M.L. 1978).

Patent infringement cases brought under the Hatch-Waxman Act are particularly appropriate for transfer and consolidation under Section 1407. They nearly always present common issues of patent validity and infringement, and always involve the same product of the patent-holder. And even where one defendant might have one additional defense that another might not, the discovery burdens on the branded manufacturer remain the same.

Indeed, when Congress passed the Act in 1984, it specifically envisioned that § 1407 may need to be utilized. "In the event of multiple ANDAs certifying patent invalidity or non-

infringement, the courts should employ the existing rules for multidistrict litigation, when appropriate, to avoid hardship on the parties and witnesses and to promote the just and efficient conduct of the patent infringement actions." H.R.Rep. No. 98-857, pt. 1, at 28 (1984), 1984 U.S.C.C.A.N. 2647, 2661

In this vein, the panel has consolidated numerous Hatch-Waxman patent infringement cases in the past. *See In re Rivastigmine Patents Litigation*, MDL No. 1661 (J.P.M.L. Feb. 16, 2005); *In re Metoprolol Succinate Patents Litigation,* MDL No. 1620 (J.P.M.L. Aug. 9, 2004); *In re Mirtazapine Patent Litigation,* MDL No. 1445 (J.P.M.L. Apr. 23, 2002); *In re Omeprazole Patent Litigation,* MDL No. 1291, (J.P.M.L Aug.12, 1999); *In re Gabapentin Patent Litigation,* MDL No. 1384 (J.P.M.L Feb. 5, 2001); *In re Nabumetone Patent Litigation,* MDL No. 1238, (J.P.M.L. 1998); *In re Buspirone Patent Litigation,* MDL No. 1410 (J.P.M.L 2001). Because the present cases easily meet the three factors delineated above, and because Judge Sleet is in a unique position to promote efficiency in this case, these actions should be transferred to Delaware for coordinated or consolidated proceedings as well.

### B. These Cases Should Be Transferred Because They Present Common Questions of Fact and Law

All the pending actions involve the same five patents and the same basic questions – are those patents valid and do they cover the defendants' proposed products? As to validity, based on the Paragraph IV letters received by Allergan, both the Paddock and Apotex ANDAs challenge the validity of all five patents based on anticipation, obviousness and other statutory grounds, many of which are identical. These validity defenses are dependent upon, among other matters, the meaning of the patent claims, the scope and content of the prior art, the nature of the disclosure of the patents-in-suit, and the facts behind the inventions of the patents-in-suit. All of these matters are the same across the three ANDAs filed by the defendants, and all are dependent on the same issues.

Accordingly, these actions "share the same factual and legal questions with respect to [the five complex patents] concerning patent validity. . . ." *In re Columbia Univ. Patent*

*Litigation*, 313 F. Supp. 2d 1383, 1385 (J.P.M.L. 2004). As for infringement, they share the same questions of law—namely, construction of the patent claims—that have already partially been considered by Judge Sleet. (Brooks Decl. Exh. M) And while the defendants might have different products that they intend to sell, all of the generic products purport to be the biological equivalent of the ALPHAGAN® P products.

Since its inception in 1968, the Panel has frequently held that consolidation and transfer of several patent cases involving the same patents is appropriate, particularly where, as here, validity is a central issue in each case. *See, e.g., In re MLR, LLC Patent Litigation*, 269 F. Supp. 2d 1380 (J.P.M.L. 2003) (ordering consolidation and transfer of three patent cases involving the same patent).[1] In *In re MLR*, the patent infringement plaintiffs, who were being sued by defendants in two other jurisdictions, moved to consolidate and transfer the pretrial proceedings to the Northern District of Illinois. Finding that the three pending actions involved the same "complex patents" and could "thus be expected to share factual and legal questions concerning such matters as patent validity, prior art, obviousness and interpretation of various claims of the patents," the Panel held that "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary." *Id.* at 1381.

---

[1] *See also In re Acacia Media Techs. Corp. Patent Litigation*, 360 F. Supp. 2d 1377 (J.P.M.L. 2005) (ordering transfer of patent cases pending in several jurisdictions which involved the same questions as to validity and infringement of the same set of patents); *In re Columbia Univ. Patent Litigation*, 313 F. Supp. 2d 1383 (J.P.M.L. 2004) (ordering transfer of actions pending in four districts which involved the same questions regarding validity of the same patent); *In re Mailblocks, Inc., Patent Litigation*, 279 F. Supp. 2d 1379 (J.P.M.L. 2003) (ordering transfer of two patent actions involving validity issues common to the same two complex patents pending in each action); *In re Smith Patent Litigation*, 407 F. Supp. 1403 (J.P.M.L. 1976) (ordering transfer of actions pending in three districts where all actions shared common questions of fact with respect to the validity of the same patent); *In re Molinaro/Catanzo Patent Litigation*, 380 F. Supp. 794 (J.P.M.L. 1974) (ordering transfer of several patent actions with common questions of validity on the same patent); *In re Triax Co. Patent Litigation*, 385 F. Supp. 590 (J.P.M.L. 1974) (ordering transfer of two pending infringement actions involving same patents where common questions of fact were involved because the validity of those patents was involved in all of the actions); *In re CBS Color Tube Patent Litigation*, 329 F. Supp. 540 (J.P.M.L. 1971) (ordering transfer where four cases involved the same three patents and questions relating to validity were common to all four actions).

The same is the case here. At a minimum, the three ANDAs and three pending cases raise numerous common issues of patent validity, patent claim construction and patent written description and enablement. They also present common issues on infringement, including, at a minimum, claim construction and the underlying technology at issue. Accordingly, consolidation and transfer are appropriate. *See e.g., In re Molinaro/Catanzaro Patent Litigation,* 380 F. Supp. 794 (J.P.M.L. 1974).

### C. These Cases Should Be Transferred and Consolidated For the Convenience to the Parties and Witnesses

Unless these three cases are transferred for consolidated or coordinated pretrial proceedings, the inventors, experts and other key witnesses in this case will be subject to multiple depositions. Allergan will have to prepare and present corporate witnesses on presumably very similar, if not identical, Rule 30(b)(6) topics. Third party witnesses—including one of the inventors on four of the patents, and the two inventors on the fifth patent—who have relevant information may also be unnecessarily subpoenaed multiple times. All of this can be avoided if the cases are transferred to the District Court for the District of Delaware and consolidated. "[T]ransfer under Section 1407 has the benefit of placing all actions . . . before a single transferee judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions." *In re MLR*, 269 F. Supp. 2d at 1381; *In re Molinaro/Catanzaro Patent Litigation*, 380 F. Supp. at 795 (ordering centralization of actions involving one patent in several districts because the validity issue "raises complex questions of fact common to each action and defendants [would otherwise] necessarily pursue similar, if not identical, discovery against plaintiffs to elicit those facts.").

Accordingly, the entire process can be streamlined because each inventor, Allergan expert and other key witnesses, both employed by the parties and third parties, will not be subject to multiple depositions. The parties will also forego the expense of duplicative efforts to

discover the same information that had everyone been sitting in the room at the same time would have been avoided. The overall efficiency achieved warrants consolidation and transfer.

Lastly, transfer and consolidation in Delaware will be more convenient for all parties. While all of the parties would benefit from transfer and consolidation, and therefore the economies are highly favorable, there is little to no inconvenience for the defendants. With the exception of Allergan, all of the parties to this suit are located in the Midwest or on the East Coast. Delaware is a far more convenient forum for the defendants than California. The defendants are physically located in Ontario (Apotex, Inc.), Florida (Apotex Corp.), Minnesota (Paddock), Ohio (PharmaForce), Virginia (Exela U.S.) and India (Exela India). Physically, Delaware is far more convenient for the defendants than California. In addition, counsel for defendants are all located in Chicago and New York, both locations being closer to Delaware than California. "Convenience of counsel often coincides with convenience of the parties they represent and is a factor to be considered under Section 1407." *In re Air Crash Disaster Near Chicago, Illinois, On May 25, 1979,* 476 F. Supp. 445, 449 n.4 (J.P.M.L. 1979).

**D. Transfer and Consolidation of These Cases Is Necessary for the Just and Efficient Conduct of the Actions**

"[T]he crucial issue in determining whether to grant pretrial consolidation is . . . whether 'the economies of transfer outweigh the resulting inconvenience to the parties.'" 15 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3863, at p. 413-415 (3d ed. 2004) (citation omitted). Here there can be no doubt that the economies of transfer outweigh any resulting inconvenience.

**1. Discovery Will Be Expedited Through Transfer and Consolidation**

To date, no discovery has taken place in any of the pending actions, other than a deposition in the Exela case related to jurisdiction. Thus consolidation of the actions now will be minimally disruptive and produce maximum benefit. Once discovery commences Allergan will be required to produce voluminous documents regarding the patents at issue and the

development of the ALPHAGAN® P products. Transfer and consolidation would avoid duplicative discovery efforts while at the same time ensuring uniformity in document production.

**2. Transfer and Consolidation Will Promote Consistency in Pretrial Rulings**

Consolidation and transfer of these actions to Delaware would also prevent inconsistent pretrial rulings. This is especially important in a complex patent case such as this one, where the court is required to make a claim construction ruling as a matter of law, usually during the pretrial phase of the case. *See Markman v. Westview Instruments*, 517 U.S. 370 (1996). In *In re Columbia University Patent Litigation*, for example, the Panel ordered consolidation and transfer of actions pending in three jurisdictions involving validity issues of ***one*** patent in each case where, among other things, "[c]entralization under Section 1407 is necessary in order to . . . prevent inconsistent pretrial rulings, especially with respect to time-consuming and complex matters of claims construction. . . ." 313 F. Supp. 2d 1383, 1385 (J.P.M.L. 2004).

Consolidation is even more prudent here. Unlike in *In re Columbia*, where only one patent was involved, here there are five patents at issue. The risk of inconsistent rulings is thus increased dramatically. Centralization of these cases in Delaware would promote just and efficient conduct of the actions prior to trial by ensuring consistent pretrial rulings, especially on the pivotal issue of claim construction.

**3. Transfer and Consolidation Will Accommodate Tag-Along Actions**

The oldest of the patents at issue does not expire until December 2012 – over five years from now – and the other four do not expire until January 2022. Last year Allergan faced Alcon's application to manufacture and sell a generic copy of ALPHAGAN® P 0.15%. This year Allegan is facing Exela's application to manufacture and sell a generic copy of ALPHAGAN® P 0.15% and Apotex's applications to manufacture and sell generic copies of ALPHAGAN® P 0.15% and 0.1%. Given the success of the ALPHAGAN® P products, Allergan may face even more generic applications in the coming years. In such a situation, "[t]ransfer under Section 1407 at this time will have the salutary effect of providing a ready

forum for the inclusion of any newly filed actions in centralized pretrial proceedings." *In re Gas Meter Antitrust Litigation*, 464 F. Supp. 391, 393 (J.P.M.L. 1979).

### 4. Judicial Resources Will Be Conserved Through Transfer and Consolidation in Delaware

The five patents and the products in suit involve complex ophthalmic pharmaceutical technology with which Judge Sleet is already familiar. It would be a waste of judicial resources for two new Courts to learn the necessary technology in sufficient detail to construe the claims at issue or rule on summary judgment when Judge Sleet has already done so.

Given that "it is not an insubstantial burden which patent litigation imposes upon a district judge," *In re Molinaro/Catanzaro Patent Litigation*, 380 F. Supp. 794, 795 (J.P.M.L. 1974), centralization of these actions in Delaware would greatly conserve the resources of the judiciary. This is especially true here where there is already a Court that is familiar with this technology, all but one of the patents-in-suit, and these products. The result is "the salutary effect of having all discovery relevant to the validity issue supervised by one judge so that an informed decision on the merits can be made ***and at a substantial savings of judicial time and resources***." *Id.* (emphasis added).

Finally, the District of Delaware is particularly appropriate for transfer and consolidation of a patent case, especially over the Central District of California. The District of Delaware has specialized pretrial orders for patent cases, and annually, sees more patent litigation per district judge per year than almost any other district. (Brooks Decl. N.) Unlike the Central District, which does not use an e-filing system, the District of Delaware has fully automated e-filing procedures, making the case easily accessible for all counsel involved, no matter where in the country they are located. (Brooks Decl. Exh. O) And, of course, Judge Sleet's familiarity with the patents and the subject matter of these cases inures to all parties' benefit, and will allow for a just and efficient resolution of these and future matters.

Accordingly, given the undeniable efficiencies and benefits that would be achieved, these cases, and any future cases regarding generic drug applications for either of Allergan's

ALPHAGAN® P products, should be transferred to the United States District Court for the District of Delaware, the Honorable Judge Gregory M. Sleet presiding, for consolidated or coordinated pretrial proceedings.

## IV. CONCLUSION

For the foregoing reasons, the Panel should transfer the California and Virginia Actions to Delaware and consolidate them with the Delaware Action pursuant to 28 U.S.C. § 1407.

Dated: May 24, 2007

FISH & RICHARDSON P.C.

By: [signature]

Juanita R. Brooks
12390 El Camino Real
San Diego, CA 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099

Counsel for
ALLERGAN, INC.

10740201.doc

# Exhibit C

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| IN RE BRIMONIDINE PATENTS LITIGATION | ) ) | MDL Docket No. ________________ |
|---|---|---|

---

**DECLARATION OF JUANITA R. BROOKS IN SUPPORT OF ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

---

I, Juanita R. Brooks, declare as follows:

1.     I am a principal at the law firm of Fish & Richardson P.C., counsel of record for ALLERGAN, INC. ("Allergan") in the above-captioned matter.  I make this declaration of my own personal knowledge, and if called upon as a witness would competently testify to the facts set forth below.

2.     Attached hereto as Exhibit A is a true and correct copy of the SEC Form 10-K Annual Report of Allergan, Inc. for Fiscal Year Ended December 21, 2004.

3.     Attached hereto as Exhibit B is a true and correct copy of an article entitled *Twelve-Month Evaluation of Brimonidine-Purite Versus Brimonidine in Patients with Glaucoma or Ocular Hypertension*, by L. Jay Katz, M.D.

4.     Attached hereto as Exhibit C is a true and correct copy of a document entitled Agreed Order of Dismissal, dated March, 7, 2006; *Allergan, Inc. and Allergan Sales, LLC. V. Alcon, et al.*

5.     Attached hereto as Exhibit D is a true and correct copy of a letter from Apotex, Inc. to Allergan, Inc., dated April 26, 2007.

6.     Attached hereto as Exhibit E is a true and correct copy of a letter signed by Dr. Phanesh Koneru and sent to Allergan, Inc., dated February 8, 2007.

7.     Attached hereto as Exhibit F is a true and correct copy of a document titled "Offer of Confidential Access and Confidentiality Agreement Pursuant to 21 U.S.C. §355(i)(55)(C)(III)," that was sent to Allergan, Inc. along with the letter described in the previous paragraph.

8. Attached hereto as Exhibit G is a true and correct copy of the Corporate Record and Business Registration information for Exela PharmSci, Inc. as reported by the Virginia Secretary of State and accessed from Westlaw on February 13, 2007.

9. Attached hereto as Exhibit H is a true and correct copy of Exela PharmSci, Inc.'s Complaint for Declaratory Judgment, dated on April 6, 2007 and filed in the Eastern District of Virginia.

10. Attached hereto as Exhibit I is a true and correct copy of Defendants' Notice of Motion and Motion to Dismiss For Lack of Personal Jurisdiction and Motion to Dismiss Under Rule 12(b)(6), dated April 16, 2007.

11. Attached hereto as Exhibit J is a true and correct copy of Certificate as to Interested Parties Pursuant to Local Rule 7.1-1, dated April 16, 2007.

12. Attached hereto as Exhibit K is a true and correct copy of a web page from www.paddocklabs.com, captured on May 24, 2007.

13. Attached hereto as Exhibit L is a true and correct copy of Defendants' Answer to Plaintiff's Amended Complaint for Patent Infringement and Defendant's Counterclaims, dated May 10, 2007.

14. Attached hereto as Exhibit M is a true and correct copy of Judge Sleet's Order Construing the Terms of U.S. Patent Nos. 6,673,337 and 6,641,834 in *Allergan, Inc. and Allergan Sales, LLC. v. Alcon, et al.*, which is dated July 26, 2006.

15. Attached hereto as Exhibit N is a true and correct copy of *"Solving the Mystery of Patentees' 'Collective Enthusisam' for Delaware,"* Delaware Law Review, Vol. 7, No. 2 (2004).

16. Attached hereto as Exhibit O is a true and correct copy of Order re Electronic Case Filing Policies and Procedures, dated February 8, 2005.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed by me in San Diego, California this 24th day of May, 2007.

Dated: May 24, 2007

FISH & RICHARDSON P.C., P.A.

By: [signature]

Juanita R. Brooks
12390 El Camino Real
San Diego, CA 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099

Counsel for Plaintiffs/Declaratory Judgment Defendant
ALLERGAN, INC.

10737992.doc

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE BRIMONIDINE | ) | MDL Docket No. ________________ |
| PATENTS LITIGATION | ) | |

---

**EXHIBITS TO DECLARATION OF JUANITA R. BROOKS IN SUPPORT OF ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

---

10740179.doc

# Exhibit A

Table of Contents

---

## SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For The Fiscal Year Ended December 31, 2004**

**Commission File No. 1-10269**

# Allergan, Inc.

*(Exact name of Registrant as Specified in its Charter)*

| | |
|---|---|
| **Delaware** | **95-1622442** |
| *(State of Incorporation)* | *(I.R.S. Employer Identification No.)* |
| **2525 Dupont Drive** | **92612** |
| **Irvine, California** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**(714) 246-4500**

*(Registrant's telephone number)*

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which each class registered |
|---|---|
| Common Stock, $0.01 par value | New York Stock Exchange |
| Preferred Share Purchase Rights | |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐ .

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☑ No ☐ .

The aggregate market value of the registrant's common equity held by non-affiliates was approximately $11,819 million on June 25, 2004, based upon the closing price on the New York Stock Exchange on such date.

Common Stock outstanding as of February 25, 2005 — 134,254,772 shares (including 2,649,633 shares held in treasury).

**DOCUMENTS INCORPORATED BY REFERENCE**

Part III incorporates certain information by reference from the registrant's proxy statement for the annual meeting of stockholders to be held on April 26, 2005, which proxy statement will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2004.

---

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| PART I | | 1 |
| Item 1. | Business | 1 |
| Item 2. | Properties | 21 |
| Item 3. | Legal Proceedings | 21 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 23 |
| PART II | | 23 |
| Item 5. | Market For Registrant's Common Equity, and Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| Item 6. | Selected Financial Data | 25 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 46 |
| Item 8. | Financial Statements and Supplementary Data | 53 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 53 |
| Item 9A. | Controls and Procedures | 53 |
| Item 9B. | Other Information | 54 |
| PART III | | 54 |
| Item 10. | Directors and Executive Officers of Allergan, Inc. | 54 |
| Item 11. | Executive Compensation | 56 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 56 |
| Item 13. | Certain Relationships and Related Transactions | 57 |
| Item 14. | Principal Accountant Fees and Services | 57 |
| PART IV | | 58 |
| Item 15. | Exhibits and Financial Statement Schedules | 58 |
| SIGNATURES | | 63 |
| EXHIBIT 10.7 | | |
| EXHIBIT 10.8 | | |
| EXHIBIT 10.9 | | |
| EXHIBIT 10.13 | | |
| EXHIBIT 10.17 | | |
| EXHIBIT 10.20 | | |
| EXHIBIT 10.33 | | |
| EXHIBIT 21 | | |
| EXHIBIT 23 | | |
| EXHIBIT 31.1 | | |
| EXHIBIT 31.2 | | |
| EXHIBIT 32 | | |

Table of Contents

## PART I

### Item 1. *Business*

**General Development of Our Business**

Allergan, Inc. is a technology-driven, global health care company that develops and commercializes specialty pharmaceutical products for the ophthalmic, neurological, dermatological and other specialty markets. We are a pioneer in specialty pharmaceutical research, targeting products and technologies related to specific disease areas such as glaucoma, retinal disease, dry eye, psoriasis, acne and movement disorders. Additionally, we develop and market aesthetic-related pharmaceuticals and over-the-counter products. Within these areas, we are an innovative leader in therapeutic and other prescription products, and to a limited degree, over-the-counter products that are sold in more than 100 countries around the world. We are also focusing research and development efforts on new therapeutic areas, including gastroenterology, neuropathic pain and genitourinary diseases.

We were originally incorporated in California in 1948 and became known as Allergan Corporation in 1950. In 1977, we reincorporated in Delaware. In 1980, we were acquired by SmithKline Beecham plc (then known as SmithKline Corporation). From 1980 through 1989, we operated as a wholly-owned subsidiary of SmithKline and in 1989 we again became a stand-alone public company through a spin-off distribution by SmithKline.

Our Internet website address is www.allergan.com. We make our periodic and current reports, together with amendments to these reports, available on our Internet website, free of charge, as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Securities and Exchange Commission. The information on our Internet website is not incorporated by reference in this Annual Report on Form 10-K.

In June 2002, we completed the spin-off of our optical medical device business to our stockholders. The optical medical device business consisted of two businesses: our ophthalmic surgical products business and our contact lens care products business. The spin-off was effected by contributing our optical medical device business to a newly formed subsidiary, Advanced Medical Optics, Inc., or AMO, and issuing a dividend of AMO's common stock to our stockholders. Our consolidated financial statements and related notes reflect the financial position, results of operations and cash flows of the optical medical device business as a discontinued operation.

In October 2004, our board of directors approved certain restructuring activities related to the scheduled termination of our manufacturing and supply agreement with AMO. Under the manufacturing and supply agreement, which was entered into in connection with the AMO spin-off, we agreed to manufacture certain products for AMO for a period of up to three years ending in June 2005. As part of the termination of the manufacturing and supply agreement, we will eliminate certain manufacturing positions at our Westport, Ireland; Waco, Texas; and Guarulhos, Brazil manufacturing facilities. We anticipate that the pre-tax restructuring charges to be incurred in connection with the termination of the manufacturing and supply agreement will total between $24 million and $28 million and that there will be a reduction in our workforce of approximately 350 individuals.

In January 2005, our board of directors approved the initiation and implementation of a restructuring of certain activities related to our European operations. The restructuring seeks to optimize operations, improve resource allocation and create a scalable, lower cost and more efficient operating model for our European research and development and commercial activities. Specifically, the restructuring anticipates moving key European research and development and select commercial functions from our Mougins, France and other European locations to our Irvine, California, High Wycombe, U.K. and Dublin, Ireland facilities and streamlining our European commercial back office functions. Under applicable law, the proposed restructuring requires consultations and, in certain cases, negotiations with European and national works councils, other management/ labor organizations and local authorities. The restructuring steps to be implemented and their ultimate cost will depend in part on the outcome of such consultations and negotiations. We anticipate

Table of Contents

incurring restructuring charges and charges relating to severance, relocation and one-time termination benefits, payments to public employment and training programs, implementation, transition, capital and other asset-related expenses, duplicate operating expenses and contract termination costs in connection with the restructuring. We currently estimate that the pre-tax charges and capital expenditures resulting from the restructuring will be between $50 million and $60 million. We also estimate that the restructuring will yield annual operating cost reductions of between $6 million and $9 million.

**Our Business**

The following table sets forth, for the periods indicated, net sales from continuing operations for each of our specialty pharmaceutical product lines, earnings (loss) from continuing operations, domestic and international sales as a percentage of total net sales and domestic and international long-lived assets:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2003 | 2002 |
| | (in millions) | | |
| Net Sales by Product Line | | | |
| Eye Care Pharmaceuticals | $1,137.1 | $ 999.5 | $ 827.3 |
| *Botox* ®/ Neuromodulator | 705.1 | 563.9 | 439.7 |
| Skin Care Products | 103.4 | 109.3 | 90.2 |
| Other(1) | 100.0 | 82.7 | 27.8 |
| Total | $2,045.6 | $1,755.4 | $1,385.0 |
| Earnings (loss) from continuing operations | $ 377.1 | $ (52.5) | $ 64.0 |
| Sales | | | |
| Domestic | 69.1% | 70.4% | 70.6% |
| International | 30.9% | 29.6% | 29.4% |
| Long-Lived Assets | | | |
| Domestic | $ 593.9 | $ 573.8 | $ 381.2 |
| International | $ 287.1 | $ 252.9 | $ 225.2 |

(1) Other sales primarily consist of sales to AMO pursuant to a manufacturing and supply agreement entered into as part of the AMO spin-off that is scheduled to terminate in June 2005.

See Note 15, "Business Segment Information," in the notes to the consolidated financial statements listed under Item 15 (a) of Part IV of this report for further information concerning our foreign and domestic operations.

**Eye Care Pharmaceutical Product Line**

We develop, manufacture and market a broad range of prescription and non-prescription products designed to treat diseases and disorders of the eye, including glaucoma, dry eye, inflammation, infection and allergy.

*Glaucoma.* The largest segment of the market for ophthalmic prescription drugs is for the treatment of glaucoma, a sight-threatening disease typically characterized by elevated intraocular pressure leading to optic nerve damage. Glaucoma is currently the world's second leading cause of blindness, and we estimate that over 60 million people worldwide have glaucoma. According to IMS Health Inc., an independent research firm, our products for the treatment of glaucoma, including *Alphagan* ®, *Alphagan* ® *P* and *Lumigan* ®, captured approximately 17% of the worldwide glaucoma market for the first nine months of 2004.

Our largest selling eye care pharmaceutical products are the ophthalmic solutions *Alphagan* ® (brimonidine tartrate ophthalmic solution) 0.2% and *Alphagan* ® *P* (brimonidine tartrate ophthalmic solution)

Table of Contents

0.15%, preserved with *Purite* ®. *Alphagan* ® and *Alphagan* ® *P* lower intraocular pressure by reducing aqueous humor production and increasing uveoscleral outflow. *Alphagan* ® *P* is an improved reformulation of *Alphagan* ® containing brimonidine, *Alphagan* ®'s active ingredient, preserved with *Purite* ®. We currently market *Alphagan* ® and *Alphagan* ® *P* in over 70 countries worldwide.

*Alphagan* ® and *Alphagan* ® *P* combined were the third best selling glaucoma products in the world for the first nine months of 2004, according to IMS Health Inc. Combined sales of *Alphagan* ® and *Alphagan* ® *P* represented approximately 13% of our total consolidated sales in 2004, 16% of our total consolidated sales in 2003 and 18% of our total consolidated sales in 2002. In July 2002, based on the acceptance of *Alphagan* ® *P*, we discontinued the U.S. distribution of *Alphagan* ®. In May 2004, we entered into an exclusive licensing agreement with Kyorin Pharmaceutical Co., Ltd., under which Kyorin agreed to be responsible for the development and commercialization of *Alphagan* ® and *Alphagan* ® *P* in Japan's ophthalmic specialty area. Kyorin agreed to incur associated costs and provided us with an up-front payment. Kyorin also agreed to make development and commercialization milestone payments to us, as well as royalty-based payments on product sales. We agreed to work collaboratively with Kyorin on overall product strategy and management. Kyorin subsequently sub-licensed its rights under the agreement to Senju Pharmaceutical Co., Ltd. The marketing exclusivity period for *Alphagan* ® *P* expired in the U.S. in September 2004, although we have a number of patents covering the *Alphagan* ® *P* technology that extend to 2021 in the U.S. and 2009 in Europe, with corresponding patents pending in Europe. In May 2003, the first generic form of *Alphagan* ® was approved by the U.S. Food and Drug Administration, or FDA. Additionally, a generic form of *Alphagan* ® is sold in a limited number of other countries, including Canada, Mexico, India, Brazil, Colombia and Argentina. See Item 3 of Part I of this report, "Legal Proceedings" and Note 13, "Commitments and Contingencies," in the notes to the consolidated financial statements listed under Item 15(a) of Part IV of this report for further information regarding litigation involving *Alphagan* ®. Falcon Pharmaceuticals, Ltd., an affiliate of Alcon Laboratories, Inc., is attempting to obtain FDA approval for and to launch a brimonidine product to compete with our *Alphagan* ® *P* product. In May 2004, we filed a New Drug Application with the FDA for a new formulation of *Alphagan* ® *P*. This New Drug Application remains pending.

*Lumigan* ® (bimatoprost ophthalmic solution) 0.03% is a topical treatment indicated for the reduction of elevated intraocular pressure in patients with glaucoma or ocular hypertension who are either intolerant or insufficiently responsive when treated with other intraocular pressure-lowering medications. Sales of *Lumigan* ® represented approximately 11% of our total consolidated sales in 2004, 10% of our total consolidated sales in 2003 and 9% of our total consolidated sales in 2002. In March 2002, the European Commission approved *Lumigan* ® through its centralized procedure. In January 2004, the European Union's Committee for Proprietary Medicinal Products approved *Lumigan* ® as a first-line therapy for the reduction of elevated intraocular pressure in chronic open-angle glaucoma and ocular hypertension. We currently sell *Lumigan* ® in over 40 countries worldwide. In May 2004, we entered into an exclusive licensing agreement with Senju Pharmaceutical Co., Ltd., under which Senju is responsible for the development and commercialization of *Lumigan* ® in Japan's ophthalmic specialty area. Senju will incur associated costs and provided us with an up-front payment. Senju will also make development and commercialization milestone payments to us, as well as royalty-based payments on product sales. We will work collaboratively with Senju on overall product strategy and management.

In September 2001, we filed a New Drug Application with the FDA for a brimonidine and timolol combination designed to treat glaucoma. This New Drug Application remains pending. During the fourth quarter of 2003, we received approval from Health Canada for our brimonidine and timolol combination, which is marketed as *Combigan* ™. In December 2004, we received our first European approval of *Combigan* ™ in Switzerland. In November 2003, we filed a New Drug Application with the FDA for a *Lumigan* ® and timolol combination designed to treat glaucoma or ocular hypertension. In August 2004, we announced that the FDA issued an approvable letter regarding the *Lumigan* ® and timolol combination, setting out the conditions, including additional clinical investigation, that we must meet in order to obtain final FDA approval.

*Ocular Surface Disease.* In December 2002, the FDA approved *Restasis*® (cyclosporine ophthalmic emulsion) 0.05%, the first and currently the only prescription therapy for the treatment of chronic dry eye

Table of Contents

disease. We launched *Restasis®* in the United States in April 2003. Dry eye disease is a painful and irritating condition involving abnormalities and deficiencies in the tear film initiated by a variety of causes. The incidence of dry eye disease increases markedly with age, after menopause in women and in people with systemic diseases such as Sjogren's syndrome and rheumatoid arthritis. Until the approval of *Restasis®*, physicians used lubricating tears as a temporary measure to provide palliative relief of the debilitating symptoms of dry eye disease. In June 2001, we entered into a licensing, development and marketing agreement with Inspire Pharmaceuticals, Inc. under which we obtained an exclusive license to develop and commercialize Inspire's INS365 Ophthalmic in exchange for royalty payments to Inspire on sales of both *Restasis®* and, ultimately, INS365. INS365 completed Phase III clinical trials investigating its ability to relieve the signs and symptoms of dry eye disease by rehydrating conjunctival mucosa and increasing non-lacrimal tear component production. In December 2003, the FDA issued an approvable letter for INS365 and also requested additional clinical data. In February 2005, Inspire announced that INS365 failed to demonstrate statistically significant improvement as compared to a placebo for the primary endpoint of the incidence of corneal clearing. Inspire also announced that INS365 achieved improvement compared to a placebo for a number of secondary endpoints, and that Inspire intends to file a New Drug Application amendment with the FDA by the end of the second quarter of 2005.

*Ophthalmic Inflammation.* Our leading ophthalmic anti-inflammatory product is *Acular®* (ketorolac ophthalmic solution) 0.5%. *Acular®* is a registered trademark of and is licensed from its developer, Syntex (U.S.A.) Inc., a business unit of Hoffmann-LaRoche Inc. *Acular®* is indicated for the temporary relief of itch associated with seasonal allergic conjunctivitis, the inflammation of the mucus membrane that lines the inner surface of the eyelids, and for the treatment of post-operative inflammation in patients who have undergone cataract extraction. *Acular PF®* was the first, and currently remains the only, unit-dose, preservative-free topical non-steroidal anti-inflammatory drug in the United States. *Acular PF®* is indicated for the reduction of ocular pain and photophobia following incisional refractive surgery. *Acular®* is the number one prescribed non-steroidal anti-inflammatory in the United States. See Item 3 of Part I of this report, "Legal Proceedings" and Note 13, "Commitments and Contingencies," in the notes to the consolidated financial statements listed under Item 15(a) of Part IV of this report for information regarding our successful patent infringement lawsuit against Apotex, Inc., et al. confirming the validity and enforceability of our intellectual property covering *Acular®*. Apotex, Inc. subsequently appealed that judgment and we are currently awaiting the United States Court of Appeals for the Federal Circuit's ruling on the appeal.

In June 2003, we received FDA approval of *Acular LS®*, a reformulated ketorolac 0.4% concentration, for the reduction of ocular pain, burning and stinging following corneal refractive surgery. We launched *Acular LS®* in the United States in August 2003.

Our product *Pred Forte®* remains a leading topical steroid worldwide based on 2004 sales. *Pred Forte®* has no patent protection or marketing exclusivity and faces generic competition.

*Ophthalmic Infection.* A leading product in the ophthalmic anti-infective market is our *Ocuflox® / Oflox® / Exocin®* ophthalmic solution. *Ocuflox®* has no patent protection or marketing exclusivity and faces generic competition.

In March 2003, we received FDA approval of *Zymar®* (gatifloxacin ophthalmic solution) 0.3%. *Zymar®* is the first fourth-generation fluoroquinilone to enter the market for the treatment of bacterial conjunctivitis. Laboratory studies have shown that *Zymar®* kills the most common bacteria that cause eye infections as well as specific resistant bacteria. We launched *Zymar®* in the United States in April 2003. According to Verispan, an independent research firm, *Zymar®* was the number one ocular anti-infective prescribed by ophthalmologists in the United States in 2004.

*Allergy.* The allergy market is, by its nature, a seasonal market, peaking during the spring months. We market *Alocril®* ophthalmic solution for the treatment of itch associated with allergic conjunctivitis. Additionally, in October 2003, we received FDA approval of *Elestat™* (epinastine ophthalmic solution) 0.05%, for the prevention of itching associated with allergic conjunctivitis. In December 2003, we announced the execution of an agreement with Inspire Pharmaceuticals for the co-promotion of *Elestat™* in the United States within the ophthalmic specialty area and to allergists. Under the terms of the agreement, Inspire

provided us with an up-front payment and we make payments to Inspire based on *Elestat* ™ net sales. In addition, the agreement reduced our existing royalty payment to Inspire for *Restasis* ®. Inspire has primary responsibility for selling and marketing activities in the United States related to *Elestat* ™. We have retained all international marketing and selling rights. We launched *Elestat* ™ in Europe under the brand names *Relestat* ® and *Purivist* ® during 2004, and Inspire launched *Elestat* ™ in the United States during 2004.

**Neuromodulator**

Our neuromodulator product, *Botox* ® (Botulinum Toxin Type A), is used for a wide variety of treatments which continue to expand. *Botox* ® is accepted in many global regions as the standard therapy for indications ranging from therapeutic neuromuscular disorders and related pain to cosmetic facial aesthetics. There are currently in excess of 100 therapeutic and cosmetic uses for *Botox* ® reported in medical literature. The versatility of *Botox* ® is based on its localized treatment effect and approximately 16 years of safety experience in large patient groups. Marketed as *Botox* ®, *Botox* ® Cosmetic, *Vistabel* ® or *Vistabex* ®, depending on the indication and country of approval, the product is currently approved in over 70 countries for a broad range of indications. Sales of *Botox* ® represented approximately 34%, 32% and 32% of our total consolidated sales in 2004, 2003 and 2002, respectively.

*Botox* ®. *Botox*® is used therapeutically for the treatment of certain neuromuscular disorders which are characterized by involuntary muscle contractions or spasms. The approved therapeutic indications for *Botox* ® in the United States are as follows:

- blepharospasm, the uncontrollable contraction of the eyelid muscles which can force the eye closed and result in functional blindness;
- strabismus, or misalignment of the eyes, in people 12 years of age and over;
- cervical dystonia, or sustained contractions or spasms of muscles in the shoulders or neck in adults, along with the associated pain; and
- severe primary axillary hyperhidrosis (underarm sweating) that is inadequately managed with topical agents.

In many countries outside of the United States and Japan, *Botox* ® is also approved for treating blepharospasm, strabismus, cervical dystonia, hemifacial spasm, pediatric cerebral palsy, hyperhidrosis and post-stroke focal spasticity. We are currently pursuing new indication approvals for *Botox* ® in the United States, Japan and Europe, including headache, post-stroke focal spasticity and overactive bladder.

*Botox* ® *Cosmetic*. The FDA approved *Botox* ® in April 2002 for the temporary improvement in the appearance of moderate to severe glabellar lines in adult men and women age 65 or younger. Referred to as *Botox* ®, *Botox* ® Cosmetic, *Vistabel* ® or *Vistabex* ®, depending on the country of approval, this product is designed to relax wrinkle-causing muscles to smooth the deep, persistent, glabellar lines between the brow that often develop during the aging process. Health Canada approved *Botox* ® Cosmetic for similar use in Canada in April 2001. In 2004, we continued our previously launched direct-to-consumer marketing campaigns in Canada and the United States. These campaigns included television commercials and print advertising aimed at consumers and aesthetic specialty physicians. Currently, over 30 countries have approved the glabellar line indication for *Botox* ®, *Botox* ® Cosmetic, *Vistabel* ® or *Vistabex* ®, including Australia, Brazil, Canada, Denmark, France, Israel, Italy, Mexico, Norway, Poland, Portugal, Spain, Sweden, and Switzerland. In January 2005, we received a positive opinion from the European Union by way of the Mutual Recognition Process for *Vistabel* ®. The positive opinion was received in all twelve concerned member states in which we filed, including, among others, Austria, Hungary, Greece, Belgium and Finland. We now sponsor training of aesthetic specialty physicians in approved countries to further expand the base of qualified physicians using *Botox* ®, *Botox* ® Cosmetic, *Vistabel* ® or *Vistabex* ®.

**Skin Care Product Line**

Our skin care product line focuses on the high growth, high margin segments of the acne and psoriasis markets, particularly in the United States and Canada.

*Tazarotene Products.* We market *Tazorac* ® gel in the United States for the treatment of plaque psoriasis, a chronic skin disease characterized by dry red patches, and acne. We also market the cream formulation of *Tazorac* ® in the United States for the treatment of psoriasis and the topical treatment of acne. Under a co-promotion agreement for *Tazorac* ® in the United States, PediaMed Pharmaceuticals, Inc. markets *Tazorac* ® to the pediatric medical community and Proctor & Gamble markets *Tazorac* ® to general practitioners. We market *Tazorac* ® to dermatologists with our in-house sales force. We have also engaged Pierre Fabre Dermatologie as our promotion partner for *Zorac* ® in certain parts of Europe, the Middle East and Africa.

In October 2002, we received FDA approval of *Avage*®. *Avage* ® is a tazarotene cream indicated for the treatment of facial fine wrinkling, mottled hypo- and hyperpigmentation (blotchy skin discoloration) and benign facial lentigines (flat patches of skin discoloration) in patients using a comprehensive skin care and sunlight avoidance program. We launched *Avage* ® in the United States in January 2003.

In November 2003, we filed a New Drug Application with the FDA for oral tazarotene for the treatment of moderate to very severe psoriasis. In July 2004, the FDA Joint Dermatologic & Opthalmic Drugs and Drug Safety & Risk Management Advisory Committee recommended against approval of this New Drug Application, and in September 2004, the FDA issued a non-approvable letter. The FDA listed three non-approvability issues for oral tazarotene for the treatment of moderate to very severe psoriasis: (1) the development of an acceptable risk management program; (2) completion of a non-inferiority study in severe psoriasis; and (3) satisfaction of an FDA deficiency letter regarding the manufacture of the oral tazarotene capsules. We intend to continue working with the FDA toward our goal of bringing oral tazarotene to patients suffering from psoriasis.

In May 2004, we transferred certain rights to our pre-clinical programs and broad research portfolio in retinoid and rexinoid nuclear receptor compounds to Concurrent Pharmaceuticals, Inc., a privately held biopharmaceutical company. The clinical assets and compounds subject to the transaction included near-clinical compounds and were primarily derived from our retinoid program. The transaction was designed to provide Concurrent with a portfolio of development compounds and near-clinical candidates that would comprise a discovery engine with the potential to create a pipeline of product leads and follow-on programs. Under the terms of the transaction, we received equity in Concurrent, the right to designate one person to serve on Concurrent's board of directors, as well as the right to receive future milestone and royalty payments. As part of the transaction, our retinoid receptor research team joined Concurrent.

In January 2005, we launched *Prevage* ™ antioxidant cream, the first and only clinically tested antioxidant that not only reduces the appearance of fine lines and wrinkles, but also provides protection against environmental factors including sun damage, air pollution and cigarette smoke. Representing the next generation of antioxidants, *Prevage* ™ is a novel cosmeceutical containing 1% idebenone — a revolutionary, potent and effective new antioxidant. *Prevage* ™ is marketed to physicians.

*Azelex*®. *Azelex* ® cream is approved by the FDA for the topical treatment of mild to moderate inflammatory acne vulgaris. We market *Azelex* ® cream primarily in the United States.

*M.D. Forte* ®. We also develop and market glycolic acid-based skin care products. Our *M.D. Forte*® line of alpha hydroxy acid products are marketed to physicians.

*Finacea* ®. In 2003 we entered into a collaboration with Intendis, Inc. (formerly known as Berlex, Inc.) to jointly promote Intendis' topical rosacea treatment, *Finacea* ® (azelaic acid gel 15%). *Finacea* ® is the first new therapeutic class option to be approved by the FDA for the treatment of rosacea in more than a decade and has rapidly gained a leading position in the market.

Table of Contents

**Employee Relations**

At December 31, 2004, we employed approximately 5,030 persons throughout the world, including approximately 2,490 in the United States. None of our U.S.-based employees are represented by unions. We believe that our relations with our employees are generally good.

**International Operations**

Our international sales of specialty pharmaceutical products have represented 30.9%, 29.6% and 29.4% of total sales for the years ended December 31, 2004, 2003 and 2002, respectively. Our products are sold in over 100 countries. Marketing activities are coordinated on a worldwide basis, and resident management teams provide leadership and infrastructure for customer-focused, rapid introduction of new products in the local markets.

**Sales and Marketing**

We maintain a global marketing team, as well as regional sales and marketing organizations. We also engage contract sales organizations to promote certain products. Our sales efforts and promotional activities are primarily aimed at eye care professionals, neurologists, plastic surgeons and dermatologists who use, prescribe and recommend our products. We advertise in professional journals and have an extensive direct mail program of descriptive product literature and scientific information that we provide to specialists in the ophthalmic, dermatological and movement disorder fields. We have developed training modules and seminars to update physicians regarding evolving technology in our products. In 2004, we also utilized direct-to-consumer advertising for our *Botox* ® Cosmetic and *Restasis* ® products.

Our products are sold to drug wholesalers, independent and chain drug stores, pharmacies, commercial optical chains, opticians, mass merchandisers, food stores, hospitals, ambulatory surgery centers and medical practitioners, including ophthalmologists, neurologists, dermatologists, pediatricians and plastic surgeons. As of December 31, 2004, we employed approximately 1,400 sales representatives throughout the world. We also utilize distributors for our products in smaller international markets.

U.S. sales, including manufacturing operations, represented 69.1%, 70.4% and 70.6% of our consolidated product net sales in 2004, 2003 and 2002, respectively. Sales to Cardinal Healthcare for the years ended December 31, 2004, 2003 and 2002 were 14.1%, 14.0% and 14.8%, respectively, of our total consolidated product net sales. Sales to McKesson Drug Company for the years ended December 31, 2004, 2003 and 2002 were 13.0%, 14.2% and 13.3%, respectively, of our total consolidated product net sales. No other country, or single customer, generates over 10% of our total product net sales.

**Research and Development**

Our global research and development efforts currently focus on eye care, skin care, neuromodulators, and neurology. We also have development programs in genitourinary diseases and gastroenterology. We have a fully integrated pharmaceutical research and development organization with in-house discovery programs, including medicinal chemistry, high throughput screening, and biological sciences. We supplement our own research and development activities with our commitment to identify and obtain new technologies through in-licensing, research collaborations, joint ventures and acquisitions.

As of December 31, 2004, we had approximately 1,030 employees involved in our research and development efforts. Our research and development expenditures for 2004, 2003 and 2002 were approximately $345.6 million, $763.5 million and $233.1 million, respectively, including expenditures on in-process research and development in connection with our 2003 acquisitions of Bardeen Sciences Company, LLC and Oculex Pharmaceuticals, Inc. Excluding in-process research and development expenditures, we have increased our annual investment in research and development by over $200 million in the past five years, dedicating approximately 20% of our investment in research and development to the discovery of new compounds. In 2004, we completed construction of a new $75 million research and development facility in Irvine, California, which will provide us with approximately 175,000 square feet of additional laboratory space. In 2004, we began

construction on a new biologics facility on our Irvine, California campus. We expect that this facility will be completed in 2005 at an aggregate cost of approximately $50 million.

Our strategy is to develop innovative products to address unmet medical needs. Our top priorities include furthering our leadership in the field of neuromodulators, identifying new potential compounds for sight-threatening diseases such as glaucoma, age-related macular degeneration and macular edema, and developing novel therapies for pain, gastroenterology, and genitourinary diseases. We plan to continue to build on our strong market positions in therapeutic dry eye products and dermatology products for acne and psoriasis, and to explore new therapeutic areas that are consistent with our specialty pharmaceutical focus.

*Eye Care Research and Development.* Our research and development efforts for the ophthalmic pharmaceuticals business focus primarily on new therapeutic products for retinal disease, glaucoma, and dry eye. As part of our focus on diseases of the retina, we acquired Oculex Pharmaceuticals, Inc. in 2003. With this acquisition, we obtained a novel drug delivery technology for use with compounds to treat diseases, including macular edema and age-related macular degeneration. We have subsequently begun Phase III studies for macular edema associated with diabetes and retinal vein occlusion. In April 2004, we announced that we were also selected as a partner to supply our novel ophthalmic formulation of triamcinolone for two National Eye Institute-sponsored clinical trials on macular edema associated with diabetic retinopathy and retinal vein occlusion. Under the terms of the clinical trial agreement, we are responsible for all costs associated with drug development, manufacturing, pharmacokinetic studies, and regulatory aspects of the trials. In addition, we will pay a fee to the study coordinating centers for the conduct of the trials.

*Neuromodulator Research and Development.* We continue to invest heavily in the research and development of neuromodulators, primarily *Botox* ®. We are focused on both expanding the approved indications for *Botox* ® and pursuing new neuromodulator-based therapeutics. This includes expanding the approved uses for *Botox* ® to include treatment for spasticity, headache, brow furrow and urologic conditions including overactive bladder. In collaboration with the United Kingdom's Health Protection Agency, formerly known as the Centre for Applied Microbiology & Research, we are focused on engineering neuromodulators for the treatment of severe pain. We are also continuing our investment in the areas of biologic process development and manufacturing.

*Skin Care Research and Development.* Our research and development team for our skin care business is working on expanding indications and formulations for tazarotene. As mentioned above, we filed a New Drug Application with the FDA in November 2003 for oral tazarotene for the treatment of moderate to very severe psoriasis. In July 2004, the FDA Joint Dermatologic & Opthalmic Drugs and Drug Safety & Risk Management Advisory Committee recommended against approval of this New Drug Application, and in September 2004, the FDA issued a non-approvable letter. The FDA listed three non-approvability issues for oral tazarotene for the treatment of moderate to very severe psoriasis: (1) the development of an acceptable risk management program; (2) completion of a non-inferiority study in severe psoriasis; and (3) satisfaction of an FDA deficiency letter regarding the manufacture of the oral tazarotene capsules. We intend to continue working with the FDA toward our goal of bringing oral tazarotene to patients suffering from psoriasis.

In November 2002, we entered into a research collaboration and license agreement with Peplin Biotech Ltd. for the right to develop and commercialize PEP005 for the topical treatment of non-melanoma skin cancer and actinic keratosis. In June 2004, we filed Investigational New Drug Applications with the FDA for a topical formulation of PEP005 for the treatment of actinic keratosis, a pre-cancerous skin condition, and for basal cell carcinoma, the most common form of non-melanoma skin cancer. In October 2004, we mutually agreed with Peplin to discontinue our collaboration.

*Other Areas of Research and Development.* We are also working to leverage our technologies in therapeutic areas outside of our current specialties, such as the use of alpha agonists for the treatment of neuropathic pain. Additionally, we are developing a novel proton pump inhibitor designed to reduce excess stomach acid secretion. In support of these two programs, we filed Investigational New Drug Applications with the FDA for a proton pump inhibitor pro drug for the treatment of gastrointestinal disease in June 2004 and for an alpha adrenergic agonist for the treatment of neuropathic pain in September 2004. These Investigational New Drug Applications remain pending.

In December 2002, we entered into a strategic research collaboration and license agreement with ExonHit Therapeutics. The goals of this collaboration are to identify new molecular targets based on ExonHit Therapeutics' gene profiling *DATAS* ™ technology and to work collaboratively developing unique compounds and commercial products based on these targets. Our strategic alliance with ExonHit Therapeutics provides us with the rights to compounds developed in the fields of neurodegenerative disease, pain and ophthalmology.

The continuing introduction of new products supplied by our research and development efforts and in-licensing opportunities are critical to our success. There are intrinsic uncertainties associated with research and development efforts and the regulatory process. We cannot assure you that any of the research projects or pending drug marketing approval applications will result in new products that we can commercialize. Delays or failures in one or more significant research projects and pending drug marketing approval applications could have a material adverse affect on our future operations.

**Manufacturing**

We manufacture the majority of our commercial products in our own plants located in Waco, Texas; Westport, Ireland; and Sao Paulo, Brazil. We maintain sufficient manufacturing capacity at these facilities to support forecasted demand as well as a modest safety margin of additional capacity to meet peaks of demand and sales growth in excess of expectations. We increase our capacity as required in anticipation of future sales increases. In the event of a very large or very rapid unforeseen increase in market demand for a specific product or technology, supply of that product or technology could be negatively impacted until additional capacity is brought on line. Third parties manufacture a small number of commercial products for us. However, the revenues from these products are not material to our operating results.

We are vertically integrated into the production of plastic parts and produce our own bottles, tips and caps for use in the manufacture of our ophthalmic solutions. Additionally, we ferment, purify and characterize the botulinum toxin used in our product *Botox* ®. With these two exceptions, we purchase all other raw materials from qualified domestic and international sources. These raw materials consist of active pharmaceutical ingredients, pharmaceutical excipients, and packaging components. Where practical, we maintain more than one supplier for each material, and we have an ongoing alternate sourcing endeavor that identifies additional sources of key raw materials. In some cases, however, most notably with active pharmaceutical ingredients, we are a niche purchaser of specialty chemicals, which are sole sourced. These sources are identified in filings with regulatory agencies, including the FDA, and cannot be changed without prior regulatory approval. In these cases, we maintain inventories of the raw material itself and precursor intermediates to mitigate the risk of interrupted supply. A lengthy interruption of the supply of one of these materials could adversely affect our ability to manufacture and supply commercial product. A small number of the raw materials required to manufacture certain of our products are derived from biological sources which could be subject to contamination and recall by their suppliers. We use multiple lots of these raw materials at any one time in order to mitigate such risks. However, a shortage, contamination or recall of these products could disrupt our ability to maintain an uninterrupted commercial supply of our finished goods.

Competition

We face significant competition in all of our markets worldwide. Numerous companies are engaged in the development, manufacture and marketing of health care products competitive with those that we manufacture. Our major eye care competitors include Alcon Laboratories, Inc., Bausch & Lomb, Pfizer, Novartis Ophthalmics and Merck & Co., Inc. These competitors have equivalent or, in most cases, greater resources than us. This enables them, among other things, to spread their research and development costs, as well as their marketing and promotion costs, over a broader revenue base. Our competitors may also have more experience and expertise in obtaining marketing approvals from the FDA and other regulatory agencies. Our skin care business competes against a number of companies, including among others, Dermik, a division of Sanofi-Aventis, Galderma, a joint venture between Nestle and L'Oreal, Medicis, Bristol-Myers Squibb, Schering-Plough Corporation and Johnson & Johnson, most of which have greater resources than us. With respect to neuromodulators, until December 2000, *Botox* ® was the only neuromodulator approved by the FDA. At that time, the FDA approved *Myobloc* ®, a neuromodulator formerly marketed by Elan Pharmaceuti-

cals and now marketed by Solstice Neurosciences Inc. We believe that Beaufour Ipsen Ltd. intends to seek FDA approval of its *Dysport* ® neuromodulator for certain therapeutic indications, and that Beaufour Ipsen's marketing partner, Inamed Corporation, intends to seek FDA approval of *Dysport* ®/ *Reloxin* ® for cosmetic indications. Beaufour Ipsen has marketed *Dysport* ® in Europe since 1991, prior to our European commercialization of *Botox* ® in 1992. Also, Mentor Corporation has announced its intention to develop and seek regulatory approval to market a competing neuromodulator in the United States. In addition, we are aware of competing neuromodulators currently being developed and commercialized in Asia, Europe, South America and other markets. A Chinese entity received approval to market a botulinum toxin in China in 1997, and we believe that it has launched or is planning to launch its botulinum toxin product in other lightly regulated markets in Asia, South America and Central America. These lightly regulated markets may not require adherence to the FDA's current good manufacturing practices, or cGMPs, the European Medical Evaluation Agency or other regulatory agencies in countries that are members of the Organization for Economic Cooperation and Development, and companies operating in these markets may be able to produce products at a lower cost than we can. In addition, Merz Pharmaceuticals is seeking German regulatory approval for a botulinum toxin currently expected to be launched during the second half of 2005, and a Korean company is developing a botulinum toxin that received exportation approval from Korean authorities in early 2005 and that is expected to be launched in Korea during 2005.

In addition, competition from generic drug manufacturers is a major challenge in the United States and is growing internationally. In marketing our products to health care professionals, pharmacy benefits management companies, health care maintenance organizations, and various other national and regional health care providers and managed care entities, we compete primarily on the basis of product quality, product technology, price, reputation and access to technical information. We believe that we compete favorably in our product markets.

#### Government Regulation

Cosmetics, drugs and biologics are subject to regulation by the FDA, state agencies and, in varying degrees, by foreign health agencies. Pharmaceutical products and biologics are subject to extensive pre- and post-market regulation by the FDA, including regulations that govern the testing, manufacturing, safety, efficacy, labeling, storage, record keeping, advertising and promotion of the products under the Federal Food, Drug, and Cosmetic Act with respect to drugs and the Public Health Services Act with respect to biologics, and by comparable agencies in a number of foreign countries. Failure to comply with applicable FDA or other requirements may result in civil or criminal penalties, recall or seizure of products, partial or total suspension of production or withdrawal of a product from the market.

The process required by the FDA before a new drug or biologic may be marketed in the United States generally involves the following: completion of preclinical laboratory and animal testing; submission of an Investigational New Drug Application, which must become effective before clinical trials may begin; and performance of adequate and well controlled human clinical trials to establish the safety and efficacy of the proposed drug or biologic for its intended use. Clinical trials are typically conducted in three sequential phases, which may overlap, and must satisfy extensive Good Clinical Practice regulations and regulations for informed consent. Approval by the FDA of a New Drug Application, or NDA, is required prior to marketing a new drug, and approval of a Biologics License Application, or BLA, is required before a biologic may be legally marketed in the United States. To satisfy the criteria for approval, an NDA or BLA must demonstrate the safety and effectiveness of the product based on results of product development, preclinical studies and the three phases of clinical trials. Both NDAs and BLAs must also contain extensive manufacturing information, and the applicant must pass an FDA pre-approval inspection of the manufacturing facilities at which the drug or biologic is produced to assess compliance with the FDA's current good manufacturing practices, or cGMPs, prior to commercialization. Satisfaction of FDA pre-market approval requirements typically takes several years and the actual time required may vary substantially based on the type, complexity and novelty of the product, and we cannot be certain that any approvals for our products will be granted on a timely basis, or at all.

Table of Contents

Once approved, the FDA may withdraw product approval if compliance with pre- and post-market regulatory standards is not maintained or if safety problems occur after the product reaches the marketplace. In addition, the FDA may require post-marketing clinical studies and surveillance programs to monitor the effect of approved products. The FDA may limit further marketing of the product based on the results of these post-market studies and programs. Drugs and biologics may be marketed only for the approved indications and in accordance with the provisions of the approved label. Further, any modifications to the drug or biologic, including changes in indications, labeling, or manufacturing processes or facilities, may require the submission of a new or supplemental NDA or BLA, which may require that we develop additional data or conduct additional preclinical studies and clinical trials.

Any products manufactured or distributed by us or our collaborators pursuant to FDA approvals are also subject to continuing regulation by the FDA, including recordkeeping requirements and reporting of adverse experiences associated with the drug. Drug and biologic manufacturers and their subcontractors are required to register their establishments with the FDA and certain state agencies, and are subject to periodic unannounced inspections by the FDA and certain state agencies for compliance with ongoing regulatory requirements, including cGMPs, which regulate all aspects of the manufacturing process and impose certain procedural and documentation requirements. Failure to comply with the statutory and legal requirements can subject a manufacturer to possible legal or regulatory action, including fines and civil penalties, suspension or delay in the issuance of approvals, seizure or recall of products, and withdrawal of approvals, any one or more of which could have a material adverse effect upon us.

The FDA imposes a number of complex regulatory requirements on entities that advertise and promote pharmaceuticals and biologics, including, but not limited to, standards and regulations for direct-to-consumer advertising, off-label promotion, industry sponsored scientific and educational activities, and promotional activities involving the Internet. A manufacturer can make only those claims relating to safety and efficacy that are approved by the FDA. The FDA has very broad enforcement authority under the Federal Food, Drug, and Cosmetic Act, and failure to abide by these regulations can result in penalties, including the issuance of a warning letter directing us to correct deviations from FDA standards, a requirement that future advertising and promotional materials be pre-cleared by the FDA, and state and federal civil and criminal investigations and prosecutions. Physicians may prescribe legally available drugs and biologics for uses that are not described in the product's labeling and that differ from those tested by us and approved by the FDA. Such off-label uses are common across medical specialties. Physicians may believe that such off-label uses are the best treatment for many patients in varied circumstances. The FDA does not regulate the behavior of physicians in their choice of treatments. The FDA does, however, impose stringent restrictions on manufacturers' communications regarding off-label use.

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA has broad regulatory and enforcement powers, including the ability to levy fines and civil penalties, suspend or delay the issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect upon us.

Internationally, the regulation of drugs is also complex. In Europe, our products are subject to extensive regulatory requirements. As in the United States, the marketing of medicinal products has for many years been subject to the granting of marketing authorizations by medicine agencies. Particular emphasis is also being placed on more sophisticated and faster procedures for reporting adverse events to the competent authorities. The European Union procedures for the authorization of medicinal products were amended in May 2004 and are due to be implemented by October 2005. The new procedures are intended to improve the efficiency of operation of both the mutual recognition and centralized procedures. Additionally, new rules have been introduced or are under discussion in several areas, including the harmonization of clinical research laws and the law relating to orphan drugs and orphan indications. Outside the United States, reimbursement pricing is typically regulated by government agencies.

Among other countries, we currently sell *Botox* ® in Japan, where the regulatory process is at least as equally complex as in the U.S. Pre-marketing approval and clinical studies are required, as is negotiated

Table of Contents

governmental pricing for pharmaceuticals. The regulatory regime for pharmaceuticals in Japan has historically been lengthy and costly, primarily because Japan required the repetition of all relevant clinical studies in Japan. Japan is in the process of implementing changes to comply with the International Conference on Harmonization, an agreement among Japan, the United States and the European Union to facilitate the registration of drugs utilizing data collected outside of the country. The timeline for completion of these changes and the rules during this transitional period are not certain. During this transitional period, registration of pharmaceutical products will remain unpredictable.

The total cost of providing health care services has been and will continue to be subject to review by governmental agencies and legislative bodies in the major world markets, including the United States, which are faced with significant pressure to lower health care costs. The Medicare Prescription Drug Modernization Act of 2003 imposed certain reimbursement restrictions on our products in the United States. These reimbursement restrictions or other price reductions or controls could materially and adversely affect our revenues and financial condition. Additionally, price reductions and rebates have recently been mandated in several European countries, principally Germany, Italy, Spain and the United Kingdom. Certain products are also no longer eligible for reimbursement in France, Italy and Germany. Reference pricing is used in several markets around the world to reduce prices. Furthermore, parallel trade within the European Union, whereby products flow from relatively low-priced to high-priced markets, has been increasing.

We cannot predict the likelihood or pace of any significant regulatory or legislative action in these areas, nor can we predict whether or in what form health care legislation being formulated by various governments will be passed. Medicare reimbursement rates are subject to change at any time. We also cannot predict with precision what effect such governmental measures would have if they were ultimately enacted into law. However, in general, we believe that such legislative activity will likely continue. If adopted, such measures can be expected to have an impact on our business.

**Patents, Trademarks and Licenses**

We own, or are licensed under, numerous U.S. and foreign patents relating to our products, product uses and manufacturing processes. We believe that our patents and licenses are important to our business, but that with the exception of the U.S. and European patents relating to *Lumigan* ®, *Acular* ® and *Alphagan* ® *P*, no one patent or license is currently of material importance in relation to our overall sales. The U.S. compound and ophthalmic use patents covering *Lumigan* ® currently expire in 2012. An application is pending with the U.S. Patent and Trademark Office for a patent term extension for *Lumigan* ®. The European patent covering *Lumigan* ® expires in various countries between 2013 and 2017. The U.S. patent covering the commercial formulation of *Acular* ® expires in 2009; and in 2008 in Europe. The U.S. patents covering the commercial formulation of *Alphagan* ® *P* expire in 2012 and 2021; and in 2009 in Europe, with corresponding patents pending.

Our success with our products will depend, in part, on our ability to obtain, and successfully defend if challenged, patent or other proprietary protection. However, the issuance of a patent is not conclusive as to its validity or as to the enforceable scope of the claims of the patent. Accordingly, our patents may not prevent other companies from developing similar or functionally equivalent products or from successfully challenging the validity of our patents. Hence, if our patent applications are not approved or, even if approved, such patents are circumvented or not upheld in a legal proceeding, our ability to competitively exploit our patented products and technologies may be significantly reduced. Also, such patents may or may not provide competitive advantages for their respective products or they may be challenged or circumvented by competitors, in which case our ability to commercially exploit these products may be diminished.

From time to time, we may need to obtain licenses to patents and other proprietary rights held by third parties to develop, manufacture and market our products. If we are unable to timely obtain these licenses on commercially reasonable terms, our ability to commercially exploit such products may be inhibited or prevented. See "Certain Factors and Trends Affecting Allergan and its Businesses — We may be subject to intellectual property litigation and infringement claims, which could cause us to incur significant expenses and losses or prevent us from selling our products."

Table of Contents

We also rely on trade secrets and proprietary know-how that we seek to protect, in part, through confidentiality agreements with our partners, customers, employees and consultants. It is possible that these agreements will be breached or will not be enforceable in every instance, and that we will not have adequate remedies for any such breach. It is also possible that our trade secrets will otherwise become known or independently developed by competitors.

We may find it necessary to initiate litigation to enforce our patent rights, to protect our trade secrets or know-how or to determine the scope and validity of the proprietary rights of others. Litigation involving patents, trademarks, copyrights and proprietary technologies can often be protracted and expensive and, as with litigation generally, the outcome is inherently uncertain. See Item 3 of Part I of this report, "Legal Proceedings" and Note 13, "Commitments and Contingencies," in the notes to the consolidated financial statements listed under Item 15(a) of Part IV of this report for information concerning our current intellectual property litigation.

We market our products under various trademarks, for which we have both registered and unregistered trademark protection in the United States and certain countries outside the United States. We consider these trademarks to be valuable because of their contribution to the market identification of our products.

**Environmental Matters**

We are subject to federal, state, local and foreign environmental laws and regulations. We believe that our operations comply in all material respects with applicable environmental laws and regulations in each country where we have a business presence. Although we continue to make capital expenditures for environmental protection, we do not anticipate any significant expenditures in order to comply with such laws and regulations that would have a material impact on our earnings or competitive position. We are not aware of any pending litigation or significant financial obligations arising from current or past environmental practices that are likely to have a material adverse effect on our financial position. We cannot assure you, however, that environmental problems relating to properties owned or operated by us will not develop in the future, and we cannot predict whether any such problems, if they were to develop, could require significant expenditures on our part. In addition, we are unable to predict what legislation or regulations may be adopted or enacted in the future with respect to environmental protection and waste disposal.

**Seasonality**

Our business, taken as a whole, is not materially affected by seasonal factors, although we have noticed an historical trend with respect to sales of our *Botox* ® product. Specifically, sales of *Botox* ® have tended to be lowest during the first fiscal quarter, with sales during the second and third fiscal quarters being comparable and marginally higher than sales during the first fiscal quarter. *Botox* ® sales during the fourth fiscal quarter have tended to be the highest due to patients obtaining their final therapeutic treatment at the end of the year, presumably to fully utilize deductibles and to receive additional cosmetic treatments prior to the holiday season.

## CERTAIN FACTORS AND TRENDS AFFECTING ALLERGAN AND ITS BUSINESSES

Statements made by us in this report and in other reports and statements released by us that are not historical facts constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, Section 21 of the Securities Exchange Act of 1934 and the Private Securities Litigation Reform Act of 1995. These forward-looking statements are necessarily estimates reflecting the best judgment of senior management and include comments that express our opinions about trends and factors that may impact future operating results. Disclosures that use words such as we "believe," "anticipate," "estimate," "intend," "could," "plan," "expect" and similar expressions are intended to identify forward-looking statements. Such statements rely on a number of assumptions concerning future events, many of which are outside of our control, and involve risks and uncertainties that could cause actual results to differ materially from opinions and expectations. Any such forward-looking statements, whether made in this report or elsewhere, should be considered in context of the various disclosures made by us about our businesses including, without limitation,

# Exhibit B

J Glaucoma 2002
Apr;11(2):119-126

2002050756

# Twelve-Month Evaluation of Brimonidine-Purite Versus Brimonidine in Patients With Glaucoma or Ocular Hypertension

L. Jay Katz, MD

*Brimonidine-Purite Study Groups 1 and 2, Wills Eye Hospital, Philadelphia, Pennsylvania*

**Purpose:** To compare the efficacy and safety of brimonidine-Purite (Alphagan; Allergan, Irvine, CA) 0.15% and 0.2% three times daily with brimonidine (Alphagan) 0.2% three times daily in patients with glaucoma or ocular hypertension.

**Patients and Methods:** In this 12-month, randomized, multicenter, double-masked, parallel-group study, patients were randomly assigned to receive brimonidine-Purite 0.15% (n = 381), brimonidine-Purite 0.2% (n = 383), or brimonidine 0.2% (n = 383) three times daily. Visits were conducted before the study, at baseline, at weeks 2 and 6, and at months 3, 6, 9, and 12. Diurnal intraocular pressure was measured at 8 AM, 10 AM, 3 PM, and 5 PM at baseline, week 6, and at months 3, 6, and 12. Intraocular pressure was also measured at 8 and 10 AM at week 2 and month 9. Safety was evaluated by adverse events and other ocular and systemic measures.

**Results:** At baseline, mean intraocular pressure was similar in the three treatment groups. During follow-up, there were no statistically significant among-group differences in mean intraocular pressure or mean changes from baseline intraocular pressure (at peak or trough). The difference in mean intraocular pressure between the brimonidine-Purite-0.15% and brimonidine-0.2% treatment group was less than 1 mm Hg at all time points. The relative percent difference in allergic conjunctivitis was 41% lower in the brimonidine-Purite 0.15% group compared with the brimonidine 0.2% group. The comfort and satisfaction rating significantly favored brimonidine-Purite 0.15%.

**Conclusions:** Over 12-months, brimonidine-Purite 0.15% and 0.2% provided intraocular pressure lowering comparable with brimonidine 0.2% in patients with glaucoma or ocular hypertension. Brimonidine-Purite 0.15% showed the most favorable safety and tolerability profile with a reduced incidence of allergic conjunctivitis and better satisfaction and comfort rating.

**Key Words:** Benzalkonium chloride—Brimonidine—Glaucoma—Ocular hypertension—Purite.

Since the introduction of brimonidine 0.2% ophthalmic solution (Alphagan; Allergan, Irvine, CA) in 1996, this highly selective $\alpha_2$-adrenergic agonist has proven to be an effective and safe agent for the long-term management of glaucoma and ocular hypertension.[1] In a randomized, continuous clinical trial, the efficacy of brimonidine 0.2% twice daily was sustained over 4 years and was comparable with the efficacy of timolol 0.5%.[2–6] Additional studies have shown the flexibility of brimonidine 0.2% twice daily as an effective monotherapy, adjunctive, and replacement therapy.[7–9] Brimonidine 0.2% twice daily has become a widely accepted first- and second-line therapy for the long-term management of glaucoma and ocular hypertension.

Studies show that brimonidine 0.2% has a lower risk of systemic adverse events than topical β-blockers.[2,3,7,10,11] In addition, brimonidine 0.2% has a lower

Received May 9, 2001; accepted August 7, 2001.

Members of the Brimonidine-Purite Study Groups 1 and 2 are listed in the Appendix at the end of this article.

Supported by Allergan (Irvine, CA).

Address correspondence and reprint requests to L. Jay Katz, MD, Wills Eye Hospital, 900 and Walnut Street, Philadelphia, PA 19107-5599. E-mail: ljk22222@aol.com

THIS MATERIAL MAY BE PROTECTED BY COPYRIGHT LAW (17 USC)

incidence of ocular allergy and shows no cross toxicity compared with apraclonidine (Iopidine; Alcon, Fort Worth, TX).[12] Reports of ocular allergy associated with chronic brimonidine therapy range from 4.2% to 12.7% of patients, depending on the diagnostic criteria and duration of therapy.[1,4,13]

A new formulation of brimonidine ophthalmic solution has been developed to enhance safety and tolerability while maintaining effective intraocular pressure (IOP) reduction. Brimonidine-Purite (Alphagan, Allergan, Irvine, CA) has a different preservative and a lower concentration of active drug than the original brimonidine 0.2% (Alphagan). In the reformulation, the preservative has been changed from benzalkonium chloride (BAK) to Purite. Benzalkonium chloride is the most common antimicrobial preservative used in topical multiuse ophthalmic preparations, including most glaucoma medications.[14,15] It works by denaturing proteins, lysing cytoplasmic membranes, and oxidizing enzymes. At high concentrations, BAK may be more toxic than other preservatives. It can accumulate and remain in ocular tissue for relatively lengthy periods, and may induce cell death in a dose-dependent manner.[16,17] Because glaucoma is a chronic disease and patients may be taking multiple glaucoma medications, these patients may be exposed to high concentrations of BAK with potentially detrimental ocular effects. In contrast, Purite is a stabilized oxychloro complex and oxidative preservative used in Refresh Tears (Allergan, Irvine, CA) artificial eye lubricant and Lens Plus Purite (Allergan, Irvine, CA) Saline.[18-20] When Purite is exposed to light, it is converted to natural tear components (i.e., sodium and chloride ions, oxygen, and water).[21] Purite is a microbicide with a wide spectrum of antimicrobial activity and a very low level of toxicity in mammalian cells.[22]

In addition to the change in preservative, brimonidine-Purite 0.15% contains 25% less active drug than original brimonidine 0.2%. Animal studies suggest that brimonidine tartrate has enhanced ocular bioavailability when formulated as brimonidine-Purite.[23] In addition, 0.15% is the lowest effective concentration tested, which attains the desired therapeutic effect.[24] Therefore, the new formulation of brimonidine may provide an improved safety and tolerability profile with comparable efficacy.

The objective of this study was to evaluate the safety and efficacy of brimonidine-Purite 0.15% and 0.2% compared with brimonidine 0.2%. The results represent the pooled analyses of two identically designed clinical trials. All three study medications were administered three times daily for 1 year in patients with glaucoma or ocular hypertension. Although brimonidine twice daily has been shown to be as effective as three-times-daily brimonidine,[24,25] the three-times-a-day dosage was selected for this study to satisfy US regulatory requirements.

## PATIENTS AND METHODS

### Study Design

Two identically designed, 12-month, double-masked, randomized, parallel-group studies were conducted at 44 sites across the United States. The results presented here are from the analyses of pooled data from these two clinical trials. The studies were conducted in accordance with Institutional Review Board and Informed Consent Regulations. Each investigator obtained appropriate review board approval before study initiation. All patients gave their written consent before participating in any study-related activities. Patients who were treated with ocular hypotensive medications before study entry were required to undergo a washout period ranging from 4 to 28 days, depending on the medication taken. This washout eliminated any potential residual effects of previous therapy.

Patients were randomly assigned to receive brimonidine-Purite 0.15% (n = 381), brimonidine-Purite 0.2% (n = 383), brimonidine 0.2% (n = 383) three times daily in the morning (7:30–8:30 AM), in the midafternoon (2:30–3:30 PM), and in the evening (9:30–10:30 PM). Scheduled visits occurred before study, at baseline, at weeks 2 and 6, and at months 3, 6, 9, and 12.

### Criteria

Key inclusion criteria included an age of 18 years or older with a diagnosis of glaucoma (primary open angle, pseudoexfoliative, pigment dispersion, chronic angle closure with a patent peripheral iridectomy/iridotomy for at least 3 months) or ocular hypertension (IOP $\geq$ 22 mm Hg, $\leq$ 34 mm Hg in each eye after washout, with between-eye IOP asymmetry $\leq$ 5 mm Hg), likelihood to be controlled on monotherapy, negative pregnancy test for women of childbearing potential, and best corrected visual acuity of 20/100 or better.

Key exclusion criteria included uncontrolled systemic disease, other active ocular disease, abnormally low or high blood pressure or heart rate, anticipated alteration of existing chronic therapy with agents that could substantially affect IOP, use of ocular medication other than periodic use of artificial tears, and functionally significant visual field loss.

#### Efficacy Variables

The primary efficacy variable was IOP. Diurnal IOP was measured at approximately 8 AM (before the morning drop), 10 AM, 3 PM (before the afternoon drop), and 5 PM at baseline, week 6, and at months 3, 6, and 12. The IOP was also measured at approximately 8 AM (before the morning drop) and 10 AM at week 2 and month 9.

Other efficacy variables included clinical success as evaluated by the investigator (regardless of whether a physician recommended continuation of study medication for the patient), subject satisfaction evaluation, and subject comfort evaluation using standardized scales.

Other measures that were evaluated included adverse events, visual acuity, cup/disc ratio, biomicroscopy, ophthalmoscopy, visual fields, heart rate, and systolic and diastolic blood pressure. The severity of adverse events was assessed based on the following guidelines: mild (awareness of sign or symptom, but easily tolerated), moderate (discomfort enough to cause interference with usual activity) and severe (incapacitating or unable to work or perform usual activities).

#### Statistical Analysis

The primary variables of analysis for efficacy were mean IOP and the mean change in IOP from baseline. These IOP data were analyzed using both the intent-to-treat with last observation carried forward and per-protocol populations. The per-protocol population consisted of observed cases. Only patients who met the protocol entry criteria, had no major protocol violations, received study medication, and had at least one follow-up visit were included in the per-protocol analysis, and only data from visits within specified time windows were included. Decisions for per-protocol exclusions were made before unmasking of the treatment groups for analysis. Safety data were analyzed using the intent-to-treat population. For comparison of treatment efficacy, both noninferiority and a two-sided paired *t* test for superiority were performed. Noninferiority criteria were set by the US Food and Drug Administration. Criteria were tested by constructing a two-sided 95% confidence interval for the between-group difference between experimental drug and brimonidine in mean IOP. If the upper limit of 95% confidence interval at all time points did not exceed 1.5 mm Hg, brimonidine-Purite was considered at least as effective as brimonidine.

Nominal categorical data such as sex and race were analyzed by the Cochran-Mantel-Haenszel method and continuous variables such as age and blood pressure were analyzed using a two-way analysis of variance with factors of treatment group and investigator site. Adverse events were analyzed using the Pearson $\chi^2$ test or Fisher exact test. Ordinal categorical variables such as comfort and safety data were analyzed using the stratum (investigator site) adjusted Kruskal-Wallis and Wilcoxon rank-sum test.

### RESULTS

#### Subject Demographics

The demographics and clinical characteristics of patients taking brimonidine-Purite 0.15% three times daily, brimonidine-Purite 0.2% three times daily, and brimonidine 0.2% three times daily are summarized in Table 1. No significant between-group differences were noted in baseline demographics, which included mean patient age, gender, race, and iris color.

#### Efficacy

Criteria for the per-protocol analysis were met by 97.9% (1,123 of 1,147) of patients (brimonidine-Purite 0.15%, 97.6% [372 of 381 patients]; brimonidine-Purite 0.2%, 97.9% [375 of 383 patients]; brimonidine 0.2%, 98.2% [376 of 383 patients]) and 92% of all data points were included with a similar distribution across the treatments. Twenty-four patients did not meet the entry criteria as defined in the study protocol and were excluded from the efficacy analysis. Other key reasons for patient data exclusions from the per-protocol analysis included use of excluded medications during the study, inappropriate instillation of study medications, and visits occurring outside of visit windows. There was no significant difference in the IOP results between the intent-to-treat and per-protocol analyses, and the per-protocol results are presented. The conclusions drawn from either intent-to-treat or per-protocol populations were the same.

#### Overall IOP Efficacy

At baseline, mean IOP was similar across the three treatment groups at each time point. Baseline mean IOP at 10 AM was 23.6 mm Hg (with an approximate SD of 3.2 mm Hg). Baseline mean IOP at 8 AM was 24.9 mm Hg (with an approximate SD of 2.7 mm Hg) (Fig. 1 and 2). Over the next 12 months, the difference in mean IOP at 10 AM (morning peak) (Fig. 1) and 8 AM (morning trough) (Fig. 2) between brimonidine-Purite 0.15% and brimonidine 0.2% was less than or equal to 0.4 mm Hg.

The mean IOP for each group was within 1 mm Hg of

TABLE 1. *Demographics and clinical characteristics of patients on brimonidine-Purite 0.15%, brimonidine-Purite 0.2%, and brimonidine 0.2%*

| | Brimonidine-Purite 0.15% (n = 381) | | Brimonidine-Purite 0.2% (n = 383) | | Brimonidine 0.2% (n = 383) | | Total (n = 1147) | | |
|---|---|---|---|---|---|---|---|---|---|
| Variable | No. | (%) | No. | (%) | No. | (%) | No. | (%) | P |
| Age (years) | | | | | | | | | 0.460 |
| Mean | 63.4 | | 63.8 | | 62.7 | | 63.3 | | |
| SD | 12.8 | | 12.1 | | 12.6 | | 12.5 | | |
| Min | 22.4 | | 25.4 | | 25.2 | | 22.4 | | |
| Max | 88.8 | | 90.4 | | 93.4 | | 93.4 | | |
| Median | 64.7 | | 65.8 | | 64.2 | | 64.7 | | |
| Sex | | | | | | | | | 0.845 |
| Male | 169 | 44.4% | 162 | 42.3% | 167 | 43.6% | 498 | 43.4% | |
| Female | 212 | 55.6% | 221 | 57.7% | 236 | 56.4% | 649 | 56.6% | |
| Race | | | | | | | | | 0.377 |
| Caucasian | 303 | 79.5% | 298 | 77.8% | 305 | 79.6% | 906 | 79.0% | |
| Black | 48 | 12.6% | 59 | 15.4% | 47 | 12.3% | 154 | 13.4% | |
| Asian | 2 | 0.5% | 1 | 0.3% | 3 | 0.8% | 6 | 0.5% | |
| Hispanic | 28 | 7.3% | 23 | 6.0% | 26 | 6.8% | 77 | 6.7% | |
| Other | 0 | 0.0% | 2 | 0.5% | 2 | 0.5% | 4 | 0.3% | |
| Iris color | | | | | | | | | 0.468 |
| Blue | 113 | 29.7% | 108 | 28.2% | 111 | 29.0% | 332 | 28.9% | |
| Brown | 179 | 47.0% | 196 | 51.2% | 183 | 47.8% | 558 | 48.6% | |
| Green | 23 | 6.0% | 18 | 4.7% | 18 | 4.7% | 59 | 5.1% | |
| Hazel | 59 | 15.5% | 58 | 15.1% | 68 | 17.8% | 185 | 16.1% | |
| Other | 7 | 1.8% | 3 | 0.8% | 3 | 0.8% | 13 | 1.1% | |

the mean IOP in the other groups at all visits and all time points, showing comparable IOP-lowering capabilities.

**Brimonidine-Purite 0.15% Versus Brimonidine 0.2%**

There were no statistically significant differences in diurnal mean IOP measurements between brimonidine-Purite 0.15% and brimonidine 0.2%, except at the 5-PM time point at month 3 ($P$ = 0.046) where the mean IOP difference was 0.5 mm Hg in favor of brimonidine 0.2%. There were no statistically significant differences in the mean changes from baseline in diurnal IOP measurements, except for the 10-AM time point at week 2 ($P$ = 0.015), the 5-PM time point at month 3 ($P$ = 0.010), and the 5-PM time point at month 6 ($P$ = 0.004). The mean

FIG. 1. Efficacy graph at 10 AM (peak) showing mean intraocular pressure of patients with glaucoma or ocular hypertension during 12-month treatment with brimonidine-Purite 0.15% and brimonidine 0.2% (Alphagan). The difference in mean intraocular pressure between the treatment groups was less than or equal to 0.4 mm Hg at all time points. All standard errors were less than 0.180.

FIG. 2. Efficacy graph at 8 AM (trough) showing mean intraocular pressure of patients with glaucoma or ocular hypertension during 12-month treatment with brimonidine-Purite 0.15% and brimonidine 0.2% (Alphagan). All standard errors were less than 0.211.

change from baseline IOP difference was 0.6, 0.7, and 0.9 mm Hg, respectively favoring brimonidine 0.2%. The noninferiority criteria were satisfied because 40/40 of the upper limits of 95% confidence intervals were less than or equal to 1.5 mm Hg, with 36/40 less than or equal to 1.0 mm Hg (mean IOP and mean change from baseline IOP), showing that brimonidine-Purite 0.15% was comparable in efficacy with brimonidine 0.2%.

### Brimonidine-Purite 0.15% Versus Brimonidine-Purite 0.2%

There were no statistically significant differences observed in mean IOP or mean changes from baseline in diurnal IOP measurements between brimonidine-Purite 0.15% and brimonidine-Purite 0.2%, except at the 5-PM time point at month 3 ($P = 0.027$, mean IOP), the 10-AM time point at month 9 ($P = 0.009$, mean IOP), and the 10-AM time point at month 12 ($P = 0.011$, mean IOP). The mean IOP difference was 0.6, 0.8, and 0.8 mm Hg, respectively, favoring brimonidine-Purite 0.2%. The noninferiority criteria were satisfied because 40/40 of the upper limits of 95% confidence intervals were less than or equal to 1.5 mm Hg, with 35/40 less than or equal to 1.0 mm Hg (mean IOP and mean changes from baseline IOP), showing that brimonidine-Purite 0.15% was comparable in efficacy with brimonidine-Purite 0.2%.

### Brimonidine-Purite 0.2% Versus Brimonidine 0.2%

In the comparison of brimonidine-Purite 0.2% and brimonidine 0.2%, there were no statistically significant differences observed in mean IOP or mean changes from baseline in diurnal IOP measurements except for the 10-AM time point at month 9 ($P = 0.045$, mean IOP), the 10-AM time point at month 12 ($P = 0.018$, mean IOP), and the 5-PM time point at month 12 ($P = 0.041$, mean IOP). The average difference in mean IOP and mean changes from baseline in IOP difference was −0.6, −0.8, and −0.7 mm Hg, respectively, favoring brimonidine-Purite 0.2%. The only measurement favoring brimonidine 0.2% was at the 10-AM time point at month 6 (mean change from baseline IOP difference of 0.7 mm Hg, $P = 0.019$). The noninferiority criteria were satisfied because 40/40 of the upper limits of the 95% confidence intervals were less than or equal to 1.5 mm Hg, with 37/40 less than or equal to 1.0 mm Hg (mean IOP and mean changes from baseline IOP), showing that brimonidine-Purite 0.2% was comparable in efficacy with brimonidine 0.2%.

### Safety

The following results were analyzed as intent-to-treat, and all data points were considered. Throughout the study, patients were monitored for signs and symptoms of adverse events (Table 2). Investigators rated the majority of adverse events as mild or moderate in severity. The overall frequency of treatment-related adverse events reported was fewer in the brimonidine-Purite 0.15% than with brimonidine-Purite 0.2% or brimonidine 0.2%. There was a lower incidence rate of allergic conjunctivitis, conjunctival hyperemia, and oral dryness favoring brimonidine-Purite 0.15% compared

Case 1:07-cv-00278-GMS Document 4-5 Filed 05/25/2007 Page 24 of 29

TABLE 2. *Summary of treatment-related adverse events of patients with glaucoma or ocular hypertension during twelve-month treatment with brimonidine-Purite 0.15%, brimonidine-Purite 0.2%, and brimonidine 0.2% (among group P-values). The second P-value is a summary of possible, probable, and definite treatment-related adverse events in pairwise comparison of patients with glaucoma or ocular hypertension during twelve-month treatment with brimonidine-Purite 0.15 and brimonidine 0.2%*

| Adverse event | Brimonidine-Purite 0.15% ($n$ = 381) No. (%) | Brimonidine-Purite 0.2% ($n$ = 383) No. (%) | Brimonidine 0.2% ($n$ = 383) No. (%) | Amongst group P | Brimonidine-Purite 0.15 vs. brimonidine 0.2% P |
|---|---|---|---|---|---|
| Allergic conjunctivitis | 35 (9.2%) | 56 (14.6%) | 60 (15.7%) | 0.018 | 0.007 |
| Oral dryness | 20 (5.3%) | 36 (9.4%) | 40 (10.4%) | 0.024 | 0.008 |
| Conjunctival hyperemia | 69 (18.2%) | 81 (21.1%) | 98 (25.6%) | 0.043 | 0.013 |
| Eye discharge | 5 (1.3%) | 7 (1.8%) | 15 (3.9%) | 0.043 | 0.025 |

with the treatment groups. There was only a 0.8% incidence of somnolence with brimonidine-Purite 0.15% compared with 2.6% in brimonidine-Purite 0.2% and brimonidine 0.2%. Although this difference did not meet statistical significance, because it is a rare adverse event it could be clinically relevant.

Table 2 also shows a direct comparison of the adverse events between the subjects on brimonidine-Purite 0.15% and brimonidine 0.2%. This pairwise comparison showed a statistically significant difference favoring brimonidine-Purite 0.15% ($P < 0.001$) in overall incidence of adverse events. Statistically significant lower incidences of conjunctival hyperemia, allergic conjunctivitis, and oral dryness were shown in the brimonidine-Purite 0.15% group ($P \leq 0.013$).

There were no statistical differences in the visual acuity, cup/disc ratio, visual fields, heart rate, and systolic and diastolic blood pressure.

### Quality of Life

There were no statistical differences in the investigators' response to the clinical success of the medications. However, there were significant differences in how patients rated their satisfaction with their study medication at the time of exit from the study. The level of satisfaction was greater for patients using brimonidine-Purite 0.15% than those using brimonidine 0.2% ($P = 0.005$) (Fig. 2). Although less statistically significant, the level of satisfaction was greater for patients using brimonidine-Purite 0.2% than those using brimonidine 0.2% ($P = 0.020$). There was no statistical difference between the level of satisfaction of patients using brimonidine-Purite 0.15% compared with those using brimonidine-Purite 0.2%.

Throughout the year, more than 90% of all the treatment groups rated their study medications as comfortable, very comfortable, or soothing (Fig. 3). However, there were significant differences in how patients rated the comfort of their study medication at the time of exit from the study. Significantly more patients reported that brimonidine-Purite 0.15% was more comfortable than brimonidine 0.2% ($P = 0.042$). Furthermore, patients reported that brimonidine-Purite 0.2% was more comfortable than brimonidine 0.2% ($P = 0.027$). There was no statistical significance between the level of comfort of patients using brimonidine-Purite 0.15% compared with those using brimonidine-Purite 0.2%.

### Patient Discontinuations

The most frequent reasons cited for discontinuation (in descending order) were adverse events, lack of efficacy, administrative issues, and protocol violations. Lack of efficacy was cited as the reason for discontinuation in only 5.3% of these patients in all 3 groups.

There were no statistical differences among the groups regarding adverse events that led to discontinuation from the study ($P = 0.203$). A smaller percentage of patients, however, discontinued therapy in the brimonidine-Purite

FIG. 3. Patient satisfaction evaluation summary for patients with glaucoma or ocular hypertension during 12-month treatment with brimonidine-Purite 0.15%, brimonidine-Purite 0.2%, and brimonidine 0.2%. The among-group $P$ of 0.010 is a comparison of the seven-category response distributions for the three treatment groups. Patients rated the level of satisfaction with their study medication at the time of exit from the study. The pairwise comparison of brimonidine-Purite 0.15% versus brimonidine 0.2% yielded a $P$ of 0.005, favoring brimonidine-Purite 0.15%.

0.15% (21.8%) group than in the brimonidine-Purite-0.2% (24.8%) or brimonidine-0.2% (27.4%) groups. The most common adverse events leading to discontinuation were conjunctival hyperemia, allergic conjunctivitis, and eye pruritus. Indeed, 5.1% fewer patients in brimonidine-Purite 0.15% cited allergic conjunctivitis as reason for discontinuation compared to brimonidine 0.2% ($P$ = 0.017).

## DISCUSSION

In this pooled analysis of two identically designed, 12-month, randomized, multisite, double-masked, parallel-group studies, brimonidine-Purite 0.15% and 0.2% provided IOP lowering comparable with brimonidine 0.2% in patients with glaucoma or ocular hypertension. Overall, the new 0.15% concentration of the brimonidine-Purite formulation showed IOP efficacy clinically comparable with brimonidine 0.2% throughout this 1-year study.

The formulations were applied three times daily in this study. The mean IOP at trough (8-AM measurement, before morning drop) of all 3 groups was comparable to the mean IOP at trough in previous studies where brimonidine 0.2% was administered twice daily.[2-4] In an earlier study, application of brimonidine 0.2% three times daily and twice daily provided comparable IOP lowering at morning trough.[24] This finding suggests that brimonidine-Purite 0.15% would have comparable efficacy on morning IOP whether applied twice daily or three times daily; this hypothesis is being tested in an ongoing clinical trial.

Brimonidine 0.2%, which has been marketed since 1996, has shown a favorable adverse event profile, except for allergic conjunctivitis. The incidence of allergic conjunctivitis with brimonidine 0.2% has been reported to be 12.7% with twice-daily dosing.[4] In this present study, the incidence of allergic conjunctivitis was 15.7% for patients taking brimonidine 0.2% three times daily The higher incidence of allergic conjunctivitis is likely related to the increased frequency of dosing. It is interesting that the incidence of allergic conjunctivitis with patients on brimonidine-Purite 0.15% three times daily, which contains 25% less active ingredient of brimonidine, was only 9.2%. This incidence rate is less than the 12.7% incidence rate previously reported. This finding strongly suggests that with a twice-daily dosing of brimonidine-Purite 0.15%, the incidence of allergic conjunctivitis may be even lower than the 9.2% incidence with three-times-daily dosage regimen. Furthermore, it appears that the decreased concentration of brimonidine is primarily responsible for the decreased incidence of allergic conjunctivitis. The relative percent difference in allergic conjunctivitis during this current 1-year study was at least 41% less with brimonidine-Purite 0.15% than with brimonidine-Purite 0.2% or brimonidine 0.2%. Brimonidine-Purite 0.15% also had a significantly lower incidence of oral dryness than brimonidine 0.2%. Although not statistically significant, the lower incidence of somnolence with brimonidine-Purite 0.15% could prove to be beneficial. These findings suggest that brimonidine-Purite 0.15% has a superior adverse-events profile compared with brimonidine 0.2%.

In addition to having a comparable IOP-lowering effect to brimonidine 0.2% solution and a superior adverse event profile, reformulated brimonidine-Purite 0.15% appears to be better tolerated than brimonidine 0.2%. Brimonidine-Purite 0.15% had a significantly higher rate of satisfaction ($P$ = 0.005) and comfort ($P$ = 0.042) than the original formulation (Figs. 2 and 3). At the patients' last visit, more than 80% were satisfied with the reformulated brimonidine-Purite 0.15%, and 84.6% ($P$ = 0.042) found it to be comfortable. The higher comfort experienced by those in the brimonidine-Purite groups should lead to improved compliance with the antiglaucoma regimen. The potentially enhanced ocular bioavailability associated with the reformulation may also explain why brimonidine-Purite 0.15% shows efficacy comparable with brimonidine 0.2% with a lower concentration of active drug (Fig. 4).

FIG. 4. Patient comfort evaluation summary for patients with glaucoma or ocular hypertension during 12-month treatment with brimonidine-Purite 0.15%, brimonidine-Purite 0.2%, and brimonidine 0.2%. The among-group $P$ of 0.046 is a comparison of the six-category response distributions for the three treatment groups. Patients rated the level of satisfaction with their study medication at the time of exit from the study. The pairwise comparison of brimonidine-Purite 0.15% versus brimonidine 0.2% yielded a P of 0.042, favoring brimonidine-Purite 0.15%.

## CONCLUSIONS

Brimonidine-Purite at concentrations of 0.15% or 0.2% effectively lowers IOP in patients with glaucoma or ocular hypertension. Brimonidine-Purite 0.15% also shows comparable efficacy with brimonidine 0.2% with less than a 1-mm Hg difference between study drugs at all time points throughout this study. The brimonidine-Purite 0.15% concentration showed a more favorable safety and tolerability profile with a 41% relative percent reduction in ocular allergy when compared with brimonidine 0.2%. The brimonidine-Purite 0.15% formulation received superior satisfaction and comfort ratings. Based on these clinical findings, it can be concluded that brimonidine-Purite 0.15% is an effective, safe, and well-tolerated therapy for the long-term treatment of high IOP.

## APPENDIX

Members of the Brimonidine-Purite Study Groups 1 and 2 investigators include (in alphabetical order) Mark Abelson, MD, Edward Andersen, MD, Amy Batoosingh BA, Richard S. Bennion, MD, E. Randy Craven, MD, Harvey DuBiner, MD, Richard Evans, MD, Carlos Felix, MS, William C. Flynn, MD, Daniel Foreman, MD, Gary N. Foulks, MD, Stephen Gee, MD, L. Jay Katz, MD, Alex Kent, MD, Jeff Lozier, MD, Jeffrey Morris, MD, Thomas Mundorf, MD, Charles S. Ostrov, MD, Matthew Parsons, MD, Jay Perlman, MD, PhD, Michael J. Price, MD, Arnold Prywes, MD, Edward R. Rashid, MD, Patrick Riedel, MD, Eleanora Safyan, BS, Kenneth Sall, MD, John Samples, MD, Thomas Samuelson, MD, Howard I. Schenker, MD, Gail Schwartz, MD, PA, John D. Sheppard, MD, Dong H. Shin, MD, PhD, Steven Simmons, MD, Dara Stevenson, MD, William C. Stewart, MD, Richard T. Sturm, MD, Lloyd Suter, MD, Stuart A. Terry, MD, Christopher M. Tortora, MD, Thomas R. Walters, MD, Mark Weiss, MD, Sidney Weiss, MD, Robert D. Williams, MD, Lisa Wohl, MD, SC, Eugene Barry Wolchok, MD, and Brandon Wool, MD.

## REFERENCES

1. Melamed A, David R. Ongoing clinical assessment of the safety profile and efficacy of brimonidine compared with timolol: year-three results. *Clin Ther* 2000;22:103–11.
2. Schuman JS. Clinical experience with brimonidine 0.2% and timolol 0.5% in glaucoma and ocular hypertension. *Surv Ophthalmol* 1996;41(Suppl 1):S27–37.
3. LeBlanc RP. 12-month results of an ongoing randomized trial comparing brimonidine tartrate 0.2% and timolol 0.5% given twice daily in glaucoma or ocular hypertension. *Ophthalmology* 1998;105:1960–7.
4. Katz LJ, for the Brimonidine Study Groups 1 and 2. Twice-daily brimonidine tartrate 0.2% vs timolol 0.5%: 1-year results in glaucoma patients. *Am J Ophthalmol* 1999;127:20–6.
5. Schuman JS. Effects of systemic β-blocker therapy on the efficacy and safety of topical brimonidine and timolol. *Ophthalmology* 2000;107:1171–7.
6. Cantor LB. The evolving pharmacotherapeutic profile of brimonidine, an $\alpha_2$-adrenergic agonist, after four years of continuous use. *Exp Opin Pharmacother* 2000;1:815–34.
7. Schuman JS, Horwitz B, Choplin NT, et al. A one-year study of brimonidine twice daily in glaucoma and ocular hypertension. A controlled, randomized, multicenter clinical trial. Chronic Brimonidine Study Group. *Arch Ophthalmol* 1997;115:847–52.
8. Lee DA. Efficacy of brimonidine as replacement therapy in patients with open-angle glaucoma or ocular hypertension. *Clin Ther* 2000;22:53–65.
9. Lee DA, Gornbein J, Abrams C. The effectiveness and safety of brimonidine as mono-, combination, or replacement therapy for patients with primary open-angle glaucoma or ocular hypertension: a post hoc analysis of an open-label community trial. *J Ocul Pharmacother* 2000;16:3–18.
10. Serle JB. A comparison of the safety and efficacy of twice daily brimonidine 0.2% versus betaxolol 0.25% in subjects with elevated intraocular pressure. *Surv Ophthalmol* 1996;41(Suppl 1):S39–47.
11. Javitt J, Goldberg I. Comparison of the clinical success rates and quality of life effects of brimonidine tartrate 0.2% and betaxolol 0.25% suspension in patients with open-angle glaucoma and ocular hypertension. *J Glaucoma* 2000;9:398–408.
12. Robin AL. Questions concerning the role of apraclonidine in the management of glaucoma. *Arch Ophthalmol* 1995:113;712–4.
13. Abelson MB, Chapin M, Batoosingh A, et al. A retrospective examination of drug-induced allergy to Alphagan and a proposal for a new reporting system. *Invest Ophthalmol Vis Sci* 1999;40:S515, (abstract 2718).
14. Berdy GJ, Abelson MB, Smith LM, George MA. Preservative-free artificial tear preparations. Assessment of corneal epithelial toxic effects. *Arch Ophthalmol* 1992;110:528–532.
15. Pisella PJ, Fillacier K, Elena PP, et al. Comparison of the effects of preserved and unpreserved formulations of timolol on the ocular surface of albino rabbits. *Ophthalmic Res* 2000;32:3–8.
16. Gasset AR, Ishii Y, Kaufman HE, Miller T. Cytotoxicity of ophthalmic preservatives. *Am J Ophthalmol* 1974;78:98–105.
17. De Saint Jean M, Debbasch C, et al. Toxicity of preserved and unpreserved antiglaucoma topical drugs in an in vitro model of conjunctival cells. *Curr Eye Res* 2000;20:85–94.
18. Grant WM, Schuman JS. *Toxicology of the Eye*. 4th ed. Springfield, IL: CC Thomas, 1990:208–13.
19. Debbasch C, Rat P, Warnet J-M. Evaluation of the toxicity of benzalkonium chloride on the ocular surface. *J Toxicol Cutaneous Ocul Toxicol* 2000;19(2–3):105–115.
20. Rosen S, M. Abelson, A. Giovanoni, D. Welch. Assessment of the comfort and tolerance of 0.5% carboxymethylcellulose preserved with Purite (Refresh Tears) in dry eye sufferers (Abstract). *Invest Ophthalmol Vis Sci* 1998;39:B343.
21. Masschelein WJ. *Chlorine Dioxide, Chemistry and Environmental Impact of Oxychlorine Compounds*. Ann Arbor, MI: Ann Arbor Science, 1979.
22. Grant R, Ajello M, Vlass E. Salt water or high tech? A look at two new rinsing solutions for contact lenses. *Optician* 1996;212:38–41.
23. Data on file, Allergan. Department of Pharmacokinetics and Drug Metabolism. 1999.
24. Rosenthal AL, Walters T, Berg E, Safyan E, Batoosingh AL. A comparison of the safety and efficacy of brimonidine 0.2%, BID versus TID, in subjects with elevated intraocular pressure. *Invest Ophthalmol Vis Sci* 1996;37(Suppl):S1102, (abstract).
25. Walters RT. Development and use of brimonidine in treating acute and chronic elevations of intraocular pressure: a review of safety, efficacy, dose response, and dosing studies. *Surv Ophthalmol* 1996;41(Suppl 1):S19–26.

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ALLERGAN, INC., and ALLERGAN SALES, LLC.,<br><br>Plaintiffs,<br><br>v.<br><br>ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LTD.,<br><br>Defendants. | Civil Action No: 04-968-GMS |

**AGREED ORDER OF DISMISSAL**

The Court being advised that the parties have settled and resolved their differences and have entered into an agreement setting out the terms and conditions of the settlement, having an effective date of March 6, 2006 ("March 6, 2006 Agreement"), and as part of such agreement have agreed to the dismissal of this case in accordance with the entry of this Order.

NOW, THEREFORE, upon the consent of the parties hereto, it is hereby ORDERED, ADJUDGED and DECREED that:

1. Pursuant to Rule Fed. R. Civ. P. 41, the above-captioned matter is dismissed with prejudice, with each party to bear its own costs and attorneys' fees.

2. The parties submit to and the Court does hereby retain exclusive and continuing jurisdiction over the parties and the subject matter of this action for the purpose of enforcing the March 6, 2006 Agreement.

FISH & RICHARDSON P.C.

*/s/ William J. Marsden, Jr.*
William J. Marsden, Jr. (No. 2247)
(Marsden@fr.com)
Sean P. Hayes (No. 4413)
(hayes@fr.com)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
(302) 652-5070

Jonathan E. Singer
Michael J. Kane
Deanna J. Reichel
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
(612) 335-5070

Juanita Brooks
W. Chad Shear
12390 El Camino Real
San Diego, CA 92130
(858) 678-5070

*Attorneys for Plaintiffs Allergan, Inc. and Allergan Sales, LLC*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*
Josy W. Ingersoll (No. 1088)
(jingersoll@ycst.com)
Melanie K. Sharp (No. 2501)
(msharp@ycst.com)
The Brandywine Building
1000 West Street
Wilmington, DE 19801
(302) 571-6600

Daniel J. Thomasch
Joseph Evall
M. Veronica Mullally
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY 10103
(212) 506-5000

*Attorneys for Defendants Alcon, Inc., Alcon Laboratories, Inc., and Alcon Research Ltd.*

SO ORDERED this ___ day of _____________, 2006.

_______________________________
The Honorable Gregory M. Sleet
United States District Judge

# Exhibit D



APOTEX INC.
CANADA'S PHARMACEUTICAL COMPANY
SOCIÉTÉ PHARMACEUTIQUE ENTIÈREMENT CANADIENNE

April 26, 2007

**VIA COURIER**

Allergan, Inc.
2525 Dupont Drive
P.O. Box 19534
Irvine, CA 92523-9534
Attention: Lewis Gryziewicz
Senior Director, Regulatory Affairs

Allergan Sales, Inc.
2525 Dupont Drive
Irvine, CA 92523-9534

Stout, Uxa, Buyan & Mullins, LLP
Suite 300 4 Venture
Irvine CA 92618

Dear Sir/Madame:

**Re: Brimonidine Tartrate Ophthalmic Solution, 0.15 %, and Brimonidine Tartrate Ophthalmic Solution 0.10 %**

**Paragraph IV Certification for**
**U.S. Patents No. 5,424,078; No. 6,562,873; No. 6,627,210; No. 6,641,834; and No. 6,673,337**

Pursuant to subsection 505(j)(2)(B) of the Federal Food, Drug and Cosmetic Act, ("the Act"), Apotex Inc. (hereinafter, "Apotex") is providing to you, as the New Drug Application (NDA) holder (NDA 021262 and 021770) of the listed drug product or as the patent owner (assignee) or agent thereof of the listed patents, notice that Apotex has submitted, and the Food and Drug Administration (FDA) has received, an Abbreviated New Drug Application (ANDA) under section 505(j) of the Act to engage in the commercial manufacture, use, importation, offer for sale or sale of Apotex's Proposed Products, Brimonidine Tartrate Ophthalmic Solution, 0.15 % and Brimonidine Tartrate Ophthalmic Solution 0.1 % (hereinafter "Apotex's proposed products"), prior to the expiration of U.S. Patents No. 5,424,078, entitled "Aqueous Ophthalmic Formulations and Methods for Preserving Same" (sometimes referred to herein as "the '078 patent"); No. 6,562,873, "Compositions Containing Therapeutically Active Components Having Enhanced Solubility" (sometimes referred to herein as "the '873 patent"); No. 6,627,210, "Compositions Containing α-2-Adrenergic Agonist Components" (sometimes referred to herein as "the '210 patent); No. 6,641,834, "Compositions Containing α-2-Adrenergic Agonist Components" (sometimes referred to herein as "the '834 patent"); and No. 6,673,337, "Compositions Containing α-2-Adrenergic Agonist Components" (sometimes referred to herein as "the '337 patent).

150 Signet Drive, Toronto, Ontario, Canada M9L 1T9
Tel: (416) 749-9300 • Fax: (416) 401-3849 • www.apotex.com

MEMBER
CGPA



Furthermore, in accordance with 21 CFR §314.95, the following information is provided:

1. The application contains the required bioavailability or bioequivalence data.

2. The ANDA Numbers for the applications are 078479 and 078480.

3. The established name of the proposed Apotex brimonidine products are Brimonidine Tartrate Ophthalmic Solution, 0.15 % and Brimonidine Tartrate Ophthalmic Solution, 0.1 %; and the name of your product as listed in the 26th Edition of the Orange Book is Alphagan® P.

4. Apotex's proposed Brimonidine product contains brimonidine tartrate as the active ingredient as a 0.15 % ophthalmic solution or as a 0.1 % ophthalmic solution.

5. United States Patent Numbers 5,424,078; 6,562,873; 6,627,210; 6,641,834; and 6,673,337, expiring on December 13, 2012; January 10, 2022; January 18, 2022; January 28, 2022; and January 26, 2022 are invalid, unenforceable and/or will not be infringed by Apotex's manufacture, use, or sale of the Apotex's Brimonidine Products.

The following is a detailed statement of the factual and legal basis of Apotex's opinion that these patents are invalid and/or will not be infringed. In addition, Apotex reserves the right to demonstrate additional factual and legal bases should future information so warrant.

**Background Information**

Brimonidine is a relatively selective alpha-2-adrenergic antagonist. The original compound patent (United States Patent No. 3,890,319) was issued on June 17, 1975 to Pfizer.



Brimonidine tartrate

**Molecular Formula:** $C_{11}H_{10}BrN_5.C_4H_6O_6$
**Molecular Weight:** 442.22

In the late 1990s Allergan released Alphagan®, an aqueous solution of brimonidine tartrate for topical application to eye. The original formulation of Alphagan® was available in two strengths, 0.2 % and 0.5 % w/v brimonidine tartrate. Alphagan® was indicated for lowering intraocular pressure (IOP) in patients with open angle glaucoma or ocular hypertension.

On March 16, 2001, Allergan received approval for an updated formulation, called Alphagan® P, at a strength of 0.15 % brimonidine tartrate. A second Alphagan® P formulation at a strength of 0.1 % brimonidine tartrate was approved on August 19, 2005.

**Materials Cited**

Attached to this Notice is Schedule A, which lists supplementary and background materials which support the positions and arguments given herein.

**1. United States Patent No. 5,424,078: 'Aqueous Ophthalmic Formulations and Methods for Preserving Same' (Dziabo, Ripley)**

The '078 patent was filed on May 2, 1991 as U.S. Patent Application 07/694,640 as a Continuation-in-part of U.S. Patent Application 07/277,791 (hereinafter, the '791 application), filed November 29, 1988. The '078 patent issued on June 13, 1995 to Dziabo *et al.*, indicating on its face that it was assigned to Allergan, Inc. The '078 Patent was prosecuted by Frank J. Uxa but the parental '791 application was filed by another agent, Bill McCarthy.

The abstract of the '078 patent states:

> Stabilized chlorine dioxide is a preservative for ophthalmic formulations. The stabilized chlorine dioxide, when employed as a preservative ophthalmic formulations is preferably present in an amount of from about 0.0002 or about 0.002 to about 0.02 weight/volume percent. The aqueous ophthalmic formulations, in addition to the stabilized chlorine dioxide and the water which functions as a vehicle for the formulations, contains an ophthalmically acceptable tonicity component effective to maintain the osmolality of the formulation at least about 200 mOsmol/kg, and a buffer to maintain the pH of the ophthalmic formulation within an acceptable physiological range. A method for preserving aqueous ophthalmic formulations utilizing stabilized chlorine dioxide is also set forth.

The disclosure of the '078 patent states at column 2, line 20, under the heading *Summary of the Invention:*

> Broadly, the present invention relates to aqueous ophthalmic formulations containing an effective minor amount of stabilized chlorine dioxide to effectively preserve the ophthalmic formulation; a buffer component and a tonicity component. The present ophthalmic formulations are effectively preserved and can be used, e.g., in the contact lens care context, without causing irritation or discomfort to the eyes of the user of the formulations.
>
> In one aspect, the present invention relates to aqueous ophthalmic formulations or compositions, for example, solutions, comprising water, e.g., as a vehicle; an amount, preferably from about 0.0002 or about 0.002 to about 0.02 weight/volume percent, of stabilized chlorine dioxide effective to act as the sole preservative in the formulation; at least one buffer component in an amount effective to maintain the pH of the formulation in the range of about 6.8 to about 8; and at least one tonicity component in an amount effective to maintain the formulation at an osmolality of at least about 200 mOsmol/kg, especially at a tonicity value substantially corresponding to the tonicity value of fluids of an eye. The present ophthalmic formulations preferably include substantially no, i.e., are substantially free of, germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers, for example, the quaternary ammonium polymers, the polymeric amino and/or imino compounds and their salts disclosed in the above-noted Stockel et al patents. More preferably, the present ophthalmic formulations are substantially free of any such positively charged, nitrogen-containing cationic polymers. To provide the ophthalmic formulations with a pH substantially corresponding to the pH of the fluids of the eye, the pH of the ophthalmic formulation can be adjusted, if required, by addition of an acid or a base.

Accordingly, the subject matter of the '078 patent relates to aqueous ophthalmic formulations with a stabilized chlorine dioxide preservative. Stabilized chlorine dioxide is actually a misnomer. Chemically, stabilized chlorine dioxide refers to a solution of sodium chlorite which, under specific conditions, acts as a source of low quantities of molecular chlorine dioxide. For simplicity, we will use the term chlorine dioxide interchangeably with stabilized chlorine dioxide.

## 1.1 The Claims

The '078 patent contains 18 claims, reproduced below.

1. A method for preserving an aqueous ophthalmic formulation so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic formulation stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic formulation, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality of at least about 200 mOsmol/kg, provided that said aqueous ophthalmic formulation is ophthalmically acceptable and no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic formulation.

2. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.

3. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.

4. The method of claim 1 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 7 to about 7.5.

5. The method of claim 1 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality in the range of about 200 to about 400 mOsmol/kg.

6. The method of claim 1 wherein said aqueous ophthalmic formulation is a solution.

7. A method for preserving an aqueous ophthalmic solution so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic solution stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic solution at an osmolality in the range of about 200 to about 400

mOsmol/kg, provided that said aqueous ophthalmic solution is ophthalmically acceptable and substantially no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic solution.

8.  A preserved ophthalmic formulation comprising an ophthalmically acceptable aqueous medium and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically acceptable aqueous medium, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality of at least about 200 mOsmol/kg, provided that said preserved ophthalmic formulation is ophthalmically acceptable and is free of germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers.

9.  The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.

10. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.

11. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is selected from the group consisting of alkali metal chlorides and alkaline earth metal chlorides and mixtures thereof.

12. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises sodium chloride.

13. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises an alkaline earth metal salt selected from the group consisting of calcium chloride and magnesium chloride and mixtures thereof.

14. The preserved ophthalmic formulation of claim 8 wherein said at least one buffer component is selected from the group consisting of potassium phosphates, boric acid, sodium borate, sodium phosphates and mixtures thereof.

15. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 7 to about 7.5.

16. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality in the range of about 200 to about 400 mOsmol/kg.

17. The preserved ophthalmic formulation of claim 8 which is a solution.

18. A preserved ophthalmic solution comprising an ophthalmically acceptable aqueous solution and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically aqueous acceptable solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said preserved ophthalmic solution is ophthalmically acceptable and is free of germicidally effective amounts of any positively charged, nitrogen-containing polymers.

## 1.2 Lack of support/loss of priority

The inventors listed on the '078 patent asserted, with explicit recognition of their duties under 37 C.F.R. §1.56 (discussed further, below) that their application deserved the priority date afforded by the '791 application, filed on November 29, 1988. Their Declaration, signed by their hand, reads:

> "I hereby claim the benefit under Title 35, United States Code, § 120 of any applications listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, § 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations §1.56(a) which occurred between the filing date of the prior application and the national or international PCT filing date of this application: 277,791 (serial number), November 29, 1988 (filing date), Pending (status)."

Every claim of the '078 patent recites either a requirement for an osmolality "of at least about 200 mOsmol/kg" (e.g. Claim 1) or "in the range of about 200 to about 400 mOsmol/kg" (e.g. Claim 5). The osmolality limitations first appear in the specification filed in U.S. Patent Application 07/694,640 in 1991. The osmolality language was inserted into both the claims and the body of the specification, including in the new "Example VIII (Comparative)". The '791 application, as originally filed, lacked Example VIII and makes no mention whatsoever of osmolality or any desirable osmolality range. This was new matter with regard to the '791 application that entirely lacked support in the application. Therefore, the claims of the '078 patent reciting these limitations cannot receive the benefit of the earlier filing date because the '791 application lacked "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art… to make and use the same," (35 U.S.C. §112, first paragraph) with regard to osmolality. Consequently, the claims of the '078 patent can <u>only</u> claim benefit from its May 2, 1991 filing date.

## 1.3 Unenforceability

Apotex contends that the '078 patent is invalid for inequitable conduct during its prosecution. As noted above, the '078 inventors claimed priority from the '791 application which was filed on November 29, 1988 by Allergan's agent, Bill McCarthy. On the same day, the same Bill McCarthy filed United States Application Number 07/277,790, (the " '790 application") which

was assigned to Bio-Cide International Inc. The two applications, one submitted by inventors in California and assigned to a California company, the other submitted by an Oklahoma inventor and assigned to an Oklahoma company, bear sequential serial numbers. Though the '790 application never issued, the corresponding PCT Application WO 90/06126 (hereafter the " '126 application"), claiming international priority from the '790 application, was filed November 22, 1989 and subsequently published June 14, 1990. The priority document of the '126 application, the '790 application, is not available at this time for review.

The contents of the disclosures of the '791 and '126 applications are extraordinarily similar even though the contents of these applications were not publicly available at the time they were filed. Although both applications presumably included a signed oath of sole inventorship as required by 35 U.S.C. §115, the complete specifications of the '126 application as published and the '791 application *as filed* are identical- line for line, down to hyphens, punctuation, carriage returns, and paragraphs. The differences between the two specifications are purely superficial. There are differences in title, inventors and assignees, changed section titles ("Background Art" and "Disclosure of the Invention" versus "Brief Description of the Prior Art" and "Summary of the Invention") , single versus double spacing, corrected spelling of the word "ophthalmic" in '126, and ending of the '126 "Background Art" in section in mid-sentence 18 lines before the end of the corresponding section of the '791 application.

Furthermore, the claims in the '126 application as finally published and the <u>original</u> claims in the '791 application both relate to the use of chlorine dioxide in solutions for preservation and disinfection, materially differing only in concentration of chlorine dioxide. The '791 claims originally were to solutions with "about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide as a preservative", while the '126 application claimed compositions with "at least 0.02 weight/volume percent stabilized chlorine dioxide as a disinfectant". There is no difference here between disinfection and preservation- both require the same compound do the same thing- kill contaminating microbes. Examples 1 and 2 make clear that chlorine dioxide at concentrations lower than 0.02% acts both " as a preservative" and "as a disinfectant," erasing any asserted difference in utility. ('791 specification, page 13 lines 11-28 stated originally that "tests indicated that total kill of bacteria was achieved by the solution containing 0.002 weight/volume percent stabilized chlorine dioxide after seven days" while 0.005 and 0.004% killed all introduced bacteria in less than a day- the earliest time reported) Of course, exactly the same composition is claimed by both applications when the concentration is 0.02%. Even if some distinction might be found between "disinfectant" and "preservative", regardless of the allegedly different utility the same invention was claimed by both applicants. *In re Schreiber* 128 F.3d 1473 (Fed. Cir. 1997) (a paper cone having particular dimensions claimed as a popcorn dispenser is anticipated by a paper cone with the same dimensions used as a disposable motor oil funnel)

Only later were sections of the specification corresponding to the '126 claims and concentrations deleted by careful amendment of the '791 application. The extraordinary overlap in content between the two applications and the simultaneous filing by different inventors <u>by the same agent,</u> of <u>the same invention,</u> <u>on the same day</u> is strong evidence of substantial collaboration between the two sets of inventors. The '791 applicants, however, neglected to disclose the existence of Bio-Cide's co-pending '790 application or the corresponding '126 PCT application to the Examiner during the prosecution of the '078 patent. Nor was there any recognition that the inventor named on the '126 application must have been substantively involved in the invention described and enabled by the same disclosure containing same experiments and formulations. Intentional non-

joinder of an inventor will render a patent unenforceable. *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315 (Fed. Cir. 2000)

It cannot reasonably be asserted that the '790 application or its corresponding '126 PCT application were not material to the patentability of the '078 patent. Nor can it be reasonably asserted that persons substantively involved with the prosecution of the '078 patent were unaware of the '791 application or that its non-disclosure was unintentional, given the meticulous amendment of the '791 specification to delete the language that supports the claims of the '126 application. The failure of the agent/inventors to disclose this materially relevant document of which they were aware of to the Examiner during prosecution is a breach of the duty of candor and good faith to the Patent & Trademark Office and therefore constitutes inequitable conduct. According to M.P.E.P. §2016, such inequitable conduct is grounds for rendering all claims of the '078 patent unenforceable:

**1.3 Noninfringement**

Claim 13 recites that "at least one ophthalmically acceptable tonicity component comprises an alkaline earth metal salt selected from the group consisting of calcium chloride and magnesium chloride and mixtures thereof" be present in the preserved ophthalmic formulation. Since Apotex's proposed Brimonidine product does not contain calcium chloride or magnesium chloride as a tonicity component, it can not infringe claim 13 of the '078 patent. Calcium chloride is present in the 0.1% brimonidine formulation as the hexahydrate at 0.006%w/v and in the 0.15% brimonidine formulation at 0.02%w/v and magnesium chloride is present in both formulations at 0.006%w/v. Such low concentrations have no practical impact on the tonicity of Apotex's proposed products, and so these cannot be "tonicity components" as required by claim 13 of the '078 patent even if, for example, such a function is ascribed to these compounds.

**1.4 Invalidity**

Apotex further asserts that the '078 patent and all of its claims are invalid, void and of no effect. The following is a detailed legal and factual basis of that assertion. In addition, Apotex reserves the right to demonstrate additional factual and legal bases for the invalidity of the claims of the '078 patent in the future.

**1.4.1 Invalidity under 35 U.S.C. §102(f): Inventorship**

Identification of the inventor(s) is a requirement for patent validity; one may receive a patent unless... "he did not himself invent the subject matter sought to be patented" 35 USC 102(f). Furthermore, "[w]hen an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title." 35 U.S.C. §116, first paragraph, emphasis added. Proper and full disclosure of inventors is, therefore, not optional and both non-joinder and mis-joinder of named inventors can lead to a finding of invalidity. See e.g., *Pannu v Ionlabs Corp.*, 155 F.3d 1344, 1348-9 (Fed. Cir. 1998).

As required by 35 U.S.C. 115 and 37 C.F.R. §1.63, Dziabo and Ripley signed and submitted a declaration when the '078 patent was filed stating that they are "original and first inventor(s) of the subject matter". The '126 application contradicts this sworn statement, as discussed above. There remains substantial common content and data between the '078 patent and the '126 application,

providing clear evidence of *at least* collaboration between the two sets of inventors. At a minimum, the '126 application inventor was, with full knowledge of Allergan, their inventors, and/or agents, improperly excluded from the list of inventors when submitting the declaration of the inventors in United States Patent Application Number 277,791 as filed. Potentially, the Biocide inventor was the true original and first inventors of all of the subject matter of the '078 patent claims and therefore Allergan, the inventors, and/or their agent improperly identified themselves as the "original and first inventor(s)" of the '078 patent. According to 37 CFR 1.64 (a) (emphasis added):

> The oath or declaration (§ 1.63), including any supplemental oath or declaration (§ 1.67), must be made by all of the actual inventors except as provided for in § § 1.42, 1.43, 1.47, or § 1.67.

This misstatement of inventorship not only constitutes one or more acts of inequitable conduct by Allergan, the inventors, and/or its agents on the Patent & Trademark Office, but is also grounds for invalidation of the '078 patent.

### 1.4.2 Invalidity under 35 U.S.C. §102(a) and/or (b): Anticipation

Section 102 of 35 U.S.C. broadly defines what is referred to as anticipation, or lack of novelty. As a defense to allegations of infringement, invalidity by anticipation requires that a prior art reference, use or sale disclose all of the claim limitations of the asserted patent. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed". *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

As discussed above, Allergan added new matter and claimed a new invention that was not disclosed in the parent application by adding the "osmolality" limitation to the claims. See, *AK Steel Corp. v. Sollac*, 344 F.3d 1234 (Fed. Cir. 2003) (summary judgment of invalidity where claims unsupported by the specification were not enabled and claims were also anticipated by prior art when new matter improperly added was not entitled to the priority date of the parent application); see also, *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323-1327 (Fed. Cir. 2000). Accordingly, the filing date of May 2, 1991 is the priority date of these claims.

#### 1.4.2.1 PCT Application WO 90/06126 by Bobby C. Danner

There is no evidence the invention claimed in the '078 patent was invented between May 2, 1991 and June 14, 1990. The '126 application was published June 14, 1990 and therefore publicly available well before the filing date of the '078 patent (May 2, 1991). Each of the claims of the '078 patent are therefore also invalid under 35 U.S.C. §102(a) because they are anticipated by the teachings of WO 90/06126.

The '126 application teaches the use of stabilized chlorine dioxide for the disinfection and preservation of ophthalmic solutions. Furthermore, the '126 application teaches the inclusion of buffering and tonicity agents to render the pH and the osmolality of the solution suitable for use in the eye. Having only the differences described, *supra*, the '078 patent and the '126 application remain strikingly similar. Despite addition of new matter and deletion of passages that specifically support the '126 application claims, most of the text remains the same and the

experimental section, Examples I – VII, remain identical between the '126 application and the '078 patent as issued.

The new matter expressly enumerating the tonicity of the claimed ophthalmic formulation does not overcome anticipation. Claims 1-4, 6, 8-15, and 17 require "an osmolality of at least about 200 mOsmol/kg" and claims 5, 7, 16, and 18 specifically require "an osmolality in the range of about 200 to about 400 mOsmol/kg". These particular limitations are both plainly taught in WO 90/06126, p. 7 lines 12-18 which reads "[w]hen formulating an aqueous ophthalmic solution in accordance with the present invention, stabilized chlorine dioxide and an ophthalmologically acceptable inorganic salt or other suitable tonicity imparting agent are admixed with sterile water to provide an ophthalmic solution having a tonicity value substantially corresponding to the tonicity of fluids of the eye." The mean osmolality of human eye fluids was known at the time of the alleged invention to be about 300 mOsmol/kg. (Milder, B. The Lacrimal Apparatus. Ch. 2 in *Adler's Physiology of the Eye.* 7th ed. (1981), R. A. Moses, ed., C.V. Mosby Co. St. Louis, at p. 20) Persons skilled in the art of formulating ophthalmic compositions as of the priority date of the '078 patent knew with good certainty the "value substantially corresponding to the tonicity value of the fluids of the eye," how to target the osmolality of their compositions to the range specified in the '078 patent, and knew that the tonicity imparting agents enumerated in the '078 patent such as sodium chloride, glycerin, propylene glycol, etc., were "suitable tonicity imparting agents". Anticipating teachings need not repeat the language of the claims, they need only teach and enable what has been claimed in the invalidated claims. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984) ("[T]he teaching in the prior reference need not be *ipsissimis verbis* . . . ."); see also, *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991) ("An anticipatory reference, however, need not duplicate word for word what is in the claims."). Because the tonicity of fluids of an eye expressly taught by the '126 application fall within the range claimed in the '078 claims, that element of claims 1, 5, 7, 8, 16, and 18 is, thereby fully anticipating these claims.

The following table sets out the claims of the '078 patent and the corresponding anticipating art from the '126 application.

| Claims of United States Patent Number 5,424,078 | Corresponding Art from WO 90/06126 |
| --- | --- |
| *1. A method for preserving an aqueous ophthalmic formulation so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic formulation stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic formulation, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality of at least about 200 mOsmol/kg, provided that said aqueous ophthalmic formulation is ophthalmically acceptable and no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic formulation.* | In one aspect the present invention relates to an aqueous ophthalmic solution comprising purified water as a vehicle, from about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide, and an effective minor amount of an ophthalmically acceptable inorganic salt to provide the ophthalmic solution with a tonicity value substantially corresponding to the tonicity value of fluids of an eye. To stabilize the pH of the ophthalmic solution, the ophthalmic solution also includes an effective minor amount of a buffering agent. To provide the ophthalmic solution with a pH substantially corresponding to the pH of the fluids of the eye, and to eliminate the rinsing of the contact lenses prior to the insertion of the contact lens into the eye, the pH of the ophthalmic solution can be adjusted, if required, by addition of an acid or a base so that the ophthalmic solution has an acceptable physiological pH (i.e. a pH in the range of from about 6.8 to about 8).<br><br>Page 2, lines 17 to 34.<br>Note: A person skilled in the art would know that the osmolality of fluids in the eye is about 300 mOsmol/kg. (milder) |
| *2. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.* | See Claim 1.<br>Claimed range of stabilized chlorine dioxide is specified. |
| *3. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.* | While the amount of stabilized chlorine dioxide employed as the disinfecting agent can vary widely, desirable results can be obtained when the stabilized chlorine dioxide utilized as the disinfecting agent is present in the disinfectant composition in an amount of from about 0.02 to 2.0 weight/volume percent, desirably from about 0.04 to about 0.1 weight/volume percent, and more desirably from about 0.05 to about 0.08 weight/volume percent.<br><br>Page 8, lines 19 to 27.<br>Claimed range of stabilized chlorine dioxide is specified. See also Claim 1. |
| *4. The method of claim 1 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 7 to about 7.5.* | In order to insure that the aqueous ophthalmic solution containing a preserving amount of stabilized chlorine dioxide does not irritate one's eye, it is desirable that the ophthalmic solution have a pH value of from about 6.8 to about 8 so that the pH of the ophthalmic solution substantially corresponds to the pH value of the fluids in the eye, or which can be tolerated by the eye without causing any discomfort or irritation.<br><br>Page 5, lines 24 to 31. See also Claim 1. |

| Claims of United States Patent Number 5,424,078 | Corresponding Art from WO 90/06126 |
| --- | --- |
| *5. The method of claim 1 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality in the range of about 200 to about 400 mOsmol/kg.* | See Claim 1.<br>Note: A person skilled in the art would know that the osmolality of fluids in the eye is about 300 mOsmol/kg. |
| *6. The method of claim 1 wherein said aqueous ophthalmic formulation is a solution.* | See Claim 1.<br>Art specifies an ophthalmic solution. |
| *7. A method for preserving an aqueous ophthalmic solution so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic solution stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said aqueous ophthalmic solution is ophthalmically acceptable and substantially no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic solution.* | In one aspect the present invention relates to an aqueous ophthalmic solution comprising purified water as a vehicle, from about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide, and an effective minor amount of an ophthalmically acceptable inorganic salt to provide the ophthalmic solution with a tonicity value substantially corresponding to the tonicity value of fluids of an eye. To stabilize the pH of the ophthalmic solution, the ophthalmic solution also includes an effective minor amount of a buffering agent. To provide the ophthalmic solution with a pH substantially corresponding to the pH of the fluids of the eye, and to eliminate the rinsing of the contact lenses prior to the insertion of the contact lens into the eye, the pH of the ophthalmic solution can be adjusted, if required, by addition of an acid or a base so that the ophthalmic solution has an acceptable physiological pH (i.e. a pH in the range of from about 6.8 to about 8).<br><br>Page 2, lines 17 to 34<br>Note: A person skilled in the art would know that the osmolality of fluids in the eye is about 300 mOsmol/kg. |

| Claims of United States Patent Number 5,424,078 | Corresponding Art from WO 90/06126 |
|---|---|
| *8. A preserved ophthalmic formulation comprising an ophthalmically acceptable aqueous medium and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically acceptable aqueous medium, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality of at least about 200 mOsmol/kg, provided that said preserved ophthalmic formulation is ophthalmically acceptable and is free of germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers.* | In one aspect the present invention relates to an aqueous ophthalmic solution comprising purified water as a vehicle, from about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide, and an effective minor amount of an ophthalmically acceptable inorganic salt to provide the ophthalmic solution with a tonicity value substantially corresponding to the tonicity value of fluids of an eye. To stabilize the pH of the ophthalmic solution, the ophthalmic solution also includes an effective minor amount of a buffering agent. To provide the ophthalmic solution with a pH substantially corresponding to the pH of the fluids of the eye, and to eliminate the rinsing of the contact lenses prior to the insertion of the contact lens into the eye, the pH of the ophthalmic solution can be adjusted, if required, by addition of an acid or a base so that the ophthalmic solution has an acceptable physiological pH (i.e. a pH in the range of from about 6.8 to about 8).<br><br>Page 2, lines 17 to 34.<br>Note: A person skilled in the art would know that the osmolality of fluids in the eye is about 300 mOsmol/kg. |
| *9. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.* | See Claim 8.<br>Claimed range of stabilized chlorine dioxide is specified. |
| *10. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.* | While the amount of stabilized chlorine dioxide employed as the disinfecting agent can vary widely, desirable results can be obtained when the stabilized chlorine dioxide utilized as the disinfecting agent is present in the disinfectant composition in an amount of from about 0.02 to 2.0 weight/volume percent, desirably from about 0.04 to about 0.1 weight/volume percent, and more desirably from about 0.05 to about 0.08 weight/volume percent.<br><br>Page 8, lines 19 to 27.<br>Claimed range of stabilized chlorine dioxide is specified.<br><br>See also Claim 8. |

| Claims of United States Patent Number 5,424,078 | Corresponding Art from WO 90/06126 |
|---|---|
| *11. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is selected from the group consisting of alkali metal chlorides and alkaline earth metal chlorides and mixtures thereof.* | Ingredients — Percent (weight/volume)<br>Stabilized Chlorine Dioxide — 0.005<br>Sodium Chloride USP — 0.85<br>Boric Acid NF — 0.10<br>Purified water USP* — To 100 ml<br><br>Page 15, lines 13 to 17.<br>Sodium chloride is an alkali metal chloride. |
| *12. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises sodium chloride.* | See Claim 11. |
| *13. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises an alkaline earth metal salt selected from the group consisting of calcium chloride and magnesium chloride and mixtures thereof.* | Typical of such ophthalmically acceptable inorganic salts are alkali metal chlorides and alkaline earth metal chlorides, such as sodium chloride, potassium chloride, calcium chloride and magnesium chloride.<br><br>Page 7, lines 33 to 36. |
| *14. The preserved ophthalmic formulation of claim 8 wherein said at least one buffer component is selected from the group consisting of potassium phosphates, boric acid, sodium borate, sodium phosphates and mixtures thereof.* | Any suitable buffering agent can be employed which is compatible with the other ingredients of the ophthalmic solution, and which does not have deleterious or toxic properties which could harm the eye. Examples of suitable buffering agents are boric acid, sodium borate, sodium phosphates (including mono, di- and tri- basic phosphates, such as sodium phosphate monobasic monohydrate, sodium phosphate dibasic heptahydrate, and mixtures, thereof).<br><br>Page 6, lines 9 to 17. |
| *15. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 7 to about 7.5.* | In order to insure that the aqueous ophthalmic solution containing a preserving amount of stabilized chlorine dioxide does not irritate one's eye, it is desirable that the ophthalmic solution have a pH value of from about 6.8 to about 8 so that the pH of the ophthalmic solution substantially corresponds to the pH value of the fluids in the eye, or which can be tolerated by the eye without causing any discomfort or irritation.<br><br>Page 5, lines 24 to 31. See also Claim 8<br>. |
| *16. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality in the range of about 200 to about 400 mOsmol/kg.* | See Claim 8.<br>Note: A person skilled in the art would know that the osmolality of fluids in the eye is about 300 mOsmol/kg (Document 17, 18 Schedule A). |

| Claims of United States Patent Number 5,424,078 | Corresponding Art from WO 90/06126 |
|---|---|
| *17. The preserved ophthalmic formulation of claim 8 which is a solution.* | See Claim 8.<br>Art specifies an ophthalmic solution. |
| *18. A preserved ophthalmic solution comprising an ophthalmically acceptable aqueous solution and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically aqueous acceptable solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said preserved ophthalmic solution is ophthalmically acceptable and is free of germicidally effective amounts of any positively charged, nitrogen-containing polymers.* | In one aspect the present invention relates to an aqueous ophthalmic solution comprising purified water as a vehicle, from about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide, and an effective minor amount of an ophthalmically acceptable inorganic salt to provide the ophthalmic solution with a tonicity value substantially corresponding to the tonicity value of fluids of an eye. To stabilize the pH of the ophthalmic solution, the ophthalmic solution also includes an effective minor amount of a buffering agent. To provide the ophthalmic solution with a pH substantially corresponding to the pH the fluids of the eye, and to eliminate the rinsing of the contact lenses prior to the insertion of the contact lens into the eye, the pH of the ophthalmic solution can be adjusted, if required, by addition of an acid or a base so that the ophthalmic solution has an acceptable physiological pH (i.e. a pH in the range of from about 6.8 to about 8).<br><br>(page 2, lines 17 to 34)<br>Note: A person skilled in the art would know that the osmolality of fluids in the eye is 302 mOsmol/kg. |

As shown above, the disclosure of the '126 application anticipates the elements of each claim of the '078 patent. As all remaining elements of claims 1 to 18 inclusive are anticipated by the disclosure of the '126 application (see preceding Table), each of the claims is invalid pursuant to 35 U.S.C. §102.

**1.4.2.2 Harakeh et al J. Appl. Bacteriology (1988) Vol. 64, p459-463: 'Inactivation of bacteria by Purogene'**

The above article was published in the May 1988 issue of the Journal of Applied Bacteriology. In this article, the authors write that:

> "[t]he main purpose of this study was to examine the bacteriocidal efficacy of Purogene (Bio-cide, Inc. Norman, Oklahoma), a chlorine dioxide-based formulation, against a wide range of bacteria and to investigate the effects of various parameters on its efficacy as a disinfectant. Purogene has a number of industrial and medical applications and is the principle ingredient of a variety of products."

As stated in the above text, Purogene is a commercialized formulation of stabilized chlorine dioxide commercial product from Bio-Cide. It is the same Purogene employed by Dziabo and Ripley in the '078 patent (column 7, lines 24 to 33):

EXAMPLE I

A series of experiments were performed to determine the antimicrobial properties of a borate buffered saline solution preserved with stabilized chlorine dioxide. The stabilized chlorine dioxide employed was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Oklahoma, sold under the trademark Purogene. The concentration of the stabilized chlorine dioxide added to the borate buffered saline solution was varied.

The Harakeh article clearly teaches that stabilized chlorine dioxide is an effective disinfectant against a wide selection of bacteria type (page 461, Table 2 and first column):

**Table 2. Inactivation of bacteria by 0·75 mg/l of Purogene (pH 7; 23°C)**

| Organisms | Recovery (min) | | |
|---|---|---|---|
| | Zero | log $N_5/N_0$ | log $N_{15}/N_0$ |
| *Escherichia coli* | $1{\cdot}79 \times 10^7 \pm 0{\cdot}210$ | $4{\cdot}80 \times 10^1 \pm 0{\cdot}928$ $-5{\cdot}57$* | $4{\cdot}31 \times 10^1 \pm 0{\cdot}748$ $-5{\cdot}61$* |
| *Pseudomonas aeruginosa* | $8{\cdot}07 \times 10^7 \pm 1{\cdot}345$ | $5{\cdot}13 \times 10^2 \pm 1{\cdot}152$ $-5{\cdot}20$* | $3{\cdot}39 \times 10^2 \pm 0{\cdot}927$ $-5{\cdot}38$* |
| *Yersinia enterocolitica* | $4{\cdot}39 \times 10^6 \pm 3{\cdot}634$ | $2{\cdot}66 \times 10^1 \pm 1{\cdot}725$ $-5{\cdot}22$* | $2{\cdot}55 \times 10^1 \pm 1.258$ $-5{\cdot}24$* |
| *Klebsiella pneumoniae* | $1{\cdot}46 \times 10^8 \pm 0{\cdot}511$ | $1{\cdot}51 \times 10^3 \pm 0{\cdot}645$ $-5{\cdot}014$* | $1{\cdot}47 \times 10^3 \pm 0{\cdot}841$ $-5{\cdot}002$* |
| *Streptococcus pyogenes* | $1{\cdot}02 \times 10^9 \pm 2{\cdot}829$ | $1{\cdot}24 \times 10^7 \pm 4{\cdot}66$ $-1{\cdot}915$* | $1{\cdot}36 \times 10^7 \pm 5{\cdot}690$ $-1{\cdot}875$* |
| *Salmonella typhimurium* | $5{\cdot}69 \times 10^8 \pm 3{\cdot}005$ | $6 \times 10^{-1} \pm 0{\cdot}169$ $-8{\cdot}98$* | $7{\cdot}33 \times 10^{-2} \pm 0{\cdot}252$ $-9{\cdot}89$* |
| *Bacillus subtilis* | $6{\cdot}33 \times 10^7 \pm 0{\cdot}577$ | $1{\cdot}90 \times 10^3 \pm 0{\cdot}173$ $-4{\cdot}52$ | $1{\cdot}83 \times 10^3 \pm 0{\cdot}289$ $-4{\cdot}54$* |

* Figures represent log survival ratio after contact for 5 and 15 min.

Effect of bacterial species on the efficacy of Purogene

The possibility that different bacteria might behave differently in their response to inactivation by Purogene was also considered. To investigate this, a wide range of bacteria was tested with Purogene (pH 3-5) in PBS at 23 ± 1°C. (Table 2). The organisms tested varied in their response to Purogene: Strep. pyogenes was the most resistant (2 log reduction) and Salm. typhimurium the most sensitive (9 log reduction). About a 5 log reduction was noted in the case of the other test organisms.

A person skilled in the art would be taught by the Harakeh reference that stabilized chlorine dioxide is an effective disinfectant or preservative for "industrial and medical applications." Knowing that at pH 7 the bacteriocidal efficacy of stabilized chlorine dioxide had been demonstrated by Harakeh, a person skilled in the art would be motivated to use stabilized chlorine dioxide as a preservative in ophthalmic formulations. Example IV of the '078 patent asserts that 99.9% reduction in microbial challenge within 14 days falls meets the requirements of the USP to be an effective and acceptable ophthalmic preservative. The concentration used by Harakeh (0.75 mg/L, 0.000075% w/v) is lower than specified by claims 2-3, 7, 9, 10, and 18. Nevertheless, only 15 minutes of exposure to this concentration killed between 99% and 99.999999% (2 and 9 log reduction, respectively) of the bacteria, depending on the bacterial species. Harakeh notes that 99.999% (5-log) of most bacteria species tested died within the 15 minute test period. This indicates that the low concentration tested was adequate to act as a preserving agent for ophthalmic formulations.

Furthermore, PBS, phosphate buffered saline, is a very common, standard biological solution that unless specified otherwise has the same pH and is isotonic with eyes, being 0.9% sodium chloride in water buffered with about 10mM phosphate to pH 6-8, most usefully 7.0-7.5, and having an osmolality of ~300 mOsm/L, and lacking a germicidally effective amount of a positively charged nitrogen containing cationic polymer. These correspond closely or exactly to values in the '078 claims. The '078 patent specifically lists and claims the phosphate buffer system as a suitable ophthalmically acceptable buffer according to the invention (column 4 lines 53 and 55-59 and claim 14) and sodium chloride as an ophthalmically acceptable tonicity component (column 5, line 29 and 41 and claim 12). Therefore, PBS, used by Harakeh as a testing medium, is an aqueous ophthalmic formulation according to the invention. Accordingly, this reference teaches every element of the methods of at least claims 1, 4, 5, and 6 and the compositions of at least claims 8 and 11-12, 14, 15, and 17, and renders them invalid pursuant to 35 U.S.C. 102(a) and/or (b). This reference fully anticipates at least these claims even if the priority date is taken to be November 29, 1988 because this reference was published in May of 1988.

### 1.4.3 Invalidity under 35 U.S.C. 103(a): Obviousness

Section 103(a) of 35 U.S.C. requires that valid patent claims not merely be novel in accordance with Section 102 of 35 U.S.C., but also that "the differences between the subject matter sought to be patented and the prior art [not be] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

The Federal Circuit has paraphrased the requirements of §103(a) as "[P]atentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success viewed in light of the prior art.'" *Merck v. Biocraft,* 874 F.2d 804 at 809 (Fed. Cir. 1989), citing *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) [emphases added]. In assessing obviousness, the controlling case law [*Graham v. John Deere*, 383 U.S. 1 at 17-18 (1966)] requires a four-part analysis:

1. The scope and content of the prior art are determined;
2. The differences between the prior art and the claims are determined;
3. The level of ordinary skill in the art at the time the invention was made is ascertained; and
4. Any objective indicia of unobviousness are examined.

Analysis of factors 1-2 is incorporated in the discussion of individual prior art references below.

**Factor 4. Objective indicia of unobviousness**

Objective indicia of non-obviousness include any unexpected results, commercial success, copying of the invention, and failures of others to solve the problem addressed by the invention.

See *Graham v. John Deere Co.,* 383 U.S. 1, 17-18; *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991); *In re Rouffet*, 149 F.3d 1350, 1355 (Fed.Cir.1998).

Apotex contends that none of the results alleged by the applicants to the support the patentability of the '078 patent were in any sense unexpected or surprising. The use of stabilized chlorine dioxide as a disinfectant or preservative or bacteriocide in aqueous compositions was well established in the prior art, including the above-discussed '126 application.

**Factor 3. Level of ordinary skill in the art.**

The "person having ordinary skill in the art", 35 U.S.C. §103(a), is a hypothetical- not actual- person. *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566 (Fed. Cir. 1987). "Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably pertinent to the particular problem with which the inventor was involved."" *Pentec, Inc. v. Graphics Control Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985), quoting *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979).

With regard to the '078 patent, a person having ordinary skill in the art to which the subject matter of its claims pertains would have at least a doctorate in pharmacy, pharmacology or pharmaceutical sciences and be trained and qualified to themselves develop solutions for use as contact lens cleaning solutions and ophthalmic pharmaceutical compositions such as ophthalmic ointments and eye drops, and have several years actual experience actually developing such products. The person having ordinary skill in the art would therefore have an understanding of the chemistry and mechanism of action of stabilized chlorine dioxide, antimicrobial quaternary ammonium compounds, tonicity components, and all other aspects of the art related to developing products compatible with the eye and the functions required for the specific application, e.g., ophthalmically compatible cleaning agents for cleaning contact lenses. A degree in Pharmacy or Pharmaceutical Sciences or pharmacology gives the individual an understanding of drugs and drug formulations as they relate to diseases and to delivery to different parts of the body as well as the interactions of particular formulation components. If the worker's formal education is not in the pharmaceutical sciences or pharmacology *per se*, but in a related field such as Chemistry, to be one of ordinary skill in these arts would require such an individual to have several additional years of actual experience formulating, developing and/or using such products.

**Factor 1 and Factor 2. Contents of the Prior Art and the Claimed Invention**

**1.4.3.1 PCT Application WO 90/06126 by Bobby C. Danner**

Each of the claims of the '078 patent are also invalid being obvious in light of WO 90/06126 under 35 U.S.C. §103(a). The '126 application was filed November 22, 1989 and published June 14, 1990 by Bio-Cide International Inc. The contents of the '126 application were therefore publicly available well before the filing date of United States Application Number 694,640 that ultimately matured into the '078 patent.

Apotex relies on the discussion, *supra*, describing the anticipation of the '078 patent by this reference for element-by-element analysis and comparison of the claims of the '078 patent to the teachings of the '126 application. If the '126 application does not squarely invalidate the '078 patent as failing to teach every element claimed by the '078 patent, it renders it invalid as obvious by itself and optionally in view of the common knowledge of those having skill in the art. Furthermore, a person skilled in the art would be motivated by the '126 application, particularly the Examples, to use stabilized chlorine dioxide as a preservative in ophthalmic solutions. The '126 application further teaches that a person skilled in the art would know to tailor the pH and osmolality of ophthalmic formulations to match that of eye fluids in order to minimize irritation of the patients' eyes.

To the extent explicit description of the common knowledge in the art is required, Apotex optionally relies on (Milder, Ch. 2 of Adler's Physiology of the Eye 7th ed. 1981) teaching the osmotic pressure of tears as 300 mOm/L with a pH of 7.4, further optionally on J. D. Mullins Ophthalmic Preparations Ch. 87 in *Remington's Pharmaceutical Sciences* 17th ed., (1985) A. R. Gennaro ed., Mack Publishing Co. Eaton Pennsylvania. at page 1651, teaching that "ophthalmic solutions are formulated to be sterile, isotonic, and buffered for stability and comfort," and at 1581 that "the eye can usually tolerate solutions equivalent to a range of 0.5% to 1.8% sodium chloride [and] isotonicity is always desireable..." As described *supra*, the person having ordinary skill in the art would know that the range of pH and osmolality of the '078 patent claims was within the range described as useful in the prior art. Therefore, any limitations in the claims to specific pH ranges (e.g. claim 1, "pH in the range of 6.8 to about 8") or osmolality ranges (e.g. claim 6, "osmolality in the range of about 200 to about 400 mOsmol/kg") merely correspond to known properties of the human eye and anticipate or render these elements obvious. Therefore, claims 1 to 18 inclusive of the '078 patent are obvious in light of the '126 application alone and optionally in view of Milder and/or Mullens.

**1.4.3.2 Harakeh et al J. Appl. Bacteriology (1988) Vol. 64, p459-463**

The Harakeh reference was published in the May 1988 issue of the Journal of Applied Bacteriology. In this article, the authors write that:

> "[t]he main purpose of this study was to examine the bacteriocidal efficacy of Purogene (Bio-cide, Inc. Norman, Oklahoma), a chlorine dioxide-based formulation, against a wide range of bacteria and to investigate the effects of various parameters on its efficacy as a disinfectant. Purogene has a number of industrial and medical applications and is the principle ingredient of a variety of products."

This was is the same Purogene employed by Dziabo and Ripley in the '078 patent (column 7, lines 24 to 33):

> EXAMPLE I
>
> A series of experiments were performed to determine the antimicrobial properties of a borate buffered saline solution preserved with stabilized chlorine dioxide. The stabilized chlorine dioxide employed was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Oklahoma, sold under the trademark Purogene. The concentration of the stabilized chlorine dioxide added to the borate buffered saline solution was varied.

The Harakeh article clearly teaches that stabilized chlorine dioxide is an effective disinfectant against a wide selection of bacteria type (page 461, Table 2 and first column), provided above. Apotex here relies on and incorporates by reference the earlier discussion of anticipation by this reference.

To the extent, if any, this reference does not expressly teach every element of all of the claims of the '078 patent, such elements would be known and/or available in the art to a person having skill in the art of formulating ophthalmic compositions and would have clear motivation to pursue and combine those specific elements with the teaching of Harakeh. The skilled worker knew to tailor the osmolality and pH of ophthalmic formulations to match that of eye fluids in order to minimize irritation of the patients' eyes. The skilled formulator knew that the pH of the human eye is 7.4, and that isotonicity with the eye is desireable, but a certain range of hyper- and hypo-tonicity is generally tolerable. J. D. Mullins Ophthalmic Preparations Ch. 87 in *Remington's Pharmaceutical Sciences* 17th ed., (1985) A. R. Gennaro ed., Mack Publishing Co. Eaton Pennsylvania. at page 1651. Therefore, any limitations in the claims to specific pH ranges (e.g. claim 1, "pH in the range of 6.8 to about 8") or osmolality ranges (e.g. claim 6, "osmolality in the range of about 200 to about 400 mOsmol/kg") cannot distinguish the alleged invention from the prior art as they merely correspond to the known environment of the human eye and the conventional characteristics of ophthalmic formulations.

A person skilled in the art would be motivated and taught by Harakeh and Farris to employ chlorine dioxide as a preservative for ophthalmic compositions having the conventional pH and osmolality as taught in the art and would have fully expected stabilized chlorine dioxide in the claimed concentrations to act as an effective preservative therefor. Harakeh notes that 99.999% (5-log) of most bacteria species tested died within the 15 minute test period. This indicates that the low concentration tested was adequate to act as a preserving agent for ophthalmic formulations. To the extent that microbiocidal activity of this concentration might be inadequate for use as a preservative, one having ordinary skill in the art would be motivated to simply use more to achieve the desired effect, and expect successful preservation with the 2.66- fold to 266-fold increase would remain within the range of claims 2, 7, 9, and 18. Increasing the concentration used by Harakeh by 53-fold to 133-fold results in the concentration required by claims 3 and 10, and one having skill in the art would similarly expect to successfully achieve preservation of ophthalmic compositions with this concentration of stabilized chlorine dioxide based on the teaching of Harakeh. No inventive skill would have been required to use the methods or prepare the compositions of the '078 patent as of the time of the invention.

Claims 1 to 18 inclusive of the '078 patent are obvious in light of Harakeh, optionally in view of Mullins and/or Milder under 35 U.S.C. §103(a) because the references were available in the art before the May 2, 1991 filing date of United States Application Number 694,640 that ultimately matured into the '078 patent.

**2. United States Patent No. 6,562,873: 'Compositions Containing Therapeutically Active Components Having Enhanced Solubility' to Olejnik, Korslake**

The '873 patent was filed on July 10, 2001 as U.S. Patent Application 09/903,962 and claims priority from provisional application 60/218,206, filed July 14, 2000. The '873 patent issued from this application on May 13, 2003 to Olejnik *et al.*, indicating on its face that it was assigned to Allergan, Inc. The '873 patent was prosecuted by Frank J. Uxa.

Because of the close relationship and similarity in the specification and subject matter of the '873, '210, '834, '337 patents discussed herein, each reference cited and relied on and each argument made with respect to validity for any one patent is adopted by reference for the other patents in this group even if such reference or argument is not discussed in whole or part.

The abstract of the '873 patent states:

> Compositions which include therapeutically active components, solubility enhancing components other than cyclodextrins, and oxy-chloro components, wherein the oxy-chloro components are substantially effective as preservatives. In one embodiment, the oxy-chloro components are useful for preserving the therapeutically active components. In one embodiment, the oxy-chloro components include chlorite components. In a useful embodiment, the solubility enhancing components include carboxymethylcellulose.

The disclosure of the '873 patent states at column 1, line 43, under the heading *Brief Summary of the Invention:*

> New TAC-containing compositions have been discovered. The present compositions provide for enhanced TAC solubility substantially without detrimentally affecting the effectiveness of the preservative or preservatives being employed. Solubility enhancing components (SECs) have been found which very effectively increase the solubility of the TACs in the present compositions, and preferably in the biological systems or environments into which the components are introduced. Also, preferably, such solubilization allows the provision of more reliable and reproducible dosage forms of the drugs. This solubility enhancement in accordance with the present invention is achieved substantially without degrading preservative effectiveness. In addition, TAC-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the TACs and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.
>
> The present compositions include oxy-chloro components which are effective in at least assisting in preserving the compositions without detrimentally affecting the TACs and substantially without being detrimentally affected by the SECs. Moreover, the present oxy-chloro components provide preservative action with reduced or even substantially no harm or irritation to the tissues to which the present compositions are administered.

Accordingly, the subject matter of the '873 patent relates to compositions incorporating a therapeutically active component, solubility enhancing component other than cyclodextrin, and an oxy-chloro preservative component. More specifically, the '873 patent relates to the use of additives in ophthalmic formulations to allegedly improve the solubility profile of the active agent.

## 2.1 The Claims

The '873 patent contains 49 claims, reproduced below.

1. A composition comprising:

   a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof, and being present in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered;

   a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component;

   an oxy-chloro component in an effective amount to at least aid in preserving the composition; and

   a liquid carrier component.

2. The composition of claim 1 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.

3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.

4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.

5. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.

6. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

7. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition without the solubility enhancing component.

8. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.

9. The composition of claim 1 wherein the solubility enhancing component comprises a polyanionic component.

10. The composition of claim 9 wherein said polyanionic components is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.

11. The composition of claim 1 wherein the solubility enhancing component comprises an anionic cellulose derivative.

12. The composition of claim 1 wherein the solubility enhancing component comprises a carboxymethylcellulose.

13. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).

14. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10 (w/v).

15. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

16. The composition of claim 1 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.

17. The composition of claim 1 wherein the oxy-chloro component comprises a chlorite component.

18. The composition of claim 1 wherein the oxy-chloro component comprises stabilized chlorine dioxide.

19. The composition of claim 1, wherein the oxy-chloro component is present in an amount of about 500 ppm (w/v) or less.

20. The composition of claim 1 wherein the oxy-chloro component is present in an amount in a range of about 10 ppm (w/v) to about 200 ppm (w/v).

21. The composition of claim 1 which further comprises an additional preservative component other than the oxy-chloro component in an amount effective to at least aid in preserving the composition.

22. The composition of claim 21, wherein the additional preservative component is selected from the group consisting of sorbic acid, benzalkonium chloride, chlorbutol and alkyl esters of p-hydroxybenzoic acid and mixtures thereof.

23. The composition of claim 1 wherein the liquid carrier is an aqueous liquid carrier component.

24. The composition of claim 1 which is a solution.

25. The composition of claim 1 which has a pH of about 7 or greater.

26. The composition of claim 1 which has a pH in a range of about 7 to about 9.

27. The composition of claim 1 which is ophthalmically acceptable.

28. A composition comprising:

a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered;

an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component;

a chlorite component in an effective amount to at least aid in preserving the composition; and

an aqueous liquid carrier component.

29. The composition of claim 28 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

30. The composition of claim 28 wherein the anionic cellulose derivative comprises carboxymethylcellulose.

31. The composition of claim 28 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% to about 0.6% (w/v).

32. A composition comprising: a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; a solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline; a chlorite component in an effective amount to at least aid in preserving the composition; and an aqueous liquid carrier component.

33. The composition of claim 32 wherein the solubility enhancing component comprises a carboxymethylcellulose.

34. The composition of claim 32 which is ophthalmically acceptable.

35. A composition comprising: a therapeutically active component in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered; an oxy-chloro component in an effective amount to at least aid in preserving the composition; and a liquid carrier component, wherein the composition is substantially free of cyclodextrins.

36. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of antibacterials, antihistamines, decongestants, antiinflammatories, antiparasitics, miotics, anticholinergics, adrenergics, antivirals, local anesthetics, antifungals, amoebicidals, trichomonocidals, analgesics, mydriatics, antiglaucoma drugs, carbonic anhydrase inhibitors, ophthalmic diagnostic agents, ophthalmic agents used as adjuvants in surgery, chelating agents, antineoplascics, antihypertensives, muscle relaxants, diagnostics, and mixtures thereof.

37. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of adrenergic agonists and mixtures thereof.

38. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof.

39. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.

40. The composition of claim 35 wherein the therapeutically active component includes a quinoxaline component.

41. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.

42. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.

43. The composition of claim 35 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

44. The composition of claim 35, which further includes a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component.

45. The composition of claim 44 wherein the solubility enhancing component comprises a polyanionic component.

46. The composition of claim 35 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.

47. The composition of claim 35 wherein the oxy-chloro component comprises a chlorite component.

48. The composition of claim 35 wherein the oxy-chloro component comprises stabilized chlorine dioxide.

49. The composition of claim 35 which is ophthalmically acceptable.

It is noteworthy that, contrary to the title and abstract of this patent, claims 35-43 and 46-49 lack any recitation of any solubility enhancing component.

### 2.1.1 Terminal Disclaimer

The claims of the '873 Patent are subject to a terminal disclaimer set forth in the December 24, 2002 letter to the Examiner:

> Your petitioner, Allergan Sales, Inc., hereby disclaims the terminal part of any United States patent granted on the above-identified application which would extend beyond the expiration date of the full statutory term as presently shortened by any terminal disclaimer of any patent issuing from United States Application Serial No. 09/904,018, and hereby agrees that any United States patent so granted on the above-identified application shall be enforceable only for and during such period that the legal title to such patent shall be the same as the legal title to any patent issuing from United States Application Serial No. 09/904,018, this agreement to run with any patent granted on the above-identified application and be binding upon the grantee, its successors or assigns.

United States Application Serial No. 09/904,018 later matured into the '210 Patent.

## 2.2    Non-infringement

Infringement occurs when the accused device meets each claim limitation. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). Unless each and every requirement of a patent claim is found in the accused product, there can be no literal infringement. See, e.g., *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

Apotex's proposed products will not infringe at least claims 21 and 22 of the '873 patent. Dependent claim 21 limits the composition of claim 1 to those containing an additional preservative component in addition to stabilized chlorine dioxide. Dependent claim 22 further limits the composition of claim 21 to additional preservatives from the group consisting of sorbic acid, benzalkonium chloride, chlorbutol and alkyl esters of p-hydroxybenzoic acid and mixtures thereof. Apotex's Proposed Products do not use any preservatives in addition to stabilized chlorine dioxide. Furthermore, Apotex's Proposed Products do not contain sorbic acid, benzalkonium chloride, chlorbutol, alkyl esters of p-hydroxybenzoic acid or mixtures thereof.

## 2.3    Invalidity

Apotex asserts that the '873 Patent and claims 1 to 49 are invalid, void and of no effect. The following is a detailed legal and factual basis of that assertion. In addition, Apotex reserves the right to demonstrate additional factual and legal bases for the invalidity of the claims of the '873 Patent in the future.

### 2.3.1    Invalidity under 35 U.S.C. §112, first paragraph, Lack of written description

At least claims 1-9, 13-27, 32 and 44 of the '873 patent are invalid for lack of written description under 35 U.S.C. §112, first paragraph because the claims do not identify the formula or chemical name of the required SEC, claiming instead through a functional definition.

> "A written description of "an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *Regents of the University of California v. Eli Lilly,* 119 F.3d 1559, 1568 (Fed. Cir. 1997).

Claims 1-9, 13-27, 32 and 44 of the '873 patent attempt to claim the genus of SECs by function alone and impermissibly requires one to make and test a particular composition in order to determine whether it falls within the scope of the claims. This plainly violates the written description requirement. *See New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.,* 298 F.3d 1290, 1296-1297 (Fed. Cir. 2002). A chemical genus may not be defined by its function. See *Enzo Biochem, Inc. v. Gen-probe, Inc.,* 296 F.3d 1316, 1324 (Fed. Cir. 2002).

**2.3.2 Invalidity under 35 U.S.C. §112, second paragraph: Enablement**

As Figure 1 of the '337 Patent shows, brimonidine tartrate is fully soluble (≥ 0.15 %) at pH 7.3 in the absence of sodium CMC. Allergan's Alphagan® P formulation is available in two concentrations of brimonidine tartrate, 0.1 % and 0.15 %. Both concentrations are presumed to be therapeutically effective in that both have FDA approval for sale.

Therefore, at a pH value around 7.3, addition of an "SEC" cannot increase solubility of brimonidine tartrate in solution at a concentration of 0.1 % or 0.15 %, because solubility is at 100 % and thus no increase in solubility is physically possible. Therefore, no "SEC" can serve to increase the absolute solubility of the brimonidine tartrate. Consequently, the claims of the '337 patent cannot be said to cover an aqueous composition containing brimonidine tartrate at 0.1 % or 0.15 % at pH 7.3 because both concentrations provide a therapeutic benefit to a patient to whom they are administered and brimonidine tartrate is completely soluble in such an aqueous solution. On the other hand, if it were asserted that the patent claims encompassed such compositions, the claims violate 35 USC §112 as not enabling one having skill in the art to make and use the claimed invention because the invention does not work. For this reason, the '873 patent is also invalid under 35 U.S.C. §101 for lack of utility.

The applicants make it clear in a February 20, 2002 letter to the Examiner (February 20, 2002 Response to Examiner in '873 File History) that the presence of a solubility enhancing component is critical to the invention in combination with the oxy-chloro component:

> Applicant respectfully disagrees with the restriction requirement and requirement for election of species. An important aspect of the invention is that the compositions comprise a therapeutically active component and both a solubility enhancing component and an oxy-chloro component to render the therapeutically active component more effective.

Claims 35-43 and 46-49 inclusive of the of the '873 Patent do not require the inclusion of a solubility enhancing component in the claimed compositions.

The lack of a solubility enhancing requirement is at odds with the disclosure of the '873 Patent. 35 USC §112 demands that that the written description of the invention enable a person skilled in the art to practice the invention.

> §112. Specification
>
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Therefore at least claims 35-43 and 46-49 are invalid for lack of enablement under 35 U.S.C. §112 because they claim an invention that does not require a solubility enhancing component, contrary to the written description of the alleged invention.

Furthermore, the data provided in the patent Example 2 do not demonstrate the asserted solubility enhancement upon which the '873 patent claims depend. ('873 patent, column 16, lines 19-62) While statistical "$R^2$ values" are provided, these merely indicate whether or not the data can fit a Henderson-Hasselbalch model of solubility. "$R^2$ values" do not and can not indicate whether there is any statistically significant difference in the solubility of brimonidine tartrate between formulations. The actual results are at best unclear. For example, at pH 6.68, a pH value where solubility was measured for samples both with and without CMC (carboxymethylcellulose sodium), the apparent solubility of brimonidine was slightly higher in the absence of CMC than in the presence of 0.17% CMC. The applicants also inferred that at pH 7.5 solubility of brimonidine was greater for 0.5% CMC than for 1.5% CMC without having examined <u>any</u> formulation at that pH. (lines 57-59). Curiously, these samples were made with only 0.2% brimonidine (Table III) but analysis showed some samples assayed as having >1.4% brimonidine (Table IV).

Despite such inconsistencies, the inventors simply conclude, and claim, that CMC enhances solubility of brimonidine tartrate despite this lack of an enabling disclosure.

**<u>2.3.3 Invalidity under 35 U.S.C. 102(a): Anticipation</u>**

Section 102 of 35 U.S.C. broadly defines what is referred to as anticipation, or lack of novelty. As a defense to allegations of infringement, invalidity by anticipation requires that a prior art reference, use or sale disclose all of the claim limitations of the asserted patent. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed". *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

**<u>2.3.3.1 PCT Application WO 00/12137: 'Preserved Cyclodextrin-containing Compositions' to Beck, Kerslake, and Olejnik</u>**

The WO 00/12137 Patent Application to Beck, Kerslake, Olejnik was published March 9, 2000 and relates to aqueous ophthalmic compositions containing brimonidine tartrate, are preserved by an oxy-chloro component, and contain a solubility enhancing component that increases the apparent water solubility of the therapeutic component, brimonidine tartrate (page 2, lines 13 to 20). The only difference between the disclosure of WO 00/12137 and the alleged invention of the '873 patent is the preferred solubility enhancing component. At least from the teachings of Loftsson and the literature cited therein, one having ordinary skill in the art would expect that carboxymethylcellulose sodium would facilitate dissolution of a cationic drug like brimonidine tartrate. Therefore there existed motivated to replace the cyclodextrins of the WO 00/12137 application with CMC to arrive at the alleged invention of the '873 patent.

The WO 00/12137 application provides:

> For example, the present compositions may include a pharmaceutical effective in providing a therapeutic effect when administered to the eyes of a human or animal. The preservative employed is preferably ophthalmically acceptable at the concentration employed so that the human or animal is effectively treated without significant harm caused by the presence of the preservative.

In Example 1, the inventors list a example composition (Composition 1) with the following components (see page 16):

| Components | Composition 1 |
|---|---|
| Sodium chloride | 0.62% (w/v) |
| Potassium chloride | 0.14% (w/v) |
| Calcium chloride (dihydrate) | 0.02% (w/v) |
| Magnesium chloride (hexahydrate) | 0.006% (w/v) |
| Sodium carboxymethylcellulose | 0.5% (w/v) |
| Boric acid | 0.2% (w/v) |
| Sodium borate (decahydrate) | 0.14% (w/v) |
| Brimodine tartarate[1] | 0.2% (w/v) |
| Stabilized chlorine dioxide[2] | 50 ppm (w/v) |
| Sulfobutylether β cyclodextrin | ~~~ |
| Water, USP | Q.S. to volume |
| pH | 7.4 |

(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline

(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE*

In the above ophthalmic composition stabilized chlorine dioxide is the sole preservative and sodium carboxymethylcellulose is said to be a solubility enhancing component of the invention of the '873 patent. Furthermore, the active therapeutic component is brimonidine tartrate, an alpha-2-adrenergic agonist.

The following table sets out the claims of the '873 Patent and the corresponding art from the WO '137 Application.

<table>
<tr><th>Claims of United States Patent Number 6,562,873</th><th>Corresponding Art from WO 00/12137 Application</th></tr>
<tr><td>1. A composition comprising: a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof, and being present in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered; a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component; an oxy-chloro component in an effective amount to at least aid in preserving the composition; and a liquid carrier component.</td><td>
<table>
<tr><th>Components</th><th>Composition 1</th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
WO 00/12137 page 16, lines 4 to 19.<br><br>Note: Brimonidine tartrate is an alpha-2-adrenergic agonist.</td></tr>
</table>

| Claims of United States Patent Number 6,562,873 | Corresponding Art from WO 00/12137 Application |
|---|---|
| *2. The composition of claim 1 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.* | See claim 1.<br><br>Note: Brimonidine tartrate is an imino-imidazoline compound. |
| *3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.* | See claim 1.<br>Note: Brimonidine tartrate is the quinoxaline component. |
| *4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.* | See claim 1.<br><br>Note: Brimonidine tartrate is the quinoxaline component. |
| *5. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.* | See claim 1.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. |
| *6. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.* | See claim 1.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. |
| *7. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition without the solubility enhancing component.* | See claim 1.<br><br>Note: Inherent outcome of practicing art. |
| *8. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.* | See claim 1.<br><br>Note: Inherent outcome of practicing art. |
| *9. The composition of claim 1 wherein the solubility enhancing component comprises a polyanionic component.* | See claim 1.<br><br>Note: NaCMC is a polyanionic polymer. |
| *10. The composition of claim 9 wherein said polyanionic components is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.* | See claim 1.<br><br>Note: NaCMC is a polyanionic polymer derived from cellulose. |

| Claims of United States Patent Number 6,562,873 | Corresponding Art from WO 00/12137 Application |
|---|---|
| *11. The composition of claim 1 wherein the solubility enhancing component comprises an anionic cellulose derivative.* | See claim 1.<br><br>Note: NaCMC is a polyanionic polymer derived from cellulose. |
| *12. The composition of claim 1 wherein the solubility enhancing component comprises a carboxymethylcellulose.* | See claim 1. |
| *13. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).* | See claim 1.<br><br>Note: NaCMC concentration is 0.5 % w/v. |
| *14. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10 (w/v).* | See claim 1.<br><br>Note: NaCMC concentration is 0.5 % w/v. |
| *15. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).* | See claim 1.<br><br>Note: NaCMC concentration is 0.5 % w/v. |
| *16. The composition of claim 1 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.* | Very useful examples of the present preservative components include, but are not limited to, chlorite components, sorbic acid components and mixtures thereof.<br><br>WO 00/12137, page 9, line 1 to 3. See also claim 1<br><br>Note: Stablized chlorine dioxide (aka sodium chlorite) is a chlorite component. |
| *17. The composition of claim 1 wherein the oxy-chloro component comprises a chlorite component.* | Very useful examples of the present preservative components include, but are not limited to, chlorite components, sorbic acid components and mixtures thereof.<br><br>WO 00/12137, page 9, line 1 to 3. See also claim 1.<br><br>Note: Stablized chlorine dioxide (aka sodium chlorite) is a chlorite component. |
| *18. The composition of claim 1 wherein the oxy-chloro component comprises stabilized chlorine dioxide.* | Very useful examples of the present preservative components include, but are not limited to, chlorite components, sorbic acid components and mixtures thereof.<br><br>WO 00/12137, page 9, line 1 to 3. See also claim 1. |
| *19. The composition of claim 1, wherein the oxy-chloro component is present in an amount of about 500 ppm (w/v) or less.* | Very useful examples of the present preservative components include, but are not limited to, chlorite components, sorbic acid components and mixtures thereof.<br><br>WO 00/12137, page 9, line 1 to 3. See also claim 1.<br>Note: Stabilized chlorine dioxide concentration is 50 ppm. |

| Claims of United States Patent Number 6,562,873 | Corresponding Art from WO 00/12137 Application |
|---|---|
| *20. The composition of claim 1 wherein the oxy-chloro component is present in an amount in a range of about 10 ppm (w/v) to about 200 ppm (w/v).* | Very useful examples of the present preservative components include, but are not limited to, chlorite components, sorbic acid components and mixtures thereof.<br><br>WO 00/12137, page 9, line 1 to 3. See also claim 1.<br>Note: Stabilized chlorine dioxide concentration is 50 ppm. |
| *21. The composition of claim 1 which further comprises an additional preservative component other than the oxy-chloro component in an amount effective to at least aid in preserving the composition.* | Note: Apotex's Proposed Products do not employ an additional preservative. |
| *22. The composition of claim 21, wherein the additional preservative component is selected from the group consisting of sorbic acid, benzalkonium chloride, chlorbutol and alkyl esters of p-hydroxybenzoic acid and mixtures thereof.* | Note: Apotex's Proposed Products do not include sorbic acid, benzalkonium chloride, chlorbutol or alkyl esters of p-hydroxybenzoic acid. |
| *23. The composition of claim 1 wherein the liquid carrier is an aqueous liquid carrier component.* | The present compositions can have the characteristics of simple liquid, for example, aqueous liquid, solutions<br><br>WO 00/12137, page 6, lines 13 to 15. See also claim 1.<br>Note: Water is an aqueous liquid carrier. |
| *24. The composition of claim 1 which is a solution.* | The present compositions can have the characteristics of simple liquid, for example, aqueous liquid, solutions<br><br>WO 00/12137, page 6, lines 13 to 15. See also claim 1.<br>Note: Water is an aqueous liquid carrier. |
| *25. The composition of claim 1 which has a pH of about 7 or greater.* | See claim 1.<br><br>Note: pH is 7.4. |
| *26. The composition of claim 1 which has a pH in a range of about 7 to about 9.* | See claim 1.<br><br>Note: pH is 7.4. |
| *27. The composition of claim 1 which is ophthalmically acceptable.* | See claim 1.<br><br>Note: Stabilized chlorine dioxide is ophthalmically acceptable. |

<table>
<tr><th>Claims of United States<br>Patent Number 6,562,873</th><th>Corresponding Art from<br>WO 00/12137 Application</th></tr>
<tr><td>28. A composition comprising: a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component; a chlorite component in an effective amount to at least aid in preserving the composition; and an aqueous liquid carrier component.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition [1]</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE®<br><br>
WO 00/12137 page 16, lines 4 to 19.<br><br>
Note: Brimonidine tartrate is an alpha-2-adrenergic agonist; NaCMC is an anionic cellulose derivative; stabilized chlorine dioxide is a chlorite; water is an aqueous liquid carrier.</td></tr>
<tr><td>29. The composition of claim 28 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.</td><td>See claim 28.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.</td></tr>
<tr><td>30. The composition of claim 28 wherein the anionic cellulose derivative comprises carboxymethylcellulose.</td><td>See claim 28.<br><br>Note: NaCMC is an anionic cellulosic derivative.</td></tr>
<tr><td>31. The composition of claim 28 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% to about 0.6% (w/v).</td><td>See claim 28.<br><br>Note: NaCMC concentration is 0.5 % w/v.</td></tr>
</table>

<table>
<tr><th>Claims of United States<br>Patent Number 6,562,873</th><th>Corresponding Art from<br>WO 00/12137 Application</th></tr>
<tr><td>32. A composition comprising: a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; a solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline; a chlorite component in an effective amount to at least aid in preserving the composition; and an aqueous liquid carrier component.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition 1</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartrate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE®<br><br>
WO 00/12137 page 16, lines 4 to 19.<br><br>
Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline; NaCMC is a solubility enhancing component; stabilized chlorine dioxide is a chlorite; water is an aqueous liquid carrier.</td></tr>
<tr><td>33. The composition of claim 32 wherein the solubility enhancing component comprises a carboxymethylcellulose.</td><td>See claim 32.</td></tr>
<tr><td>34. The composition of claim 32 which is ophthalmically acceptable.</td><td>See claim 32.<br><br>Note: Stabilized chlorine dioxide is ophthalmically acceptable.</td></tr>
</table>

<table>
<tr><th>Claims of United States<br>Patent Number 6,562,873</th><th>Corresponding Art from<br>WO 00/12137 Application</th></tr>
<tr><td>35. A composition comprising: a therapeutically active component in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered; an oxy-chloro component in an effective amount to at least aid in preserving the composition; and a liquid carrier component, wherein the composition is substantially free of cyclodextrins.</td><td>
<table>
<tr><th>Components</th><th>Composition 1</th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE'<br><br>
WO 00/12137 page 16, lines 4 to 19.<br><br>
Note: Brimonidine tartrate is a therapeutically active agent; stabilized chlorine dioxide is an oxy-chloro component; water is liquid carrier.</td></tr>
<tr><td>36. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of antibacterials, antihistamines, decongestants, antiinflammatories, antiparasitics, miotics, anticholinergics, adrenergics, antivirals, local anesthetics, antifungals, amoebicidals, trichomonocidals, analgesics, mydriatics, antiglaucoma drugs, carbonic anhydrase inhibitors, ophthalmic diagnostic agents, ophthalmic agents used as adjuvants in surgery, chelating agents, antineoplascics, antihypertensives, muscle relaxants, diagnostics, and mixtures thereof.</td><td>See claim 35.<br><br>Note: Brimonidine tartrate is an adrenergic.</td></tr>
<tr><td>37. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of adrenergic agonists and mixtures thereof.</td><td>See claim 35.<br><br>Note: Brimonidine tartrate is an adrenergic agonist.</td></tr>
<tr><td>38. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof.</td><td>See claim 35.<br><br>Note: Brimonidine tartrate is an alpha-2-adrenergic agonist.</td></tr>
</table>

| **Claims of United States Patent Number 6,562,873** | **Corresponding Art from WO 00/12137 Application** |
|---|---|
| *39. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.* | See claim 35.<br><br>Note: Brimonidine tartrate is an imino-imidazoline. |
| *40. The composition of claim 35 wherein the therapeutically active component includes a quinoxaline component.* | See claim 35.<br><br>Note: Brimonidine tartrate is the quinoxaline component. |
| *41. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.* | See claim 35.<br><br>Note: Brimonidine tartrate is the quinoxaline component. |
| *42. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.* | See claim 35.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. |
| *43. The composition of claim 35 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.* | See claim 35.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. |
| *44. The composition of claim 35, which further includes a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component.* | See claim 35.<br><br>Note: NaCMC is solubility enhancing component. |
| *45. The composition of claim 44 wherein the solubility enhancing component comprises a polyanionic component.* | See claim 35.<br><br>Note: NaCMC is a polyanionic component. |
| *46. The composition of claim 35 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.* | See claim 35.<br><br>Note: Stabilized chlorine dioxide is a chlorite. |

| Claims of United States Patent Number 6,562,873 | Corresponding Art from WO 00/12137 Application |
|---|---|
| *47. The composition of claim 35 wherein the oxy-chloro component comprises a chlorite component.* | See claim 35.<br><br>Note: Stabilized chlorine dioxide is a chlorite. |
| *48. The composition of claim 35 wherein the oxy-chloro component comprises stabilized chlorine dioxide.* | See claim 35. |
| *49. The composition of claim 35 which is ophthalmically acceptable.* | See claim 35.<br><br>Note: Stabilized chlorine dioxide is ophthalmically acceptable. |

As can be seen in the above table, for claims 1-20 and 23-49 of the '873 patent, the WO '137 Application teaches compositions that read on every element of these claims, including their respective amounts, of the compositions specified in the claims of the '873 Patent. This remains true whether or not CMC actually acts to enhance the solubility of brimonidine or the inventors listed on the WO '137 application appreciated that CMC acted as a solubility enhancing agent. *Schering Corp v. Geneva Pharm. USA Inc.* 339 F.3d 1373 (Fed. Cir. 2003) Accordingly, Composition 1 of the WO '137 application renders claims 1-20 and 23-49 of the '873 patent invalid under 35 U.S.C. §102(a) because every element of these claims is taught in at least Composition 1 of the WO '137, and this application was published before the priority date of the '873 patent.

### 2.3.4 Invalidity under 35 U.S.C. §103(a): Obviousness

Section 103(a) of 35 U.S.C. requires that valid patent claims not merely be novel in accordance with Section 102 of 35 U.S.C., but also that "the differences between the subject matter sought to be patented and the prior art [not be] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

The Federal Circuit has paraphrased the requirements of §103(a) as "[P]atentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process <u>should be carried out</u> and would have a <u>reasonable likelihood of success</u> viewed in light of the prior art.'" *Merck v. Biocraft,* 874 F.2d 804 at 809 (Fed. Cir. 1989), citing *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) [emphases added]. In assessing obviousness, the controlling case law [*Graham v. John Deere*, 383 U.S. 1 at 17-18 (1966)] requires a four-part analysis:

1. The scope and content of the prior art are determined;
2. The differences between the prior art and the claims are determined;
3. The level of ordinary skill in the art at the time the invention was made is ascertained; and

4. Any objective indicia of unobviousness are examined.

Analysis of factors 1-2 is incorporated in the discussion of individual prior art references below.

**Factor 4. Objective indicia of unobviousness**

Objective indicia of non-obviousness include any unexpected results, commercial success, copying of the invention, and failures of others to solve the problem addressed by the invention. See *Graham v. John Deere Co.*, 383 U.S. 1, 17-18; *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991); *In re Rouffet*, 149 F.3d 1350, 1355 (Fed.Cir.1998). Even though "secondary considerations may often be the most probative and cogent evidence in the record," *Stratoflex Inc. v Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) and "may be sufficient to overcome a prima facie case of obviousness," *In re Beattie*, 974 F.2d 1309, 1313 (Fed. Cir. 1992), "they do not control the obviousness conclusion." *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed Cir. 1988). Where a strong prima facie case of obviousness is made, secondary considerations may not suffice to demonstrate non-obviousness. *Pfizer, Inc. v. Apotex* 2007 U.S. App. LEXIS 6623 at *63 (Fed. Cir. March 22, 2007)

Apotex contends that none of the results alleged by the applicants to the support the patentability of the '873 Patent were in any sense unexpected or surprising. The use of brimonidine tartrate as a alpha-2-adrenergic agonists, sodium carboxymethyl cellulose as a solubility enhancing agent, and chlorine dioxide as a preservative of ophthalmic compositions was established in the prior art.

Furthermore, commercial success is particularly uninformative with regard to the obviousness analysis because FDA-based marketing exclusivity and patents on earlier formulations precluded competition. *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371 (Fed. Cir. 2005).

**Factor 3. Level of ordinary skill in the art**

The "person having ordinary skill in the art", 35 U.S.C. §103(a), is a hypothetical- not actual- person. *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566 (Fed. Cir. 1987). "Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably pertinent to the particular problem with which the inventor was involved."" *Pentec, Inc. v. Graphics Control Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985), quoting *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979).

With regard to the '873 Patent, a person having ordinary skill in the art to which the subject matter of its claims pertains would have at least a doctorate in pharmacy, pharmacology or pharmaceutical sciences and be trained and qualified to themselves develop ophthalmic pharmaceutical compositions such as ophthalmic ointments and eye drops, and have several years actual experience actually developing such products. The person having ordinary skill in the art would therefore have an understanding of the chemistry and mechanism of action of brimonidine tartrate, stabilized chlorine dioxide, antimicrobial quaternary ammonium compounds, tonicity components, solubility modifying agents, viscosity modifying agents, and all other aspects of the art related to developing products compatible with the eye and the functions required for the specific product. A degree in Pharmacy or Pharmaceutical Sciences or

pharmacology gives the individual an understanding of drugs and drug formulations as they relate to diseases and to delivery to different parts of the body as well as the interactions of particular formulation components. If the worker's formal education is not in the pharmaceutical sciences or pharmacology *per se*, but in a related field such as Chemistry, to be one of ordinary skill in these arts would require such an individual to have several additional years of actual experience formulating, developing and/or using such products.

**Factor 1 and Factor 2. Contents of the Prior Art and the Claimed Invention**

**2.3.4.1 Brimonidine, Alphagan 0.5% and Alphagan 0.2%**

As the Court of Appeals for the Federal Circuit has observed, "On September 6, 1996, Allergan obtained approval of its NDA for the drug, brimonidine, the chemical compound in Alphagan, for reducing [intra-ocular pressure]. As a result, Allergan received a five-year period of market exclusivity for brimonidine plus a six-month extension for researching the health effects and safety of the drug in children. This exclusive term expired on March 6, 2002. Brimonidine is not protected by a patent and is therefore in the public domain." *Allergan, Inc. v. Alcon Labs.*, 324 F.3d 1322, 1327 (Fed. Cir. 2003). That product, Alphagan®, was available as 0.2% and 0.5% solutions preserved with benzalkonium chloride 0.05 mg/ml and containing citric acid; polyvinyl alcohol; sodium chloride; sodium citrate; and purified water. (Alphagan Labeling, at http://www.fda.gov/cder/foi/label/2001/21262s006lbl.pdf)

**2.3.4.2 Rosen, S., M. Abelson, A. Giovanoni, D. Welch, *Invest. Ophthal.* 1998 39: S451**

In this reference Rosen et al. describe clinical trials of another Allergan product, Refresh Tears®, which comprises 0.5% carboxymethylcellulose sodium, along with sodium chloride, potassium chloride, calcium chloride dihydrate, magnesium chloride hexahydrate, boric acid and sodium borate decahydrate (as buffering agents) and purified water with a stabilised oxychloro complex (Purite™) equivalent to 0.005% w/v stabilised chlorine dioxide (50 ppm). This is the same, or nearly the same, as the formulation of Apotex's proposed products without the brimonidine tartrate. The authors concluded that the formulation was "safe, comfortable, and well-accepted" by patients with dry eyes. Such a formulation provides benefits relative to products with cationic preservatives, such as fewer allergic reactions and reduced toxicity to corneal tissues. Such toxicity was recognized in the field and subsequently reviewed in Noecker, R. Effects of Common Ophthalmic preservatives on ocular health, *Adv. In Therapy* (2001) 18:205-215. One having ordinary skill in the art would have been motivated to use such a benign vehicle for delivery of a therapeutic compound like brimonidine, which must be administered daily for treatment of glaucoma. Accordingly, Rosen (1998) in view of the Alphagan® product renders the '873 patent claims 1-9, 20, and 23-49 invalid under 35 U.S.C. 103(a).

**2.3.4.3 Loftsson, T., Fridriksdottir, H., Gudmundsdottir, T. K. *Int. J. Pharmaceutics* 1996, *127*, 293-296: 'The effect of water-soluble polymers on aqueous solubility of drugs'**

In this article published in 1996, Loftsson et al stated that:

> Water-soluble polymers have been used in pharmaceutical formulations for many years and although the polymers are usually considered to be chemically inert. they are known to form complexes with small molecules in aqueous solutions. Almost 40 years ago Takeru Higuchi and coworkers investigated interactions of various drugs with a number of water-soluble polymers,

> i.e., polyethylene glycols. polypropylene glycols, polyvinylpyrrolidone and carboxymethyl cellulose.

Loftsson et al also teach:

> In our work with cyclodextrins and polymers we have observed that polymers can be used to solubilize water-insoluble drugs. or drugs with limited water-insoluble drugs or drugs with limited aqueous solubility. In this paper we show that small amounts of polymers commonly used in various drug formulations, <u>such as eye drops</u> and nasal sprays. enhance aqueous solubility of many drugs through complex formation. The polymers can interact with drug molecules via electrostatic bond (i.e., ion-to-ion, ion-to-dipole and dipole-to-dipole bonds) but other types of forces, such as van der Waals' forces and hydrogen bridges, may frequently participate in the complex formation (Rácz, 1989).

Clearly, Loftsson et al article clearly states that a person skilled in the art of aqueous drug formulation would have been aware of Kennon and Higuchi's work, described further below. Furthermore, Loftsson et al. teach that "small amounts of polymers commonly used in various drug formulations, <u>such as eye drops</u> and nasal sprays, enhance aqueous solubility of many drugs through complex formation." Therefore, the person skilled in the art would fully expect that carboxymethylcellulose sodium would improve the solubility a cationic drug, such as brimonidine tartrate, in aqueous solution well before the July 10, 2001 filing date of the '873 Patent.

To the extent, if any, a person having ordinary skill in the art preparing a brimonidine eye drop found that solubility was limited in an aqueous composition, they would be motivated to use the known strategy of increasing the solubility by addition of a polyanion. In this way, Loftsson renders the subject matter of the '873 patent obvious in view of the Alphagan® product and Rosen, *supra*, and further optionally in view of the '126 application discussed at length in the section discussing the '078 patent and reviewed below.

**<u>2.3.4.4 PCT Application WO 90/06126 by Bobby C. Danner</u>**

The claims of the '873 patent are also directed to compositions with a solubility enhancing component and a oxy-chloro preservative. The use of stabilized chlorine dioxide in ophthalmic compositions was well established before the date of filing of the '873 patent. The '126 application, *inter alia*, teaches the use of chlorine dioxide for the preservation of ophthalmic solutions.

The '126 application was filed November 22, 1989 and published June 14, 1990, naming Bobby C. Danner of Oklahoma as inventor and Bio-cide International Inc. of Oklahoma as assignee. The contents of the '126 application were therefore publicly available well before the priority date of the '873 Patent (July 14, 2000).

The '126 application teaches the use of stabilized chlorine dioxide for the disinfection and preservation of ophthalmic solutions. Furthermore, the '126 application teaches the inclusion of buffering and tonicity agents to render the solution amenable to use in the eye as discussed in regard to the '078 patent *supra*.

Based on the contents of the art at the time of the filing of the '873 Patent a person skilled in the art would be knowledgeable that brimonidine tartrate is an example of a therapeutically effective alpha-2-adrenergic agonists. Loftsson et al. teaches the person skilled in the art that sodium carboxymethylcellulose can be used to improved the solubility of cationic drugs. Further, Danner teaches that chlorine dioxide is an effective preservative for ophthalmic compositions. Therefore, claims 1 to 20 inclusive and 23 to 49 inclusive of the '873 patent are obvious in light of Loftsson and the '126 application under 35 U.S.C. §103(a) because one having ordinary skill in the art would reasonably expect that solubility problems, if any, encountered in the development of an ophthalmic dosage form of brimonidine would be ameliorated by inclusion of carboxymethylcellulose.

**2.3.4.5 United States Patent Number 5,834,470: '6-(2-Imidazoleamino) Quinoxaline Compounds Useful as α-2-Adrenoreceptor Agonists' to Maurer**

United States Patent Number 5,834,470 issued November 10, 1998 to Proctor & Gamble, teaches α-2-adrenergic agonist compositions composed of a quinoxaline α-2-agonists and their use in treatment of ocular disorders, such as glaucoma, via topical application to the eye. This reference provided at Column 2, lines 24 to 49 that:

> The subject invention relates to methods of treating nasal congestion comprising administration, to a human or lower animal in need of such treatment of a safe and effective amount of a compound having the following structure:
>
> R N N NH HN N R
>
> Wherein
> (a) R is unsubstituted $C_1$ -$C_3$ alkanyl or alkenyl; and
>
> (b) R' is selected from hydrogen; unsubstituted $C_1$ -$C_3$ alkanyl or alkenyl; unsubstituted $C_1$ -$C_3$ alkylthio or alkoxy; hydroxy; thiol; and halo.
>
> The subject invention also relates to the use of such compounds for preventing or treating other respiratory, ocular and/or gastrointestinal disorders.

The '470 patent at Column 3, line 66 to column 4, line 4 provides:

> The compounds of the subject invention are also useful for the treatment of ocular disorders associated with increased intraocular pressure, such as glaucoma. The compounds are administered either perorally, or topically as drops, gels or creams directly to the surface of the mammalian eye.

The '470 patent also teaches that pharmaceutically acceptable carriers including sodium carboxymethylcellulose (see column 8, line 61 to column 9, line 9):

> Some examples of substances which can serve as pharmaceutically-acceptable carriers or components thereof are sugars, such as lactose, glucose and sucrose; starches, such as corn starch

> and potato starch; cellulose and its derivatives, such as sodium carboxymethyl cellulose, ethyl cellulose, and methyl cellulose; powdered tragacanth; malt; gelatin; talc; solid lubricants, such as stearic acid and magnesium stearate; calcium sulfate; vegetable oils, such as peanut oil, cottonseed oil, sesame oil, olive oil, corn oil and oil of theobroma; polyols such as propylene glycol, glycerine, sorbitol, mannitol, and polyethylene glycol; alginic acid; emulsifiers, such as the Tweens.RTM.; wetting agents, such sodium lauryl sulfate; coloring agents; flavoring agents; tableting agents, stabilizers; antioxidants; preservatives; pyrogen-free water; isotonic saline; and phosphate buffer solutions.

The '470 patent further teaches that these modified cellulose derivatives can be used in topical ocular compositions (col. 10, lines. 38-52):

> Preferred compositions of the subject invention include aqueous solutions comprising a safe and effective amount of a subject compound intended for topical intraocular administration. Such compositions preferably comprise from about 0.0001% to about 5% of a subject compound, more preferably from about 0.01% to about 0.5%. Such compositions also typically include one or more of preservatives, such as benzalkonium chloride, thimerosal, phenylmercuric acetate; vehicles, such as poloxamers, modified celluloses, povidone and purified water; tonicity adjustors, such as sodium chloride, mannitol and glycerin; buffers such as acetate, citrate, phosphate and borate; antioxidants such as sodium metabisulfite, butylated hydroxy toluene and acetyl cysteine; acids and bases may be used to adjust the pH of these formulations as needed.

Based on the contents of the art at the time of the filing of the '873 Patent a person skilled in the art would be knowledgeable use of therapeutically effective alpha-2-adrenergic agonists in combination with sodium carboxymethylcellulose in ocular compositions because of the teachings of the '470 Patent. The person skilled in the art would also be aware that Loftsson teaches the person skilled in the art that sodium carboxymethylcellulose can be used to improved the solubility of cationic drugs and that Danner (the '126 application) teaches that chlorine dioxide is an effective preservative for ophthalmic compositions. One having ordinary skill in the art would have a reasonable expectation that the composition of the '873 could be successfully prepared based on these teachings. Therefore, claims 1 to 20 inclusive and 23 to 49 inclusive of the '873 patent are invalid in light of Maurer, Loftsson and Danner ('126 application) under 35 U.S.C. §103(a) because the subject of those claims would have been obvious to one having ordinary skill in the art.

### 2.3.4.6. PCT Application WO 00/12137: 'Preserved Cyclodextrin-containing Compositions' to Beck, Kerslake, and Olejnik

The WO 00/12137 patent application to Beck, Kerslake, and Olejnik was published March 9, 2000 and relates to aqueous ophthalmic compositions containing brimonidine tartrate, are preserved by an oxy-chloro component, and contain a solubility enhancing component that increases the apparent water solubility of the therapeutic component, brimonidine tartrate (page 2, lines 13 to 20). The only difference between the disclosure of WO 00/12137 and the alleged invention of the '873 patent is the preferred solubility enhancing component. At least from the teachings of Loftsson and the literature cited therein, one having ordinary skill in the art would expect that carboxymethylcellulose sodium would facilitate dissolution of a cationic drug like brimonidine tartrate. Therefore, there existed motivation to replace the cyclodextrins of the WO 00/12137 application with CMC to arrive at the alleged invention of the '873 patent.

In the "Composition 1" discussed *supra*, stabilized chlorine dioxide is the sole preservative and sodium carboxymethylcellulose is said to be a solubility enhancing component of the invention

of the '873 patent. Furthermore, the active therapeutic component is brimonidine tartrate, an alpha-2-adrenergic agonist.

As can be seen in the table above in the discussion of anticipation, claims 1 to 20 inclusive and 23 to 49 inclusive the WO '137 Application teaches compositions that read on each of the components, including their respective amounts, of the compositions specified in the claims of the '873 Patent. To the extent, if any, that claims 1-20 and 23-49 of the '873 patent are not fully anticipated by the WO '137 application, they are rendered obvious. As discussed above, one having ordinary skill in the art would have been motivated to use carboxymethylcellulose in the place of cyclodextrins to enhance solubility of brimonidine if such was necessary. Therefore, claims 1-20 inclusive and 23-49 inclusive of the '873 patent are rendered obvious by WO 00/12137 under 35 U.S.C. §103(a) because WO 00/12137 was published on March 9, 2000, prior to the July 14, 2000 priority date of the '873 patent and one having ordinary skill in the art would have been motivated to use the formulation of Compound 1 as a delivery system for brimonidine.

**3. United States Patent No. 6,627,210: 'Compositions Containing α-2-Adrenergic Agonist Components' to Olejnik, Kerslake**

The '210 patent was filed on July 10, 2001 by Allergan as U.S. Patent Application 09/904,018 claiming priority from provisional Application Number 60/218,200 filed on July 14, 2000. The '210 patent issued from this application on September 30, 2003 to Olejnik *et al.*, indicating on its face that it was assigned to Allergan, Inc. The '210 patent was prosecuted by Carlos A. Fisher; Martin A. Voet; Robert J. Baran.

The abstract of the '210 patent states:

> Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

The disclosure of the '210 patent states at column 1, line 53, under the heading *Summary of the Invention:*

> New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.
>
> The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition

to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

Accordingly, the subject matter of the '210 patent relates to compositions useful for improving the effectiveness of α-2-adrenergic agonists in ophthalmic formulations by employing solubility enhancement component to allegedly improve the solubility profile of the active agent.

## 3.1 The Claims

The '210 patent contains 34 claims, reproduced below.

1. A therapeutically effective aqueous composition comprising: a therapeutically active alpha-2-adrenergic agonist component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and a polyanionic solubility enhancing component in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

2. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

3. The composition of claim 1 wherein the therapeutically active component is substantially unionized.

4. The composition of claim 1 wherein the therapeutically active component is substantially unionized in a biological environment to which the composition is administered.

5. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition the solubility enhancing component.

6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.

7. The composition of claim 1 wherein said polyanionic component is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.

8. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of anionic cellulose derivatives and mixtures thereof.

9. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of carboxymethylcelluloses and derivatives thereof.

10. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).

11. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10% (w/v).

12. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

13. The composition of claim 1 which has a pH of about 7 or greater.

14. The composition of claim 1 which has a pH in a range of about 7 to about 9.

15. The composition of claim 1 which is ophthalmically acceptable.

16. A therapeutically effective aqueous composition comprising: a therapeutically active component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component.

17. The composition of claim 16 wherein the alpha-2-adrenergic agonist component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

18. The composition of claim 16 wherein the anionic cellulose derivative comprises carboxymethylcellulose.

19. The composition of claim 16 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

20. A therapeutically effective aqueous composition comprising: a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and an anionic solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

21. The composition of claim 20 wherein the solubility enhancing component comprises a carboxymethylcellulose.

22. The composition of claim 20 which is ophthalmically acceptable.

23. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

24. The composition of claim 23 in which the preservative comprises benzalkonium chloride.

25. The composition of claim 23 in which the preservative comprises an oxy-chloro component.

26. The composition of claim 23 in which the preservative comprises a chlorite component.

27. The composition of claim 16 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

28. The composition of claim 27 which the preservative comprises benzalkonium chloride.

29. The composition of claim 27 in which the preservative comprises an oxy-chloro component.

30. The composition of claim 27 in which the preservative comprises a chlorite component.

31. The composition of claim 20 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

32. The composition of claim 31 in which the preservative comprises benzalkonium chloride.

33. The composition of claim 31 in which the preservative comprises an oxy-chloro component.

34. The composition of claim 31 in which the preservative comprises a chlorite component.

### 3.1.1 Terminal Disclaimer

The claims of the '210 Patent are subject to a terminal disclaimer made in a May 19, 2003 letter to the Examiner:

> The owner, Allergan Sales, LLC, successor by operation of law to Allergan Sales, Inc., of 1000 percent interest in the instant application hereby disclaims the terminal part of any United States patent granted on the above-identified application except as provided below the terminal part of the statutory term of any patent granted on the instant application, which would extend beyond the expiration date of the full statutory term defined in 35 USC 154 and 173, as may be presently shortened by any terminal diclaimer of 1) any patent issuing on co-pending United States Patent Application No. 10/236/556 and on 2) issued United States Patnet6,562,873...

### 3.2 Non-infringement

Infringement occurs when the accused device meets each claim limitation. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). Unless each and every requirement of a patent claim is found in the accused product, there can be no literal infringement. See, e.g., *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). An accused device also may infringe a claim under the doctrine of equivalents if it performs substantially the same overall function, in substantially the same way, to produce substantially the same overall result as the claimed invention. *Warner-Jenkins Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *Grover Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950).

Dependent claims 24, 28, and 32 limit the compositions of claims 23, 27, and 31 to those containing benzalkonium chloride as an additional preservative component. At least claims 24, 28 and 32 will not be infringed by Apotex's Proposed Products because they do not contain benzalkonium chloride.

### 3.3 Invalidity

Apotex asserts that the '210 Patent and all of its claims are invalid, void and of no effect. The following is a detailed legal and factual basis of that assertion. In addition, Apotex reserves the

right to demonstrate additional factual and legal bases for the invalidity of the claims in the '210 Patent in the future.

### 3.3.1 Invalidity under 35 U.S.C. §103(a): Obviousness

Section 103(a) of 35 U.S.C. requires that valid patent claims not merely be novel in accordance with Section 102 of 35 U.S.C., but also that "the differences between the subject matter sought to be patented and the prior art [not be] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

The Federal Circuit has paraphrased the requirements of §103(a) as "[P]atentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success viewed in light of the prior art.'" *Merck v. Biocraft,* 874 F.2d 804 at 809 (Fed. Cir. 1989), citing *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) [emphases added]. In assessing obviousness, the controlling case law [*Graham v. John Deere*, 383 U.S. 1 at 17-18 (1966)] requires a four-part analysis:

1. The scope and content of the prior art are determined;
2. The differences between the prior art and the claims are determined;
3. The level of ordinary skill in the art at the time the invention was made is ascertained; and
4. Any objective indicia of unobviousness are examined.

Analysis of factors 1-2 is incorporated in the discussion of individual prior art references below.

**Factor 4. Objective indicia of unobviousness**

Objective indicia of non-obviousness include any unexpected results, commercial success, copying of the invention, and failures of others to solve the problem addressed by the invention. See *Graham v. John Deere Co.,* 383 U.S. 1, 17-18; *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991); *In re Rouffet*, 149 F.3d 1350, 1355 (Fed.Cir.1998).

Apotex contends that none of the results alleged by the applicants to the support the patentability of the '210 Patent were in any sense unexpected or surprising. The use of brimonidine tartrate as an alpha-2-adrenergic agonist, anionic cellulosic derivatives as solubility enhancing agents, and stabilized chlorine dioxide as a preservative for ophthalmic compositiosn was well established in the prior art.

**Factor 3. Level of ordinary skill in the art**

The "person having ordinary skill in the art", 35 U.S.C. §103(a), is a hypothetical- not actual- person. *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566 (Fed. Cir. 1987). "Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably

pertinent to the particular problem with which the inventor was involved."" *Pentec, Inc. v. Graphics Control Corp.*, 776 F.2d 309, 313 (Fed. Cir. 1985), quoting *In re Wood*, 599 F.2d 1032, 1036 (CCPA 1979).

With regard to the '210 Patent, a person having ordinary skill in the art to which the subject matter of its claims pertains would have at least a doctorate in pharmacy, pharmacology or pharmaceutical sciences and be trained and qualified to develop ophthalmic formulations for topical application of therapeutic agents. Such a person would have a clear understanding of the breadth of chemical components that are regularly part of a pharmaceutical formulator's repertoire.

**Factors 1 and 2: Contents of the Prior Art and the Claimed Invention**

**3.3.1.1 Kennon, L., Higuchi, T. *J. Am. Pharmaceut. Assoc.* 1959, *45*, 261-264: 'Interaction Studies of Cationic Drugs with Anionic Polyelectrolytes I* Sodium Carboxymethylcellulose'**

The claims of the '210 patent are also directed to compositions with a solubility enhancing component to improve the solubility of alpha-2-adrenergic agonists, in particular brimonidine tartrate. Brimonidine tartrate is an acid addition salt formed by the reaction of tartaric acid with brimonidine. Brimonidine tartrate is an ionic salt, where the tartrate and brimonidine represent the anionic and cationic components of the salt respectively. Brimonidine tartrate is an example of a cationic drug species.

In this 1959 article, Kennon and Higuchi taught that the solubility of cationic drugs can be increased by the addition of polyelectrolytes.

> The incorporation of polyelectrolytes in pharmaceutical systems is more prevalent presently than was formerly the case. The significance of their value in considerations of drug insolubilization, appearance, and stability, and also in prolongation of action is appreciated to a greater extent. The latter two facets of polyelectrolyte application are the ones which are apparently receiving the most attention in industrial pharmaceutical research currently.

In the same article, Kennon and Higuchi tested the ability of sodium carboxymethylcellulose, a polyelectrolyte, to affect the solubility of various cationic drug species:

> Fig. 2 – Graph indicates that non-Donnan binding of the ephedrine and amphetamine by sodium carboxymetbylcellulose is absent. The ratio of the concentration of the drug inside to outside of the dialysis bags, at equilibrium, has been plotted against the amount of drug present.



> The object of the present work was to determine the magnitude of the drug-binding property of a water-soluble polyelectrolyte and the effects of varying drug concentrations, the presence of neutral salt, and different cationic pharmaceuticals on this binding. The overall binding effect involved here may be considered to be the sum of that arising from the Donnan equilibrium and that produced by all other interactions. The latter types of binding are not amenable to complete and vigorous definition, but may be looked upon as being due to a combination of those forces which are significant in holding atoms together in such structures as crystals, molecules, and loose intermolecular complexes. The pharmaceuticals chosen were the hydrochloride salts of amphetamine, Benadryl®, procaine, Pyribenzamine®, ephedrine, and quinine.
>
> Carboxymethylcellulose sodium was chosen as the polyelectrolyte for this initial study because it is familiar in pharmacy, being used as a thickener, a dispersing agent, and as a physical binder. The present communication is restricted to this agent only, although preliminary tests have shown it to be one of the weaker binders. The results of the study utilizing other polyelectrolytes will be reported in a future communication.
>
> Kennon, at page 261.

**<u>3.3.1.2 Loftsson, T., Fridriksdottir, H., Gudmundsdottir, T. K. *Int. J. Pharmaceutics* 1996, *127*, 293-296: 'The effect of water-soluble polymers on aqueous solubility of drugs'</u>**

As discussed *supra*, the observations of Kennon and Higuchi were recognized by other practitioners in the art, including in this reference published in 1996, by Loftsson et al.

Loftsson et al. clearly state that a person skilled in the art of aqueous drug formulation would have been aware of Kennon and Higuchi's work on the effects of CMC on drug solubility. Furthermore, Loftsson et al themselves teach that:

> "Small amounts of polymers commonly used in various drug formulations, <u>such as eye drops</u> and nasal sprays, enhance aqueous solubility of many drugs through complex formation."
>
> Loftsson, p294.

Therefore, the person skilled in the art would know that addition of carboxymethylcellulose to aqueous solution of a cationic drug could improve the solubility of the drug, such as brimonidine tartrate, well before the July 10, 2001 filing date of the '210 Patent.

**3.3.1.3 PCT Application WO 90/06126 by Bobby C. Danner**

The claims of the '210 patent are also directed to compositions with a solubility enhancing component and a oxy-chloro preservative. The use of stabilized chlorine dioxide in ophthalmic compositions was well established before the date of filing of the '210 patent. The WO 90/06126 application teaches the use of chlorine dioxide for the preservation of ophthalmic solutions as discussed *supra.*

The '126 application was filed November 22, 1989 and published June 14, 1990 by Bio-cide International Inc. The contents of the WO '126 application were therefore publicly available well before the priority date of the '210 patent (July 14, 2000).

The '126 application teaches the use of stabilized chlorine dioxide for the disinfection and preservation of ophthalmic solutions. Furthermore, the '126 application teaches the inclusion of buffering and tonicity agents to render the solution amenable to use in the eye.

Based on the contents of the art at the time of the filing of the '210 Patent a person skilled in the art would be knowledgeable that brimonidine tartrate is an example of a therapeutically effective alpha-2-adrenergic agonists. Loftsson teaches the person skilled in the art that sodium carboxymethylcellulose can be used to improved the solubility of cationic drugs. Further, Danner teaches that chlorine dioxide is an effective preservative for ophthalmic compositions. Therefore, claims 1 to 23 inclusive, 25 to 27 inclusive, 29 to 31 inclusive, and 33 to 34 inclusive of the '210 patent are obvious in light of Loftsson and Danner (WO '126) under 35 U.S.C. §103(a) because both references were available in the art before the July 10, 2001 filing date of United States Application Number 09/904,018 that ultimately matured into the '210 Patent.

**3.3.1.4 United States Patent Number 5,834,470: '6-(2-Imidazoleamino) Quinoxaline Compounds Useful as α-2-Adrenoreceptor Agonists' to Maurer**

United States Patent Number 5,834,470 issued November 10, 1998 to Proctor & Gamble, teaches α-2-adrenergic agonist compositions composed of a quinoxaline α-2-agonists and their use in treatment of ocular disorders, such as glaucoma, via topical application to the eye, in solution with CMC, as discussed *supra.*

Based on the contents of the art at the time of the filing of the '210 Patent a person skilled in the art would be knowledgeable use of therapeutically effective alpha-2-adrenergic agonists in combination with sodium carboxymethylcellulose in ocular compositions because of the teachings of the '470 Patent. Loftsson teaches the person skilled in the art that sodium carboxymethylcellulose can be used to improved the solubility of cationic drugs. Further, Danner teaches that chlorine dioxide is an effective preservative for ophthalmic compositions. Therefore, claims 1 to 23 inclusive, 25 to 27 inclusive, 29 to 31 inclusive, and 33 to 34 inclusive of the '210 patent are obvious in light of Maurer, Loftsson and Danner (WO '126) under 35 U.S.C. §103(a) because each reference was available in the art before the July 10, 2001 filing

date of United States Application Number 09/904,018 that ultimately matured into the '210 Patent.

### 3.3.1.5 PCT Application WO 00/12137: 'Preserved Cyclodextrin-containing Compositions' to Beck, Kerslake, and Olejnik

The WO 00/12137 patent application to Allergan scientists, published March 9, 2000, relates to aqueous solutions of brimonidine tartrate directed to therapeutic applications that are preserved by an oxy-chloro component and containing a solubility enhancing component that increases the apparent water solubility of the therapeutic component, brimonidine tartrate. This is prior art with regard to the '210 patent because it was published before the '210 patent's priority date.

In the ophthalmic formulation entitled "Composition 1", stabilized chlorine dioxide is the sole preservative and sodium carboxymethylcellulose is used as a solubility enhancing component. Furthermore, the active therapeutic component is brimonidine tartrate, as discussed *supra*. The following table sets out the claims of the '210 Patent and the corresponding art from the WO '137 Application.

<table>
<tr><th>United States<br>Patent Number 6,627,210</th><th>Corresponding Art from<br>WO 00/12137 Application</th></tr>
<tr><td>1. A therapeutically effective aqueous composition comprising: a therapeutically active alpha-2-adrenergic agonist component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and a polyanionic solubility enhancing component in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition 1</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE*<br>
WO 00/12137 page 16, lines 4 to 19.<br><br>
Note: Brimonidine tartrate is the tartrate salt of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline; according to the '210 patent, NaCMC is a polyanionic solubility enhancing agent.</td></tr>
<tr><td>2. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.</td><td>See claim 1.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline</td></tr>
</table>

| United States<br>Patent Number 6,627,210 | Corresponding Art from<br>WO 00/12137 Application |
|---|---|
| *3. The composition of claim 1 wherein the therapeutically active component is substantially unionized.* | See claim 1.<br><br>Note: At pH 7.4 brimonidine tartrate is substantially unionized. |
| *4. The composition of claim 1 wherein the therapeutically active component is substantially unionized in a biological environment to which the composition is administered.* | See claim 1.<br><br>Note: At pH 7.4 brimonidine tartrate is substantially unionized. |
| *5. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition the solubility enhancing component.* | See claim 1. |
| *6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.* | See claim 1.<br><br>Note: NaCMC is a solubility enhancing component. |
| *7. The composition of claim 1 wherein said polyanionic component is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.* | See claim 1.<br><br>Note: NaCMC is an anionic cellulose derivative. |
| *8. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of anionic cellulose derivatives and mixtures thereof.* | See claim 1.<br><br>Note: NaCMC is an anionic cellulose derivative asserted in the '210 patent to enhance solubility of brimonidine. |
| *9. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of carboxymethylcelluloses and derivatives thereof.* | See claim 1. |

<table>
<tr><th>United States<br>Patent Number 6,627,210</th><th>Corresponding Art from<br>WO 00/12137 Application</th></tr>
<tr><td>10. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).</td><td>See claim 1.<br><br>Note: NaCMC concentration is 0.5 % w/v.</td></tr>
<tr><td>11. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10% (w/v).</td><td>See claim 1.<br><br>Note: NaCMC concentration is 0.5 % w/v.</td></tr>
<tr><td>12. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).</td><td>See claim 1.<br><br>Note: NaCMC concentration is 0.5 % w/v.</td></tr>
<tr><td>13. The composition of claim 1 which has a pH of about 7 or greater.</td><td>See claim 1.<br><br>Note: The pH of the composition is 7.4.</td></tr>
<tr><td>14. The composition of claim 1 which has a pH in a range of about 7 to about 9.</td><td>See claim 1.<br><br>Note: The pH of the composition is 7.4.</td></tr>
<tr><td>15. The composition of claim 1 which is ophthalmically acceptable.</td><td>See claim 1.<br><br>Note: Stabilized chlorine dioxide is ophthalmically acceptable.</td></tr>
<tr><td>16. A therapeutically effective aqueous composition comprising: a therapeutically active component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition 1</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE®<br>
WO 00/12137 page 16, lines 4 to 19.<br><br>
Note: Brimonidine tartrate is the tartrate salt of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline; according to the '210 patent, NaCMC is an anionic cellulosic derivative.</td></tr>
</table>

<table>
<tr><th>United States<br>Patent Number 6,627,210</th><th>Corresponding Art from<br>WO 00/12137 Application</th></tr>
<tr><td>17. The composition of claim 16 wherein the alpha-2-adrenergic agonist component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.</td><td>See claim 16.<br><br>Note: Brimonidine tartrate is the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.</td></tr>
<tr><td>18. The composition of claim 16 wherein the anionic cellulose derivative comprises carboxymethylcellulose.</td><td>See claim 16.</td></tr>
<tr><td>19. The composition of claim 16 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).</td><td>See claim 16.<br><br>Note: NaCMC concentration is 0.5 % w/v.</td></tr>
<tr><td>20. A therapeutically effective aqueous composition comprising: a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and an anionic solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition 1</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE®<br>
WO 00/12137 page 16, lines 4 to 19.<br><br>
Note: Brimonidine tartrate is the tartrate salt of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline; according to the '210 patent, NaCMC is an anionic cellulosic derivative that improves the solubility of brimonidine tartrate.</td></tr>
<tr><td>21. The composition of claim 20 wherein the solubility enhancing component comprises a carboxymethylcellulose.</td><td>See claim 20.</td></tr>
<tr><td>22. The composition of claim 20 which is ophthalmically acceptable.</td><td>See claim 1.<br><br>Note: Stabilized chlorine dioxide is ophthalmically acceptable.</td></tr>
<tr><td>23. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.</td><td>See claim 1.<br><br>Note: Stabilized chlorine dioxide is an oxy-chloro component.</td></tr>
</table>

| United States Patent Number 6,627,210 | Corresponding Art from WO 00/12137 Application |
|---|---|
| *24. The composition of claim 23 in which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not contain benzalkonium chloride. |
| *25. The composition of claim 23 in which the preservative comprises an oxy-chloro component.* | See claim 23.<br><br>Note: Stabilized chlorine dioxide is a chlorite. |
| *26. The composition of claim 23 in which the preservative comprises a chlorite component.* | See claim 23.<br><br>Note: Stabilized chlorine dioxide is a chlorite. |
| *27. The composition of claim 16 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.* | See claim 16.<br><br>Note: Stabilized chlorine dioxide is an oxy-chloro component. |
| *28. The composition of claim 27 which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not contain benzalkonium chloride. |
| *29. The composition of claim 27 in which the preservative comprises an oxy-chloro component.* | See claim 16.<br><br>Note: Stabilized chlorine dioxide is an oxy-chloro component. |
| *30. The composition of claim 27 in which the preservative comprises a chlorite component.* | See claim 16.<br><br>Note: Stabilized chlorine dioxide is a chlorite. |
| *31. The composition of claim 20 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.* | See claim 20.<br><br>Note: Stabilized chlorine dioxide is an oxy-chloro component. |
| *32. The composition of claim 31 in which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not contain benzalkonium chloride. |
| *33. The composition of claim 31 in which the preservative comprises an oxy-chloro component.* | See claim 20.<br><br>Note: Stabilized chlorine dioxide is an oxy-chloro component. |
| *34. The composition of claim 31 in which the preservative comprises a chlorite component.* | See claim 20.<br><br>Note: Stabilized chlorine dioxide is a chlorite. |

As can be seen in the above table, for claims 1 to 23 inclusive, 25 to 27 inclusive, 29 to 31 inclusive, and 33 to 34 inclusive the WO '137 Application teaches compositions that read on each of the components, including their respective amounts, of the compositions specified in the claims of the '210 Patent. Therefore, claims 1 to 23 inclusive, 25 to 27 inclusive, 29 to 31 inclusive, and 33 to 34 inclusive of the '210 patent are obvious in light of WO 00/12137 under

35 U.S.C. §103(a) because WO 00/12137 was published on March 9, 2000, more than one year prior to the filing of the July 10, 2001 filing date of the '210 Patent.

### 3.3.2 Invalidity under 35 U.S.C. § 112 first paragraph: Lack of written description

35 USC §112 demands that that the written description of the invention enable a person skilled in the art to practice the invention.

> §112. Specification
>
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

The claims in the '210 patent are invalid under 35 U.S.C. §112 for lack of written description because the claims do not identify the formula or chemical name of the required SEC, claiming instead through a functional definition. "A written description of "an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997).

## 4. United States Patent No. 6,641,834: 'Compositions Containing Alpha-2-Adrenergic Agonist Components' to Olejnik, Kerslake

### 4.1 Filing details

The '834 patent was filed as United States Patent Application Serial No. 10/236,566 on September 6, 2002, claiming priority as a continuation of United States Patent Application Serial No. 09/904,018, filed on July 10, 2001, which itself claimed the benefit of provisional application Serial No. 60/218,200, which was filed on July 14, 2000. The '834 patent issued from this application on November 4, 2003 to Olejnik *et al.*, indicating on its face that it was assigned to Allergan Sales, Inc.. The '834 patent was prosecuted by Stout, Uxa, Buyan & Mullins, LLP; Frank J. Uxa; Carlos A. Fisher.

The claims that issued in the '834 patent were added by a preliminary amendment submitted with the application on September 6, 2002. This preliminary amendment cancelled all the claims originally contained in the parent application (United States Patent Application Serial No. 09/904,018) and replaced them with a set of claims containing only two independent claims: one similar to issued claim 1 that was directed toward compositions containing up to 0.15 % brimonidine tartrate and that had a pH of about 7.0 or greater, where the drug was soluble in the composition at 21°C; and the other with the same limitations but where the drug could take different forms (brimonidine, salts, esters and mixtures thereof).

The preliminary amendment stated the following in the Remarks section of the amendment:

> The specification has been amended to make reference to prior, related applications. New claims 47 to 66 have been added and are directed to embodiments for which patent protection is sought. Each of these new claims is fully supported by the present specification.
> Applicant respectfully requests early and favorable action in the above-indentified application.

## 4.2 The '834 Patent

The abstract of the '834 patent states:

> Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose. (Emphasis supplied.)

The disclosure of the '834 patent states at column 1, line 57, under the heading *Summary of the Invention:*

> New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness. (Emphasis supplied.)
>
> The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs. (Emphasis supplied.)

The disclosure of the '834 patent states at column 1, line 15, under the heading *Background of the Invention*:

> The present invention relates to compositions containing alpha-2-adrenergic agonist components. More particularly, the invention relates to such compositions in which the alpha-2-adrenergic agonist components have enhanced solubility at the therapeutically effective concentrations. (Emphasis supplied.)

Accordingly, the subject matter of the '834 patent relates to compositions useful for improving the effectiveness of α-2-adrenergic agonists in ophthalmic formulations by employing solubility enhancement component to improve the solubility profile of the active agent.

### 4.2.1 The Claims

The '834 patent contains 22 claims, reproduced below.

1. A therapeutically effective aqueous ophthalmic composition comprising: up to about 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate, the composition having a pH of about 7.0 or greater, and the 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate being soluble in the composition at about 21 ° C.

2. The composition of claim 1 which includes up to 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.

3. The composition of claim 1 which includes about 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.

4. The composition of claim 1 which includes 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.

5. The composition of claim 1 having a pH of 7.0 or greater.

6. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

7. The composition of claim 6 wherein the oxy-chloro component comprises a chlorite component.

8. The composition of claim 1 which is substantially free of anionic cellulosic derivatives.

9. The composition of claim 1 which is substantially free of carboxymethyl cellulose.

10. A therapeutically effective aqueous ophthalmic composition comprising: up to about 0.15 % (w/v) of a component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, esters of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline and mixtures thereof, the composition having a pH of about 7.0 or greater, and the component being soluble in the composition at about 21 ° C.

11. The composition of claim 10 which includes up to 0.15 % (w/v) of the component.

12. The composition of claim 10 which includes about 0.15 % (w/v) of the component.

13. The composition of claim 10 which includes 0.15 % (w/v) of the component.

14. The composition of claim 10 having a pH of 7.0 or greater.

15. The composition of claim 10, which further comprises an oxy-chloro component in an amount effective to at least assist in preserving the composition.

16. The composition of claim 15 wherein the oxy-chloro component comprises a chlorite component.

17. The composition of claim 10 which is substantially free of anionic cellulosic derivatives.

18. The composition of claim 10 which is substantially free of carboxymethyl cellulose.

19. The composition of claim 6 in which the preservative comprises benzalkonium chloride.

20. The composition of claim 10 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

21. The composition of claim 20 in which the preservative comprises benzalkonium chloride.

22. The composition of claim 20 in, which the preservative comprises a oxy-chloro component.

### 4.2.2 Terminal Disclaimer

The claims of the '834 Patent are subject to a terminal disclaimer submitted an a March 14, 2003 letter to the Examiner:

> The owner, Allergan Sales, Inc., of 100 percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application, which would extend beyond the expiration date of the full statutory term defined in 35 USC 154 and 156 and 173, as may be presently shortened by any terminal disclaimer, of any patent first issuing on co-pending United States Patent Application No. 09/904,018. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and any patent issuing from the above- identified patent application are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

United States Application Serial No. 09/904,018 later matured into the '210 Patent.

### 4.3 Non-infringement

Infringement occurs when the accused device meets each claim limitation. *Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004)*. Unless each and every requirement of a patent claim is found in the accused product, there can be no literal infringement. See, e.g., *Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991).* An accused device also may infringe a claim under the doctrine of equivalents if it performs substantially the same overall function, in substantially the same way, to produce substantially the same overall result as the claimed invention. *Warner-Jenkins Co. v. Hilton Davis Chem. Co.,*

*520 U.S. 17, 40 (1997); Grover Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950).*

Apotex's Proposed Products will not infringe at least claims 8, 9, 17, 18, 19, 20, 21, and 22 of the '834 patent. Claims 8, 9, 17 and 18 recite a requirement that the composition be "substantially free" of an anionic cellulosic derivative (claims 8 and 17) or carboxymethyl cellulose (claims 9 and 18). As discussed in the '834 specification (col. 8 lines 26-31):

> A particularly useful and preferred class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethyl-celluloses and derivatives thereof.

Therefore, compositions such as Apotex's Proposed Products, which contain sodium carboxymethylcellulose as noted in the excerpt from the Proposed Products' Monograph are expressly excluded from the scope of claims 8, 9, 17, and 18.

Claims 19, 20, 21 and 22 each require the presence of "a quaternary ammonium compound in an amount effective to at least assist in preserving the composition". As Apotex's Proposed Products do not contain a quaternary ammonium compound effective to at least assist in preserving the composition, the product cannot infringe claims 19, 20, 21 and 22.

The inventors plainly distinguished between drug components and preservative components at least at column 9, lines 23-25:

> In one embodiment, the compositions may also include preservative components or components which assist in the preservation of the composition. The preservative components selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of polyanionic components, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

and again at column 9, lines 43-45:

> Preferably, the present preservative components or components which assist in the preservation of the composition, preferably the alpha-2-adrenergic agonist components therein, are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm (w/v) or less to about 200 ppm (w/v). Preservative components in accordance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Therefore, the inventors plainly excluded any α-2-adrenergic agonist component from the possible preservative components of these claims. Claims 19 and 21 further limits the quaternary ammonium compound to benzalkonium chloride, which is not a component of the Apotex's Proposed Products.

### 4.4 Invalidity

Apotex asserts that the '834 Patent and all of its claims are invalid, void and of no effect. The following is a detailed legal and factual basis of that assertion. In addition, Apotex reserves the right to demonstrate additional factual and legal bases for the invalidity of the claims of the '834 Patent in the future.

#### 4.4.1 Invalidity under 35 U.S.C. §112: Lack of written description and support

The specifications of United States Patent Application Number 10/236,566 and United States Patent Application Number 09/904,018 are identical and nowhere in either specification is there support for the claim limitations "up to about 0.15 %" or "0.15 %" of brimonidine tartrate or brimonidine salts, esters and mixtures thereof, which are part of each issued claim. The "0.15 %" concentration limitation does not appear anywhere in those specifications nor in the originally filed claims. That limitation first appeared in the new claims submitted by preliminary amendment on September 6, 2002.

The claims of the '834 patent are invalid under 35 U.S.C. §112, first paragraph, for lack of written description because there is no support in the specification or the claims originally filed in the parent application.

> §112. Specification
>
> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

In particular, there is no support in the specification for the claim term "up to about 0.15 % (w/v)" or "0.15 %." See, e.g., *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998). Allergan did not refer to any disclosure to support the term when it was introduced by preliminary amendment upon filing of the continuation application. Furthermore, the specification teaches away from a 0.15 % limitation in that all concentrations of the drug referred to in the specification are 0.2 % and higher. Moreover, Figure 1 and Table IV in the specification indicate that in the absence of a solubility enhancing component the drug is fully soluble at the required pH limitation (around pH 7) up to a concentration of around 0.25 %

A patent may be held invalid or a claim unpatentable for failure to meet the written description requirements, based solely on the specification. See *In re Rushig,* 379 F.2d 990 (CCPA 1967) (disclosure of a class of compounds did not describe specific compounds within the class); *PIN/NIP, Inc. v. Platte Chemical Co.*, 304 F.3d 1235, 1247-48 (Fed. Cir. 2002); *TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*, 264 F.3d 1111, (Fed. Cir. 2001) (summary judgment of invalidity where original disclosure not sufficiently detailed to enable one skilled in the art to recognize that appellant had invented what was claimed).

Thus, all of the claims of the '834 patent should be found by a Court to be invalid under 35 U.S.C. §112, first paragraph, because there is no support in the specification of the parent application, nor in the specification filed as the continuation, for the "up to 0.15 %" limitation. Therefore, all of the claims that include a recitation of "0.15%" with any other modifiers (claims 1-22; all of the claims) are not supported by the specification and should be found invalid for lack of written description under 35 U.S.C. §112, first paragraph, in that they violate the requirement that '[t]he specification shall contain a written description of the invention.'

### 4.4.2 Invalidity under 35 U.S.C. §102: Anticipation and Priority Date

Section 102 of 35 U.S.C. broadly defines what is referred to as anticipation, or lack of novelty. As a defense to allegations of infringement, invalidity by anticipation requires that a single prior art reference, use or sale disclose all of the claim limitations of the asserted patent. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed". *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

All of the claims recite a "0.15 %" concentration limitation for the active ingredient. That 0.15 % concentration limitation that the inventors argued was a critical component of their invention while prosecuting the application is not supported anywhere in the specification as noted above. As a consequence, Allergan added new matter and claimed a new invention that was not disclosed in the parent application via the preliminary amendment filed in the continuation application. Therefore, the claims of the '834 patent are not only invalid as being not described in the specification, they are also not entitled to the priority date of the parent application. See, *AK Steel Corp. v. Sollac*, 344 F.3d 1234 (2003) (summary judgment of invalidity where claims unsupported by the specification were not enabled and claims were also anticipated by prior art when new matter improperly added was not entitled to the priority date of the parent application); see also, *Purdue Pharma L.P. v. Faulding Inc., 230 F.3d 1320, 1323-1327 (Fed. Cir. 2000).* At most, the claims of the '834 patent are only entitled to the filing date of United States Patent Application Number 10/236,566, which was September 6, 2002.

#### 4.4.2.1 Allergan's Alphagan® P labeling

Allergan's Alphagan® P product was approved by the FDA on March 16, 2001 and the product label for Alphagan® P was posted on the FDA's website on August 21, 2001, as the "Approved Labeling" for NDA 21-262. That labeling bears a copyright notice dated 2000 and describes the Alphagan® P product as containing 0.15 % brimonidine tartrate, with the brimonidine tartrate soluble in the product vehicle at pH 7.2. It also indicates that Alphagan® P product has a pH of 6.6 – 7.4 and contains sodium carboxymethylcellulose and an oxy-chloro preservative Purite®. This posted labeling is anticipating prior art under 35 U.S.C. §102(b) because it was published at least in August 2001, more than one year prior to the September 6, 2002, filing date of United States Patent Application Number 10/236,566 to which the claims of the '834 patent are, at best, entitled.

The following table sets out the claims of the '834 Patent and the corresponding anticipating art from the FDA approved product label for Alphagan® P 0.15 %.

| United States Patent No. 6,641,834 | Corresponding Anticipating Art from FDA approved Alphagan® P 0.15 % Product Label |
|---|---|
| *1. A therapeutically effective aqueous ophthalmic composition comprising: up to about 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate, the composition having a pH of about 7.0 or greater, and the 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate being soluble in the composition at about 21 °C.* | **ALPHAGAN® P**<br>**(brimonidine tartrate ophthalmic solution) 0.15%**<br><br>**Sterile**<br>**DESCRIPTION**<br>**ALPHAGAN® P** (brimonidine tartrate ophthalmic solution) 0.15% is a relatively selective alpha-2 adrenergic agonist for ophthalmic use. The chemical name of brimonidine tartrate is 5-bromo-6-(2-imidazolidinylideneamino) quinoxaline L-tartrate. It is an off-white to pale yellow powder. It has a molecular weight of 442.24 as the tartrate salt, and is both soluble in water (1.5 mg/mL) and in the product vehicle (3.0 mg/mL) at pH 7.2. The structural formula is:<br>HN NH Br N N N COOH H—C-OH HO-C—H COOH<br>Formula: $C_{11}H_{10}BrN_5 \cdot C_4H_6O_6$<br>CAS Number: 59803-98-4<br>In solution, **ALPHAGAN® P** (brimonidine tartrate ophthalmic solution) 0.15% has a clear, greenish-yellow color. It has an osmolality of 250-350 mOsmol/kg and a pH of 6.6-7.4.<br>**Each mL of ALPHAGAN® P contains:**<br>**Active ingredient:** brimonidine tartrate 0.15% (1.5 mg/mL)<br>**Preservative:** Purite® 0.005% (0.05mg.mL)<br>**Inactives:** sodium carboxymethylcellulose; sodium borate; boric acid; sodium-chloride; potassium chloride; calcium chloride; magnesium chloride; purified water; with hydrochloric acid and/or sodium hydroxide to adjust pH.<br>Center for Drug Evaluation Research, Approval Package for Application Number 21-262 |
| *2. The composition of claim 1 which includes up to 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.* | See claim 1. |
| *3. The composition of claim 1 which includes about 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.* | See claim 1. |
| *4. The composition of claim 1 which includes 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.* | See claim 1. |
| *5. The composition of claim 1 having a pH of 7.0 or greater.* | See claim 1. |

| United States Patent No. 6,641,834 | Corresponding Anticipating Art from FDA approved Alphagan® P 0.15 % Product Label |
|---|---|
| *6. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.* | See claim 1. |
| *7. The composition of claim 6 wherein the oxy-chloro component comprises a chlorite component.* | See claim 1. |
| *8. The composition of claim 1 which is substantially free of anionic cellulosic derivatives.* | Note: Apotex's Proposed Products include an anionic cellulosic, CMC. |
| *9. The composition of claim 1 which is substantially free of carboxymethyl cellulose.* | Note: Apotex's Proposed Products include an anionic cellulosic, CMC. |
| *10. A therapeutically effective aqueous ophthalmic composition comprising: up to about 0.15 % (w/v) of a component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, esters of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline and mixtures thereof, the composition having a pH of about 7.0 or greater, and the component being soluble in the composition at about 21 °C.* | **ALPHAGAN® P**<br>**(brimonidine tartrate ophthalmic solution) 0.15%**<br><br>**Sterile**<br>**DESCRIPTION**<br>**ALPHAGAN® P** (brimonidine tartrate ophthalmic solution) 0.15% is a relatively selective alpha-2 adrenergic agonist for ophthalmic use. The chemical name of brimonidine tartrate is 5-bromo-6-(2-imidazolidinylideneamino) quinoxaline L-tartrate. It is an off-white to pale yellow powder. It has a molecular weight of 442.24 as the tartrate salt, and is both soluble in water (1.5 mg/mL) and in the product vehicle (3.0 mg/mL) at pH 7.2. The structural formula is:<br>HN NH Br N N N COOH H—C—OH HO-C—H COOH<br>Formula: $C_{11}H_{10}BrN_5 \cdot C_4H_6O_6$<br>CAS Number: 59803-98-4<br>In solution, **ALPHAGAN® P** (brimonidine tartrate ophthalmic solution) 0.15% has a clear, greenish-yellow color. It has an osmolality of 250-350 mOsmol/kg and a pH of 6.6-7.4.<br>Each mL of **ALPHAGAN® P** contains:<br>**Active Ingredient:** brimonidine tartrate 0.15% (1.5 mg/mL)<br>**Preservative:** Purite® 0.005% (0.05mg.mL)<br>**Inactives:** sodium carboxymethylcellulose; sodium borate; boric acid; sodium-chloride; potassium chloride; calcium chloride; magnesium chloride; purified water, with hydrochloric acid and/or sodium hydroxide to adjust pH.<br>Center for Drug Evaluation Research, Approval Package for Application Number 21-262 |

| United States Patent No. 6,641,834 | Corresponding Anticipating Art from FDA approved Alphagan® P 0.15 % Product Label |
|---|---|
| *11. The composition of claim 10 which includes up to 0.15 % (w/v) of the component.* | See claim 10. |
| *12. The composition of claim 10 which includes about 0.15 % (w/v) of the component.* | See claim 10. |
| *13. The composition of claim 10 which includes 0.15 % (w/v) of the component.* | See claim 10. |
| *14. The composition of claim 10 having a pH of 7.0 or greater* | See claim 10. |
| *15. The composition of claim 10, which further comprises an oxy-chloro component in an amount effective to at least assist in preserving the composition.* | See claim 10. |
| *16. The composition of claim 15 wherein the oxy-chloro component comprises a chlorite component.* | See claim 10. |
| *17. The composition of claim 10 which is substantially free of anionic cellulosic derivatives.* | Note: Apotex's Proposed Products include an anionic cellulosic, CMC. |
| *18. The composition of claim 10 which is substantially free of carboxymethyl cellulose* | Note: Apotex's Proposed Products include an anionic cellulosic, CMC. |
| *19. The composition of claim 6 in which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |
| *20 .The composition of claim 10 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |
| *21. The composition of claim 20 in which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |
| *22. The composition of claim 20 in, which the preservative comprises a oxy-chloro component.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |

Claims 1 to 7 inclusive, 10 to 16 inclusive of the '834 patent are invalid as anticipated over the Alphagan® P product label as prior art under 35 U.S.C. §102(b). The only claims of the '834 patent that are not anticipated by Allergan's Alphagan® P product label are remaining claims 8, 9, 17 to 22 inclusive (i.e., claims that specify that the composition is free of an anionic cellulosic derivative or that the composition comprises benzalkonium chloride as a preservative), but these claims cannot be infringed by Apotex's Proposed Products as they contain an anionic cellulosic derivative, sodium carboxymethyl cellulose, and do not contain benzalkonium chloride.

### 4.4.3 Invalidity under 35 U.S.C. § 103(a): Obviousness

Section 103(a) of 35 U.S.C. requires that valid patent claims not merely be novel in accordance with Section 102 of 35 U.S.C., but also that "the differences between the subject matter sought to be patented and the prior art [not be] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp., 714 F.2d 1573 (Fed. Cir. 1983).*

The Federal Circuit has paraphrased the requirements of §103(a) as "[P]atentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success viewed in light of the prior art.'" *Merck v. Biocraft,* 874 F.2d 804 at 809 (Fed. Cir. 1989), citing *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) [emphases added]. In assessing obviousness, the controlling case law [*Graham v. John Deere, 383 U.S. 1 at 17-18 (1966)]* requires a four-part analysis:

1. The scope and content of the prior art are determined;
2. The differences between the prior art and the claims are determined;
3. The level of ordinary skill in the art at the time the invention was made is ascertained; and
4. Any objective indicia of unobviousness are examined.

We will examine these issues out of the above order, beginning with the third and fourth criteria and ending with criteria 1 and 2.

#### Factor 3. Level of ordinary skill in the art

The "person having ordinary skill in the art", 35 U.S.C. §103(a), is a hypothetical- not actual-person. *Panduit Corp. v. Dennison Manufacturing Co., 810 F.2d 1561, 1566 (Fed. Cir. 1987).* "Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably pertinent to the particular problem with which the inventor was involved."" *Pentec, Inc. v. Graphics Control Corp., 776 F.2d 309, 313 (Fed. Cir. 1985), quoting In re Wood,* 599 *F.2d 1032, 1036 (CCPA 1979).*

With regard to the '834 patent, a person having ordinary skill in the art to which the subject matter of its claims pertains would have at least a doctorate in pharmacy, pharmacology or pharmaceutical sciences and be trained and qualified to themselves develop ophthalmic pharmaceutical compositions such as ophthalmic ointments and eye drops, and have several years actual experience actually developing such products. The person having ordinary skill in the art would therefore have an understanding of the chemistry and mechanism of action of brimonidine tartrate, stabilized chlorine dioxide, antimicrobial quaternary ammonium compounds, tonicity components, solubility modifying agents, viscosity modifying agents, and all other aspects of the art related to developing products compatible with the eye and the functions required for the specific product. A degree in Pharmacy or Pharmaceutical Sciences or pharmacology gives the individual an understanding of drugs and drug formulations as they relate to diseases and to delivery to different parts of the body as well as the interactions of particular formulation components. If the worker's formal education is not in the pharmaceutical sciences or pharmacology *per se*, but in a related field such as Chemistry, to be one of ordinary skill in these arts would require such an individual to have several additional years of actual experience formulating, developing and/or using such products.

**Factor 4. Objective indicia of unobviousness**

Objective indicia of non-obviousness include any unexpected results, commercial success, copying of the invention, and failures of others to solve the problem addressed by the invention. See *Graham v. John Deere Co.,* 383 U.S. 1, 17-18; *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991); *In re Rouffet*, 149 F.3d 1350, 1355 (Fed.Cir.1998). Apotex is not aware of any objective indicia of non-obviousness of the claimed subject matter. The patents have kept away competition.

Apotex contends that none of the results alleged by the applicants to the support the patentability of the '834 Patent were in any sense unexpected or surprising. The use brimonidine tartrate as an alpha-2-adrenergic agonist and carboxymethylcellulose-stabilized chlorine dioxide as a preservative for ophthalmic compositions was well established in the prior art. The assertions of the Batoosingh Declaration regarding the findings reported in the Katz, *J. Glaucoma* **11**:119-126 (2002) article are in part misleading and show nothing unexpected.

The Declaration omits the fact that three compositions were studied. Those compositions contained brimonidne tartrate at 0.15 % with Purite® (oxy-chloro preservative), as well as brimonidine tartrate 0.2 % with and without Purite®. All three compositions showed "comparable" intraocular pressure lowering efficacies and the lower dosage of brimonidine tartrate exhibited "the most favorable safety and tolerability profile with a reduced incidence of allergic conjunctivitis and better satisfaction and comfort rating."

A skilled worker would expect that a lower dosage would cause fewer side effects. What is not shown is that the lower brimonidine concentration was not expected to be effective. There is no evidence that the higher drug concentration was needed to obtain the desired result, only that it was used. There is therefore nothing unexpected about the result obtained. *In re Chupp*, 816 F.2d, 643, 646 (Fed. Cir. 1987).

**Factors 1 and 2: Contents of the Prior Art and the Claimed Invention**

**4.4.3.1   US Patent No. 6,358,935: 'Preserveded Cyclodextrin-containing Compositions' to Beck, Kerslake, and Olejnik**

The US Patent No. 6,358,935 to Allergan scientists, was published March 9, 2000 as WO 00/12137 Patent Application, relates to aqueous therapeutic solutions of brimonidine tartrate that are preserved by an oxy-chloro component and containing a solubility enhancing component that increases the apparent water solubility of the therapeutic component, brimonidine tartrate (WO '137 application at page 2, lines 13 to 20). In the ophthalmic formulation called "Composition 1", stabilized chlorine dioxide is the sole preservative and sodium carboxymethylcellulose is used as a solubility enhancing component. Furthermore, the active therapeutic component is brimonidine tartrate.

The following table sets out the claims of the '834 Patent and the corresponding art from the WO '137 Application and the FDA approved product label for Alphagan® P 0.15 %.

| United States Patent No. 6,641,834 | Corresponding Art from WO 00/12137 Application or FDA Approved Product Label for Alphagan® P 0.15 % |
|---|---|
| *1. A therapeutically effective aqueous ophthalmic composition comprising: up to about 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate, the composition having a pH of about 7.0 or greater, and the 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate being soluble in the composition at about 21 °C.* | See below |

| Components | Composition 1 |
|---|---|
| Sodium chloride | 0.62% (w/v) |
| Potassium chloride | 0.14% (w/v) |
| Calcium chloride (dihydrate) | 0.02% (w/v) |
| Magnesium chloride (hexahydrate) | 0.006% (w/v) |
| Sodium carboxymethylcellulose | 0.5% (w/v) |
| Boric acid | 0.2% (w/v) |
| Sodium borate (decahydrate) | 0.14% (w/v) |
| Brimodine tartarate[1] | 0.2% (w/v) |
| Stabilized chlorine dioxide[2] | 50 ppm (w/v) |
| Sulfobutylether β cyclodextrin | ~~~ |
| Water, USP | Q.S. to volume |
| pH | 7.4 |

(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline

(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE*

WO 00/12137 page 16, lines 4 to 19.

or

**ALPHAGAN® P**

**(brimonidine tartrate ophthalmic solution) 0.15%**

**Sterile**

**DESCRIPTION**

**ALPHAGAN® P** (brimonidine tartrate ophthalmic solution) 0.15% is a relatively selective alpha-2 adrenergic agonist for ophthalmic use. The chemical name of brimonidine tartrate is 5-bromo-6-(2-imidazolidinylideneamino) quinoxaline L-tartrate. It is an off-white to pale yellow powder. It has a molecular weight of 442.24 as the tartrate salt, and is both soluble in water (1.5 mg/mL) and in the product vehicle (3.0 mg/mL) at pH 7.2. The structural formula is:

Formula: $C_{11}H_{10}BrN_5 \cdot C_4H_6O_6$

CAS Number: 59803-98-4

In solution, **ALPHAGAN® P** (brimonidine tartrate ophthalmic solution) 0.15% has a clear, greenish-yellow color. It has an osmolality of 250-350 mOsmol/kg and a pH of 6.6-7.4.

**Each mL of ALPHAGAN® P contains:**

**Active ingredient:** brimonidine tartrate 0.15% (1.5 mg/mL)

**Preservative:** Purite® 0.005% (0.05mg.mL)

**Inactives:** sodium carboxymethylcellulose; sodium borate; boric acid; sodium chloride; potassium chloride; calcium chloride; magnesium chloride; purified water; with hydrochloric acid and/or sodium hydroxide to adjust pH.

Center for Drug Evaluation Research, Approval Package for Application Number 21-262

| United States Patent No. 6,641,834 | Corresponding Art from WO 00/12137 Application or FDA Approved Product Label for Alphagan® P 0.15 % |
|---|---|
| *2. The composition of claim 1 which includes up to 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.* | See claim 1. |
| *3. The composition of claim 1 which includes about 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.* | See claim 1. |
| *4. The composition of claim 1 which includes 0.15 % (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.* | See claim 1. |
| *5. The composition of claim 1 having a pH of 7.0 or greater.* | See claim 1. |
| *6. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.* | See claim 1. |
| *7. The composition of claim 6 wherein the oxy-chloro component comprises a chlorite component.* | See claim 1. |
| *8. The composition of claim 1 which is substantially free of anionic cellulosic derivatives.* | Note: Apotex's Proposed Products do include sodium carboxymethyl cellulose, an anionic cellulosic derivative. |
| *9. The composition of claim 1 which is substantially free of carboxymethyl cellulose.* | Note: Apotex's Proposed Products do include sodium carboxymethyl cellulose, an anionic cellulosic derivative. |

<table>
<tr><th>United States<br>Patent No. 6,641,834</th><th>Corresponding Art from<br>WO 00/12137 Application or<br>FDA Approved Product<br>Label for Alphagan® P 0.15 %</th></tr>
<tr><td>10. A therapeutically effective aqueous ophthalmic composition comprising: up to about 0.15 % (w/v) of a component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, esters of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline and mixtures thereof, the composition having a pH of about 7.0 or greater, and the component being soluble in the composition at about 21 °C.</td><td>
<table>
<tr><th>Components</th><th>Composition 1</th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE*
WO 00/12137 page 16, lines 4 to 19.
or
ALPHAGAN® P<br>(brimonidine tartrate ophthalmic solution) 0.15%
Sterile<br>DESCRIPTION<br>ALPHAGAN® P (brimonidine tartrate ophthalmic solution) 0.15% is a relatively selective alpha-2 adrenergic agonist for ophthalmic use. The chemical name of brimonidine tartrate is 5-bromo-6-(2-imidazolidinylideneamino) quinoxaline L-tartrate. It is an off-white to pale yellow powder. It has a molecular weight of 442.24 as the tartrate salt, and is both soluble in water (1.5 mg/mL) and in the product vehicle (3.0 mg/mL) at pH 7.2. The structural formula is:
Formula: $C_{11}H_{10}BrN_5 \cdot C_4H_6O_6$<br>CAS Number: 59803-98-4
In solution, ALPHAGAN® P (brimonidine tartrate ophthalmic solution) 0.15% has a clear, greenish-yellow color. It has an osmolality of 250-350 mOsmol/kg and a pH of 6.6-7.4.<br>Each mL of ALPHAGAN® P contains:<br>Active Ingredient: brimonidine tartrate 0.15% (1.5 mg/mL)<br>Preservative: Purite® 0.005% (0.05mg.mL)<br>Inactives: sodium carboxymethylcellulose; sodium borate; boric acid; sodium chloride; potassium chloride; calcium chloride; magnesium chloride; purified water; with hydrochloric acid and/or sodium hydroxide to adjust pH.
Center for Drug Evaluation Research, Approval Package for Application Number 21-262
</td></tr>
</table>

| United States Patent No. 6,641,834 | Corresponding Art from WO 00/12137 Application or FDA Approved Product Label for Alphagan® P 0.15 % |
|---|---|
| *11. The composition of claim 10 which includes up to 0.15 % (w/v) of the component.* | See claim 10. |
| *12. The composition of claim 10 which includes about 0.15 % (w/v) of the component.* | See claim 10. |
| *13. The composition of claim 10 which includes 0.15 % (w/v) of the component.* | See claim 10. |
| *14. The composition of claim 10 having a pH of 7.0 or greater* | See claim 10. |
| *15. The composition of claim 10, which further comprises an oxy-chloro component in an amount effective to at least assist in preserving the composition.* | See claim 10. |
| *16. The composition of claim 15 wherein the oxy-chloro component comprises a chlorite component.* | See claim 10. |
| *17. The composition of claim 10 which is substantially free of anionic cellulosic derivatives.* | Note: Apotex's Proposed Products do include sodium carboxymethyl cellulose, an anionic cellulosic derivative. |
| *18. The composition of claim 10 which is substantially free of carboxymethyl cellulose* | Note: Apotex's Proposed Products do include sodium carboxymethyl cellulose, an anionic cellulosic derivative. |
| *19. The composition of claim 6 in which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |
| *20. The composition of claim 10 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |
| *21. The composition of claim 20 in which the preservative comprises benzalkonium chloride.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |
| *22. The composition of claim 20 in, which the preservative comprises a oxy-chloro component.* | Note: Apotex's Proposed Products do not include benzalkonium chloride. |

As can be seen in the above table, for claims 1 to 5 inclusive and 10 to 16 inclusive, the WO '137 application and Alphagan® P 0.15 % product label both teach compositions that read on each of the components of the compositions specified in the claims of the '834 Patent. In the case of the Alphagan® P product label, the specific amount of brimonidine tartrate is taught. As a result, no inventive work would be required by the person skilled in the art in order to

formulate the compositions claimed by the '834 Patent. Therefore, claims 1 to 5 inclusive and 10 to 16 inclusive of the '834 patent, if not anticipated as discussed above, are obvious in light of WO 00/12137 or the FDA Approved Product Label for Alphagan® P 0.15 % under 35 U.S.C. §103(a). The former was published on March 9, 2000, and the latter on August 21, 2001, both more than one year prior to the filing of the September 6, 2002 filing date of the '834 Patent.

We note that US Patent No. 6,358,935 was of record during the prosecution of the '834 patent and its teachings were overcome. However, the lack of support for the subject matter of the amended claims of the Serial No. 10/236,566 application was not appreciated at that time, possibly in view of counsel's representation that the claims were "*fully supported by the present specification*". Consequently, the true importance of the Beck patent or its published WO version was not on the record before by the Examiner.

**5. United States Patent No. 6,673,337: 'Compositions Containing Alpha-2-Adrenergic Agonist Components to Olejnik, Kerslake**

The '337 patent was filed on November 19, 2002 as U.S. Patent Application 10/299,386 and is said to be a divisional application of 09/904,018 filed July 10, 2001 which claims priority from provisional application US 60/218,200 filed July 14, 2000. The '337 patent issued on January 6, 2004 to Olejnik *et al.*, indicating on its face that it was assigned to Allergan, Inc.. The '337 patent was prosecuted by Frank J. Uxa; Carlos A. Fisher; Martin A. Voet.

The abstract of the '337 patent states:

> Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

The disclosure of the '337 patent states at column 1, line 57, under the heading *Summary of the Invention:*

> New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.
>
> The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing

> components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

The disclosure of the '337 patent states at column 4, line 11, under the heading *Description of the Related Art*:

> Compositions comprising alpha-2-adrenergic agonist components and SECs are provided. The alpha-2-adrenergic agonist components in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. The SECs employed in the present compositions may be effective in the solubilization of ionized alpha-2-adrenergic agonist components, unionized alpha-2-adrenergic agonist components or both. The present compositions include liquid carrier components and have the characteristics of liquid, for example, aqueous liquid, solutions.

Accordingly, the subject matter of the '337 patent relates to compositions useful for improving the effectiveness of α-2-adrenergic agonists in ophthalmic formulations by employing solubility enhancement component to improve the solubility profile of the active agent.

## 5.1 The Claims

The '337 patent contains 10 claims, reproduced below.

1. A therapeutically effective ophthalmic composition comprising: an alpha-2-adrenergic agonist component in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and a solubility enhancing component other than a cyclodextrin in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

2. The composition of claim 1 wherein the alpha-2-adrenergic component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, derivatives thereof, and mixtures thereof.

3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.

4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, derivatives thereof, and mixtures thereof.

5. The composition of claim 1 wherein said solubility enhancing component comprises an anionic polymer.

6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the alpha-2-adrenergic agonist component relative to the solubility in a biological environment of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

7. The composition of claim 6 wherein the solubility enhancing component comprises an anionic polymer.

8. The composition of claim 3 wherein said solubility enhancing component comprises an anionic polymer.

9. The composition of claim 1 which further comprises an effective amount of a preservative.

10. The composition of claim 6 which further comprises an effective amount of a preservative.

It is seen that none of the above claims recites a pH value for the composition, nor a concentration of alpha-2-adrenergic agonist. None of those claims mentions the name of the active ingredient of Alphagan P, brimponidine tartrate, nor does any claim mention sodium carboxymethylcellulose as the solubility enhancing component. No claim above recites the presence of a chloro-oxy preservative in a recited composition.

## 5.1.1 Terminal Disclaimer

The claims of the '337 Patent are subject to a terminal disclaimer submitted in the June 13, 2003 letter to the Examiner:

> The owner, ALLERGAN, INC., of 100 percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application, which would extend beyond the expiration date of the full statutory term defined in 35 USC 154 and 156 and 173, as may be presently shortened by any terminal disclaimer, of 1) any patent issuing on co-pending United States Patent Application No.10/236,566 and on 2) issued United States Patent 6,562,873. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it, any patent issuing from the above-identified patent application, and the above-identified patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

United States Application Serial No. 10/236,566 later matured into the above '834 Patent.

## 5.2 Invalidity

Apotex asserts that the '337 Patent and all of its claims are invalid, void and of no effect. The following is a detailed legal and factual basis of that assertion. In addition, Apotex reserves the right to demonstrate additional factual and legal bases for the invalidity of the claims of the '337 Patent in the future.

**5.2.1 Invalidity under 35 U.S.C. §101: lack of utility**

***35 U.S.C. 101 Inventions patentable***

> *Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.*

As Figure 1 of the '337 Patent shows, brimonidine tartrate is fully soluble ($\geq$ 0.15 %) at pH 7.3 in the absence of sodium CMC. Allergan's Alphagan® P formulation is available in two concentrations of brimonidine tartrate, 0.1 % and 0.15 %. Both concentrations are presumed to be therapeutically effective in that both have FDA approval for sale.

Therefore, at a pH value around 7.3, addition of an "SEC" cannot increase solubility of brimonidine tartrate in solution at a concentration of 0.1 % or 0.15 %, because solubility is at 100 % and thus no increase in solubility is physically possible. Therefore, no "SEC" can serve to increase the absolute solubility of the brimonidine tartrate.

Consequently, the claims of the '337 patent cannot be said to cover an aqueous composition containing brimonidine tartrate at 0.1 % or 0.15 % at pH 7.3 because both concentrations provide a therapeutic benefit to a patient to whom they are administered and brimonidine tartrate is completely soluble in such an aqueous solution. On the other hand, if it were asserted that the patent claims encompassed such compositions, the claims should be found invalid by a Court because they would violate 35 USC §101, above, in claiming an invention that does not function.

**5.2.2 Invalidity under 35 U.S.C. §112: Lack of written description**

All claims of the '337 patent are invalid for lack of written description under 35 U.S.C. §112, first paragraph, because the claims do not identify the formula or chemical name of the required SEC or preservative, claiming instead through a functional definition.

> "A written description of "an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *Regents of the University of California v. Eli Lilly,* 119 F.3d 1559, 1568 (Fed. Cir. 1997).

The claims of the '337 patent attempt to claim the genus of SECs or preservatives by function alone and impermissibly requires one to make and test a particular composition in order to determine whether it falls within the scope of the claims. This plainly violates the written description requirement. *See New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.,* 298 F.3d 1290, 1296-1297 (Fed. Cir. 2002). A chemical genus may not be defined by its function. *See Enzo Biochem, Inc. v. Gen-probe, Inc.,* 296 F.3d 1316, 1324 (Fed. Cir. 2002).

**5.2.3 Invalidity under 35 U.S.C. §103(a): Obviousness**

Section 103(a) of 35 U.S.C. requires that valid patent claims not merely be novel in accordance with Section 102 of 35 U.S.C., but also that "the differences between the subject matter sought to be patented and the prior art [not be] such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Once a claim is held to be invalid (whether by anticipation, obviousness, or any other cognizable defense), "there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983).

The Federal Circuit has paraphrased the requirements of §103(a) as "[P]atentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success viewed in light of the prior art.'" *Merck v. Biocraft*, 874 F.2d 804 at 809 (Fed. Cir. 1989), citing *In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) [emphases added]. In assessing obviousness, the controlling case law [*Graham v. John Deere*, 383 U.S. 1 at 17-18 (1966)] requires a four-part analysis:

1. The scope and content of the prior art are determined;
2. The differences between the prior art and the claims are determined;
3. The level of ordinary skill in the art at the time the invention was made is ascertained; and
4. Any objective indicia of unobviousness are examined.

These issues will be examined below, out of the above order, beginning with the third and fourth criteria and ending with criteria 1 and 2.

**Factor 3. Level of ordinary skill in the art**

The "person having ordinary skill in the art", 35 U.S.C. §103(a), is a hypothetical- not actual- person. *Panduit Corp. v. Dennison Manufacturing Co., 810 F.2d 1561, 1566 (Fed. Cir. 1987).* "Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably pertinent to the particular problem with which the inventor was involved."" *Pentec, Inc. v. Graphics Control Corp., 776 F.2d 309, 313 (Fed. Cir. 1985), quoting In re Wood, 599 F.2d 1032, 1036 (CCPA 1979).*

With regard to the '337 patent, a person having ordinary skill in the art to which the subject matter of its claims pertains would have at least a doctorate in pharmacy, pharmacology or pharmaceutical sciences and be trained and qualified to themselves develop ophthalmic pharmaceutical compositions such as ophthalmic ointments and eye drops, and have several years actual experience actually developing such products. The person having ordinary skill in the art would therefore have an understanding of the chemistry and mechanism of action of brimonidine tartrate, stabilized chlorine dioxide, antimicrobial quaternary ammonium compounds, tonicity components, solubility modifying agents, viscosity modifying agents, and all other aspects of the art related to developing products compatible with the eye and the

functions required for the specific product. A degree in Pharmacy or Pharmaceutical Sciences or pharmacology gives the individual an understanding of drugs and drug formulations as they relate to diseases and to delivery to different parts of the body as well as the interactions of particular formulation components. If the worker's formal education is not in the pharmaceutical sciences or pharmacology *per se*, but in a related field such as Chemistry, to be one of ordinary skill in these arts would require such an individual to have several additional years of actual experience formulating, developing and/or using such products.

**Factor 4. Objective indicia of unobviousness**

Objective indicia of non-obviousness include any unexpected results, commercial success, copying of the invention, and failures of others to solve the problem addressed by the invention. See *Graham v. John Deere Co.,* 383 U.S. 1, 17-18; *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991); *In re Rouffet*, 149 F.3d 1350, 1355 (Fed.Cir.1998). Apotex is not aware of any objective indicia of non-obviousness of the claimed subject matter.

Even though "secondary considerations may often be the most probative and cogent evidence in the record," *Stratoflex Inc. v Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) and "may be sufficient to overcome a prima facie case of obviousness," *In re Beattie*, 974 F.2d 1309, 1313 (Fed. Cir. 1992), "they do not control the obviousness conclusion." *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed Cir. 1988). Where a strong prima facie case of obviousness is made, secondary considerations may not suffice to demonstrate non-obviousness. *Pfizer, Inc. v. Apotex* 2007 U.S. App. LEXIS 6623 at *63 (Fed. Cir. March 22, 2007)

Apotex contends that none of the results alleged by the applicants to the support the patentability of the '337 patent were in any sense unexpected or surprising. The use of brimonidine tartrate as a alpha-2-adrenergic agonists, sodium carboxymethyl cellulose as a solubility enhancing agent, and chlorine dioxide as a preservative of ophthalmic compositions was established in the prior art.

Furthermore, commercial success is particularly uninformative with regard to the obviousness analysis because patents on the drug and earlier formulations precluded competition, *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371 (Fed. Cir. 2005), and copying

**Factors 1 and 2: Contents of the Prior Art and the Claimed Invention**

**5.2.3.1 Kennon, L., Higuchi, T. *J. Am. Pharmaceut. Assoc.* 1959, *45*, 261-264: 'Interaction Studies of Cationic Drugs with Anionic Polyelectrolytes I* Sodium Carboxymethylcellulose'**

The claims of the '337 patent are also directed to compositions with a solubility enhancing component to improve the solubility of alpha-2-adrenergic agonists, in particular brimonidine tartrate. Brimonidine tartrate is an acid addition salt formed by the reaction of tartaric acid with brimonidine. Brimonidine tartrate is an ionic salt, where the tartrate and brimonidine represent the anionic and cationic components of the salt respectively. Brimonidine tartrate is an example of a cationic drug species in that the active material is cationic at physiological pH values..

In this 1956 article Kennon and Higuchi taught that the solubility of cationic drugs can be increased by the addition of polyelectrolytes as discussed *supra*. Kennon and Higuchi specifically tested the ability of sodium carboxymethylcellulose, a polyelectrolyte, to affect the solubility of various cationic drug species.

**5.2.3.2 Loftsson, T., Fridriksdottir, H., Gudmundsdottir, T. K. *Int. J. Pharmaceutics* 1996, *127*, 293-296: 'The effect of water-soluble polymers on aqueous solubility of drugs'**

The observations of Kennon and Higuchi were recognized by other practitioners in the art, including in this reference published in 1996 by Loftsson et al. Loftsson et al also teach that it was known in the art that polymeric additives found in eye drops enhance solubility of many drugs.

The Loftsson et al. article clearly states that a person skilled in the art of aqueous drug formulation would have been aware of Kennon and Higuchi's work. Furthermore, Loftsson et al themselves teach that "small amounts of polymers commonly used in various drug formulations, such as eye drops and nasal sprays, enhance aqueous solubility of many drugs through complex formation. Therefore, the person skilled in the art would know that addition of CMC, an anionic polymer, to aqueous solution of a cationic drug could improve the solubility of a cationic drug, such as alpha-2-adrenergic agonist brimonidine tartrate, well before the November 19, 2002 filing date of the '337 Patent.

**5.2.3.3 United States Patent Number 5,834,470: '6-(2-Imidazoleamino) Quinoxaline Compounds Useful as α-2-Adrenoreceptor Agonists' to Maurer**

As discussed *supra*, United States Patent Number 5,834,470 issued November 10, 1998 to Proctor & Gamble, teaches α-2-adrenergic agonist compositions composed of a quinoxaline α-2-agonists and their use in treatment of ocular disorders, such as glaucoma, via topical application to the eye. The patent also teaches that pharmaceutically acceptable carriers including sodium carboxymethylcellulose, an anionic cellulosic polymer at least at column 8, line 61 to column 9, line 9: The '470 patent further teaches that these modified cellulose derivatives can be used in topical ocular compositions, at col. 10, lines. 38 to 52.

**5.2.3.4 US Patent No. 6,358,935 and WO 00/12137: 'Preserved Cyclodextrin-containing Compositions' to Beck, Kerslake, and Olejnik**

The US Patent No. 6,358,935 to Allergan scientists, was published March 9, 2000 as WO 00/12137 Patent Application, and resulted from application Serial No. 09/388,968 filed on September 2, 1999. This disclosure of this patent relates to aqueous therapeutic solutions of brimonidine tartrate that are preserved by an oxy-chloro component and containing a solubility enhancing component that increases the apparent water solubility of the therapeutic component, brimonidine tartrate. See e.g., the WO '137 application page 2, lines 13 to 20). As discussed at length *supra*, the inventors list a example composition (Composition 1) that anticipates or renders obvious the subject of the '337 patent claims, as detailed below.

The following table sets out the claims of the '337 Patent and the corresponding art from the WO '137 Application.

<table>
<tr><th>United States<br>Patent No. 6,673,337</th><th>Corresponding Art<br>from WO 00/12137</th></tr>
<tr><td>1. A therapeutically effective ophthalmic composition comprising: an alpha-2-adrenergic agonist component in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and a solubility enhancing component other than a cyclodextrin in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition 1</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartarate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE®<br><br>
WO 00/12137 page 16, lines 4 to 19.</td></tr>
<tr><td>2. The composition of claim 1 wherein the alpha-2-adrenergic component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, derivatives thereof, and mixtures thereof.</td><td>See claim 1.<br><br>Note: Brimonidine tartrate is an alpha-2-adrenergic agonist and an imino-imidazoline.</td></tr>
<tr><td>3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component</td><td>See claim 1.<br><br>Note: Brimonidine tartrate is an alpha-2-adrenergic agonist and is the quinoxaline component.</td></tr>
<tr><td>4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, derivatives thereof, and mixtures thereof.</td><td>See claim 1.<br><br>Note: Brimonidine tartrate is an alpha-2-adrenergic agonist and is the quinoxaline component.</td></tr>
<tr><td>5. The composition of claim 1 wherein said solubility enhancing component comprises an anionic polymer.</td><td>See claim 1.<br><br>Note: Sodium carboxymethylcellulose is an anionic polymer.</td></tr>
</table>

<table>
<tr><th>United States<br>Patent No. 6,673,337</th><th>Corresponding Art<br>from WO 00/12137</th></tr>
<tr><td>6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the alpha-2-adrenergic agonist component relative to the solubility in a biological environment of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.</td><td>
<table>
<tr><th><u>Components</u></th><th><u>Composition 1</u></th></tr>
<tr><td>Sodium chloride</td><td>0.62% (w/v)</td></tr>
<tr><td>Potassium chloride</td><td>0.14% (w/v)</td></tr>
<tr><td>Calcium chloride (dihydrate)</td><td>0.02% (w/v)</td></tr>
<tr><td>Magnesium chloride (hexahydrate)</td><td>0.006% (w/v)</td></tr>
<tr><td>Sodium carboxymethylcellulose</td><td>0.5% (w/v)</td></tr>
<tr><td>Boric acid</td><td>0.2% (w/v)</td></tr>
<tr><td>Sodium borate (decahydrate)</td><td>0.14% (w/v)</td></tr>
<tr><td>Brimodine tartrate[1]</td><td>0.2% (w/v)</td></tr>
<tr><td>Stabilized chlorine dioxide[2]</td><td>50 ppm (w/v)</td></tr>
<tr><td>Sulfobutylether β cyclodextrin</td><td>~~~</td></tr>
<tr><td>Water, USP</td><td>Q.S. to volume</td></tr>
<tr><td>pH</td><td>7.4</td></tr>
</table>
(1) Tartarate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline<br>
(2) Product sold by Bio-Cide International Inc., under the trademark PUROGENE'<br><br>
WO 00/12137 page 16, lines 4 to 19.</td></tr>
<tr><td>7. The composition of claim 6 wherein the solubility enhancing component comprises an anionic polymer.</td><td>See claim 6.<br><br>Note: Sodium carboxymethylcellulose is an anionic polymer and is asserted by the '337 patent to be solubility enhancing.</td></tr>
<tr><td>8. The composition of claim 3 wherein said solubility enhancing component comprises an anionic polymer.</td><td>See claim 3.<br><br>Note: Sodium carboxymethylcellulose is an anionic polymer and is asserted by the '337 patent to be solubility enhancing.</td></tr>
<tr><td>9. The composition of claim 1 which further comprises an effective amount of a preservative.</td><td>See claim 1.<br><br>Note: Stabilized chlorine dioxide is an effective preservative.</td></tr>
<tr><td>10. The composition of claim 6 which further comprises an effective amount of a preservative.</td><td>See claim 6.<br><br>Note: Stabilized chlorine dioxide is an effective preservative.</td></tr>
</table>

Based on the contents of the art at the time of the filing of the '337 Patent, there was no difference between the claimed subject matter and the prior art. A person skilled in the art would be knowledgeable use of therapeutically effective alpha-2-adrenergic agonists such as brimonidine tartrate in combination with sodium carboxymethylcellulose as a solubility enhancing component in an ocular composition.

Thus, Loftsson et al. and Kennon and Higuchi taught the person skilled in the art that sodium carboxymethylcellulose can be used to improved the aqueous solubility of cationic drugs like brimonidine tartrate. The '470 patent taught the use of a solubility enhancing amount of carboxymethylcellulose along with a quinoxaline alpha-2-adrenergic agonist in an ocular comoposition for glaucoma. Claims 1 through 10 of the '337 patent should therefore be found obvious by a Court.

The teachings of US Patent No. 6,358,935 are available under 35 U.S.C. §102(e)/103(a) because US Patent No. 6,358,935 was filed before the invention of the '337 (the filing date) of the earliest parental application of the '337 patent by a different inventive entity from that of the '337 patent. The teachings of US Patent No. 6,358,935 (WO 00/12137) further provide a composition (Example 1) that reads on each of the components of the compositions specified in the claims of the '337 Patent. A person skilled in the art would require no inventive work to formulate the compositions specified by the claims of the '337 patent. Therefore, claims 1 to 10 inclusive of the '337 patent are obvious in light of those teachings alone or in combination with those above.

**6.      Offer of confidential access pursuant to 21 U.S.C.S355(j)(5)(C) *et seq***

Pursuant to 21 U.S.C. § 355(j)(5)(C) *et seq*. Apotex makes an offer of confidential access to certain information in Apotex's application pursuant to the provisions of 21 USC § 355(j)(5)(C) (i)(III) under the following terms and restrictions:

1. The offer is solely for the purpose of determining whether an action referred to in 21 USC § 355(j) (5) (B) (iii) should be brought and for no other purpose.

2. Apotex will permit confidential access to certain information from its proprietary ANDA to attorneys from one outside law firm representing Allergan, Inc. and Allergan Sales, Inc. and provided, however, that such attorneys do not engage, formally or informally, in any patent prosecution work for Allergan or any FDA counseling, litigation or other work before or involving the FDA. Such information from the ANDA, (hereinafter, "Confidential Information") shall be marked before production by Apotex with the legend "Confidential".

3. The Attorneys from the outside firm representing Allergan, Inc. or Allergan Sales, Inc. shall not disclose any confidential Apotex information to any other person or entity, including Allergan employees, outside scientific consultants, and/or other outside counsel retained by Allergan, Inc. or Allergan Sales, Inc., without Apotex's prior written consent.

4. The Attorneys from the outside firm representing Allergan, Inc. or Allergan Sales, Inc. shall not disclose any Apotex Confidential Information of no relevance to any issue of patent infringement to any person other than a person provided an offer of confidential access.

5. The Confidential Information disclosed is, and remains, the property of Apotex. By providing the Confidential Information, Apotex does not grant any interest in or license for the Confidential Information.

6. The Attorneys from the outside firm representing Allergan, Inc. or Allergan Sales, Inc. shall, within thirty-five (35) days from the date that it first receives the Confidential Information, return to Apotex, all Confidential Information and any copies thereof received from Apotex. The

Attorneys from the outside firm representing Allergan, Inc. or Allergan Sales, Inc. shall return all Confidential Information before any infringement suit is filed by Allergan, Inc. or Allergan Sales, Inc., if suit is commenced before this 35-day period expires. In the event that Allergan, Inc. or Allergan Sales, Inc. opts to file suit, none of the information contained or obtained from any Confidential Information that Apotex provides shall be included in any publicly-available complaint or other pleading.

7. Nothing in this offer of Confidential Information shall be construed as an admission by Apotex regarding the validity, enforceability, and/or infringement of any U.S. Patents. Further, nothing herein shall be construed as an agreement or an admission by Apotex with respect to the competency, relevancy or, materiality of any such Confidential Information. The fact that Apotex provides Confidential Information upon the request of Allergan, Inc. or Allergan Sales, Inc. shall not be construed as an admission by Apotex that such Confidential Information is relevant to the disposition of any issue relating to any alleged infringement of any patent, or to the validity or enforceability of any patent.

8. A request by the Attorneys from the outside firm representing Allergan, Inc. or Allergan Sales, Inc. for the Confidential Information is considered acceptance of this offer of confidential access to the Confidential Information with the restrictions set out in this offer of confidential access and shall be considered terms of an enforceable contract.

Written notice requesting access under this Offer of Confidential Access should be made to:

Welsh & Katz, Ltd.
Attn: Robert B. Breisblatt
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606

A copy of this letter is being forwarded to the representative of record.

The following is the name and address of Apotex's agent in the United States authorized to accept service of process for Apotex:

Welsh & Katz, Ltd.
Attn: Robert B. Breisblatt
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606

Yours very truly,

Anthony Qu, Ph.D.
Vice-President Product Development Liquid Dose
Apotex Inc.

## SCHEDULE A

1. United States Patent No. 5,424,078, associated file history, and file histories for any parent application

2. United States Patent No. 6,562,873 and associated file history, and file histories for any parent application

3. United States Patent Patent No. 6,627,210 and associated file history, and file histories for any parent application

4. United States Patent Patent No. 6,641,834 and associated file history, and file histories for any parent application

5. United States Patent No. 6,673,337 and associated file history, and file histories for any parent application

6. Merck Index 14th edition, 2006

7. Center for Drug Evaluation Research: Approval Package for Application Number 21-262

8. 21 CFR 314.53

9. Harakeh, S.; Illescas, A.; Matin, A. 'Inactivation of bacteria by Purogene' *J. Appl. Bacteriology* **1998**, *64*, 459-463.

10. PCT Patent Application Number WO 90/06126

11. Farris, L. R. *Trans. Am. Ophthalmol. Soc.* **1986**, *84*, 250-68.

12. United States Patent No. 4,120,949

13. Kennon, L.; Higuchi, T. J. 'Interaction Studies of Cationic Drugs with Anionic Polyelectrolytes I* Sodium Carboxymethylcellulose' *Am. Pharmaceut. Assoc.* **1956**, *45*, 261-264

14. United States Patent No. 5,834,470

15. PCT Patent Application Number WO 00/12137

16. United States Patent No. 5,834,470

17. Mullins, J. D. In *Remington's Pharmaceutical Sciences*, 17th ed.; Gennaro, A. R. Ed.; Mack Publishing Company: Easton, PA, **1985**, 1553-1566.

18. Milder, B. In *Adler's Physiology of the eye*, 7th ed.; Moses, R. A. Ed.; C. V. Mosby Company: St. Louis, **1981**, 16-37.

19. Noecker, R. 'Effects of Common Ophthalmic preservatives on ocular health' *Adv. In Therapy* **2001**, *18*, 205-215

20. United States Patent No. 3,890,319

21. Allergan 2001 Annual Report

22. Allergan press release 04-24-2001

23. Cantor L.B. 'The Evolving pharmacotherapeutic Profile of Brimonidine, an α2-adrenergic agonist, after four years of continuous use' *Expert Opinions on Pharmacotherapy* **2000**, *1*, 815-834

24. Chen F.S.; Maurice, D.M. 'The pH in the Precorneal Tear Film and Under a contact Lens Measured with a Fluorescent Probe' *Experimental Eye Research* 1990, *50*, 251-259

25. Derick R.J.; Robin, A.L.; Walters, T.R.; Barnebey, H.S.; Choplin, N.; Schuman, J.; Kelley, E.P.; Chen, K.; Stoecker, J.F. 'Brimonidine Tartrate - a One -Month Dose Response Study' *Ophthalmology - Journal of the American Academy of Ophthalmology*, **1997**, *104*, 131-136

26. Guo J.H.; Skinner, G. W.; Harcum, W.W.; Barnum, P.E. 'Pharmaceutical Applications of Naturally Occurring Water-Soluble Polymers' *Pharmaceutical Science and Technology Today*, **1998**, *1*, 254-261

27. Gupta M.; Majumdar, D.K. 'Effect of Concentration, pH and preservative on in vivo transcorneal permeation of ibuprofen and flurbiprofen from non-buffered aqueous drops' *Indian Journal of Experimental Biology* **1997**, *35*, 844-849

28. Nordlund, J.R.; Pasquale, L.R.; Robin, A.L.; Rudikoff, M.T.; Ordman, J.; Chen, K.S.; Walt, J. 'The cardiovascular, Pulmonary, and Ocular Hypotensive effect of 0.2% Brimonidine' *Archives of Ophthalmology*, *113*, 77-83

29. Toris C.B.; Gleason, M.L.; Camras, C.B.; Yablonski, M.E. 'Effects of Brimonidine on Aqueous Humor Dynamics in Human Eyes' *Archives of Ophthalmology*, **1995**, *113*, 1514-1517

30. Walters T.R. '12-Month Evaluation of Brimonidine-Purite™ Compared with Alphagan® in Patients with Glaucoma or Ocular Hypertension' *Investigative Ophthalmology* **2001**, *42*, 2996-B138

31. United States Patent No. 5,091,528

32. United States Patent No. 5,215,991

33. United States Patent No. 5,782,992

34. United States Patent No. 4,793,989

35. PCT Patent Application No. WO 00/19981

36. PCT Patent Application No. WO 96/13267

37. Davies, N.M. 'Biopharmaceutical Considerations in Topical Ocular Drug Delivery' *Clinical and Experimental Pharmacology and Physiology* **2000**, *27*, 558-562

38. Saeettone, M.F.; Giannaccini, B.; Ravecca, S.; La Marca, F.; Tota, G. 'Polymer effects on ocular bioavailability – the influence of different liquid vehicles on the mydriatric response of tropicamide in humans as in rabbits' *Int. J. Pharmaceutics* **1984**, *20*, 187-202.

39. United States Patent No. 5,834,470

# Exhibit E



FEB 12 2007

RECEIVED
FEB 13 2007
LEGAL DEPARTMENT

February 8, 2007

**VIA REGISTERED MAIL - RETURN RECEIPT REQUESTED**

David E.I. Pyott
Chief Executive Officer
Allergan, Inc.
2625 Dupont Drive
Irvine, California 92612

Re: Brimonidine tartrate ophthalmic solution 0.15% [Alphagan® P]
United States Patent Nos. 5,424,078; 6,562,873; 6,627,210; 6,641,834; and 6,673,337
Notice of Paragraph IV Certification

Dear Sir:

This is a notice-of-certification letter on behalf of Exela PharmSci, Inc., ("Exela") pursuant to 505(j)(2)(B)(ii) of the Federal Food, Drug, and Cosmetic Act ("the Act") and 21 U.S.C. § 355(j)(2)(B) and § 314.95 of Title 21 of the Code of Federal Regulations:

1. To obtain approval to engage in the commercial manufacture, use or sale of brimonidine tartrate ophthalmic solution 0.15%, Exela submitted to the Food and Drug Administration ("FDA") an Abbreviated New Drug Application ("ANDA") under § 505(j) of the Act that contains the required bioavailability or bioequivalence data or information. FDA has received this application for substantive review.

2. The ANDA number is 78-590 ("Exela's ANDA").

3. The established name of Exela's proposed product is brimonidine tartrate ophthalmic solution 0.15%. Allergan, Inc. markets brimonidine tartrate ophthalmic solution 0.15% under the brand name Alphagan® P.

4. The active ingredient, strength and dosage form of the proposed drug product is brimonidine tartrate ophthalmic solution 0.15%.

5. The '078, '873, '210, '834, and '337 patents are listed in FDA's publication *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book") for Alphagan® P (brimonidine tartrate ophthalmic solution 0.15%). The ANDA Paragraph IV Certification indicates that the Applicant intends to market

the product before the expiration of U.S. Patent Nos. 5,424,078 ("the '078 patent"), which the Orange Book states expires on June 13, 2012; 6,562,873 ("the '873 patent"), which the Orange Book states expires on July 10, 2021; 6,627,210 ("the '210 patent"), which the Orange Book states expires on July 18, 2021; 6,641,834 ("the '834 patent"), which the Orange Book states expires on July 28, 2021; and 6,673,337 ("the '337 patent"), which the Orange Book states expires on July 26, 2021.

6. An offer of Confidential Access to Exela's ANDA, pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), accompanies this notice as a separate enclosure.

Attached is a detailed statement of the factual and legal bases of Exela's patent certification. This information is supplied for the sole purpose of complying with the above-referenced statutes and regulations. Neither Exela nor its attorneys waive any attorney-client privilege or work-product immunity concerning the subject matter of this communication.

Sincerely,

Phanesh Koneru
CEO
Exela PharmSci, Inc.
11710 Plaza America Drive
Suite 2000
Reston, VA 20190

Encls.: Offer of Confidential Access

Detailed Statement of the Factual and Legal Basis of Exela's Paragraph IV Patent Certification

*Duplicate with enclosures via FEDEX*

# Exhibit F

CONFIDENTIAL

**OFFER OF CONFIDENTIAL ACCESS AND CONFIDENTIALITY AGREEMENT PURSUANT TO 21 U.S.C. § 355(j)(5)(C)(i)(III)**

THIS OFFER OF CONFIDENTIAL ACCESS AND CONFIDENTIALITY AGREEMENT ("Agreement") by and between EXELA PHARMSCI, INC. ("Exela"), a Virginia corporation having a place of business at 11710 Plaza America Drive, Suite 2000, Reston, VA 20190 ("Exela"), and ALLERGAN, INC. ("Allergan"), a California corporation having a place of business at 2625 Dupont Drive, Irvine, California 92612, is made effective upon a request by Allergan for access to Exela's Abbreviated New Drug Application for brimonidine tartrate ophthalmic solution 0.15% ("Exela's ANDA").

W I T N E S S E T H :

WHEREAS, in accordance with § 505(j)(5)(C)(i)(III) of the Federal Food, Drug and Cosmetic Act as amended by Title XI of the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Exela offers to make certain "Information" (as defined below) concerning its ANDA available to Allergan subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the furnishing of Information by Exela, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

**1. DEFINITIONS**

(a) "Information" means any and all information that the Providing Party (as hereafter defined) or its Representatives provides or furnishes to the Receiving Party (as hereafter defined) or its Representatives, regardless of whether: (i) such Information is specifically marked or designated as "confidential" or "proprietary", (ii) such Information is patentable, copyrightable or otherwise protected by law, or (iii) such Information is furnished verbally, in writing or in electronic form. "Information" includes, but is not limited to, any and all notes, memoranda, analyses, compilations, studies or other documents (whether in hard copy or electronic media) prepared by either party which contain or otherwise reflect such Information, and any and all copies, extracts or other reproductions of any of the same.

(b) Notwithstanding the foregoing, the term "Information" does not include information that: (i) is or becomes available to the public through no wrongful act of the Receiving Party or its Representatives; (ii) is known to the Receiving Party on the date of this Agreement, as evidenced by written records of the Receiving Party existing on said date; (iii) is received from a third party who has the right to disclose the same to the Receiving Party; (iv) is in the rightful possession of the Receiving Party free of any obligation of confidentiality; or (v) is independently developed by the Receiving Party without reference to, or misuse of, Information furnished by the Providing Party.

(c) "Providing Party" means the party furnishing Information, and includes its subsidiary and affiliated entities.

(d) "Receiving Party" means the party receiving Information, and includes its subsidiary and affiliated entities.

(e) "Representatives" means any party's employees, agents or other representatives, including advisors, attorneys, accountants, financial advisors and potential financing sources.

**2. CONFIDENTIALITY**

(a) The information is being provided for the sole and limited purpose of allowing Allergan to evaluate whether to file a patent infringement suit under the Hatch-Waxman Act relating to U.S. Patent Nos. 5,424,078; 6,562,873; 6,627,210; 6,641,834; and 6,673,337 (the "Listed Patents"), which are the subject of Exela's ANDA certification pursuant to § 505(j)(2)(A)(vii)(IV).

(b) Persons to whom Allergan is entitled to provide access to the Information under this Agreement are restricted to counsel engaged by Allergan to represent them, and its staff, including paralegal, secretarial and clerical personnel who are engaged in assisting such counsel.

(c) Persons provided access to the Information shall: (i) agree to keep Information furnished to them by the Providing Party or Allergan strictly confidential and not disclose it to unauthorized employees or agents of Allergan to any third party; (ii) take all reasonable precautions to safeguard such Information against unauthorized disclosure; (iii) agree to be bound by the provisions of this Agreement and the Providing Party's enforcement of this Agreement against it; and (iv) not take any action inconsistent with the Providing Party's ownership of such Information.

(d) Except to the extent required by law, regulations, or judicial process and in accordance with paragraph 4 below, the Receiving Party shall not disclose to any third person or entity other than those provided for in paragraph 2(b): (i) the Providing Party's Information, (ii) the fact that such Information was disclosed to the Receiving Party, or (iii) the fact that an evaluation is taking place with respect to the Information, including the status thereof, unless exempted from one or more of these prohibitions by the express prior written consent or authorization of the Providing Party.

(e) The Receiving Party shall not copy, reproduce, or reduce to writing any part of the Information furnished to it by the Providing Party except as is reasonably necessary to accomplish the purpose of the Agreement.

(f) The Receiving Party shall be responsible for any breach of this Agreement by its officers, directors, employees or other Representatives, and shall take all reasonable measures to restrain such persons from the unauthorized use or disclosure of the Information.

## 3. USE OF INFORMATION

The Receiving Party shall use the Information solely for the limited purpose of evaluating whether to file a suit alleging infringement of the Listed Patents and for no other purpose.

## 4. GOVERNMENTAL REQUESTS FOR DISCLOSURE

In the event that the Receiving Party or any of its Representatives receives a request or is required by applicable law to disclose to a court or government agency of competent jurisdiction all or any part of the Providing Party's Information, the Receiving Party or its Representatives shall promptly notify the Providing Party of the request, and shall to the extent requested, consult with and assist the Providing Party in seeking a protective order or other appropriate protective remedy. If such order or other remedy is not obtained or the Providing Party waives compliance with the terms hereof, the Receiving Party or its Representatives, as the case may be, shall disclose only that portion of the Information which, in the reasonable and good faith opinion of its counsel, is legally required to be disclosed, and shall exercise their respective best efforts to assure that confidential treatment will be accorded such Information by the persons or entities receiving it. The Providing Party shall be given a reasonable opportunity to review the Information prior to its disclosure.

5. **NO REPRESENTATION, COMMITMENT, LICENSE OR WAIVER**

(a) The Providing Party makes no representation or warranty of any kind, whether express or implied, about the accuracy or completeness of the Information. Neither the Providing Party, nor any of its officers, directors, shareholders, employees or Representatives shall have any liability to the Receiving Party or to any other person or entity resulting from use of the Information.

(b) No failure or delay by the Providing Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6. **RETURN OF INFORMATION**

(a) If the Receiving Party does not file suit against Exela alleging infringement of the Listed Patent within forty-five (45) days of receipt of the Notice and Detailed Statements (the "45-day period") which this offer pertains, the Receiving Party shall cause persons entitled to access to the Information thirty (30) days after the expiration of the 45-day period, to destroy or return to Exela the portions of the ANDA provided and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, and the Receiving Party shall notify Exela that this has been done.

(b) If the Receiving Party files suit against Exela alleging infringement of the Listed Patent within the 45-day period:

(1) while the litigation is pending, the portions of the ANDA provided and all notes, analyses, studies or other documents to the extent that they contain information in the ANDA, shall be treated as Information under the highest level of confidentiality under any protective order entered in the action brought against Exela. Until such a protective order is entered, and becomes applicable to such applicable Information, the terms of this Offer of Confidential Access continue to apply;

(2) Unless otherwise provided in a protective order in an infringement action as identified in paragraph 6(b)(1), the Receiving Party shall cause persons entitled to access to the Information to destroy or return to Exela the portions of the ANDA provided and all notes, analyses, studies or other documents prepared to the extent that they contain information in the ANDA, within thirty (30) days after the final determination of the action brought against Exela.

## 7. INJUNCTIVE RELIEF

The parties agree that money damages will not be a sufficient remedy for any breach of this Agreement by the Receiving Party or its Representatives, and that the Providing Party is entitled to injunctive relief and specific performance as remedies for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement but shall be in addition to all other remedies available at law or in equity.

**8. TERM; TERMINATION**

This Agreement shall be effective upon execution of this Agreement by Exela and Allergan for providing access to Exela's ANDA, and shall remain in effect until such time as the Information is returned or destroyed pursuant to Paragraph 6 above. The Agreement may be renewed upon such terms as may be agreed upon by the parties. Upon termination of this Agreement, the Receiving Party shall fulfill its obligations to return the Providing Party's Information pursuant to above paragraph 6 of this Agreement. The Receiving Party's obligations of confidentiality pursuant to above paragraph 2 shall survive the termination of this Agreement.

**9. SEVERABILITY**

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision, all of which shall remain in full force and effect.

**10. ASSIGNMENT**

This Agreement shall not be assigned without the prior written consent of the Providing Party.

**11. GOVERNING LAW**

This Agreement shall be construed in accordance with the laws of the State of Virginia, without regard to conflict of laws principles.

**12. HEADINGS**

The section headings in this Agreement are for convenience only, and shall not alter or affect the meaning or interpretation of any provision of this Agreement.

**13. COUNTERPARTS**

This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same Agreement.

## 14. COMMUNICATIONS

Delivery of any counterpart signature page of this Agreement, written communication or notice hereunder by facsimile shall be equally as effective as delivery of a manually executed original of such counterpart signature page, communication or notice. Any party delivering a counterpart signature page, written communication or notice hereunder by facsimile shall also deliver a confirmatory hand-signed original.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed upon a request by Allergan for access to Exela's ANDA.

By: [signature]

Name: PHANESH KONERU

Title: CEO

Date: 02/08/2007

EXELA PHARMSCI, INC.

By: ______________________

Name: ______________________

Title: ______________________

Date: ______________________

ALLERGAN, INC.

BACKUP COPY BY FEDEX
COPY OF REGISTERED MAIL RECEIPT

# Exhibit G

24689103881

**CORPORATE RECORDS & BUSINESS REGISTRATIONS**

| | |
|---|---|
| This Record Last Updated: | 04/04/2006 |
| Database Last Updated: | 02-12-2007 |
| Update Frequency: | WEEKLY |
| Current Date: | 02/13/2007 |
| Source: | AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE |

**COMPANY INFORMATION**

| | |
|---|---|
| Name: | **EXELA** PHARMSCI, INC. |
| Address: | 43106 BALTUSROL TERRACE |
| | ASHBURN, VA 20147-5260 |

**FILING INFORMATION**

| | |
|---|---|
| Identification Number: | 0632303 |
| Filing Date: | 02/18/2005 |
| State of Incorporation: | VIRGINIA |
| Date Incorporated: | 02/18/2005 |
| Duration: | PERPETUAL |
| Status: | ACTIVE |
| Status Attained Date: | 02/18/2005 |
| Corporation Type: | NOT AVAILABLE |
| Business Type: | CORPORATION |
| Address Type: | BUSINESS |
| Where Filed: | STATE CORPORATE COMMISSION |
| | 1220 BANK ST |
| | RICHMOND, **VA** 23219 |

**REGISTERED AGENT INFORMATION**

| | |
|---|---|
| Name: | CORPORATION SERVICE COMPANY |
| Address: | 11 S 12TH ST;PO BOX 1463 |
| | RICHMOND, VA |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appointed Date: 02/18/2005

Status: ACTIVE

**PRINCIPAL INFORMATION**

Name: KONERU, PHANESH B

Title: PRESIDENT, CHIEF FINANCIAL OFFICER, SECRETARY

**STOCK INFORMATION**

Common Stock:

Dollar Value:

Authorized Shares: 100,000

Par Value: $0

Convertible: NO

**ADDITIONAL DETAIL INFORMATION**

Additional Details: INDUSTRY: GENERAL

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387) to order copies of documents related to this or other matters. Additional charges apply.

THE PRECEDING PUBLIC RECORD DATA IS FOR INFORMATION PURPOSES ONLY AND IS NOT THE OFFICIAL RECORD. CERTIFIED COPIES CAN ONLY BE OBTAINED FROM THE OFFICIAL SOURCE.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
~~Norfolk~~ Division
Alexandria

FILED
APR - 6 2007
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

EXELA PHARMSCI, INC.,

Plaintiff,

v.

ALLERGAN, INC.,

Defendant.

Civil Action No. 1:07cv338
TSE/TCB

**COMPLAINT FOR**
**DECLARATORY JUDGMENT**

Plaintiff Exela PharmSci, Inc. ("Exela"), by way of its Complaint against Allergan, Inc. ("Allergan"), alleges as follows:

**Statement of the Case**

1. This is a declaratory-judgment action seeking a declaration of noninfringement, unenforceability, or invalidity of United States Patents Nos. 5,424,078 ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), 6,641,834 ("the '834 patent"), and 6,673,337 ("the '337 patent") (attached as Exhibits 1-5). Allergan listed the above five patents with the Food and Drug Administration ("the FDA") in the Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book"), as patents that could reasonably be asserted against anyone marketing or seeking to market a generic product in competition with Allergan's 0.15% brimonidine tartrate ophthalmic solution, which Allergan sells under the brand name Alphagan® P. Exela has filed an Abbreviated New Drug Application ("ANDA") with the FDA, seeking approval to market a 0.15% brimonidine tartrate ophthalmic solution. As part of

that application, Exela certified that that it did not infringe any of the above five patents and that the patents were unenforceable or invalid. Exela also provided Allergan with notice of its certification.

2. On March 26, 2007, Allergan sued Exela alleging infringement of the '834 patent. *See Allergan, Inc. v. Exela PharmSci, Inc. and Exela PharmSci Pvt. Ltd.*, No. 07-6196 (R)(RC) (Mar. 26, 2007) ("the California Complaint"). By suing on the '834 patent within 45 days after receiving Exela's notice, Allergan invoked statutory provisions that prevent the FDA from approving Exela's ANDA for up to 30 months under certain conditions. 21 U.S.C. § 355(j)(5)(B)(iii). Because Allergan did not sue Exela on the remaining four patents listed in the Orange Book and Exela remains faced with the threat of suit on those patents, Exela has a reasonable apprehension that Allergan will sue Exela on the remaining patents listed in the Orange Book, and a justiciable controversy exists under the Declaratory Judgment Act. Allergan's conduct impairs Exela's ability to bring its brimonidine drug product to market. Exela thus seeks a declaratory judgment that it does not infringe the '078, '873, '210, '834, and '337 patents, and that those patents are invalid and/or unenforceable.

3. Exela is a Virginia corporation and is not subject to the jurisdiction of California. Exela intends to challenge jurisdiction in the California Complaint and properly brings this declaratory-judgment action in Virginia.

**Parties**

4. Exela is a Virginia corporation, and has its principal place of business at 11710 Plaza America Drive, Suite 2000, Reston, Virginia 20190. Among other things, Exela develops generic pharmaceutical products for distribution and sale in the United States.

5. On information and belief, Allergan is a Delaware corporation with its principal place of business at 2525 Dupont Drive, Irvine, California 92612.

**Jurisdiction and Venue**

6. These claims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and 21 U.S.C. § 355(j)(5)(C)(i)(II).

7. This Court has subject-matter jurisdiction based on 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 and 21 U.S.C. § 355(j)(5)(C)(i)(II).

8. This Court has personal jurisdiction over Allergan because, for example, Allergan is doing business within this district.

9. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

10. Venue is proper because Exela is a Virginia corporation and a substantial part of the events giving rise to the claim occurred in Virginia.

11. Venue is proper because Allergan resides in this district, is subject to personal jurisdiction in this district in that it is doing and transacting business in this district, and has substantial contacts in this district.

**Allergan's NDA and Exela's ANDA**

12. On information and belief, Allergan is the current holder of New Drug Application ("NDA") No. 21-262 for 0.15% brimonidine tartrate ophthalmic solution, which Allergan markets under the brand name Alphagan® P in the United States. Alphagan® P is indicated to treat glaucoma.

13. On information and belief, in 2001 the FDA approved Allergan's NDA 21-262. This permitted Allergan to market its 0.15% brimonidine tartrate ophthalmic solution.

14. Brimonidine has been approved by the FDA as an ophthalmic solution since 1996 and has been sold by several drug companies, including Alcon, Inc. ("Alcon"), Akorn, Inc., Bausch and Lomb, Inc., and Ivax Pharmaceuticals, Inc.

15. On information and belief, the FDA has approved Alcon's NDA No. 21-764 for 0.15% brimonidine tartrate ophthalmic solution, but Alcon may not market its product until September 30, 2009, due to a settlement agreement with Allergan, unless certain market conditions occur, the primary condition being a trigger based on the extent to which prescriptions of Allergan's 0.15% brimonidine tartrate ophthalmic solution have been converted to other brimonidine-containing products.

16. The FDA rated Alcon's NDA 21-764 product with an "AT" Therapeutic Evaluation Code, which means that it is considered therapeutically equivalent (same active ingredient) but not pharmaceutically equivalent (not generically substitutable). As a result, there is currently no generic product that can be sold in competition with Allergan's 0.15% brimonidine product.

17. The Federal Food, Drug and Cosmetic Act ("FFDCA") authorizes a generic company to file an ANDA, which the FDA will approve if the generic company shows that its product has the same active ingredient as, and is bioequivalent to, a product that the FDA has already approved. Typically, the ANDA applicant submits data showing that its product is bioequivalent to a product that has been the subject of an approved NDA.

18. The FFDCA requires NDA holders to submit to the FDA the patent number and expiration date of any patent(s) that the NDA holder believes "a claim of patent infringement could reasonably be asserted if a person not licensed by the [NDA] owner engaged in the

manufacture, use or sale of the drug." 21 U.S.C. § 355(b)(1). The FDA—with no substantive review of the patents—lists the patent number(s) and expiration date(s) in the Orange Book.

19. If an ANDA applicant seeks approval to market its generic product before the patents listed in the Orange Book expire, the applicant must include in its ANDA a certification that its proposed product would not infringe those patents, and/or that the patents are invalid or unenforceable. The applicant must then send a notice letter to the NDA holder and patent owner that includes a detailed statement of the factual and legal bases of the applicant's opinion that the patent is invalid, unenforceable, or would not be infringed.

20. If the patent owner sues the ANDA applicant for infringement within 45 days of receiving the notice letter, on that basis alone the FDA is prohibited by statute from approving the ANDA for 30 months or until the infringement action is over, absent a court order shortening the period.

21. Upon information and belief, Allergan, as the NDA holder for Alphagan® P (NDA 21-262), filed with the FDA a patent certification pursuant to 21 U.S.C. § 355(b)(1) requesting that five patents be listed by the FDA in the Orange Book, namely the '078, '873, '210, '834, and '337 patents.

22. Allergan's listing of these five patents means that Allergan asserts that any one of these patents is a "patent which claims the drug for which the application was submitted [i.e., Alphagan® P, NDA No. 21-262] . . . and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." *See* 21 U.S.C. § 355(b)(1).

23. All patents covering the active ingredient brimonidine expired long ago. The Orange Book patents all relate to formulations of brimonidine.

24. To engage in the commercial manufacture, use, or sale of 0.15% brimonidine tartrate ophthalmic solution, Exela filed with the FDA an ANDA for Exela's product, and the FDA assigned Exela's application ANDA No. 78-590.

25. Exela's ANDA seeks approval to market generic 0.15% brimonidine tartrate ophthalmic solution based on Allergan's NDA No. 21-262. By preparing and filing this ANDA, Exela has made substantial preparation to make, use, import, offer to sell, and sell generic 0.15% brimonidine tartrate ophthalmic solution in the United States before expiration of the patents Allergan listed in the Orange Book. Exela certified to the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (hereinafter "Paragraph IV certification(s)"), that Exela's 0.15% brimonidine tartrate ophthalmic solution will not infringe any claim of the patents listed in the Orange Book, and that those patents are invalid and unenforceable.

26. On February 8, 2007, Exela, in accordance with 21 U.S.C. § 355(j)(2)B)(i) and (ii), mailed Allergan a notice that it had filed an ANDA for its 0.15% brimonidine tartrate ophthalmic solution informing Allergan that its ANDA contained Paragraph IV certifications regarding the '078, '873, '210, '834, and '337 patents. The notice provided the factual and legal bases as to why the '078, '873, '210, '834, and '337 patents were invalid, unenforceable, or will not be infringed, by the commercial manufacture, use, or sale of Exela's 0.15% brimonidine tartrate ophthalmic solution before expiration of the '078, '873, '210, '834, and '337 patents. The notice also included an offer of confidential access to Exela's ANDA, as provided for in 21 U.S.C. § 355 (j)(5)(C)(I)(cc), (j)(5)(C)(III).

27. Upon information and belief, Allergan has stated that it received notice on February 12, 2007, that Exela had filed an ANDA for 0.15% brimonidine tartrate ophthalmic

solution with Paragraph IV certifications as to the five listed Orange Book patents, as provided by § 505(j)(2)(B)(ii) of the FFDCA and 21 C.F.R. § 314.95.

28. On March 26, 2007, Allergan filed the California Complaint alleging "Exela's proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% will infringe the '834 patent."

29. In the California Complaint, however, Allergan did not sue Exela for infringement of the '078, '873, '210, and '337 patents. Because those patents are listed in the Orange Book for 0.15% brimonidine tartrate ophthalmic solution, Exela remains faced with the threat of litigation concerning these four patents, and that threat is impairing Exela's ability to bring to market its brimonidine drug product. The 45-day period after the date on which Allergan received Exela's notice that Exela had filed an ANDA for its brimonidine drug product containing Paragraph IV certifications as to the five listed Orange Book patents has expired, as provided by § 505(j)(5)(B)(iii) of the FFDCA. Exela thus seeks a declaratory judgment of noninfringement, invalidity, and/or unenforceability of the '078, '873, '210, and '337 patents, pursuant the Declaratory Judgment Act and 21 U.S.C. § 355(j)(5)(C)(i)(II).

30. Allergan did not accept Exela's offer of access to Exela's ANDA before filing the California Complaint.

31. Allergan has not provided Exela with a covenant not to sue based on the five Orange Book patents, nor any other assurance that it would not assert a case for infringement for the remaining four patents listed in the Orange Book against Exela.

32. Allergan has demonstrated an intention to prevent generic competition for its products by attempting to enforce Orange Book-listed patents against one or more generic companies in numerous instances. With regard to 0.15% brimonidine tartrate ophthalmic

solution, Allergan sued Alcon Laboratories for its brimonidine drug product (under 505(b)(2)), based on the '834 and '337 patents and settled this case on or about March 9, 2006. *See Allergan, Inc. v. Alcon Labs.*, No. 04-968 (D. Del. filed Aug. 24, 2004).

33. The five Orange Book patents include claims for 0.15% brimonidine tartrate ophthalmic solutions that are closely related to the formulation claims in the '834 patent and involve the same technology. The '834 patent, moreover, is a continuation patent of the '210 patent. The '873 patent, the '210 patent, and the '337 patent all share a history to Provisional Application No. 60/218,200 and share many common components in their substantive specifications.

34. Allergan's selection of the '834 patent to initiate its infringement suit creates uncertainty as to Exela's legal rights under its ANDA.

35. Exela suffers a direct legal injury from the actions Allergan has already taken—Allergan's listing of the five Alphagan® P patents in the Orange Book and Allergan's suit against Exela challenging the validity of Exela's ANDA—which requires judicial relief. *See* 21 U.S.C. § 355(j)(5)(C).

36. Exela suffers from the possibility of future litigation created by Allergan electing to challenge Exela's ANDA on only one of the five listed Orange Book patents for Alphagan® P. Allergan's suit on the '834 patent alone leaves open the possibility of future litigation regardless of whether Exela wins or loses the '834 patent-infringement suit. The possibility that Exela will be subject to multiple infringement suits from Allergan over a protracted litigation on the submission of its single ANDA containing five Paragraph IV certifications is an injury relevant to finding a justiciable controversy.

37. Exela suffers from Allergan improperly bringing suit on the '834 patent in California, forcing Exela to challenge personal jurisdiction and further protract its litigation concerning its ANDA product because Exela is a Virginia corporation and a substantial part of the events giving rise to the claim occurred in Virginia.

38. Exela, therefore, has a reasonable apprehension and justiciable controversy under the Declaratory Judgment Act that Allergan would likely assert the five listed Orange Book patents against Exela if Exela commercially marketed its generic 0.15% brimonidine tartrate ophthalmic solution.

**The Presence of a Case or Controversy**

39. Under 35 U.S.C. § 271(e)(2)(A), Exela's submission of an ANDA to the FDA constitutes a "technical" act of infringement for subject-matter jurisdiction purposes for each of the patents listed in the Orange Book. Moreover, 35 U.S.C. § 271(e)(5) provides that the Court has subject-matter jurisdiction under 28 U.S.C. §§ 2201 for a declaratory judgment that any unasserted Orange Book patents are invalid or not infringed. *See also Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, No. 06-1181, 2007 WL 942201 (Fed. Cir. Mar. 30, 2007).

40. Because Allergan filed the California Complaint alleging that Exela has infringed the '834 patent, Allergan has demonstrated an intent to enforce its patents concerning 0.15% brimonidine tartrate ophthalmic solution.

41. The California Complaint gives rise to an actual controversy with respect to the '834 patent.

42. Allergan has never disavowed, in the California Complaint or elsewhere, an intent to assert that Exela infringes the '078, '873, '210, and '337 patents.

43. Exela has made, and will continue to make, substantial preparation in the United States to manufacture, sell, and offer to sell Exela's 0.15% brimonidine tartrate ophthalmic solution.

44. Allergan caused the FDA to list the '078, '873, '210, and '337 patents in the Orange Book but did not assert those patents in the California Complaint, even though those patents involve the same technology and share substantial content with the '834 patent.

45. The totality of the circumstances support that a case or controversy exists with respect to the infringement, invalidity, and/or unenforceability of the '078, '873, '210, '834 and '337 patents.

46. To avoid legal uncertainty and to protect its substantial investment (and anticipated future investment) in Exela's 0.15% brimonidine tartrate ophthalmic solution, Exela seeks declaratory-judgment relief with respect to the '078, '873, '210, '834 and '337 patents in Virginia.

**COUNT I**
**Declaratory Judgment of**
**Noninfringement of the '078 Patent**

17. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

18. A case or controversy exists between Exela and Allergan concerning the noninfringement of the '078 patent, which requires a declaration of rights by this Court.

19. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '078 patent.

20. Exela is entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '078 patent.

**COUNT II**
**Declaratory Judgment of**
**Invalidity of the '078 Patent**

21. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

22. A case or controversy exists between Exela and Allergan concerning the invalidity of the '078 patent, which requires a declaration of rights by this Court.

23. The '078 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, *et seq.*

24. Exela is entitled to a declaratory judgment that the '078 patent is invalid.

**COUNT III**
**Declaratory Judgment of**
**Noninfringement of the '873 Patent**

25. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

26. A case or controversy exists between Exela and Allergan concerning the noninfringement of the '873 patent, which requires a declaration of rights by this Court.

27. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '873 patent.

28. Exela is entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '873 patent.

**COUNT IV**
**Declaratory Judgment of**
**Invalidity of the '873 Patent**

29. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

30. A case or controversy exists between Exela and Allergan concerning the invalidity of the '873 patent, which requires a declaration of rights by this Court.

31. The '873 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, *et seq.*

32. Exela is entitled to a declaratory judgment that the '873 patent is invalid.

**COUNT V**
**Declaratory Judgment of**
**Noninfringement of the '210 Patent**

33. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

34. A case or controversy exists between Exela and Allergan concerning the noninfringement of the '210 patent, which requires a declaration of rights by this Court.

35. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '210 patent.

36. Exela is entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '210 patent.

**COUNT VI**
**Declaratory Judgment of**
**Invalidity of the '210 Patent**

37. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

38. A case or controversy exists between Exela and Allergan concerning the invalidity of the '210 patent, which requires a declaration of rights by this Court.

39. The '210 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, *et seq.*

40. Exela is entitled to a declaratory judgment that the '210 patent is invalid.

**COUNT VII**
**Declaratory Judgment of**
**Noninfringement of the '834 Patent**

41. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

42. A case or controversy exists between Exela and Allergan concerning the noninfringement of the '834 patent, which requires a declaration of rights by this Court.

43. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '834 patent.

44. Exela is entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '834 patent.

**COUNT VIII**
**Declaratory Judgment of**
**Invalidity of the '834 Patent**

45. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

46. A case or controversy exists between Exela and Allergan concerning the invalidity of the '834 patent, which requires a declaration of rights by this Court.

47. The '834 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, *et seq.*

48. Exela is entitled to a declaratory judgment that the '834 patent is invalid.

**COUNT IX**
**Declaratory Judgment of**
**Noninfringement of the '337 Patent**

49. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

50. A case or controversy exists between Exela and Allergan concerning the noninfringement of the '337 patent, which requires a declaration of rights by this Court.

51. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '337 patent.

52. Exela is entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '337 patent.

**COUNT X**
**Declaratory Judgment of**
**Invalidity of the '337 Patent**

53. Exela repeats and realleges each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

54. A case or controversy exists between Exela and Allergan concerning the invalidity of the '337 patent, which requires a declaration of rights by this Court.

55. The '337 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, *et seq.*

56. Exela is entitled to a declaratory judgment that the '337 patent is invalid.

**PRAYER FOR RELIEF**

WHEREFORE, Exela respectfully requests that the Court enter a Judgment and Order declaring that:

A. Exela's 0.15% brimonidine tartrate ophthalmic solution as described in ANDA No. 78-590 does not infringe claims 1-18 of United States Patent No. 5,424,078;

B. the claims of United States Patent No. 5,424,078 are invalid;

C. the claims of United States Patent No. 5,424,078 are unenforceable;

D. Exela's 0.15% brimonidine tartrate ophthalmic solution as described in ANDA No. 78-590 does not infringe claims 1-49 of United States Patent No. 6,562,873;

E. the claims of United States Patent No. 6,562,873 are invalid;

F. the claims of United States Patent No. 6,562,873 are unenforceable;

G. Exela's 0.15% brimonidine tartrate ophthalmic solution as described in ANDA No. 78-590 does not infringe claims 1-34 of United States Patent No. 6,627,210;

H. the claims of United States Patent No. 6,627,210 are invalid;

I. the claims of United States Patent No. 6,627,210 are unenforceable;

J. Exela's 0.15% brimonidine tartrate ophthalmic solution as described in ANDA No. 78-590 does not infringe claims 1-22 of United States Patent No. 6,641,834;

K. the claims of United States Patent No. 6,641,834 are invalid;

L. the claims of United States Patent No. 6,641,834 are unenforceable;

M. Exela's 0.15% brimonidine tartrate ophthalmic solution as described in ANDA No. 78-590 does not infringe claims 1-10 of United States Patent No. 6,673,337;

N. the claims of United States Patent No. 6,673,337 are invalid;

O. the claims of United States Patent No. 6,673,337 are unenforceable;

P. this case is an exceptional case pursuant to 35 U.S.C. § 285 and awarding Exela its attorneys' fees, costs, and expenses; and

Q. Exela is entitled to any further relief that this Court may deem just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Exela demands a jury trial of all issues in this action so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 6, 2007

Respectfully submitted,

EXELA PHARMSCI, INC.

By: [signature]
Of Counsel

Conrad M. Shumadine (VSB #4325)
WILLCOX & SAVAGE, P.C.
One Commercial Place, Suite 1800
Norfolk, Virginia 23510
Telephone: 757-628-5500
Facsimile: 757-628-5566
cshumadine@wilsav.com

Daniel G. Brown
Barry S. White
David A. Zwally
Brian J. Malkin
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY 10151
Telephone: 212-588-0800
Facsimile: 212-588-0500

*Counsel for Exela PharmSci, Inc.*

US005424078A

# United States Patent [19]

Dziabo et al.

[11] Patent Number: 5,424,078

[45] Date of Patent: Jun. 13, 1995

[54] AQUEOUS OPHTHALMIC FORMULATIONS AND METHODS FOR PRESERVING SAME

[75] Inventors: Anthony J. Dziabo, El Toro; Paul S. Ripley, Irvine, both of Calif.

[73] Assignee: Allergan, Inc., Irvine, Calif.

[21] Appl. No.: 694,640

[22] Filed: May 2, 1991

Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 277,791, Nov. 29, 1988.

[51] Int. Cl.[6] ...................... A61K 33/14; A61K 31/19

[52] U.S. Cl. ................................... 424/661; 514/557; 514/912

[58] Field of Search ................ 424/661; 514/557, 912

[56] References Cited

U.S. PATENT DOCUMENTS

Re. 32,672 5/1988 Huth et al. .......................... 252/95
2,436,134 2/1948 Aston .................................. 23/152
2,477,631 8/1949 Levy ....................................... 8/105
3,123,521 3/1964 Wentworth .......................... 167/17
3,278,447 10/1966 McNicholas ......................... 167/17
3,591,515 7/1971 Lovely ............................... 252/187
3,819,828 6/1974 McCoy ................................ 424/71
3,910,296 10/1975 Karageozian et al. ................ 134/2
4,084,747 3/1978 Alliger ................................ 424/65
4,104,190 8/1978 Hartshorn ...................... 252/187 R
4,123,376 10/1978 Gray ................................... 252/99
4,456,510 6/1984 Murakami .......................... 204/101
4,459,217 7/1984 Bogie ............................ 252/174.14
4,499,077 2/1985 Stockel et al. ..................... 424/149
4,568,517 2/1986 Kaspar et al. ........................ 422/30
4,614,549 9/1986 Ogunbuyi et al. .................. 134/19
4,618,444 10/1986 Hudson et al. ...................... 252/92
4,654,208 3/1987 Stockel et al. ....................... 424/78
4,689,215 8/1987 Ratcliff ................................ 424/53
4,690,773 9/1987 Ogunbuyi et al. ............ 252/174.12
4,696,811 9/1987 Ratcliff ................................ 424/53
4,786,492 11/1988 Ratcliff ................................ 424/53
4,788,053 11/1988 Ratcliff ................................ 424/53
4,792,244 12/1988 Ratcliff ................................ 424/53
4,793,989 12/1988 Ratcliff ................................ 424/53
4,837,009 6/1989 Ratcliff ................................ 424/53
4,851,213 7/1989 Ratcliff ................................ 424/53
4,855,135 8/1989 Ratcliff .............................. 424/127

FOREIGN PATENT DOCUMENTS

0168253 1/1986 European Pat. Off. .
0196075 10/1986 European Pat. Off. .
0199385 10/1986 European Pat. Off. .
0279401 2/1988 European Pat. Off. .
1269677 4/1982 United Kingdom .
2139260 11/1984 United Kingdom .
2187748 9/1987 United Kingdom .
WO8504107 9/1985 WIPO .
WO8605695 10/1986 WIPO .

*Primary Examiner*—Zohreh Fay
*Attorney, Agent, or Firm*—Frank J. Uxa

[57] ABSTRACT

Stabilized chlorine dioxide is a preservative for ophthalmic formulations. The stabilized chlorine dioxide, when employed as a preservative ophthalmic formulations is preferably present in an amount of from about 0.0002 or about 0.002 to about 0.02 weight/volume percent. The aqueous ophthalmic formulations, in addition to the stabilized chlorine dioxide and the water which functions as a vehicle for the formulations, contains an ophthalmically acceptable tonicity component effective to maintain the osmolality of the formulation at least about 200 mOsmol/kg, and a buffer to maintain the pH of the ophthalmic formulation within an acceptable physiological range. A method for preserving aqueous ophthalmic formulations utilizing stabilized chlorine dioxide is also set forth.

18 Claims, No Drawings

## AQUEOUS OPHTHALMIC FORMULATIONS AND METHODS FOR PRESERVING SAME

### Related Application

This application is a continuation-in-part of application Ser. No. 277,791, filed Nov. 29, 1988. The disclosure of this prior application is hereby incorporated in its entirety herein by reference.

### BACKGROUND OF THE INVENTION

The present invention relates to preserving ophthalmic formulations or compositions, such as solutions. More particularly it relates to the use of stabilized chlorine dioxide to preserve ophthalmic formulations.

The use of contact lens has become widespread as a replacement for conventional eye glasses because of the improved vision obtained by the wearer or for aesthetic reasons. Contact lenses accumulate microorganisms and cellular debris from the eye. Thus, the lenses must be periodically removed and cleaned to prevent irritation of the eye or infection. Formulations used in lens care must be preserved by some means to interdict introducing microbial contaminants onto contact lenses or into the eye. Disinfecting preparations are part of the regimen indicated for contact lens care.

Numerous ophthalmic formulations have heretofore been used with lenses. The composition of the ophthalmic formulation will often be dictated by the polymeric materials employed in the fabrication of the contact lens. Because of the chemical composition of most ophthalmic formulations, the contact lenses treated, e.g., disinfected, cleaned, soaked, and the like, in such formulations must be rinsed prior to placement in the wearer's eye to prevent irritation of the eye.

Problems have also been encountered in the use of the prior art ophthalmic formulations for the treatment of contact lenses in that such formulations often become contaminated or deteriorate when exposed to the atmosphere once the seal of he formulation container has been broken. Microorganisms and/or other impurities often contaminate the formulation which requires that the formulation be discarded. Thus, there exists a need for aqueous ophthalmic compositions having extended lives. In other words, there is a need for ophthalmic formulations which are effectively preserved without being irritating or otherwise damaging to the eye. It is to such preserved ophthalmic formulations and methods for preserving ophthalmic formulations that the present invention is directed.

Ratcliff U.S. Pat. Nos. 4,696,811 and 4,689,215 disclose the use of stabilized chlorine dioxide for the treatment and prevention of oral disease, for the reduction of malodor, as an anti-plaque agent, an anti-gingivitis and anti-peridontitis agent, as well as a denture soak. These two patents disclose the use of 0.005 percent to 0.02 percent stabilized chlorine dioxide in sterilized water as a contact lens soaking formulation. However, the patents are void of any teaching or suggestion that stabilized chlorine dioxide can be incorporated into an ophthalmic formulation as a preservative for such a formulation. In addition, the patents do not disclose the use of buffer or tonicity components.

Stockel et al U.S. Pat. No. 4,499,077 discloses an antimicrobial composition for soft contact lenses including an oxidizing agent such as an oxyhalogen compound, e.g., stabilized chlorine dioxide, or hydrogen peroxide, and a polymeric germicide, e.g., a quaternary ammonium polymer or an amino and/or imino polymer or salts thereof. Stockel et al U.S. Pat. No. 4,654,208 discloses an antimicrobial composition for contact lenses including an aqueous solution of a germicidal polymeric nitrogen compound and an oxidizing agent, e.g., chlorine dioxide, stabilized chlorine dioxide or hydrogen peroxide, to potentiate the activity of the germicidal polymeric nitrogen compound at low concentrations. The Stockel et al patents characterize the "polymeric germicides" and the "germicidal polymeric nitrogen compounds" as positively charged, nitrogen-containing cationic polymers, such as certain quaternary ammonium polymers and polymeric amino and/or imino compounds, e.g., polydiguanides. Neither of these Stockel et al patents relate to ophthalmic compositions without such positively charged, nitrogen-containing cationic polymers.

### SUMMARY OF THE INVENTION

Broadly, the present invention relates to aqueous ophthalmic formulations containing an effective minor amount of stabilized chlorine dioxide to effectively preserve the ophthalmic formulation; a buffer component and a tonicity component. The present ophthalmic formulations are effectively preserved and can be used, e.g., in the contact lens care context, without causing irritation or discomfort to the eyes of the user of the formulations.

In one aspect, the present invention relates to aqueous ophthalmic formulations or compositions, for example, solutions, comprising water, e.g., as a vehicle; an amount, preferably from about 0.0002 or about 0.002 to about 0.02 weight/volume percent, of stabilized chlorine dioxide effective to act as the sole preservative in the formulation; at least one buffer component in an amount effective to maintain the pH of the formulation in the range of about 6.8 to about 8; and at least one tonicity component in an amount effective to maintain the formulation at an osmolality of at least about 200 mOsmol/kg, especially at a tonicity value substantially corresponding to the tonicity value of fluids of an eye. The present ophthalmic formulations preferably include substantially no, i.e., are substantially free of, germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers, for example, the quaternary ammonium polymers, the polymeric amino and/or imino compounds and their salts disclosed in the above-noted Stockel et al patents. More preferably, the present ophthalmic formulations are substantially free of any such positively charged, nitrogen-containing cationic polymers. To provide the ophthalmic formulations with a pH substantially corresponding to the pH of the fluids of the eye, the pH of the ophthalmic formulation can be adjusted, if required, by addition of an acid or a base.

Methods for preserving ophthalmic formulations are also disclosed.

### DETAILED DESCRIPTION

Stabilized chlorine dioxide has been found to be effective as a sole preservative in preserving ophthalmic formulations or compositions. Thus, the present formulations include stabilized chlorine dioxide in an amount effective to act as the sole preservative in the formulations. Although one or more other preservatives may be present, it is preferred that the formulations include no other effective preservatives. In a particularly useful

embodiment, the present formulations preferably include no germicidally effective amount of any positively charged, nitrogen-containing cationic polymers, such as those disclosed in the above-noted Stockel et al patents. Still more preferably, the present formulations are substantially free of any quaternary ammonium compounds. Since stabilized chlorine dioxide has been found to be effective as the sole preservative for ophthalmic formulations, the presence of such nitrogen-containing cationic polymers and quaternary ammonium compounds, which can result in eye irritation or discomfort, is not needed.

The preserving amount of stabilized chlorine dioxide incorporated into an ophthalmic formulation (that is, to prevent microbial growth in the formulation) can vary widely but will generally be an amount sufficient to preserve the composition, for example, the physical and/or chemical integrity of the formulation. The presence of stabilized chlorine dioxide enhances, even greatly enhances, or prolongs the useful or shelf life of the present ophthalmic formulations.

The present formulations preserved with stabilized chlorine dioxide can be used in treating or caring for contact lenses made of a wide variety of different materials, such as different polymeric materials, without any substantial degradation of the lenses.

The thus treated or cared for contact lenses, such as lenses cleansed and soaked using an ophthalmic formulation in accordance with the present invention, can often be placed directly into the wearer's eye without the additional requirement of rinsing to remove residual formulation therefrom. Thus, contamination of the treated or cared for lenses can be substantially eliminated prior to placement in the wearer's eye.

Further, an effective disinfectant can be provided which effectively kills microorganisms which may be present on ophthalmic devices, for example, contact lenses. The disinfectant comprises at least 0.02 weight/volume percent stabilized chlorine dioxide as the disinfecting agent, for example, as the sole disinfecting agent.

The term "stabilized chlorine dioxide" is well known in the industry and by those skilled in the art. Stabilized chlorine dioxide includes one or more chlorine dioxide precursors such as one or more chlorine dioxide-containing complexes and/or one or more chlorite-containing components and/or one or more other entities capable of decomposing or being decomposed in a liquid, preferably aqueous, medium to form chlorine dioxide. U.S. Pat. No. No. 2,271,242 discloses a form of stabilized chlorine dioxide and a method for producing same which can be used as a preservative for aqueous ophthalmic solutions or as a disinfectant for ophthalmic devices. The disclosure of this patent is hereby incorporated in its entirety by reference herein. The manufacture or production of certain stabilized chlorine dioxide products is described in McNicholas U.S. Pat. No. 3,278,447, the disclosure of which is hereby incorporated in its entirety by reference herein. A commercially available stabilized chlorine dioxide which can be utilized in the practice of the present invention is the proprietary stabilized chlorine dioxide of BioCide International, Inc. of Norman, Okla., sold under the trademark Purogene. Other suitable stabilized chlorine dioxide products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Antheium Dioxide by International Dioxide, Inc.

One aspect of the present invention resides in the use of a preserving amount of stabilized chlorine dioxide in aqueous ophthalmic formulations. It has been found that ophthalmic devices contacted with an aqueous ophthalmic formulation containing a preserving amount of stabilized chlorine dioxide and effective amounts of at least one of each of buffer and tonicity components often do not have to be rinsed to remove residual formulation prior to use, e.g., in the eye. Similarly, when such formulations are employed in a regimen of contact lens care, the contact lenses can often be placed in a wearer's eye, without rinsing, without irritation or adverse effects occurring to the tissue of the eye, and without discomfort.

The amount of stabilized chlorine dioxide incorporated in the ophthalmic formulation as a preservative can vary widely provided that such amount effectively prevents microbial growth in the formulation. The amount of stabilized chlorine dioxide included in the formulation is preferably in the range of about 0.0002 or about 0.002 to about 0.02, more preferably about 0.004 to about 0.01, weight/volume percent of the formulation.

In order to provide that the aqueous ophthalmic formulation containing a preserving amount of stabilized chlorine dioxide does not irritate one's eye, it is important that the ophthalmic formulation have a pH value in the range of about 6.8 to about 8, preferably about 7 to about 7.5, and still more preferably so that the pH of the ophthalmic formulation substantially corresponds to the pH value of the fluids in the eye, in particular, the human eye.

To stabilize or maintain the ophthalmic formulation at the desired pH, an effective minor amount of at least one buffer component is incorporated into the ophthalmic formulation. The effective minor amount of buffer component employed to buffer or maintain the formulation at the desired pH can vary widely and depends to a large degree on the particular buffer component employed, as well as the chemical composition of the ophthalmic formulation. However, desirable results have been obtained when the amount of buffering component incorporated into the aqueous ophthalmic formulation to stabilize the formulation at an acceptable physiological pH is in the range of about 0.05 to about 1 weight/volume percent of the formulation.

Any suitable buffer component can be employed which is compatible with the other ingredients of the ophthalmic formulation, and which does not have deleterious or toxic properties which could harm the eye. Examples of suitable ophthalmically acceptable buffer components include acetate buffers, citrate buffers, phosphate buffers, borate buffers and mixtures thereof. Specific buffer components useful in the present invention include boric acid, sodium borate, sodium phosphates, including mono, di- and tri-basic phosphates, such as sodium phosphate monobasic monohydrate and sodium phosphate dibasic heptahydrate, and mixtures thereof. It should be noted that any other suitable ophthalmically acceptable buffer components can be employed to maintain the pH of the ophthalmic formulation so that the ophthalmic formulation is provided with an acceptable pH, and the before-mentioned buffer components are merely examples of such buffer components.

When it is determined that the buffered ophthalmic formulation does not have the desired pH value, the pH of the aqueous buffered ophthalmic formulation can be

adjusted by the addition of an effective amount of either a base or an acid, as the case may be. Any suitable base or acid can be employed to adjust the pH of the aqueous buffered ophthalmic formulation which does not provide the ophthalmic formulation with toxic or deleterious properties which could harm either ophthalmic devices or the eye. An example of a base which can be used to adjust the pH of the aqueous buffered ophthalmic formulation is 1N sodium hydroxide; and an example of an acid which can be used to adjust the pH of the aqueous buffered ophthalmic formulation is 1N hydrochloric acid.

Further, in order to provide that the present ophthalmic formulations do not irritate the eye, e.g., the eye of the wearer of the contact lens treated using such formulations, it is important that the ophthalmic formulations have an osmolality (a measure of tonicity) of at least about 200 mOsmol/kg, preferably in the range of about 200 to about 350 or about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the formulation substantially corresponds to the tonicity of the fluids of the eye, in particular the human eye.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the ophthalmic formulation and do not have deleterious or toxic properties which could harm the eye. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The amount of ophthalmically acceptable tonicity component utilized can vary widely. In one embodiment, the tonicity component is preferably present in the ophthalmic formulation in an amount in the range of about 0.5 to about 0.9 weight/volume percent of the formulation.

Typical of ophthalmically acceptable inorganic salt tonicity components are alkali metal chlorides and alkaline earth metal chlorides, such as sodium chloride, potassium chloride, calcium chloride and magnesium chloride.

The formulations of the present invention include an ophthalmically acceptable medium, preferably an ophthalmically acceptable liquid aqueous medium. This medium often acts as a vehicle or carrier, e.g., as a solvent, for the other components in the formulation. A material is "ophthalmically acceptable" if the material can be placed into a mammalian eye without causing any substantial damage or harm to the eye. One particularly useful ophthalmically acceptable medium is water. Preferably, the medium, and in fact the entire formulation, is sterile.

As previously set forth, the stabilized chlorine dioxide can also be utilized as a disinfecting agent in a disinfectant composition. When formulating such a disinfectant composition a suitable vehicle, such as sterilized water, is employed and at least about 0.02 weight/volume percent stabilized chlorine dioxide is incorporated as the disinfecting agent. While the amount of stabilized chlorine dioxide employed as the disinfecting agent can vary widely, desirable results can be obtained when the stabilized chlorine dioxide utilized as the disinfecting agent is present in the disinfectant composition in an amount of from about 0.02 to 2.0 weight/volume percent, desirably from about 0.04 to about 0.1 weight/volume percent, and more desirably from about 0.05 to about 0.08 weight/volume percent.

One or more additional components can be included in the present formulations based on the particular application for which the formulations are made. Thus, the present formulations can be made up as disinfecting compositions, cleaning compositions, wetting compositions, conditioning compositions, soaking compositions and the like. Also, the present formulations can be made up to be useful in performing two or more contact lens caring operations. For example, a disinfecting/cleaning formulation, or a cleaning/conditioning composition or even an all purpose lens care formulation can be made up and such multi-functional formulations are included within the scope of the present invention.

The additional component or components included in the present formulation are chosen to impart or provide at least one beneficial or desired property to the formulations. Such additional components may be selected from components which are conventionally used in one or more contact lens care compositions. Examples of such additional components include cleaning agents, wetting agents, nutrient agents, sequestering agents, viscosity builders, contact lens conditioning agents, antioxidants, and the like. These additional components are each included in the present formulations in an amount effective to impart or provide the beneficial or desired property to the compositions. For example, such additional components may be included in the present formulations in amounts similar to the amounts of such components used in other, e.g., conventional, contact lens care products.

Examples of useful wetting agents include polyvinyl alcohol, polyoxamers, polyvinyl pyrrollidone, hydroxypropyl methyl cellulose and mixtures thereof.

Examples of useful sequestering agents include disodium ethylene diamine tetraacetate, alkali metal hexametaphosphate, citric acid, sodium citrate and mixtures thereof.

Examples of useful viscosity builders include hydroxyethyl cellulose, hydroxymethyl cellulose, polyvinyl pyrrolidone, polyvinyl alcohol and mixtures thereof.

Examples of useful antioxidants include sodium metabisulfite, sodium thiosulfate, N-acetylcysteine, butylated hydroxyanisole, butylated hydroxytoluene and mixtures thereof.

The present formulations may be used in the care of a contact lens, e.g., to disinfect the lens, to preserve the lens, to otherwise treat the lens and/or to make wearing the lens more safe and comfortable. The present formulations, made up appropriately by blending or combining the various components of the formulation together, may be used in conventional contact lens care regimens by using the present formulations, in place of prior conventional compositions. In many instances, these contact lens care regimens involve contacting the lens with the present formulation in an amount, and at conditions, effective to obtain the beneficial or desired contact lens care result.

For example, a contact lens to,be disinfected may be contacted with a disinfecting composition, e.g., aqueous solution, according to the present invention, preferably at a temperature in the range of about 0° C. to about 100° C., more preferably in the range of about 10° C. to about 60° C. and still more preferably in the range of about 15° C. to about 30° C. Contacting at or about ambient temperature is very convenient and useful. The contacting preferably occurs at or about atmospheric

pressure. The contacting preferably occurs for a time to substantially disinfect the lens being treated. Such contacting times can be in the range of about 1 minute to about 12 hours or more.

After this contacting, the disinfected contact lens can be taken from the composition and placed directly in an eye, e.g., a human eye, for safe and comfortable wear. Alternately, after being disinfected, the contact lens can be contacted with a second medium, e.g., a liquid aqueous medium such as a preserved isotonic saline solution in accordance with the present invention, prior to being placed in the eye of the wearer of the disinfected contact lens.

The contact lens care formulations disclosed herein are adaptable for use in most types of contact lens care equipment, such as ultrasonic cleaners and the like.

In order to more fully describe the present invention the following examples are set forth. However, the examples are merely illustrative in purpose and are not intended to be limiting upon the inventive concept as set forth in the appended claims.

## EXAMPLE I

A series of experiments were performed to determine the antimicrobial properties of a borate buffered saline solution preserved with stabilized chlorine dioxide. The stabilized chlorine dioxide employed was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Oklahoma, sold under the trademark Purogene. The concentration of the stabilized chlorine dioxide added to the borate buffered saline solution was varied.

The borate buffered saline solution had the following composition.

| Ingredients | Percent (Weight/Volume) |
|---|---|
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified water USP* | To 100 ml |

*Quantity sufficient (Q.S.) to provide 100 ml of solution.

The pH of the buffered solution was adjusted by the addition of either hydrochloric acid NF or sodium hydroxide NF so that the pH of the saline solution was within the range of about 7.7 to 7.9.

The stabilized chlorine dioxide was added to the borate buffered saline solution in the following concentrations:

| Percent (weight/volume) |
|---|
| 0.005 |
| 0.004 |
| 0.003 |
| 0.002 |

Each of the above concentrations of stabilized chlorine dioxide exhibited the desired preservative properties for the borate buffered saline solution. Further, all four concentrations of the stabilized chlorine dioxide exhibited good antimicrobial activity, with the three highest concentrations achieving total bacterial kill after 24 hours. Tests indicated that total kill of bacteria was achieved by the solution containing 0.002 weight/volume percent stabilized chlorine dioxide after seven days.

## EXAMPLE II

To compare the preservative efficacy of stabilized chlorine dioxide on a borate buffered ophthalmic solution, a preserving amount of stabilized chlorine dioxide having a raw material age of 54 months was utilized in one sample; and a similar preserving amount of stabilized chlorine dioxide having a raw material age of about 2 months was utilized in a second sample. Each of the samples of stabilized chlorine dioxide was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Okla., sold under the trademark Purogene. No aging effect was detected between the two samples and their use as a preservative for borate buffered saline solutions. However, the aged stabilized chlorine dioxide (54 month age) possessed a slightly superior activity against the yeast *C. albicans*.

## EXAMPLE III

A preservative efficacy test was performed on a borate buffered saline solution having a composition similar to that of Example I wherein 0.005 weight/volume percent stabilized chlorine dioxide was added to the borate buffered solution and the resulting mixture stored for 90 days at 45° C. At the end of the storage period, the sample was examined and it was determined that the stabilized chlorine dioxide was an effective preservative for a borate buffered saline solution.

## EXAMPLE IV

An experiment was conducted to determine if a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide met the USP Efficacy criteria for ophthalmics as set forth in the U.S. Pharmacopeia (USP XXI, 1985). The stabilized chlorine dioxide employed was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Okla., sold under the trademark Purogene. The criteria for preservatives requires that a 99.9% reduction of microbes challenge occur within 14 days of contact with the product being tested; and that no growth of yeast and fungi occur.

The borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide met the before-mentioned criteria for preservatives. However, a control solution of the borate buffered saline solution which did not contain the stabilized chlorine dioxide present did not meet this USP Efficacy criteria for ophthalmics.

## EXAMPLE V

A 21 day subacute eye toxicity study in rabbits was conducted using a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide. The stabilized chlorine dioxide was as identified in Example I. The borate buffered saline solution containing the stabilized chlorine dioxide had the following composition:

| Ingredients | Percent (weight/volume) |
|---|---|
| Stabilized Chlorine Dioxide | 0.005 |
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified Water USP* | To 100 ml |

*Quantity sufficient (Q.S.) to provide 100 ml solution.

The pH of the above buffered saline solution was adjusted so that the pH of the solution was between 7.7 and 7.9.

The ocular effects of the buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide were evaluated in rabbit eyes in conjunction with Permalens soft contact lenses. Test eye lenses were subjected to daily cleaning, rinsing, and overnight soaking with the borate buffered saline solution containing stabilized chlorine dioxide. Control eye lenses were subjected to the same regimen using preserved normal saline solution. Lenses were fit directly to the eye and worn daily for a minimum of 8 hours for 21 consecutive days.

Eyes were observed daily for discomfort at lens insertion and for gross ocular reactions at lens removal. Slit lamp biomicroscopy was performed weekly. Pachometry and rose bengal staining were performed at the conclusion of the experiment. Histopathological evaluation was performed on eyes from three animals. No significant ocular reactions were noted.

The following is a summation of the results of the experiments set forth above:

A. Discomfort: No ocular discomfort was noted at lens insertion throughout the study.

B. Gross Observations: At the time of lens removal, +1 hyperemia was noted in one control eye on Day 17. No other ocular reactions were noted.

C. Slit Lamp Examinations (Days 7, 14 and 21): No ocular reactions were noted in any rabbit.

D. Corneal Metabolism (Days 7, 14 and 21).: No test related changes in corneal metabolism, as measured by corneal thickness, were noted throughout the study.

E. Cytotoxicity (Day 21): Rose bengal staining appeared normal in both eyes of all rabbits, indicating that corneal epithelial cell vitality was not affected by the solution tested.

F. Histopathological Evaluation: No microscopic changes which can be specifically related to the test regimen were apparent among the eyes and extraocular tissues examined. There were no predictable microscopic differences observed when comparing the test eyes and extraocular tissues with the control eyes and extraocular tissues.

The above data indicates that a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide, in conjunction with Permalens soft contact lenses, is not discomforting, irritating, toxic or cytotoxic to rabbit eyes following 21 consecutive days of testing.

### EXAMPLE VI

A 1 day acute eye toxicity and cytotoxicity study in rabbits was conducted using a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide. The stabilized chlorine dioxide was as identified in Example I. The borate buffered saline solution containing the stabilized chlorine dioxide had the following composition:

| Ingredients | Percent (weight/volume) |
|---|---|
| Stabilized Chlorine Dioxide | 0.005 |
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |

-continued

| Ingredients | Percent (weight/volume) |
|---|---|
| Purified Water USP* | To 100 ml |

*Quantity Sufficient (Q.S.) to provide 100 ml solution.

The pH of the above buffered saline solution was adjusted so that the pH of the solution was between 7.7 and 7.9.

The ocular effects of the buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide were evaluated in rabbit eyes in conjunction with Permalens soft contact lenses and multiple topical instillations. Test eye lenses were subjected to overnight soaking in the borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide followed by direct fit to the eye and 8 hours of wear with topical instillations of the test solution performed at a rate of one drop every one-half hour. Eyes were observed for discomfort and/or gross ocular reactions at lens fit, at each instillation and at lens removal. Slip lamp biomicroscopy was performed following lens removal. Control eyes were subjected to the same regimen using preserved normal saline.

The following is a summation of the results of the experiments set forth above:

A. Discomfort: No ocular discomfort was noted at lens fit or at any instillation period throughout the study.

B. Gross Observations: No ocular reactions were noted at any instillation period or at lens removal.

C. Slip Lamp Examinations: No ocular reactions were noted in any rabbit.

D. Cytotoxicity Rose bengal staining appeared normal in both eyes of all rabbits, indicating that epithelia cell vitality was not affected by the solutions tested.

The above data indicates that a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide, in conjunction with Permalens soft contact lenses, is not discomforting, irritating, toxic or cytotoxic to rabbit eyes following this exaggerated method of testing.

### EXAMPLE VII

An acute eye toxicity and cytotoxicity study in rabbits was conducted using a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide. The stabilized chlorine dioxide was that identified in Example I. The borate buffered saline solution containing the stabilized chlorine dioxide had the following composition:

| Ingredients | Percent (weight/volume) |
|---|---|
| Stabilized Chlorine Dioxide | 0.005 |
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified water USP* | To 100 ml |

*Quantity Sufficient (Q.S.) to provide 100 ml solution.

The pH of the above buffered saline solution was adjusted so that the pH of the solution was between 7.7 and 7.9.

The ocular effects of the buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide were evaluated in rabbit eyes following 1 day of multiple topical instillations performed at a

rate of one drop every one-half hour for 8 hours. Test eyes were treated with the borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide and control eyes were treated with a preserved normal saline solution.

Eyes were observed for discomfort and/or gross ocular reactions at each instillation. Slit lamp biomicroscopy was performed following the last instillation period. No ocular reactions were noted in the test eyes.

The following is a summation of the results of the experiments set forth above:

A. Discomfort: +1 discomfort, lasting up to 30 seconds, was noted in the control eye at 3 of 48 instillations involving two of three rabbits.

B. Gross Observations: No ocular reactions were noted at any instillation period.

C. Slit Lamp Examinations: No ocular reactions were noted in any rabbit.

D. Cytotoxicity: Rose bengal staining appeared normal in both eyes of all rabbits, indicating that epithelial cell vitality was not affected by the preparations tested.

The above data indicates that a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide is not discomforting, irritating, toxic or cytotoxic to rabbit eyes following this exaggerated method of testing.

EXAMPLE VIII (COMPARATIVE)

A series of compositions were prepared using sterilized distilled water and varying concentrations of the proprietary stabilized chlorine dioxide sold by Bio-Cide International, Inc. of Norman, Okla., under the trademark Purogene.

Each of these compositions was tested to determine its pH and osmolality. After the compositions were prepared, they were allowed to equilibrate overnight before the pH and osmolality were determined.

Results of these tests were as follows:

| Concentration of Stabilized Chlorine Dioxide, (w/v) % | pH | Osmolality, mOsmol/kg |
|---|---|---|
| 0.005 | 6.4 | 5 |
| 0.02 | 6.8 | 13 |
| 0.1 | 8.6 | 55 |
| 0.2 | 9.0 | 105 |

These results indicate that simple solutions of stabilized chlorine dioxide in sterilized water have varying pHs, which are often outside the range of about 6.8 to about of the present compositions. Also, such simple solutions have tonicity values or osmolalities substantially outside the range of at least about 200 mOsmol/kg of the present compositions. Put another way, such simple aqueous stabilized chlorine solutions are not effective to provide preserved compositions which are ophthalmically acceptable or compatible with the eye so as to be used without eye discomfort or irritation.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced within the scope of the following claims.

What is claimed is:

1. A method for preserving an aqueous ophthalmic formulation so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic formulation stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic formulation, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality of at least about 200 mOsmol/kg, provided that said aqueous ophthalmic formulation is ophthalmically acceptable and no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic formulation.

2. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.

3. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.

4. The method of claim 1 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 7 to about 7.5.

5. The method of claim 1 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality in the range of about 200 to about 400 mOsmol/kg.

6. The method of claim 1 wherein said aqueous ophthalmic formulation is a solution.

7. A method for preserving an aqueous ophthalmic solution so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic solution stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said aqueous ophthalmic solution is ophthalmically acceptable and substantially no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic solution.

8. A preserved ophthalmic formulation comprising an ophthalmically acceptable aqueous medium and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically acceptable aqueous medium, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality of at least about 200 mOsmol/kg, provided that said preserved ophthalmic formulation is ophthalmically acceptable and is free of germicidally effective

amounts of any positively charged, nitrogen-containing cationic polymers.

9. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.

10. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.

11. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is selected from the group consisting of alkali metal chlorides and alkaline earth metal chlorides and mixtures thereof.

12. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises sodium chloride.

13. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises an alkaline earth metal salt selected from the group consisting of calcium chloride and magnesium chloride and mixtures thereof.

14. The preserved ophthalmic formulation of claim 8 wherein said at least one buffer component is selected from the group consisting of potassium phosphates, boric acid, sodium borate, sodium phosphates and mixtures thereof.

15. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 7 to about 7.5.

16. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality in the range of about 200 to about 400 mOsmol/kg.

17. The preserved ophthalmic formulation of claim 8 which is a solution.

18. A preserved ophthalmic solution comprising an ophthalmically acceptable aqueous solution and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically aqueous acceptable solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said preserved ophthalmic solution is ophthalmically acceptable and is free of germicidally effective amounts of any positively charged, nitrogen-containing polymers.

* * * * *

US006562873B2

# (12) United States Patent

Olejnik et al.

(10) Patent No.: US 6,562,873 B2
(45) Date of Patent: *May 13, 2003

(54) COMPOSITIONS CONTAINING THERAPEUTICALLY ACTIVE COMPONENTS HAVING ENHANCED SOLUBILITY

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charleston, MA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/903,962**

(22) Filed: **Jul. 10, 2001**

(65) **Prior Publication Data**

US 2002/0071874 A1 Jun. 13, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/218,206, filed on Jul. 14, 2000.

(51) Int. Cl.[7] .......................... A61K 47/32; A61K 9/00

(52) U.S. Cl. .............................. 514/772.4; 514/772.6; 424/400

(58) Field of Search .......................... 514/772.4, 772.6; 424/400

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,278,447 A | 10/1966 | McNicholas | |
| 3,890,319 A | 6/1975 | Danielwicz et al. | |
| 4,530,920 A | 7/1985 | Nestor et al. | |
| 4,806,556 A | 2/1989 | Portoghese | |
| 5,021,416 A | 6/1991 | Gluchowski | |
| 5,202,128 A | 4/1993 | Morella et al. | |
| 5,352,796 A | 10/1994 | Hoeger et al. | |
| 5,459,133 A | 10/1995 | Neufeld | |
| 5,703,077 A | 12/1997 | Burke et al. | |
| 5,719,197 A * | 2/1998 | Kanios et al. | 514/772.6 |
| 5,725,887 A | 3/1998 | Martin et al. | |
| 5,814,638 A | 9/1998 | Lee et al. | |
| 5,834,502 A | 11/1998 | Cheng et al. | |
| 5,994,110 A | 11/1999 | Mosbach et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2048315 | 2/1992 |
| EP | 0609961 | 8/1994 |
| WO | 94/16685 | 8/1994 |
| WO | 98/47878 | 10/1998 |
| WO | 99/43299 | 9/1999 |
| WO | 99/51273 | 10/1999 |
| WO | 0012137 | 3/2000 |
| WO | 0019981 | 4/2000 |

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Blessing Fubara
(74) *Attorney, Agent, or Firm*—Stout, Uxa, Buyan & Mullins LLP; Frank J. Uxa

(57) **ABSTRACT**

Compositions which include therapeutically active components, solubility enhancing components other than cyclodextrins, and oxy-chloro components, wherein the oxy-chloro components are substantially effective as preservatives. In one embodiment, the oxy-chloro components are useful for preserving the therapeutically active components. In one embodiment, the oxy-chloro components include chlorite components. In a useful embodiment, the solubility enhancing components include carboxymethylcellulose.

**49 Claims, 1 Drawing Sheet**

U.S. Patent May 13, 2003 US 6,562,873 B2

SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
4000
3500
3000
2500
2000
1500
1000
500
0
7
7.5
8
8.5
9
9.5
10
10.5
pH
0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC



# COMPOSITIONS CONTAINING THERAPEUTICALLY ACTIVE COMPONENTS HAVING ENHANCED SOLUBILITY

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application No. 60/218,206 filed Jul. 14, 2000.

## BACKGROUND OF THE INVENTION

The present invention relates to compositions containing therapeutically active components having enhanced solubility. More particularly, the invention relates to compositions which include therapeutically active components (TACs) and components effective to enhance the solubility of the TACs at therapeutically effective concentrations.

TACs in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration. Additionally, the dispensed or administered TACs should be soluble in the biological system or environment into which they are administered, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Furthermore, solubilized TACs provide other benefits, for example, reduced irritation to tissues that interact with TACs.

It is sometimes necessary to include solubilizing agents in the compositions to solubilize the TACs. However, the inclusion of solubilizing agents may reduce the effectiveness of the preservatives in the compositions.

For example, cyclodextrins are widely known in the literature to increase the solubility of poorly water soluble therapeutically active components. However, typical preservatives are rendered relatively ineffective by cyclodextrins at normal concentrations in these compositions.

There continues to be a need to provide new compositions containing TACs.

## BRIEF SUMMARY OF THE INVENTION

New TAC-containing compositions have been discovered. The present compositions provide for enhanced TAC solubility substantially without detrimentally affecting the effectiveness of the preservative or preservatives being employed. Solubility enhancing components (SECs) have been found which very effectively increase the solubility of the TACs in the present compositions, and preferably in the biological systems or environments into which the components are introduced. Also, preferably, such solubilization allows the provision of more reliable and reproducible dosage forms of the drugs. This solubility enhancement in accordance with the present invention is achieved substantially without degrading preservative effectiveness. In addition, TAC-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the TACs and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions include oxy-chloro components which are effective in at least assisting in preserving the compositions without detrimentally affecting the TACs and substantially without being detrimentally affected by the SECs. Moreover, the present oxy-chloro components provide preservative action with reduced or even substantially no harm or irritation to the tissues to which the present compositions are administered.

The present SECs preferably are effective in solubilizing the TACs in the environment to which they are introduced, for example, a biological environment. Such solubilization preferably facilitates the advantageous transport of TACs across lipid membranes.

Soluble TACs for use in the present compositions include those components, e.g., compounds, mixtures of compounds, mixtures of other materials, useful to provide a therapeutic benefit or effect when administered to a patient, e.g. a human patient. The TACs useful in this invention include, without limitation, antibacterials, antihistamines, decongestants, antiinflammatories, antiparasitics, miotics, anticholinergics, adrenergics, antivirals, local anesthetics, antifungals, amoebicidals, trichomonocidals, analgesics, mydriatics, antiglaucoma drugs, carbonic anhydrase inhibitors, ophthalmic diagnostic agents, ophthalmic agents used as adjuvants in surgery, chelating agents, antineoplastics, antihypertensives, muscle relaxants, diagnostics and the like and mixtures thereof. Specific examples of such TACs are conventional and well known in the art.

In one embodiment, the TACs include adrenergic agonists, precursors thereof, metabolites thereof and combinations thereof. Preferably, the TACs include alpha-2-adrenergic agonists, for example, imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. In one embodiment, the TACs include quinoxlaine components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Preferably, the quinoxaline components, including the quinoxaline derivatives, are alpha-2-adrenergic agonists. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a useful embodiment, the SEC is other than cyclodextrin and includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like and mixtures thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the TAC. This interaction preferably is sufficient to render the TAC substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The oxy-chloro components included in the present compositions are effective to at least assist in preserving the compositions. Any suitable oxy-chloro component effective to at least assist in preserving the compositions may be employed. Such oxy-chloro components include, without limitation, hypochlorite components, perchlorate components, chlorite components and the like and mixtures thereof.

In one useful embodiment, the oxy-chloro component includes a chlorite component. Preferably, the chlorite component includes stabilized chlorine dioxides, alkali metal chlorites and the like and mixtures thereof. Chlorite components are very effective in the present compositions and provide preservative effectiveness, often at a relatively reduced concentration, with little or no detrimental effect on the tissue to which the composition is administered. In addition, the oxy-chloro components, e.g., the chlorite components, substantially maintain preservative effectiveness in the presence of the SECs, for example, the polyanionic components. Without wishing to limit the invention to any particular theory or mechanism of operation, it is believed that such oxy-chloro components are substantially free in the presence of the SECs or do not substantially interact the SECs.

The oxy-chloro components may be effective in the compositions in the amount of less than about 1% (w/v) or about 0.8% (w/v). In a useful embodiment, the oxy-chloro components may be in the compositions in the range of about 500 ppm (w/v) or less, preferably about 10 ppm (w/v) to about 200 ppm (w/v).

In one embodiment, additional preservatives other than the oxy-chloro components are used in the compositions. Any suitable additional preservative component may be employed in accordance with the present invention, provided that it is compatible with the oxy-chloro component, the TAC and the SEC. Preservative components which are well known and/or conventionally used in the pharmaceutical field may be employed. Examples include, without limitation, sorbic acids, benzalkonium chlorides, chlorbutols and alkyl esters of p-hydroxybenzoic acids and the like and mixtures thereof. If additional preservative component is included, it preferably is present in an amount, together with the oxy-chloro component, to effectively preserve the composition.

The compositions include a liquid carrier component, for example, an aqueous liquid carrier component. Preferably, the compositions have pH's of about 7 or greater, more preferably about 7 to about 9.

In one broad aspect of the present invention, compositions are provided which comprise a TAC, a SEC, a chlorite component and an aqueous liquid carrier. Preferably the TAC is Brimonidine tartrate. The SEC is preferably an anionic cellulose derivative, more preferably a carboxymethylcellulose, for example, in an amount in the range of about 0.2% to about 0.6% (w/v).

In another broad aspect of the present invention, compositions are provided which comprise a Brimonidine tartrate, a SEC, a chlorite component and an aqueous liquid carrier component. The Brimonidine tartrate is present in an amount effective to provide a desired effect to a human or an animal after the composition is administered to the human or animal, and the SEC is preferably a carboxymethylcellulose.

In another broad aspect of the present invention, compositions are provided which comprise a TAC and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the TACs in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrin.

The present compositions preferably are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising TACs, SECs and oxy-chloro components are provided. The TACs in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. Suitable SECs for solubilizing TACs may be used concurrently with oxy-chloro components in the present compositions to increase the solubility of the TACs substantially without detrimentally affecting the preservative effectiveness of the oxy-chloro components. In other words, SECs employed in the present compositions may effectively increase the solubility of TACs without substantially interfering with the functions of other components in the compositions. The SECs employed in the present compositions may be effective in the solubilization of ionized TACs, unionized TACs or both.

Oxy-chloro components are included in the present compositions to assist in preserving the compositions. Particularly, the oxy-chloro components are not substantially detrimentally affected by the SECs present in the compositions. Moreover, the oxy-chloro components in the compositions are effective substantially without causing undue harm or irritation to the tissue to which the present compositions are administered.

The present compositions may, and preferably do, include liquid carrier components. For example, the components often have the characteristics of a liquid, for example, a liquid solution.

The presently useful TACs preferably are chosen to benefit from the presence of the SECs and the oxy-chloro components. In general, the TACs are provided with

increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Preferably, the TACs have increased solubility in the present compositions at pH's greater than 7, as compared to identical TACs, at comparable concentrations in similar compositions, without the SECs. More preferably, the TACs have increased solubility in the present compositions at pH's in the range of about 7 to about 10, as compared to TACs in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized TACs are better able to cross the lipid membranes relative to unsolubilized TACs. It is further believed that the solubilized TACs are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the TACs in the environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and a TAC may be administered to the cornea of a human eye, which has a pH of about 7, wherein the TAC is substantially solubilized at the administered area. Furthermore, in one embodiment, the TACs solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than TACs which are not solubilized by SECs. The solubilization of TACs preferably reduces irritation to sensitive tissues in contact or interacting with the TACs.

Examples of the therapeutically active components which may be included in the present compositions include, but are not limited to, antibacterial substances such as beta-lactam antibiotics, such as cefoxitin, n-formamidoylthienamycin and other thienamycin derivatives, tetracyclines, chloramphenicol, neomycin, carbenicillin, colistin, penicillin G, polymyxin B, vancomycin, cefazolin, cephaloridine, chibrorifamycin, gramicidin, bacitracin and sulfonamides; aminoglycoside antibiotics such as gentamycin, kanamycin, amikacin, sisomicin and tobramycin; nalidixic acid and its analogs such as norfloxacin and the antimicrobial combination fluoroalanine/pentizidone, nitrofurazones and analogs thereof; antihistaminics and decongestants such as pyrilamine, chlorpheniramine, tetrahydrazoline, antazoline and analogs thereof; mast-cell inhibitors of histamine release, such as cromolyn; anti-inflammatories such as cortisone, hydrocortisone, hydrocortisone acetate, betamethasone, dexamethasone, dexamethasone sodium phosphate, prednisone, methylprednisolone, medrysone, fluorometholone, prednisolone, prednisolone sodium phosphate, triamcinolone, indainethacin, sulindac, its salts and its corresponding sulfides, and analogs thereof; miotics and anticholinergics such as echothiophate, pilocarpine, physostigmine salicylate, diisopropylfluorophosphate, epinephrine, dipivaloylepinephrine, neostigmine echothiopate iodide, demecarim bromide, carbamoyl choline chloride, methacholine, bethanechol, and analogs thereof; mydriatics such as atrophine, homatropine, scopolamine, hydroxyamphetamine, ephedrine, cocaine, tropicamide, phenylephrine, cyclopentolate, oxyphenonium, eucatropine; and the like and mixtures thereof.

Other TACs are: antiglaucama drugs, for example, timalol, and especially its maleic salt and R-timolol and a combination of timolol or R-timolol with pilocarpine; other adrenergic agonists and/or antagonists such as epinephrine

and an epinephrine complex, or prodrugs such as bitartrate, borate, hydrochloride and dipivefrine derivatives; carbonic anhydrase inhibitors such as acetazolamide, dichlorphenamide, 2-(p-hydroxyphenyl)-thiothiophenesulfonamide, 6-hydroxy-2-benzothiazolesulfonamide, and 6-pivaloyloxy-2-benzothiazolesulfonamide; antiparasitic compounds and/or anti-protozoal compounds such as ivermectin, pyrimethamine, trisulfapidimidine, clindamycin and corticosteroid preparations; compounds having antiviral activity such as acyclovir, 5-iodo-2'-deoxyuridine (IDU), adenosine arabinoside (Ara-A), trifluorothymidine, interferon, and interferon-inducing agents such as poly I:C; antifungal agents such as amphotericin B, nystatin, flucytosine, natamycin and miconazole; anesthetic agents such as etidocaine cocaine, benoxinate, dibucaine hydrochloride, dyclonine hydrochloride, naepaine, phenacaine hydrochloride, piperocaine, proparacaine hydrochloride, tetracaine hydrochloride, hexylcaine, bupivacaine, lidocaine, mepivacaine and prilocaine; ophthalmic diagnostic agents, such as: (a) those used to examine the retina such as sodium fluorescein, (b) those used to examine the conjunctiva, cornea and lacrimal apparatus, such as fluorescein and rose bengal and (c) those used to examine abnormal pupillary responses such as methacholine, cocaine, adrenaline, atropine, hydroxyamphetamine and pilocarpine; ophthalmic agents used as adjuncts in surgery, such as alpha-chymotrypsin and hyaluronidase; chelating agents such as ethylenediaminetetraacetic acid (EDTA) and deferoxamine; immunosuppressants and anti-metabolites such as methotrexate, cyclophosphamide, 6-mercaptopurine and azathioprine and combinations of the compounds mentioned above, such as antibiotics/antiinflammatories combinations such as the combination of neomycin sulfate and dexamethasone sodium phosphate and combinations concomitantly used for treating glaucoma, for example, a combination of timolol maleate and aceclidine; and the like and mixtures thereof.

In a preferred embodiment, the useful TACs include adrenergic agonists. The adrenergic agonists preferably are molecules containing amines. Also, the adrenergic agonists preferably are amine-containing molecules with pKa's of greater than 7, preferably about 7 to about 9.

More preferably, the useful TACs include alpha-adrenergic agonists. Examples of alpha-adrengergic agonists include, but not limited to, adrafinil, adrenolone, amidephrine, apraclonidine, budralazine, clonidine, cyclopentamine, detomidine, dimetofrine, dipivefrin, ephedrine, epinephrine, fenoxazoline, guanabenz, guanfacine, hydroxyamphetamine, ibopamine, indanazoline, isometheptene, mephentermine, metaraminol, methoxamine, methylhexaneamine, metizolene, midodrine, naphazoline, norepinephrine, norfenefrine, octodrine, octopamine, oxymetazoline, phenylephrine, phenylpropanolamine, phenylpropylmethylamine, pholedrine, propylhexedrine, pseudoephedrine, rilmenidine, synephrine, tetrahydrozoline, tiamenidine, tramazoline, tuaminoheptane, tymazoline, tyramine, xylometazoline, and the like and mixtures thereof.

In a still more preferred embodiment, the useful TACs include alpha-2-adrenergic agonists. As used herein, the term "alpha-2 adrenergic agonist" includes chemical entities, such as compounds, ions, complexes and the like, that produces a net sympatholytic response, resulting in increased accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or, for example, to postsynaptic alpha-2

receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha-2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4,5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines and the like.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline. The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating one or more of alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

Other useful TACs include ocular hypotensive agents (Woodward et al U.S. Pat. No. 5,688,819), cyclosporins (Ding et al U.S. Pat. No. 5,474,979), androgen tears (Sullivan U.S. Pat. No. 5,620,921), pyranoquinolinone derivatives (Cairns et al U.S. Pat. No. 4,474,787), compounds having retinoid-like activities (Chandraratna U.S. Pat. No. 5,089,509), ketorolac/pyrrole-1-carboxylic acids (Muchowski et al U.S. Pat. No. 4,089,969), ofloxacins/benzoxazine derivatives (Hayakawa et al U.S. Pat. No. 4,382,892), memantines (Lipton et al U.S. Pat. No. 5,922,773), RAR antagonists (Klein et al U.S. Pat. No. 5,952,345), RAR-alpha agonists (Teng et al U.S. Pat. No. 5,856,490). Each of the disclosures referred to in the above patents is incorporated in its entirety herein by reference.

In one embodiment, the TACs, for example Brimonidine tartrate, are substantially unionized in the composition. In another embodiment, the TACs are substantially unionized in the environment to which they are administered, for example the cornea of the human eye. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the TACs facilitate their permeation across membrane lipid bilayers.

Any suitable SEC, other than cyclodextrin, may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones, derivatives thereof and mixtures thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble TACs and/or enhance the stability of the TACs and/or reduce unwanted side effects of the TACs. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the polyanionic component and chlorite component.

The polyanionic component is preferably sufficiently anionic to interact with the TAC. Such interaction is believed to be desirable to solubilize the TAC and/or to maintain such TAC soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges. Examples include:

- metal carboxymethylstarchs
- metal carboxymethylhydroxyethylstarchs
- hydrolyzed polyacrylamides and polyacrylonitriles
- heparin
- homopolymers and copolymers of one or more of:
  - acrylic and methacrylic acids
  - metal acrylates and methacrylates
  - alginic acid
  - metal alginates
  - vinylsulfonic acid
  - metal vinylsulfonate
  - amino acids, such as aspartic acid, glutamic acid and the like
  - metal salts of amino acids
  - p-styrenesulfonic acid
  - metal p-styrenesulfonate
  - 2-methacryloyloxyethylsulfonic acids

metal 2-methacryloyloxethylsulfonates
3-methacryloyloxy-2-hydroxypropylsulonic acids
metal 3-methacryloyloxy-2-hydroxypropylsulfonates
2-acrylamido-2-methylpropanesulfonic acids
metal 2-acrylamido-2-methylpropanesulfonates
allylsulfonic acid
metal allylsulfonate and the like.

In one embodiment, the polyanionic components include anionic polysaccharides, other than cyclodextrins, which tend to exist in ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1–3 and beta 1–4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merk & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or tri-ethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

A particularly useful class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than H+and metal cations can be employed in the present invention.

In a preferred embodiment, the polyanionic polymers are cyclized. More preferably, the cyclized anionic polymers include less than ten monomer units. Even more preferably, the cyclized polyanionic polymers include less than six monomer units.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the TAC in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present composition is about 0.5%.

In one embodiment, carboxymethylcellulose may help solubilize ionized TACs. In another embodiment, carboxymethylcellulose may help solubilize unionized TACs. In a preferred embodiment, the carboxylmethylcellulose help solubilize ionized Brimonidine tartrate. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate.

In one broad embodiment, the preservative components are selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of SECs, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components effective in aiding to preserve the compositions are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm (w/v) or less to about 200 ppm (w/v). Preservative components or components effective in aiding to preserve the compositions in accor-

dance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Examples of the components effective in aiding to preserve the compositions, preferably the TACs therein, include, but are not limited to, oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component. The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite® by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1,1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

In a broad embodiment of the invention, additional preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and the like and mixtures thereof, such as the mixture of methyl, ethyl, propyl and butyl esters which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise a TAC, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the TACs in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise a TAC, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier components substantially correspond to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the TACs, SECs and preservatives may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps, even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate.

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring

agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

The following non-limiting examples illustrate certain aspects of the present invention.

## EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.). The formulation vehicle was prepared by first dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days; a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 μm filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 μm) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine

tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8.

| Sample | STUDY 1 pH[a] | STUDY 1 Solubility[e] | STUDY 2 pH[a] | STUDY 2 Solubility[e] |
|---|---|---|---|---|
| 1 | 5.55 | ≦164.4[b] | 5.50 | ≦200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 50.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control/ (untreated) | — | 0.486[c] | — | — |
| Control/ (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate had dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v.

EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™). Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 |
|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% (w/v) |
| CMC | 0.0% | 0.056% | 0.17% | 0.5% | 1.5% (w/v) |
| Stabilized chlorine dioxide[a] | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% (w/v) |
| magnesium chloride, hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% (w/v) |

TABLE III-continued

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 |
|---|---|---|---|---|---|
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% (w/v) |

[a]Sold under the trademark Purite™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

Solubility of Brimonidine tartrate (%)

| pH | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
|---|---|---|---|---|---|
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 9.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.056% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.5%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

While this invention has been described with respect to various specific examples and embodiments, it is to be

understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A composition comprising:

a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof, and being present in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered;

a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component;

an oxy-chloro component in an effective amount to at least aid in preserving the composition; and

a liquid carrier component.

2. The composition of claim 1 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.

3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.

4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.

5. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.

6. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

7. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition without the solubility enhancing component.

8. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.

9. The composition of claim 1 wherein the solubility enhancing component comprises a polyanionic component.

10. The composition of claim 9 wherein said polyanionic components is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.

11. The composition of claim 1 wherein the solubility enhancing component comprises an anionic cellulose derivative.

12. The composition of claim 1 wherein the solubility enhancing component comprises a carboxymethylcellulose.

13. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).

14. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10 (w/v).

15. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

16. The composition of claim 1 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.

17. The composition of claim 1 wherein the oxy-chloro component comprises a chlorite component.

18. The composition of claim 1 wherein the oxy-chloro component comprises stabilized chlorine dioxide.

19. The composition of claim 1, wherein the oxy-chloro component is present in an amount of about 500 ppm (w/v) or less.

20. The composition of claim 1 wherein the oxy-chloro component is present in an amount in a range of about 10 ppm (w/v) to about 200 ppm (w/v).

21. The composition of claim 1 which further comprises an additional preservative component other than the oxy-chloro component in an amount effective to at least aid in preserving the composition.

22. The composition of claim 21, wherein the additional preservative component is selected from the group consisting of sorbic acid, benzalkonium chloride, chlorbutol and alkyl esters of p-hydroxybenzoic acid and mixtures thereof.

23. The composition of claim 1 wherein the liquid carrier is an aqueous liquid carrier component.

24. The composition of claim 1 which is a solution.

25. The composition of claim 1 which has a pH of about 7 or greater.

26. The composition of claim 1 which has a pH in a range of about 7 to about 9.

27. The composition of claim 1 which is ophthalmically acceptable.

28. A composition comprising:

a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered;

an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component;

a chlorite component in an effective amount to at least aid in preserving the composition; and

an aqueous liquid carrier component.

29. The composition of claim 28 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

30. The composition of claim 28 wherein the anionic cellulose derivative comprises carboxymethylcellulose.

31. The composition of claim 28 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% to about 0.6% (w/v).

32. A composition comprising:

a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered;

a solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline;

a chlorite component in an effective amount to at least aid in preserving the composition; and

an aqueous liquid carrier component.

33. The composition of claim 32 wherein the solubility enhancing component comprises a carboxymethylcellulose.

34. The composition of claim 32 which is ophthalmically acceptable.

35. A composition comprising:

a therapeutically active component in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered;

an oxy-chloro component in an effective amount to at least aid in preserving the composition; and

a liquid carrier component, wherein the composition is substantially free of cyclodextrins.

36. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of antibacterials, antihistamines, decongestants, antiinflammatories, antiparasitics, miotics, anticholinergics, adrenergics, antivirals, local anesthetics, antifungals, amoebicidals, trichomonocidals, analgesics, mydriatics, antiglaucoma drugs, carbonic anhydrase inhibitors, ophthalmic diagnostic agents, ophthalmic agents used as adjuvants in surgery, chelating agents, antineoplascics, antihypertensives, muscle relaxants, diagnostics, and mixtures thereof.

37. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of adrenergic agonists and mixtures thereof.

38. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof.

39. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoleS, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.

40. The composition of claim 35 wherein the therapeutically active component includes a quinoxaline component.

41. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.

42. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.

43. The composition of claim 35 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

44. The composition of claim 35, which further includes a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component.

45. The composition of claim 44 wherein the solubility enhancing component comprises a polyanionic component.

46. The composition of claim 35 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.

47. The composition of claim 35 wherein the oxy-chloro component comprises a chlorite component.

48. The composition of claim 35 wherein the oxy-chloro component comprises stabilized chlorine dioxide.

49. The composition of claim 35 which is ophthalmically acceptable.

* * * * *



(12) **United States Patent**
**Olejnik et al.**

(10) **Patent No.: US 6,627,210 B2**
(45) **Date of Patent: *Sep. 30, 2003**

(54) **COMPOSITIONS CONTAINING α-2-ADRENERGIC AGONIST COMPONENTS**

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charlestown, MA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 8 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/904,018**

(22) Filed: **Jul. 10, 2001**

(65) **Prior Publication Data**

US 2002/0032201 A1 Mar. 14, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/218,200, filed on Jul. 14, 2000.

(51) Int. Cl.[7] .......................... A61K 33/14; A61K 9/00; A61K 9/08

(52) U.S. Cl. ....................... 424/427; 424/400; 424/401; 424/466; 424/422; 514/772.4; 514/772.6

(58) Field of Search ................................ 424/427, 400, 424/422, 661, 407; 514/772.4, 772.6

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,278,447 A | | 10/1966 | McNicholas | |
| 3,890,319 A | | 6/1975 | Danielwicz et al. | |
| 4,530,920 A | | 7/1985 | Nestor et al. | |
| 4,806,556 A | | 2/1989 | Portoghese | |
| 5,021,416 A | | 6/1991 | Gluchowski | |
| 5,202,128 A | | 4/1993 | Morella et al. | |
| 5,215,991 A | * | 6/1993 | Burke | 514/255 |
| 5,352,796 A | | 10/1994 | Hoeger et al. | |
| 5,459,133 A | * | 10/1995 | Neufeld | 514/211 |
| 5,703,077 A | | 12/1997 | Burke et al. | |
| 5,719,197 A | | 2/1998 | Kanios et al. | |
| 5,725,887 A | | 3/1998 | Martin et al. | |
| 5,814,638 A | | 9/1998 | Lee et al. | |
| 5,834,502 A | | 11/1998 | Cheng et al. | |
| 5,994,110 A | | 11/1999 | Mosbach et al. | |
| 2002/0010202 A1 | * | 1/2002 | Garst | 514/392 |
| 2002/0071874 A1 | * | 6/2002 | Olejnik et al. | 424/661 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2048315 | 2/1992 |
| EP | 0609961 | 8/1994 |
| WO | 94/16685 | 8/1994 |
| WO | 98/47878 | 10/1998 |
| WO | 99/43299 | 9/1999 |
| WO | 99/51273 | 10/1999 |
| WO | 0012137 | 3/2000 |
| WO | 0019981 | 4/2000 |

OTHER PUBLICATIONS

Remington's Pharmaceutical Sciences, Eighteenth Edition, 1990, pp. 1304–1305.*

U.S. patent application Ser. No. 09/903,962, Olejnik et al., filed Jul. 10, 2001.

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Rachel M. Bennett
(74) *Attorney, Agent, or Firm*—Carlos A. Fisher; Martin A. Voet; Robert J. Baran

(57) **ABSTRACT**

Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

**34 Claims, 1 Drawing Sheet**

U.S. Patent Sep. 30, 2003 US 6,627,210 B2

4000
3500
3000
2500
2000
1500
1000
500
0
SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
7
7.5
8
8.5
9
9.5
10
10.5
pH
0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC



# COMPOSITIONS CONTAINING α-2-ADRENERGIC AGONIST COMPONENTS

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application 60/218,200 filed Jul. 14, 2000.

## BACKGROUND OF THE INVENTION

The present invention relates to compositions containing alpha-2-adrenergic agonist components. More particularly, the invention relates to such compositions in which the alpha-2-adrenergic agonist components have enhanced solubility at the therapeutically effective concentrations.

Alpha-2-adrenergic agonist components include chemical entities, such as compounds, ions, complexes and the like, which are effective to act on or bind to Alpha-2-adrenergic receptors and provide a therapeutic effect. Alpha-2-adrenergic agonist components means the agonists themselves and any and all precursors thereof, metabolites thereof and combinations thereof. One of the continuing challenges of formulating compositions having alpha-2-adrenergic agonist components is to render such components more effective. For example, alpha-2-adrenergic agonist components in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration.

Additionally, the dispensed or administered alpha-2-adrenergic agonist components should advantageously be soluble in biological systems or environments, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Some alpha-2-adrenergic agonist components with higher pKa's, for example, greater than about 7, tend to diffuse very well through lipid membranes at pH valves near their pka, because in such circumstances they are predominantly unionized in neutral to alkaline biological environments. However, some of these alpha-2-adrenergic agonist components become insoluble at neutral to alkaline biological pH's. Such insolubility may decrease membrane diffusion capabilities, rendering the alpha-2-adrenergic agonist components less effective and/or their therapeutic effects more variable at a given dosage. Furthermore, solubilized alpha-2-adrenergic agonist components provide other benefits, for example, reduced irritation to tissues that interact with alpha-2-adrenergic agonist components.

There continues to be a need for new compositions containing alpha-2-adrenergic agonist components.

## SUMMARY OF THE INVENTION

New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

In one embodiment, the alpha-2-adrenergic agonist components include imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. Preferably, the alpha-2-adrenergic agonist components include quinoxaline components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a preferred embodiment, the alpha-2-adrenergic agonist components, such as those listed above, are specific for the alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and/or alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonist components are unionized in the compositions. Preferably, the alpha-2-adrenergic agonist components are also unionized in the biological environment into which the compositions are administered.

In a useful embodiment, the SEC includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges, and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like, and mixtures

thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the alpha-2-adrenergic components. This interaction preferably is sufficient to render the alpha-2-adrenergic components substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The compositions include carrier components, for example, aqueous liquid carrier components. In one embodiment, the compositions have pH's of about 7 or greater, preferably about 7 to about 9, and are ophthalmically acceptable.

In a preferred embodiment, a composition is provided which includes an alpha-2-adrenergic agonist component in an amount effective to provide at least one therapeutic benefit to a patient to whom the composition is administered, an anionic cellulose derivative in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component and an aqueous liquid carrier component. The alpha-2-adrenergic agonist component preferably comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. The anionic cellulose derivative preferably comprises a carboxymethylcellulose. The concentration of the anionic cellulose derivative in the composition should be about 0.2% (w/v) to about 0.6% (w/v).

In a preferred embodiment, the present compositions are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

In one broad aspect of the invention, complexes are formed in the compositions. In one embodiment, the complexes include monomer units derived from at least one quinoxaline component. In a preferred embodiment, the complexes of the present invention are dimers. In a particularly preferred embodiment, the complexes are complexes, especially dimers, of Bromodidine tartrate.

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxychloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the an alpha-2-adrenergic agonist component in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrins in the compositions or the patients to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising alpha-2-adrenergic agonist components and SECs are provided. The alpha-2-adrenergic agonist components in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. The SECs employed in the present compositions may be effective in the solubilization of ionized alpha-2-adrenergic agonist components, unionized alpha-2-adrenergic agonist components or both. The present compositions include liquid carrier components and have the characteristics of liquid, for example, aqueous liquid, solutions.

Preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's greater than 7, as compared to identical alpha-2-adrenergic agonist components, at comparable concentrations, in similar compositions without the SECs. More preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's in the range of about 7 to about 10 and, as compared to identical alpha-2-adrenergic agonist components in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized alpha-2-adrenergic agonist components are better able to cross the lipid membranes relative to unsolubilized alpha-2-adrenergic agonist components. It is further believed that the solubilized alpha-2-adrenergic agonist components are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the alpha-2-adrenergic agonist components in the biological environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and an alpha-2-adrenergic agonist component may be administered to the cornea of an eye, which has a pH of about 7, wherein the alpha-2-adrenergic agonist component is substantially solubilized at the administered area. Furthermore, in one embodiment, the alpha-2-adrenergic agonist components solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than alpha-2-adrenergic agonist components which are not solubilized by SECs. The solubilization of alpha-2-adrenergic agonist components preferably reduces irritation to sensitive tissues in contact or interacting with the alpha-2-adrenergic agonist components.

The presently useful alpha-2-adrenergic agonist components preferably are chosen to benefit from the presence of the SECs. In general, the alpha-2-adrenergic agonist components are provided with increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Examples of alpha-2-adrenergic agonist components include molecules containing amines. Preferably, the alpha-2-adrenergic agonist components are amine-containing molecules with pKa's of greater than about 7, more preferably about 7 to about 9.

Alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. As used herein, the term alpha-2 adrenergic agonist includes chemical entities, such as compounds, ions, complexes and the like, that produce a net sympatholytic response, resulting in increased

accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or for example, to postsynaptic alpha-2 receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha-2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4,5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines; and the like and derivatives thereof.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline. The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al U.S. Pat. No. 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonists, for example Brimonidine tartrate, are substantially unionized in the compositions. In another embodiment, the adrenergic compounds are substantially unionized in the environment to which they are administered, for example the cornea. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the adrenergic compounds facilitate their permeation across membrane lipid bilayers.

Any suitable SEC may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones and derivatives thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble alpha-2-adrenergic agonist components and/or enhance the stability of the alpha-2-adrenergic agonist components and/or reduce unwanted side effects of the alpha-2-adrenergic agonist components. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the alpha-2-adrenergic components.

The polyanionic component is preferably sufficiently anionic to interact with the alpha-2-adrenergic agonist component. Such interaction is believed to be desirable to solubilize the alpha-2-adrenergic agonist component and/or to maintain such alpha-2-adrenergic agonist component soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges. Examples include:

- metal carboxymethylstarchs
- metal carboxymethylhydroxyethylstarchs
- hydrolyzed polyacrylamides and polyacrylonitriles heparin
- homopolymers and copolymers of one or more of:
  - acrylic and methacrylic acids
  - metal acrylates and methacrylates
  - alginic acid
  - metal alginates
  - vinylsulfonic acid
  - metal vinylsulfonate
  - amino acids, such as aspartic acid, glutamic acid and the like
  - metal salts of amino acids
  - p-styrenesulfonic acid
  - metal p-styrenesulfonate
  - 2-methacryloyloxyethylsulfonic acids
  - metal 2-methacryloyloxethylsulfonates
  - 3-methacryloyloxy-2-hydroxypropylsulonic acids
  - metal 3-methacryloyloxy-2-hydroxypropylsulfonates
  - 2-acrylamido-2-methylpropanesulfonic acids
  - metal 2-acrylamido-2-methylpropanesulfonates
  - allylsulfonic acid
  - metal allylsulfonate and the like.

In another embodiment, the polyanionic components include anionic polysaccharides which tend to exist in

ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1-3 and beta 1-4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other anionic polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merk & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or triethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

Preferably, the anionic polysaccharides are cyclized. More preferably, the cyclized anionic polysaccharides include less than ten monomer units. Even more preferably, the cyclized polysaccharides include less than six monomer units.

In one embodiment, a particularly useful group of cyclized anionic polysaccharides includes the cyclodextrins. Examples of the cyclodextrin group include, but are not limited to: α-cyclodextrin, derivatives of α-cyclodextrin, β-cyclodextrin, derivatives of β-cyclodextrin, γ-cyclodextrin, derivatives of γ-cyclodextrin, carboxymethyl-β-cyclodextrin, carboxymethyl-ethyl-β-cyclodextrin, diethyl-β-cyclodextrin, dimethyl-β-cyclodextrin, methyl-β-cyclodextrin, random methyl-β-cyclodextrin, glucosyl-β-cyclodextrin, maltosyl-β-cyclodextrin, hydroxyethyl-β-cyclodextrin, hydroxypropyl-β-cyclodextrin, sulfobutylether-β-cyclodextrin, and the like and mixtures thereof. Sulfobutylether-β-cyclodextrin is a preferred cyclized anionic polyasaccharide in accordance with the present invention. It is advantageous that the SEC's, including the above mentioned cyclodextrins, employed in this invention be, at the concentration employed, non-toxic to the mammal, human, to inhibit the present incorporation is administered. As used herein, the term "derivatives" as it relates to a cyclodextrin means any substituted or otherwise modified compound which has the characteristic chemical structure of a cyclodextrin sufficiently to function as a cyclodextrin component, for example, to enhance the solubility and/or stability of active components and/or reduce unwanted side effects of the active components and/or to form inclusive complexes with active components, as described herein.

Although cyclodextrins and/or their derivatives may be employed as SECs, one embodiment of the invention may include SECs other than cyclodextrins and/or their derivatives.

A particularly useful and preferred class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than $H^+$ and metal cations can be employed in the present invention.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the alpha-2-adrenergic agonist component in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present compositions is about 0.5%.

In one embodiment, the SECs, for example a carboxymethylcellulose, assist in solubilizing the alpha-2-adrenergic agonist components in the compositions. Although the SECs are capable aiding in the solubilization of ionized alpha-2-adrenergic agonist components, it is

preferable that the SECs used in this invention could assist in the solubilization of unionized alpha-2-adrenergic agonist components. For example, in one embodiment, carboxymethylcellulose may help solubilize ionized alpha-2-adrenergic agonist components. In another embodiment, carboxymethylcellulose may help solubilize unionized alpha-2-adrenergic agonist components. In a preferred embodiment, the carboxylmethylcellulose helps solubilize ionized Brimonidine tartrate in the compositions. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate in the compositions.

In one embodiment, the compositions may also include preservative components or components which assist in the preservation of the composition. The preservative components selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of polyanionic components, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives or components which assist in the preservation of the composition which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components which assist in the preservation of the composition, preferably the alpha-2-adrenergic agonist components therein, are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm(w/v) or less to about 200 ppm(w/v). Preservative components in accordance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Very useful examples of the present preservative components include, but are not limited to oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component. The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite™ by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1,1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

Preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and mixtures thereof, such as the mixture of methyl, ethyl, propyl, butyl esters and the like which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the alpha-2-adrenergic agonist components in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise an alpha-2-adrenergic agonist component, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier component substantially

corresponds to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the SECs and the alpha-2-adrenergic agonist components may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps at 25° C., even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate.

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

In one broad aspect of the invention, complexes are formed in the present compositions. In one embodiment, the complexes include at least one monomer unit of a quinoxaline component. Examples of quinoxaline components include quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts thereof, esters thereof, other derivatives thereof, and the like and mixtures thereof. For example, in one embodiment, a complex of the present invention may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units. In another embodiment, the complex may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units and Brimonidine tartrate monomer units.

In a preferred embodiment, the complexes of the present invention are dimers. For example, a dimer in accordance with the present invention may include a quinoxaline and a 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Preferably, a dimer in accordance with the present invention includes two Brimonidine tartrate monomer units.

Without wishing to limit the invention to any theory or mechanism of operation, it is believed that any peroxide forming agent or strong oxidizing agent such as the oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof may facilitate the formation of the complexes, preferably complexes of alpha-2-adrenergic agonist components. For example, dimers of Brimonidine tartrate monomer units are believed to be formed in the presence of chlorites, preferably stabilized chlorine dioxide.

Furthermore, it is believed that the interactions between the monomers which serve to hold the monomers or monomer subunits together to form a complex, preferably an oligomer and more preferably a dimer, may include, but not limited to, covalent bonding, ionic bonding, hydrophobic bonding, electrostatic bonding, hydrogen bonding, other chemical and/or physical interactions, and the like and combinations thereof. Such complexes may disassociate in liquid, for example, aqueous liquid, media. In one embodiment, the monomers or monomer subunits are held together by other than covalent bonding. In one embodiment, the monomers or monomer subunits are held together by electrostatic bonding or forces.

The following non-limiting examples illustrate certain aspects of the present invention.

## EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23 ° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.). The formulation vehicle was prepared by first dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days; a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 μm filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 μm) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |

TABLE I-continued

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8.

| | STUDY 1 | | STUDY 2 | |
|---|---|---|---|---|
| Sample | pH[a] | Solubility[e] | pH[a] | Solubility[e] |
| 1 | 5.55 | ≧164.4[b] | 5.50 | ≧200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 50.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control/ (untreated) | — | 0.486[c] | — | — |
| Control/ (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate has dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v.

## EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™), Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 | |
|---|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| CMC | 0.0% | 0.058% | 0.17% | 0.5% | 1.5% | (w/v) |
| Stabilized chlorine dioxide* | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% | (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% | (w/v) |
| magnesium chloride, hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% | (w/v) |
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |

*Sold under the trademark Purite ™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

| | Solubility of Brimonidine tartrate (%) | | | | |
|---|---|---|---|---|---|
| pH | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 9.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.056% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.5%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

## EXAMPLE 3

Brimonidine tartrate dimers.

Brimonidine tartrate is added to a test tube containing a composition including chlorite. The test tube was allowed to equilibrate for ten days. Samples obtained from the test tube is analyzed. It is observed that a portion of the Brimonidine tartrate monomer units conjugated to form dimers.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A therapeutically effective aqueous composition comprising:

a therapeutically active alpha-2-adrenergic agonist component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

a polyanionic solubility enhancing component in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

2. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

3. The composition of claim 1 wherein the therapeutically active component is substantially unionized.

4. The composition of claim 1 wherein the therapeutically active component is substantially unionized in a biological environment to which the composition is administered.

5. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition the solubility enhancing component.

6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.

7. The composition of claim 1 wherein said polyanionic component is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.

8. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of anionic cellulose derivatives and mixtures thereof.

9. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of carboxymethylcelluloses and derivatives thereof.

10. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).

11. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10% (w/v).

12. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

13. The composition of claim 1 which has a pH of about 7 or greater.

14. The composition of claim 1 which has a pH in a range of about 7 to about 9.

15. The composition of claim 1 which is ophthalmically acceptable.

16. A therapeutically effective aqueous composition comprising:

a therapeutically active component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component.

17. The composition of claim 16 wherein the alpha-2-adrenergic agonist component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

18. The composition of claim 16 wherein the anionic cellulose derivative comprises carboxymethylcellulose.

19. The composition of claim 16 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

20. A therapeutically effective aqueous composition comprising:

a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

an anionic solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

21. The composition of claim 20 wherein the solubility enhancing component comprises a carboxymethylcellulose.

22. The composition of claim 20 which is ophthalmically acceptable.

23. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

24. The composition of claim 23 in which the preservative comprises benzalkonium chloride.

25. The composition of claim 23 in which the preservative comprises an oxy-chloro component.

26. The composition of claim 23 in which the preservative comprises a chlorite component.

27. The composition of claim 16 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

28. The composition of claim 27 which the preservative comprises benzalkonium chloride.

29. The composition of claim 27 in which the preservative comprises an oxy-chloro component.

30. The composition of claim 27 in which the preservative comprises a chlorite component.

31. The composition of claim 20 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

32. The composition of claim 31 in which the preservative comprises benzalkonium chloride.

33. The composition of claim 31 in which the preservative comprises an oxy-chloro component.

34. The composition of claim 31 in which the preservative comprises a chlorite component.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,627,210 B2
DATED : September 30, 2003
INVENTOR(S) : Olejnik et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 5,
Line 52, delete "disclose" and insert in place thereof -- disclosed --

Signed and Sealed this

Sixth Day of January, 2004

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

**Disclaimer**

6,627,210 — Orest Olejnik, Coto de Coza, CA (US); Edward D. S. Kerslake, Charlestown, MA (US). COMPOSITIONS CONTAINING a-2-ADRENERGIC AGONIST COMPONENTS. Patent dated September 30, 2003. Disclaimer filed August 25, 2004, by the assignee, Allergan, Inc.

The term of this patent, subsequent to the term of patent numbers, 6,641,834, 6,562,873 and 6,673,337 has been disclaimed.

*(Official Gazette, November 2, 2004)*



US006641834B2

(12) **United States Patent**
Olejnik et al.

(10) Patent No.: **US 6,641,834 B2**
(45) Date of Patent: ***Nov. 4, 2003**

(54) **COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS**

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charlestown, MA (US)

(73) Assignee: **Allergan Sales, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 18 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/236,566**

(22) Filed: **Sep. 6, 2002**

(65) **Prior Publication Data**

US 2003/0027811 A1 Feb. 6, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/904,018, filed on Jul. 10, 2001.

(60) Provisional application No. 60/218,200, filed on Jul. 14, 2002.

(51) Int. Cl.[7] .......................... A61K 33/14; A61K 9/00; A61K 9/08

(52) U.S. Cl. ...................... 424/427; 424/400; 424/401; 424/466; 424/422; 514/772.4; 514/772.6; 514/249

(58) Field of Search ................................ 424/661, 400, 424/427, 401, 422; 514/772.4, 772.6, 249

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,278,447 A | 10/1966 | McNicholas |
| 3,890,319 A | 6/1975 | Danielwicz et al. |
| 4,530,920 A | 7/1985 | Nestor et al. |
| 4,806,556 A | 2/1989 | Portoghese |
| 5,021,416 A | 6/1991 | Gluchowski |
| 5,202,128 A | 4/1993 | Morella et al. |
| 5,215,991 A * | 6/1993 | Burke ........................ 514/255 |
| 5,352,796 A | 10/1994 | Hoeger et al. |
| 5,459,133 A | 10/1995 | Neufeld |
| 5,703,077 A | 12/1997 | Burke et al. |
| 5,719,197 A | 2/1998 | Kanios et al. |
| 5,725,887 A | 3/1998 | Martin et al. |
| 5,814,638 A | 9/1998 | Lee et al. |
| 5,834,502 A | 11/1998 | Cheng et al. |
| 5,994,110 A | 11/1999 | Mosbach et al. |
| 6,358,935 B1 * | 3/2002 | Beck et al. .................. 514/58 |
| 2002/0032201 A1 * | 3/2002 | Olejnik et al. ............. 514/249 |
| 2002/0071874 A1 * | 6/2002 | Olejnik et al. ............. 424/661 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2048315 | 2/1992 |
| EP | 0609961 | 8/1994 |
| WO | 94/16685 | 8/1994 |
| WO | 98/47878 | 10/1998 |
| WO | 99/43299 | 9/1999 |
| WO | 99/51273 | 10/1999 |
| WO | 00/12137 | 3/2000 |
| WO | 00/19981 | 4/2000 |

OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/903,962, filed Jul. 10, 2001.

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Rachel M. Bennett
(74) *Attorney, Agent, or Firm*—Stout, Uxa, Buyan & Mullins, LLP; Frank J. Uxa; Carlos A. Fisher

(57) **ABSTRACT**

Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

**22 Claims, 1 Drawing Sheet**

U.S. Patent Nov. 4, 2003 US 6,641,834 B2

4000
3500
3000
2500
2000
1500
1000
500
0
SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC
7
7.5
8
8.5
9
9.5
10
10.5
pH



# COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of application Ser. No. 09/904,018, filed Jul. 10, 2001 which, in turn, claims the benefit of U.S. Provisional Application Ser. No. 60/218,200, filed Jul. 14, 2000. The disclosure of each of the above-noted applications is incorporated in its entirety herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to compositions containing alpha-2-adrenergic agonist components. More particularly, the invention relates to such compositions in which the alpha-2-adrenergic agonist components have enhanced solubility at the therapeutically effective concentrations.

Alpha-2-adrenergic agonist components include chemical entities, such as compounds, ions, complexes and the like, which are effective to act on or bind to Alpha-2-adrenergic receptors and provide a therapeutic effect. Alpha-2-adrenergic agonist components means the agonists themselves and any and all precursors thereof, metabolites thereof and combinations thereof. One of the continuing challenges of formulating compositions having alpha-2-adrenergic agonist components is to render such components more effective. For example, alpha-2-adrenergic agonist components in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration.

Additionally, the dispensed or administered alpha-2-adrenergic agonist components should advantageously be soluble in biological systems or environments, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Some alpha-2-adrenergic agonist components with higher pKa's, for example, greater than about 7, tend to diffuse very well through lipid membranes at pH valves near their pka, because in such circumstances they are predominantly unionized in neutral to alkaline biological environments. However, some of these alpha-2-adrenergic agonist components become insoluble at neutral to alkaline biological pH's. Such insolubility may decrease membrane diffusion capabilities, rendering the alpha-2-adrenergic agonist components less effective and/or their therapeutic effects more variable at a given dosage. Furthermore, solubilized alpha-2-adrenergic agonist components provide other benefits, for example, reduced irritation to tissues that interact with alpha-2-adrenergic agonist components.

There continues to be a need for new compositions containing alpha-2-adrenergic agonist components.

## SUMMARY OF THE INVENTION

New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

In one embodiment, the alpha-2-adrenergic agonist components include imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. Preferably, the alpha-2-adrenergic agonist components include quinoxaline components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a preferred embodiment, the alpha-2-adrenergic agonist components, such as those listed above, are specific for the alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and/or alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonist components are unionized in the compositions. Preferably, the alpha-2-adrenergic agonist components are also unionized in the biological environment into which the compositions are administered.

In a useful embodiment, the SEC includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges, and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to

include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like, and mixtures thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the alpha-2-adrenergic components. This interaction preferably is sufficient to render the alpha-2-adrenergic components substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The compositions include carrier components, for example, aqueous liquid carrier components. In one embodiment, the compositions have pH's of about 7 or greater, preferably about 7 to about 9, and are ophthalmically acceptable.

In a preferred embodiment, a composition is provided which includes an alpha-2-adrenergic agonist component in an amount effective to provide at least one therapeutic benefit to a patient to whom the composition is administered, an anionic cellulose derivative in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component and an aqueous liquid carrier component. The alpha-2-adrenergic agonist component preferably comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. The anionic cellulose derivative preferably comprises a carboxymethylcellulose. The concentration of the anionic cellulose derivative in the composition should be about 0.2% (w/v) to about 0.6% (w/v).

In a preferred embodiment, the present compositions are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

In one broad aspect of the invention, complexes are formed in the compositions. In one embodiment, the complexes include monomer units derived from at least one quinoxaline component. In a preferred embodiment, the complexes of the present invention are dimers. In a particularly preferred embodiment, the complexes are complexes, especially dimers, of Bromodidine tartrate.

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxychloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the an alpha-2-adrenergic agonist component in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrins in the compositions or the patients to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising alpha-2-adrenergic agonist components and SECs are provided. The alpha-2-adrenergic agonist components in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. The SECs employed in the present compositions may be effective in the solubilization of ionized alpha-2-adrenergic agonist components, unionized alpha-2-adrenergic agonist components or both. The present compositions include liquid carrier components and have the characteristics of liquid, for example, aqueous liquid, solutions.

Preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's greater than 7, as compared to identical alpha-2-adrenergic agonist components, at comparable concentrations, in similar compositions without the SECs. More preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's in the range of about 7 to about 10 and, as compared to identical alpha-2-adrenergic agonist components in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized alpha-2-adrenergic agonist components are better able to cross the lipid membranes relative to unsolubilized alpha-2-adrenergic agonist components. It is further believed that the solubilized alpha-2-adrenergic agonist components are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the alpha-2-adrenergic agonist components in the biological environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and an alpha-2-adrenergic agonist component may be administered to the cornea of an eye, which has a pH of about 7, wherein the alpha-2-adrenergic agonist component is substantially solubilized at the administered area. Furthermore, in one embodiment, the alpha-2-adrenergic agonist components solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than alpha-2-adrenergic agonist components which are not solubilized by SECs. The solubilization of alpha-2-adrenergic agonist components preferably reduces irritation to sensitive tissues in contact or interacting with the alpha-2-adrenergic agonist components.

The presently useful alpha-2-adrenergic agonist components preferably are chosen to benefit from the presence of the SECs. In general, the alpha-2-adrenergic agonist components are provided with increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Examples of alpha-2-adrenergic agonist components include molecules containing amines. Preferably, the alpha-

2-adrenergic agonist components are amine-containing molecules with pKa's of greater than about 7, more preferably about 7 to about 9.

Alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. As used herein, the term alpha-2 adrenergic agonist includes chemical entities, such as compounds, ions, complexes and the like, that produce a net sympatholytic response, resulting in increased accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or for example, to postsynaptic alpha-2 receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha-2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4,5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines; and the like and derivatives thereof.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline. The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonists, for example Brimonidine tartrate, are substantially unionized in the compositions. In another embodiment, the adrenergic compounds are substantially unionized in the environment to which they are administered, for example the cornea. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the adrenergic compounds facilitate their permeation across membrane lipid bilayers.

Any suitable SEC may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones and derivatives thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble alpha-2-adrenergic agonist components and/or enhance the stability of the alpha-2-adrenergic agonist components and/or reduce unwanted side effects of the alpha-2-adrenergic agonist components. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the alpha-2-adrenergic components.

The polyanionic component is preferably sufficiently anionic to interact with the alpha-2-adrenergic agonist component. Such interaction is believed to be desirable to solubilize the alpha-2-adrenergic agonist component and/or to maintain such alpha-2-adrenergic agonist component soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges.

Examples include:

metal carboxymethylstarchs

metal carboxymethylhydroxyethylstarchs

hydrolyzed polyacrylamides and polyacrylonitriles

heparin

homopolymers and copolymers of one or more of:

- acrylic and methacrylic acids
- metal acrylates and methacrylates
- alginic acid
- metal alginates
- vinylsulfonic acid
- metal vinylsulfonate
- amino acids, such as aspartic acid, glutamic acid and the like
- metal salts of amino acids
- p-styrenesulfonic acid

metal p-styrenesulfonate
2-methacryloyloxyethylsulfonic acids
metal 2-methacryloyloxethylsulfonates
3-methacryloyloxy-2-hydroxypropylsulonic acids
metal 3-methacryloyloxy-2-hydroxypropylsulfonates
2-acrylamido-2-methylpropanesulfonic acids
metal 2-acrylamido-2-methylpropanesulfonates
allylsulfonic acid
metal allylsulfonate and the like.

In another embodiment, the polyanionic components include anionic polysaccharides which tend to exist in ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1-3 and beta 1-4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other anionic polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merk & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or tri-ethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

Preferably, the anionic polysaccharides are cyclized. More preferably, the cyclized anionic polysaccharides include less than ten monomer units. Even more preferably, the cyclized polysaccharides include less than six monomer units.

In one embodiment, a particularly useful group of cyclized anionic polysaccharides includes the cyclodextrins. Examples of the cyclodextrin group include, but are not limited to: α-cyclodextrin, derivatives of α-cyclodextrin, β-cyclodextrin, derivatives of β-cyclodextrin, γ-cyclodextrin, derivatives of γ-cyclodextrin, carboxymethyl-β-cyclodextrin, carboxymethyl-ethyl-β-cyclodextrin, diethyl-β-cyclodextrin, dimethyl-β-cyclodextrin, methyl-β-cyclodextrin, random methyl-β-cyclodextrin, glucosyl-β-cyclodextrin, maltosyl-β-cyclodextrin, hydroxyethyl-β-cyclodextrin, hydroxypropyl-β-cyclodextrin, sulfobutylether-β-cyclodextrin, and the like and mixtures thereof. Sulfobutylether-β-cyclodextrin is a preferred cyclized anionic polyasaccharide in accordance with the present invention. It is advantageous that the SEC's, including the above mentioned cyclodextrins, employed in this invention be, at the concentration employed, non-toxic to the mammal, human, to inhibit the present incorporation is administered. As used herein, the term "derivatives" as it relates to a cyclodextrin means any substituted or otherwise modified compound which has the characteristic chemical structure of a cyclodextrin sufficiently to function as a cyclodextrin component, for example, to enhance the solubility and/or stability of active components and/or reduce unwanted side effects of the active components and/or to form inclusive complexes with active components, as described herein.

Although cyclodextrins and/or their derivatives may be employed as SECs, one embodiment of the invention may include SECs other than cyclodextrins and/or their derivatives.

A particularly useful and preferred class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than $H^+$ and metal cations can be employed in the present invention.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the alpha-2-adrenergic agonist component in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2%

(w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present compositions is about 0.5%.

In one embodiment, the SECs, for example a carboxymethylcellulose, assist in solubilizing the alpha-2-adrenergic agonist components in the compositions. Although the SECs are capable aiding in the solubilization of ionized alpha-2-adrenergic agonist components, it is preferable that the SECs used in this invention could assist in the solubilization of unionized alpha-2-adrenergic agonist components. For example, in one embodiment, carboxymethylcellulose may help solubilize ionized alpha-2-adrenergic agonist components. In another embodiment, carboxymethylcellulose may help solubilize unionized alpha-2-adrenergic agonist components. In a preferred embodiment, the carboxylmethylcellulose helps solubilize ionized Brimonidine tartrate in the compositions. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate in the compositions.

In one embodiment, the compositions may also include preservative components or components which assist in the preservation of the composition. The preservative components selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of polyanionic components, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives or components which assist in the preservation of the composition which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components which assist in the preservation of the composition, preferably the alpha-2-adrenergic agonist components therein, are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm(w/v) or less to about 200 ppm(w/v). Preservative components in accordance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Very useful examples of the present preservative components include, but are not limited to oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component.

The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite T by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1,1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

Preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and mixtures thereof, such as the mixture of methyl, ethyl, propyl, butyl esters and the like which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the alpha-2-adrenergic agonist components in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise an alpha-2-adrenergic agonist component, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A

particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier component substantially corresponds to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the SECs and the alpha-2-adrenergic agonist components may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps at 25° C., even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate.

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

In one broad aspect of the invention, complexes are formed in the present compositions. In one embodiment, the complexes include at least one monomer unit of a quinoxaline component. Examples of quinoxaline components include quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts thereof, esters thereof, other derivatives thereof, and the like and mixtures thereof. For example, in one embodiment, a complex of the present invention may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units. In another embodiment, the complex may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units and Brimonidine tartrate monomer units.

In a preferred embodiment, the complexes of the present invention are dimers. For example, a dimer in accordance with the present invention may include a quinoxaline and a 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Preferably, a dimer in accordance with the present invention includes two Brimonidine tartrate monomer units.

Without wishing to limit the invention to any theory or mechanism of operation, it is believed that any peroxide forming agent or strong oxidizing agent such as the oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof may facilitate the formation of the complexes, preferably complexes of alpha-2-adrenergic agonist components. For example, dimers of Brimonidine tartrate monomer units are believed to be formed in the presence of chlorites, preferably stabilized chlorine dioxide.

Furthermore, it is believed that the interactions between the monomers which serve to hold the monomers or mono-

mer subunits together to form a complex, preferably an oligomer and more preferably a dimer, may include, but not limited to, covalent bonding, ionic bonding, hydrophobic bonding, electrostatic bonding, hydrogen bonding, other chemical and/or physical interactions, and the like and combinations thereof. Such complexes may disassociate in liquid, for example, aqueous liquid, media. In one embodiment, the monomers or monomer subunits are held together by other than covalent bonding. In one embodiment, the monomers or monomer subunits are held together by electrostatic bonding or forces.

The following non-limiting examples illustrate certain aspects of the present invention.

## EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.). The formulation vehicle was prepared by first dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days; a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 μm filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 μm) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8.

| | STUDY 1 | | STUDY 2 | |
|---|---|---|---|---|
| Sample | pH[a] | Solubility[e] | pH[a] | Solubility[e] |
| 1 | 5.55 | ≧1644[b] | 5.50 | ≧200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 50.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control / (untreated) | — | 0.486[c] | — | — |
| Control / (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate had dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v.

## EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™), Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride

dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 | |
|---|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| CMC | 0.0% | 0.056% | 0.17% | 0.5% | 1.5% | (w/v) |
| Stabilized chlorine dioxide* | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% | (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% | (w/v) |
| magnesium chloride, hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% | (w/v) |
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |

*Sold under the trademark Purite ™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

| | Solubility of Brimonidine tartrate (%) | | | | |
|---|---|---|---|---|---|
| | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
| pH | | | | | |
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 9.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.056% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.5%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

EXAMPLE 3

Brimonidine Tartrate Dimers.

Brimonidine tartrate is added to a test tube containing a composition including chlorite. The test tube was allowed to equilibrate for ten days. Samples obtained from the test tube is analyzed. It is observed that a portion of the Brimonidine tartrate monomer units conjugated to form dimers.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A therapeutically effective aqueous ophthalmic composition comprising:

up to about 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate, the composition having a pH of about 7.0 or greater, and the 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate being soluble in the composition at about 21° C.

2. The composition of claim 1 which includes up to 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.

3. The composition of claim 1 which includes about 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate.

4. The composition of claim 1 which includes 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline tartrate.

5. The composition of claim 1 having a pH of 7.0 or greater.

6. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxychloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

7. The composition of claim 6 wherein the oxy-chloro component comprises a chlorite component.

8. The composition of claim 1 which is substantially free of anionic cellulosic derivatives.

9. The composition of claim 1 which is substantially free of carboxymethyl cellulose.

10. A therapeutically effective aqueous ophthalmic composition comprising:

up to about 0.15% (w/v) of a component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, esters of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline and mixtures thereof, the composition having a pH of about 7.0 or greater, and the component being soluble in the composition at about 21° C.

11. The composition of claim 10 which includes up to 0.15% (w/v) of the component.

12. The composition of claim 10 which includes about 0.15% (w/v) of the component.

13. The composition of claim 10 which includes 0.15% (w/v) of the component.

14. The composition of claim 10 having a pH of 7.0 or greater.

15. The composition of claim 10, which further comprises an oxy-chloro component in an amount effective to at least assist in preserving the composition.

16. The composition of claim 15 wherein the oxy-chloro component comprises a chlorite component.

17. The composition of claim 10 which is substantially free of anionic cellulosic derivatives.

18. The composition of claim 10 which is substantially free of carboxymethyl cellulose.

19. The composition of claim 6 in which the preservative comprises benzalkonium chloride.

20. The composition of claim 10 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

21. The composition of claim 20 in which the preservative comprises benzalkonium chloride.

22. The composition of claim 20 in, which the preservative comprises a oxy-chloro component.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,641,834 B2
DATED : November 4, 2003
INVENTOR(S) : Olejnik et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 10,
Line 10, delete "Purite T" and insert in place thereof -- Purite™ --

Signed and Sealed this

Twentieth Day of January, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,641,834 B2
DATED : November 4, 2003
INVENTOR(S) : Olejnik et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 3,
Line 48, delete "Bromodidine" and insert in place thereof -- Brimonidine --

Column 5,
Line 61, delete "disclose" and insert in place thereof -- disclosed --

Signed and Sealed this

Twenty-fourth Day of February, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

**Disclaimer**

6,641,834 — Orest Olejnik, Coto de Coza, CA (US); Edward D. S. Kerslake, Charlestown, MA (US). COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS. Patent dated November 4, 2003. Disclaimer filed August 25, 2004, by the assignee, Allergan, Inc.

The term of this patent, subsequent to the term of patent numbers, 6,627,210, 6,562,873 and 6,673,337 has been disclaimed.

*(Official Gazette, November 2, 2004)*

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,641,834 B2
DATED : November 4, 2003
INVENTOR(S) : Olejnik et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page,
Item [60], **Related U.S. Application Data**, delete "Jul. 14, 2002" and insert in place thereof -- Jul. 14, 2000 --

Signed and Sealed this

Twenty-first Day of December, 2004

JON W. DUDAS
*Director of the United States Patent and Trademark Office*



US006673337B2

(12) **United States Patent**
**Olejnik et al.**

(10) **Patent No.: US 6,673,337 B2**
(45) **Date of Patent: *Jan. 6, 2004**

(54) **COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS**

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charlestown, MA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 16 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/299,386**

(22) Filed: **Nov. 19, 2002**

(65) **Prior Publication Data**

US 2003/0087893 A1 May 8, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/904,018, filed on Jul. 10, 2001.
(60) Provisional application No. 60/218,200, filed on Jul. 14, 2000.

(51) **Int. Cl.**[7] .............. A61K 31/74
(52) **U.S. Cl.** .............. 424/78.04; 424/400; 514/249
(58) **Field of Search** .............. 424/661, 427, 424/422, 78.04, 400; 514/58, 249

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,278,447 A 10/1966 McNicholas
3,890,319 A 6/1975 Danielwicz et al.
4,530,920 A 7/1985 Nestor et al.
4,806,556 A 2/1989 Portoghese
5,021,416 A 6/1991 Gluchowski
5,202,128 A 4/1993 Morella et al.
5,215,991 A * 6/1993 Burke .............. 514/255
5,352,796 A 10/1994 Hoeger et al.
5,459,133 A 10/1995 Neufeld
5,703,077 A 12/1997 Burke et al.
5,719,197 A 2/1998 Kanios et al.
5,725,887 A 3/1998 Martin et al.
5,814,638 A 9/1998 Lee et al.
5,834,502 A 11/1998 Cheng et al.
5,994,110 A 11/1999 Mosbach et al.
6,358,935 B1 * 3/2002 Beck et al. .............. 514/58

FOREIGN PATENT DOCUMENTS

CA 2048315 2/1992
EP 0609961 8/1994
WO 94/16685 8/1994
WO 98/47878 10/1998
WO 99/43299 9/1999
WO 99/51273 10/1999
WO 0012137 3/2000
WO 0019981 4/2000

OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/903,962, Olejnik et al., filed Jul. 10, 2001.

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Rachel M. Bennett
(74) *Attorney, Agent, or Firm*—Frank J. Uxa; Carlos A. Fisher; Martin A. Voet

(57) **ABSTRACT**

Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

**10 Claims, 1 Drawing Sheet**

FIG. 1

4000
3500
3000
2500
2000
1500
1000
500
0
SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
7
7.5
8
8.5
9
9.5
10
10.5
pH
0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC



# COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS

## CROSS REFERENCE TO RELATED APPLICATION

This application is a division of application Ser. No.: 09/904,018, filed Jul. 10, 2001, which application claims the benefit of U.S. Provisional Application Serial No. 60/218,200 filed Jul. 14, 2000, the disclosure of each of these applications is hereby incorporated herein in its entirety by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to compositions containing alpha-2-adrenergic agonist components. More particularly, the invention relates to such compositions in which the alpha-2-adrenergic agonist components have enhanced solubility at the therapeutically effective concentrations.

Alpha-2-adrenergic agonist components include chemical entities, such as compounds, ions, complexes and the like, which are effective to act on or bind to Alpha-2-adrenergic receptors and provide a therapeutic effect. Alpha-2-adrenergic agonist components means the agonists themselves and any and all precursors thereof, metabolites thereof and combinations thereof. One of the continuing challenges of formulating compositions having alpha-2-adrenergic agonist components is to render such components more effective. For example, alpha-2-adrenergic agonist components in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration.

Additionally, the dispensed or administered alpha-2-adrenergic agonist components should advantageously be soluble in biological systems or environments, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Some alpha-2-adrenergic agonist components with higher pKa's, for example, greater than about 7, tend to diffuse very well through lipid membranes at pH valves near their pka, because in such circumstances they are predominantly unionized in neutral to alkaline biological environments. However, some of these alpha-2-adrenergic agonist components become insoluble at neutral to alkaline biological pH's. Such insolubility may decrease membrane diffusion capabilities, rendering the alpha-2-adrenergic agonist components less effective and/or their therapeutic effects more variable at a given dosage. Furthermore, solubilized alpha-2-adrenergic agonist components provide other benefits, for example, reduced irritation to tissues that interact with alpha-2-adrenergic agonist components.

There continues to be a need for new compositions containing alpha-2-adrenergic agonist components.

## SUMMARY OF THE INVENTION

New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization

allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

In one embodiment, the alpha-2-adrenergic agonist components include imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. Preferably, the alpha-2-adrenergic agonist components include quinoxaline components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a preferred embodiment, the alpha-2-adrenergic agonist components, such as those listed above, are specific for the alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and/or alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonist components are unionized in the compositions. Preferably, the alpha-2-adrenergic agonist components are also unionized in the biological environment into which the compositions are administered.

In a useful embodiment, the SEC includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges, and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to

include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like, and mixtures thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the alpha-2-adrenergic components. This interaction preferably is sufficient to render the alpha-2-adrenergic components substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The compositions include carrier components, for example, aqueous liquid carrier components. In one embodiment, the compositions have pH's of about 7 or greater, preferably about 7 to about 9, and are ophthalmically acceptable.

In a preferred embodiment, a composition is provided which includes an alpha-2-adrenergic agonist component in an amount effective to provide at least one therapeutic benefit to a patient to whom the composition is administered, an anionic cellulose derivative in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component and an aqueous liquid carrier component. The alpha-2-adrenergic agonist component preferably comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. The anionic cellulose derivative preferably comprises a carboxymethylcellulose. The concentration of the anionic cellulose derivative in the composition should be about 0.2% (w/v) to about 0.6% (w/v).

In a preferred embodiment, the present compositions are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

In one broad aspect of the invention, complexes are formed in the compositions. In one embodiment, the complexes include monomer units derived from at least one quinoxaline component. In a preferred embodiment, the complexes of the present invention are dimers. In a particularly preferred embodiment, the complexes are complexes, especially dimers, of Bromodidine tartrate.

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxychloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the an alpha-2-adrenergic agonist component in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrins in the compositions or the patients to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising alpha-2-adrenergic agonist components and SECs are provided. The alpha-2-adrenergic agonist components in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. The SECs employed in the present compositions may be effective in the solubilization of ionized alpha-2-adrenergic agonist components, unionized alpha-2-adrenergic agonist components or both. The present compositions include liquid carrier components and have the characteristics of liquid, for example, aqueous liquid, solutions.

Preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's greater than 7, as compared to identical alpha-2-adrenergic agonist components, at comparable concentrations, in similar compositions without the SECs. More preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's in the range of about 7 to about 10 and, as compared to identical alpha-2-adrenergic agonist components in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized alpha-2-adrenergic agonist components are better able to cross the lipid membranes relative to unsolubilized alpha-2-adrenergic agonist components. It is further believed that the solubilized alpha-2-adrenergic agonist components are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the alpha-2-adrenergic agonist components in the biological environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and an alpha-2-adrenergic agonist component may be administered to the cornea of an eye, which has a pH of about 7, wherein the alpha-2-adrenergic agonist component is substantially solubilized at the administered area. Furthermore, in one embodiment, the alpha-2-adrenergic agonist components solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than alpha-2-adrenergic agonist components which are not solubilized by SECs. The solubilization of alpha-2-adrenergic agonist components preferably reduces irritation to sensitive tissues in contact or interacting with the alpha-2-adrenergic agonist components.

The presently useful alpha-2-adrenergic agonist components preferably are chosen to benefit from the presence of the SECs. In general, the alpha-2-adrenergic agonist components are provided with increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Examples of alpha-2-adrenergic agonist components include molecules containing amines. Preferably, the alpha-

2-adrenergic agonist components are amine-containing molecules with pKa's of greater than about 7, more preferably about 7 to about 9.

Alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. As used herein, the term alpha-2 adrenergic agonist includes chemical entities, such as compounds, ions, complexes and the like, that produce a net sympatholytic response, resulting in increased accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or for example, to postsynaptic alpha-2 receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha-2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4,5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines; and the like and derivatives thereof.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline . Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline , or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al U.S. Pat. No. 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonists, for example Brimonidine tartrate, are substantially unionized in the compositions. In another embodiment, the adrenergic compounds are substantially unionized in the environment to which they are administered, for example the cornea. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the adrenergic compounds facilitate their permeation across membrane lipid bilayers.

Any suitable SEC may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones and derivatives thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble alpha-2-adrenergic agonist components and/or enhance the stability of the alpha-2-adrenergic agonist components and/or reduce unwanted side effects of the alpha-2-adrenergic agonist components. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the alpha-2-adrenergic components.

The polyanionic component is preferably sufficiently anionic to interact with the alpha-2-adrenergic agonist component. Such interaction is believed to be desirable to solubilize the alpha-2-adrenergic agonist component and/or to maintain such alpha-2-adrenergic agonist component soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges. Examples include:

- metal carboxymethylstarchs
- metal carboxymethylhydroxyethylstarchs
- hydrolyzed polyacrylamides and polyacrylonitriles
- heparin
- homopolymers and copolymers of one or more of:
  - acrylic and methacrylic acids
  - metal acrylates and methacrylates
  - alginic acid
  - metal alginates
  - vinylsulfonic acid
  - metal vinylsulfonate
  - amino acids, such as aspartic acid, glutamic acid and the like
  - metal salts of amino acids
  - p-styrenesulfonic acid

metal p-styrenesulfonate
2-methacryloyloxyethylsulfonic acids
metal 2-methacryloyloxethylsulfonates
3-methacryloyloxy-2-hydroxypropylsulonic acids
metal 3-methacryloyloxy-2-hydroxypropylsulfonates
2-acrylamido-2-methylpropanesulfonic acids
metal 2-acrylamido-2-methylpropanesulfonates
allylsulfonic acid
metal allylsulfonate and the like.

In another embodiment, the polyanionic components include anionic polysaccharides which tend to exist in ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1–3 and beta 1–4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other anionic polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merk & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or tri-ethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

Preferably, the anionic polysaccharides are cyclized. More preferably, the cyclized anionic polysaccharides include less than ten monomer units. Even more preferably, the cyclized polysaccharides include less than six monomer units.

In one embodiment, a particularly useful group of cyclized anionic polysaccharides includes the cyclodextrins. Examples of the cyclodextrin group include, but are not limited to: α-cyclodextrin, derivatives of α-cyclodextrin, β-cyclodextrin, derivatives of β-cyclodextrin, γ-cyclodextrin, derivatives of γ-cyclodextrin, carboxymethyl-β-cyclodextrin, carboxymethyl-ethyl-β-cyclodextrin, diethyl-β-cyclodextrin, dimethyl-β-cyclodextrin, methyl-β-cyclodextrin, random methyl-β-cyclodextrin, glucosyl-β-cyclodextrin, maltosyl-β-cyclodextrin, hydroxyethyl-β-cyclodextrin, hydroxypropyl-β-cyclodextrin, sulfobutylether-β-cyclodextrin, and the like and mixtures thereof. Sulfobutylether-β-cyclodextrin is a preferred cyclized anionic polyasaccharide in accordance with the present invention. It is advantageous that the SEC's, including the above mentioned cyclodextrins, employed in this invention be, at the concentration employed, non-toxic to the mammal, human, to inhibit the present incorporation is administered. As used herein, the term "derivatives" as it relates to a cyclodextrin means any substituted or otherwise modified compound which has the characteristic chemical structure of a cyclodextrin sufficiently to function as a cyclodextrin component, for example, to enhance the solubility and/or stability of active components and/or reduce unwanted side effects of the active components and/or to form inclusive complexes with active components, as described herein.

Although cyclodextrins and/or their derivatives may be employed as SECs, one embodiment of the invention may include SECs other than cyclodextrins and/or their derivatives.

A particularly useful and preferred class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than $H^+$ and metal cations can be employed in the present invention.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the alpha-2-adrenergic agonist component in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2%

(w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present compositions is about 0.5%.

In one embodiment, the SECs, for example a carboxymethylcellulose, assist in solubilizing the alpha-2-adrenergic agonist components in the compositions. Although the SECs are capable aiding in the solubilization of ionized alpha-2-adrenergic agonist components, it is preferable that the SECs used in this invention could assist in the solubilization of unionized alpha-2-adrenergic agonist components. For example, in one embodiment, carboxymethylcellulose may help solubilize ionized alpha-2-adrenergic agonist components. In another embodiment, carboxymethylcellulose may help solubilize unionized alpha-2-adrenergic agonist components. In a preferred embodiment, the carboxylmethylcellulose helps solubilize ionized Brimonidine tartrate in the compositions. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate in the compositions.

In one embodiment, the compositions may also include preservative components or components which assist in the preservation of the composition. The preservative components selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of polyanionic components, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives or components which assist in the preservation of the composition which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components which assist in the preservation of the composition, preferably the alpha-2-adrenergic agonist components therein, are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm(w/v) or less to about 200 ppm(w/v). Preservative components in accordance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Very useful examples of the present preservative components include, but are not limited to oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component.

The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite™ by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1,1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

Preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and mixtures thereof, such as the mixture of methyl, ethyl, propyl, butyl esters and the like which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the alpha-2-adrenergic agonist components in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise an alpha-2-adrenergic agonist component, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A

particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier component substantially corresponds to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the SECs and the alpha-2-adrenergic agonist components may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps at 25° C., even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate.

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids

and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

In one broad aspect of the invention, complexes are formed in the present compositions. In one embodiment, the complexes include at least one monomer unit of a quinoxaline component. Examples of quinoxaline components include quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts thereof, esters thereof, other derivatives thereof, and the like and mixtures thereof. For example, in one embodiment, a complex of the present invention may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units. In another embodiment, the complex may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units and Brimonidine tartrate monomer units.

In a preferred embodiment, the complexes of the present invention are dimers. For example, a dimer in accordance with the present invention may include a quinoxaline and a 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Preferably, a dimer in accordance with the present invention includes two Brimonidine tartrate monomer units.

Without wishing to limit the invention to any theory or mechanism of operation, it is believed that any peroxide forming agent or strong oxidizing agent such as the oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof may facilitate the formation of the complexes, preferably complexes of alpha-2-adrenergic agonist components. For example, dimers of Brimonidine tartrate monomer units are believed to be formed in the presence of chlorites, preferably stabilized chlorine dioxide.

Furthermore, it is believed that the interactions between the monomers which serve to hold the monomers or mono-

mer subunits together to form a complex, preferably an oligomer and more preferably a dimer, may include, but not limited to, covalent bonding, ionic bonding, hydrophobic bonding, electrostatic bonding, hydrogen bonding, other chemical and/or physical interactions, and the like and combinations thereof. Such complexes may disassociate in liquid, for example, aqueous liquid, media. In one embodiment, the monomers or monomer subunits are held together by other than covalent bonding. In one embodiment, the monomers or monomer subunits are held together by electrostatic bonding or forces.

The following non-limiting examples illustrate certain aspects of the present invention.

## EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.). The formulation vehicle was prepared by first dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days; a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 μm filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 μm) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8.

| | STUDY 1 | | STUDY 2 | |
|---|---|---|---|---|
| Sample | pH[a] | Solubility[e] | pH[a] | Solubility[e] |
| 1 | 5.55 | ≧164.4[b] | 5.50 | ≧200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 50.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control/ (untreated) | — | 0.486[c] | — | — |
| Control/ (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate had dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v.

## EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™), Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride

dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 | |
|---|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| CMC | 0.0% | 0.056% | 0.17% | 0.5% | 1.5% | (w/v) |
| Stabilized chlorine dioxide* | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% | (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% | (w/v) |
| magnesium chloride, hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% | (w/v) |
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |

*Sold under the trademark Purite ™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

| | Solubility of Brimonidine tartrate (%) | | | | |
|---|---|---|---|---|---|
| | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
| pH | | | | | |
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 9.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.0560% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.50%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

EXAMPLE 3

Brimonidine Tartrate Dimers

Brimonidine tartrate is added to a test tube containing a composition including chlorite. The test tube was allowed to equilibrate for ten days. Samples obtained from the test tube is analyzed. It is observed that a portion of the Brimonidine tartrate monomer units conjugated to form dimers.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A therapeutically effective ophthalmic composition comprising:

an alpha-2-adrenergic agonist component in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

a solubility enhancing component other than a cyclodextrin in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relataive to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

2. The composition of claim 1 wherein the alpha-2-adrenergic component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, derivatives thereof, and mixtures thereof.

3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.

4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, derivatives thereof, and mixtures thereof.

5. The composition of claim 1 wherein said solubility enhancing component comprises an anionic polymer.

6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the alpha-2-adrenergic ago

nist component relative to the solubility in a biological environment of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

7. The composition of claim 6 wherein the solubility enhancing component comprises an anionic polymer.

8. The composition of claim 3 wherein said solubility enhancing component comprisers an anionic polymer.

9. The composition of claim 1 which further comprises an effective amount of a preservative.

10. The composition of claim 6 which further comprises an effective amount of a preservative.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

Page 1 of 1

PATENT NO.    : 6,673,337 B2
DATED         : January 6, 2004
INVENTOR(S)   : Olejnik et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 16,
Line 15, delete "0.0560" and insert in place thereof -- 0.056 --
Line 16, delete "0.50" and insert in place thereof -- 0.5 --

Signed and Sealed this

Sixteenth Day of March, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

# Exhibit I

**HENNIGAN, BENNETT & DORMAN LLP**
**RODERICK G. DORMAN (SBN 96908)**
**dormanr@hbdlawyers.com**
**MIEKE K. MALMBERG (SBN 209992)**
**malmbergm@hbdlawyers.com**
**865 South Figueroa Street, Suite 2900**
**Los Angeles, California 90017**
**Phone: (213) 694-1200**
**FAX: (213) 694-1234**

**F FROMMER LAWRENCE & HAUG LLP**
**DANIEL G. BROWN (*Pro Hac Vice Application Forthcoming*)**
**dbrown@flhlaw.com**
**ARTHUR L. HOAG (*Pro Hac Vice Application Forthcoming*)**
**ahoag@flhlaw.com**
**BARRY S. WHITE (*Pro Hac Vice Application Forthcoming*)**
**bwhite@flhlaw.com**
**DAVID A. ZWALLY (*Pro Hac Vice Application Forthcoming*)**
**dzwally@flhlaw.com**
**BRIAN J. MALKIN (*Pro Hac Vice Application Forthcoming*)**
**bmalkin@flhlaw.com**
**745 Fifth Avenue**
**New York, New York 10151**
**Phone: (212) 588-0800**
**Fax: (212) 588-0500**

Attorneys for Defendants,
EXELA PHARMSCI, INC. and
EXELA PHARM SCI PVT. LTD.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALLERGAN, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>EXELA PHARMSCI, INC. and EXELA PHARMSCI PVT., LTD.,<br><br>Defendants. | CASE NO. CV07-01967 R (RCx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND MOTION TO DISMISS UNDER RULE 12(B)(6)**<br><br>Date: May 7, 2007<br>Time; 10:00 a.m.<br>Ctrm: 8<br>Judge Manuel L. Real |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN THAT on May 7, 2007 at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Manuel L. Real, in Courtroom 8 of the United States District Court, 312 N. Spring Street, Los Angeles, California, 90012, Defendants Exela PharmSci, Inc. and Exela Pharm Sci Pvt. Ltd. will and hereby do move this Court for an order dismissing Plaintiff Allergan, Inc.'s ("Allergan") Complaint.

This Motion is brought pursuant to Fed. R. Civ. Proc. 12(b)(6) for Allergan's failure to state a claim on which relief may be granted. In addition, Allergan's complaint should be dismissed for lack of personal jurisdiction and improper venue. Pursuant to Hon. Manuel L. Real's standing order, the parties are not required to meet and confer in accordance with Local Rule 7-3.

This Motion is based upon this Notice of Motion and Motion, Declarations, and the Memorandum of Points and Authorities concurrently filed, and any additional argument and evidence that the Court may hear.

DATED: April 16, 2007

HENNIGAN BENNETT & DORMAN LLP
FROMMER LAWRENCE & HAUG LLP

By Roderick G. Dorman
Roderick G. Dorman
Attorneys for Defendants,
EXELA PHARMSCI, INC. and
EXELA PHARM SCI PVT. LTD.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# PROOF OF SERVICE-UNITED STATES DISTRICT COURT

STATE OF CALIFORNIA, )
) ss.
COUNTY OF LOS ANGELES )

I declare as follows:

I am a resident of the State of California and over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, Suite 2900, Los Angeles, California 90017. On April 16, 2007, I served the foregoing document(s) described as **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND MOTION TO DISMISS UNDER RULE 12(B)(6)** on the interested parties in this action as follows:

☒ by transmitting via facsimile the document(s) listed above to the fax number(s) set fourth below on this date. This transmission was reported as complete without error by a transmission report issued by the facsimile machine upon which the said transmission was made immediately following the transmission.

☐ by placing the document(s) listed above in sealed envelope(s) with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below

☒ by placing the document(s) listed above in sealed envelope(s) and affixing a pre-paid air bill and causing the envelope to be delivered to a Federal Express agent for delivery.

Juanita R. Brooks
brooks@fr.com
Craig E. Countryman
countryman@fr.com
W. Chad Shear
shear@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, California 92130-2081
Tele: (858) 678-5070/Fax: (858) 678-5099

Jonathan Singer
singer@fr.com
Fish & Richardson P.C.
3300 Dain Rauscher plaza
60 S. Sixth St., Ste 3300
Minneapolis, MN 55402
Tele: (612) 337-2534/Fax: (612) 288-9696

Douglas S. Ingram
Martin A. Voet
Voet_martin@allergen.com
William J. Scarff
Allergan Inc. 2525 DuPont Drive
Irvine, CA 92612
Tele: (714) 246-4500/Fax: (714) 246-4971

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the United States. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postal meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on April 16, 2007, at Los Angeles, California.

Sylvia A. Berson

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA



# Facsimile Cover Sheet

**Hennigan Bennett & Dorman LLP**

**865 South Figueroa Street, Suite 2900**
**Los Angeles, California 90017**
**Tel: (213) 694-1200 Fax: (213) 694-1234**

| | | | |
|---|---|---|---|
| **Date:** | April 16, 2007 | **File Name:** | New Client (Allergan v. Exela) |
| **From:** | Mieke Malmberg | **Direct Line:** | (213) 694-1112 |

| To: | Company | Fax number |
|---|---|---|
| Juanita R. Brooks/Craig E. Countryman/Chad Shear | Fis & Richardson P.C. | 858.678.5099 |
| Douglas S. Ingram/Martin A. Voet/William J. Scarff | Allergan Inc. | 714.246.4971 |
| Jonathan Singer | Fish & Richards P.C. | 612.288.9696 |

**Number of pages, including cover:** ______

☐ **For Your Information** ☐ **Reply ASAP** ☐ **For Your Review**

**Supplemental Message:** Attached for service are six documents.

ORIGINAL WILL:

☐ **BE SENT BY *MAIL***
☐ **BE SENT BY *MESSENGER***
☒ **BE SENT BY FEDEX/OVERNIGHT COURIER**
☐ **NOT BE SENT**

The information contained in this transmission is privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service. Thank you.

If there are any questions or problems with the transmission of this facsimile, please call (213)-694-1200.

# Exhibit J

**HENNIGAN, BENNETT & DORMAN LLP**
**RODERICK G. DORMAN (SBN 96908)**
**dormanr@hbdlawyers.com**
**MIEKE K. MALMBERG (SBN 209992)**
**malmbergm@hbdlawyers.com**
**865 South Figueroa Street, Suite 2900**
**Los Angeles, California 90017**
**Phone: (213) 694-1200**
**FAX: (213) 694-1234**

**FROMMER LAWRENCE & HAUG LLP**
**DANIEL G. BROWN (*Pro Hac Vice Application Forthcoming*)**
**dbrown@flhlaw.com**
**ARTHUR L. HOAG (*Pro Hac Vice Application Forthcoming*)**
**ahoag@flhlaw.com**
**BARRY S. WHITE (*Pro Hac Vice Application Forthcoming*)**
**bwhite@flhlaw.com**
**DAVID A. ZWALLY (*Pro Hac Vice Application Forthcoming*)**
**dzwally@flhlaw.com**
**BRIAN J. MALKIN (*Pro Hac Vice Application Forthcoming*)**
**bmalkin@flhlaw.com**
**745 Fifth Avenue**
**New York, New York 10151**
**Phone: (212) 588-0800**
**Fax: (212) 588-0500**

Attorneys for Defendants,
EXELA PHARMSCI, INC. and
EXELA PHARM SCI PVT. LTD.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALLERGAN, INC., Plaintiff, vs. EXELA PHARMSCI, INC. and EXELA PHARMSCI PVT., LTD., Defendants. | CASE NO. CV07-01967 R (RCx) **CERTIFICATE AS TO INTERESTED PARTIES PURSUANT TO LOCAL RULE 7.1-1** Courtroom: 8 Judge Manuel L. Real |

TO THE HONORABLE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Local Rule 7.1-1, the undersigned counsel of record for defendants Exela PharmSci, Inc. and Exela Pharm Sci Pvt. Ltd. hereby certifies that the following listed parties and insurers may have a direct, pecuniary interest in the outcome of the above-captioned action. We make these representations so the Court can evaluate possible disqualification or recusal:

**A. Plaintiff**

1. Allergan, Inc.

**B. Defendants**

1. Exela PharmSci, Inc.
2. Exela Pharm Sci Pvt. Ltd.

**C. Insurers and Indemnifiers**

1. Paddock Laboratories, Inc.

DATED: April 16, 2007

HENNIGAN BENNETT & DORMAN LLP
FROMMER LAWRENCE & HAUG LLP

By Roderick G. Dorman /MKM
Roderick G. Dorman

Attorneys for Defendants
EXELA PHARMSCI, INC. and
EXELA PHARM SCI PVT. LTD.

HENNIGAN, BENNETT & DORMAN LLP LAWYERS LOS ANGELES, CALIFORNIA

# PROOF OF SERVICE-UNITED STATES DISTRICT COURT

STATE OF CALIFORNIA, )
) ss.
COUNTY OF LOS ANGELES )

I declare as follows:

I am a resident of the State of California and over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, Suite 2900, Los Angeles, California 90017. On April 16, 2007, I served the foregoing document(s) described as **CERTIFICATE AS TO INTERESTED PARTIES PURSUANT TO LOCAL RULE 7.1-1** on the interested parties in this action as follows:

☒ by transmitting via facsimile the document(s) listed above to the fax number(s) set fourth below on this date. This transmission was reported as complete without error by a transmission report issued by the facsimile machine upon which the said transmission was made immediately following the transmission.

☐ by placing the document(s) listed above in sealed envelope(s) with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below

☒ by placing the document(s) listed above in sealed envelope(s) and affixing a pre-paid air bill and causing the envelope to be delivered to a Federal Express agent for delivery.

Juanita R. Brooks
brooks@fr.com
Craig E. Countryman
countryman@fr.com
W. Chad Shear
shear@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, California 92130-2081
Tele: (858) 678-5070/Fax: (858) 678-5099

Jonathan Singer
singer@fr.com
Fish & Richardson P.C.
3300 Dain Rauscher plaza
60 S. Sixth St., Ste 3300
Minneapolis, MN 55402
Tele: (612) 337-2534/Fax: (612) 288-9696

Douglas S. Ingram
Martin A. Voet
Voet_martin@allergen.com
William J. Scarff
Allergan Inc. 2525 DuPont Drive
Irvine, CA 92612
Tele: (714) 246-4500/Fax: (714) 246-4971

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the United States. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postal meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on April 16, 2007, at Los Angeles, California.

_______________________
Sylvia A. Berson

605122\v1

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# Exhibit K

PRESIDENT
COMPANY PROFILE
MISSION
VALUES
FACILITY
MANAGEMENT TEAM
CONTACT US
HOME

Paddock Laboratories is a privately-held niche-based pharmaceutical company located in Minneapolis, Minnesota. Bruce Paddock, President, founded the business in 1977 with only three employees. Today, Paddock employs over 250 people in the areas of Product Development, Quality Control, Quality Assurance, Regulatory Affairs, Operations, Finance & IT, Sales & Marketing. Paddock is proud of its growth and quality pharmaceuticals and is committed to bringing new branded generics to the marketplace.

View Paddock's **Company Profile**

View Paddock's **Standards of Business Conduct and Ethics**

PADDOCK
Paddock App
New Presider

Paddock Dor
$2 Million: U
Pharmacy Pr

Buy Glutose

Secundum A
Now available

Company Pro
Video now ava

NEW PRO
Benzphetami
Tablets 50 m
AA Rated to D

Moexipril HC
AB Rated to L

Bar-Coded S
Color-Coded a
Coded for pati

Caffeine Citra
and Oral Solu
mg/mL
A Rated to Ca
and Cafcit® Or

Polyethylene
NF Powder fo
Solution
AA Rated to M

Glutose™
New Grape an
Lemon

Ora-Blend® a
Blend® SF

©2007 All Rights Reserved. Sales Policy.
Paddock Laboratories, Inc., 3940 Quebec Avenue No., Mpls., MN 55427

292

# Exhibit L

HENNIGAN, BENNETT & DORMAN LLP
RODERICK G. DORMAN (SBN 96908)
dormanr@hbdlawyers.com
MIEKE K. MALMBERG (SBN 209992)
malmbergm@hbdlawyers.com
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
Phone: (213) 694-1200
FAX: (213) 694-1234

FROMMER LAWRENCE & HAUG LLP
DANIEL BROWN (Bar No. 2630994) ***(admitted pro hac vice)***
dbrown@flhlaw.com
ARTHUR L. HOAG (Bar No. 2886091) ***(admitted pro hac vice)***
ahoag@flhlaw.com
BARRY S. WHITE (Bar No. 2366904) ***(admitted pro hac vice)***
bwhite@flhlaw.com
DAVID A. ZWALLY (Bar No. 3951902) ***(admitted pro hac vice)***
dzwally@flhlaw.com
BRIAN J. MALKIN (Bar No. 4269171) ***(admitted pro hac vice)***
bmalkin@flhlaw.com
745 Fifth Avenue
New York, New York 10151
Phone: (212) 588-0800
Fax: (212) 588-0500

Attorneys for Defendants
EXELA PHARMSCI, INC.; EXELA PHARM SCI PVT., LTD.;
PADDOCK LABORATORIES, INC.; and PHARMAFORCE, INC.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ALLERGAN, INC., Plaintiff, vs. EXELA PHARMSCI, INC.; EXELA PHARMSCI PVT., LTD.; PADDOCK LABORATORIES, INC.; and PHARMAFORCE, INC., Defendants. | CASE NO. CV07-01967 R (RCx) **DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND DEFENDANTS' COUNTERCLAIMS** **JURY TRIAL DEMANDED** Honorable Manuel L. Real Courtroom 8 |
| AND RELATED COUNTERCLAIMS. | |

Defendants Exela PharmSci, Inc. ("Exela"), Exela Pharm Sci Pvt., Ltd. ("Exela Pvt."), Paddock Laboratories, Inc. ("Paddock"), and PharmaForce, Inc. ("PharmaForce") (collectively "the Defendants") by way of Answer and Counterclaim to the Amended Complaint of Plaintiff Allergan, Inc. ("Allergan") hereby allege as follows. Specific responses corresponding to Allergan's averments are set forth below, but except as otherwise specifically admitted, qualified, or denied herein, all averments of the Amended Complaint are hereby denied.

**THE NATURE OF THE ACTION**

Paragraph 1: This is an action for infringement of United States Patent No. 6,641,834 (the "'834 patent") under 35 U.S.C. §§ 271(e)(2) and 271(b), and for a declaratory judgment of infringement of the '834 Patent under 28 U.S.C. §§ 2201 and 2202. A copy of the '834 patent is attached as Exhibit A. This Court has subject matter jurisdiction over the action under 28 U.S.C. §§ 1331 and 1338, 2201, and 2202.

Answer: The Defendants admit only that the Amended Complaint purports to state an action for patent infringement under the specified titles of the United States Code as specified in paragraph 1 of the Amended Complaint. The Defendants deny that the Amended Complaint properly states an action for patent infringement. The Defendants admit that what appears to be a copy of the '834 patent is attached as Exhibit A to the Amended Complaint. The Defendants further admit that this Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 but deny that the Court has declaratory-judgment jurisdiction over the claims asserted in Allergan's declaratory judgment count.

**THE PARTIES**

Paragraph 2: Plaintiff Allergan is a corporation organized and existing under the laws of the State of Delaware, with its worldwide headquarters at 2525 Dupont Drive, Irvine, California 92612. Allergan employs over 2,000 people in the State of California, and directs the marketing, manufacture and sale of its commercially successful glaucoma drug, ALPHAGAN® P 0.15% brimonidine tartrate ophthalmic

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

solution, from its offices there. Allergan has been and will be injured by the acts complained of herein.

Answer: On information and belief, the Defendants admit that Allergan is a corporation organized and existing under the laws of the State of Delaware, with its headquarters at 2525 Dupont Drive, Irvine, California 92612. The Defendants deny the allegations of the third sentence of paragraph 2. The Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 2, and therefore deny them.

Paragraph 3: On information and belief, Defendant Exela PharmSci, Inc. ("Exela U.S.") is an entity organized under the laws of the State of Virginia, and is headquartered at 11710 Plaza America Dr., Suite 2000, Reston, VA 20190. On information and belief, Exela U.S. has only four shareholders.

Answer: The Defendants admit only that Exela PharmSci, Inc. ("Exela") is a corporation organized under the laws of the State of Virginia with its headquarters at 11710 Plaza America Dr., Suite 2000, Reston, VA 20190, and currently has four shareholders. The Defendants deny any remaining allegations of paragraph 3.

Paragraph 4: On information and belief, Defendant Exela PharmSci PVT., Ltd. ("Exela India") is an entity organized under the laws of the country of India with headquarters at # 139/1 Saptagiri, Sarwabowma Nagar, Bilekahalli, Bannerghatta Road, Bangalore, Karnataka, India, 560076.

Answer: The Defendants admit the allegations of paragraph 4.

Paragraph 5: On information and belief, Exela India and Exela U.S. are alter egos of one another or agents of one another as it relates to the actions complained of herein.

Answer: The Defendants deny the allegations in paragraph 5.

Paragraph 6: On information and belief, Exela India and Exela U.S. share the same Internet website, http://www.exela.com. This website lists a California resident and address for its administrative contact: Exela,

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

smccormack@neurosystec.com, 746 Gettysburg Circle, Claremont, CA 91711, United States, Phone: (909) 621-2994.

Answer: The Defendants deny the allegation of the first sentence of paragraph 6. The Defendants admit only that the Internet website http://www.exela.com lists, as its administrative contact, smccormack@neurosystec.com, 746 Gettysburg Circle, Claremont, CA 91711, United States, Phone: (909) 621-2994. The Defendants specifically deny that Exela or Exela Pvt. have any connection with this website, and therefore deny the remaining allegations in paragraph 6.

Paragraph 7: U.S. Trademark Applications filed for the mark "EXELA PHARMSCI" have listed either a California or Indian address for the applicant. The California address is for a Mr. Phanesh Koneru, 3053 Bighorn Drive, Corona, California 92881. On information and belief, Mr. Koneru is the Chief Executive Officer of Exela U.S., and is the person who signed a letter notifying Allergan of an Abbreviated New Drug Application ("ANDA") filing for a generic version of Allergan's ALPHAGAN® P product, as further described in paragraphs 22 through 24.

Answer: The Defendants admit only that: (1) U.S. Trademark Applications filed for the mark "EXELA PHARMSCI" have listed either a California or Indian address for the applicant; (2) the California address, 3053 Bighorn Drive, Corona, California 92881, is a former address of Dr. Phanesh Koneru; (3) Dr. Koneru is the Chief Executive Officer of Exela; and (4) Dr. Koneru, on behalf of Exela, signed Exela's Paragraph IV notice-of-certification letter notifying Allergan of ANDA No. 78-590. The Defendants deny the remaining allegations of paragraph 7.

Paragraph 8: Exela also maintains a website that is "under construction" at http://www.exela.us. The registration for this website is held by Mr. Koneru at 3053 Bighorn Drive, Corona, California 92881, with two phone numbers listed, one with a

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-3-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

California area code at 951-898-5960, and the other with a Virginia area code at 703-964-7994.

Answer: The Defendants admit only that: (1) Exela maintains a website that is "under construction" at http://www.exela.us; (2) the website registration for this site lists Dr. Koneru's former California address at 3053 Bighorn Drive, Corona, California 92881, and Dr. Koneru's former California telephone number, area code (951) 898-5960; and (3) the registration for the website also lists Exela's current Virginia telephone number, area code (703) 964-7994. The Defendants deny any remaining allegations of paragraph 8.

Paragraph 9: On information and belief, Mr. Koneru is the sole employee of Exela U.S. On information and belief, the company's phone number is the same as Mr. Koneru's cellular telephone number. On information and belief, Mr. Koneru owns over 80 percent of the stock in Exela U.S.

Answer: The Defendants admit only that: (1) Dr. Koneru is currently the sole employee of Exela; (2) Exela's phone number is a cellular telephone number; and (3) Dr. Koneru currently owns over 80 percent of the stock in Exela. The Defendants deny any remaining allegations of paragraph 9.

Paragraph 10: On information and belief, Defendant Paddock Laboratories, Inc. ("Paddock") is a corporation organized and existing under the laws of the State of Minnesota, with its headquarters and principal place of business at 3940 Quebec Avenue North, Minneapolis, Minnesota 55427.

Answer: The Defendants admit the allegations in paragraph 10.

Paragraph 11: According to Exela's Certificate as to Interested Parties Pursuant to Local Rule 7.1-1, filed with this Court on April 16, 2007, Paddock is an "insurer and indemnifier" for Exela in this litigation concerning Defendants' generic version of Allergan's ALPHAGAN® P product. On information and belief, Paddock is not in the business of selling insurance of any kind.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Answer: The Defendants admit that Exela identified Paddock on its Certificate as to Interested Parties Pursuant to Local Rule 7.1-1 as an "insurer and indemnifier," as those terms are defined under the Local Rule. The Defendants further admit that Paddock is not in the business of selling insurance. The Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11, and therefore deny them.

Paragraph 12: Paddock manufactures a variety of different generic pharmaceutical products and sells them throughout the United States, including California.

Answer: The Defendants admit that Paddock manufacturers and sells bioequivalent generic pharmaceuticals and over-the-counter specialty products in the United States.

Paragraph 13: On information and belief, Defendant PharmaForce, Inc. ("PharmaForce") is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business at 960 Crupper Avenue, Columbus, Ohio 43229.

Answer: The Defendants admit the allegations in paragraph 13.

Paragraph 14: On information and belief, PharmaForce's registered statutory agent is OSAC, Inc., located at 100 South Third Street, Columbus, Ohio 43215.

Answer: The Defendants admit the allegations in paragraph 14.

Paragraph 15: On information and belief, PharmaForce develops and manufactures a variety of sterile pharmaceutical products.

Answer: The Defendants admit that PharmaForce develops and manufactures, among other things, sterile pharmaceutical products.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-5-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

## JURISDICTION AND VENUE

Paragraph 16: This action arises under the patent laws of the United States of America, United States Code, Title 35, Section 1, et seq. This Court has subject matter jurisdiction over the action under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

Answer: In response to paragraph 17, the Defendants admit that Allergan purports to assert an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., but denies that the Amended Complaint properly states an action for patent infringement. The Defendants deny that they infringe, have infringed, or will infringe the '834 patent. The Defendants further state that they do not contest subject-matter jurisdiction.

Paragraph 17: Based on the facts and causes alleged herein and any other facts to be determined, this Court has personal jurisdiction over Defendants.

Answer: The Defendants state that they do not contest personal jurisdiction in this Court for the purposes of this action.

Paragraph 18: Venue is proper under 28 U.S.C. §§ 1391 and 1400(b).

Answer: The Defendants deny that they have committed any acts of patent infringement, whether in this District or elsewhere, and deny the remaining allegations in paragraph 18. The Defendants, however, state that they do not contest venue in this Court for purposes of this action.

## BACKGROUND

Paragraph 19: The '834 patent, entitled "Compositions Containing Alpha-2-Adrenergic Agonist Components," issued to Allergan inventors Orest Olejnik and Edward D.S. Kerslake on November 4, 2003. Allergan owns the '834 patent by assignment.

Answer: The Defendants admit only that, on information and belief, the United States Patent and Trademark Office issued United States Patent No. 6,641,834 ("the '834 patent") entitled "Compositions Containing Alpha-2-Adrenergic Agonist Components" and that the patent lists on its face Orest Olejnik and Edward D.S.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Kerslake as inventors. The Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 19, and therefore deny them.

Paragraph 20: Allergan is the holder of an approved New Drug Application (NDA No. 21-262) for a 0.15% brimonidine tartrate ophthalmic solution sold under the ALPHAGAN® P trademark. In conjunction with NDA No. 21-262, Allergan has listed with the United States Food and Drug Administration ("FDA") five patents (the "Listed Patents") that cover various aspects of the approved formulation of ALPHAGAN® P. One of the Listed Patents is the '834 patent.

Answer: The Defendants admit that Allergan is the holder of New Drug Application (NDA No. 21-262) for a 0.15% brimonidine tartrate ophthalmic solution sold under the ALPHAGAN® P trademark. The Defendants also admit that Allergan listed with the FDA five patents that purportedly cover ALPHAGAN® P but the Defendants specifically deny that Allergan properly listed the five patents with the FDA. The Defendants admit that the '834 patent is one of the listed patents.

Paragraph 21: The research and development work that led to the '834 patent took place at Allergan's facilities in Irvine, California, as did the formulation work for Allergan's ALPHAGAN® P product. In addition, the preparation of NDA No. 21-262 took place at Allergan's facilities in Irvine, California.

Answer: The Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 21, and therefore deny them.

Paragraph 22: On February 12, 2007, Allergan received at its Irvine, California offices a letter signed on behalf of Exela by Mr. Phanesh Koneru on Exela PharmSci, Inc. letterhead (the "Paragraph IV Letter"). The telephone number listed on the letter is identified as a "cell" number at 703-964-7994, the same number identified in paragraph 8 above. The e-mail address listed on the letter is at "exela.us," the same domain identified at paragraph 8 above.

Answer: On information and belief, the Defendants admit the allegations of paragraph 22.

Paragraph 23: The stated purpose of the Paragraph IV Letter was to notify Allergan that Exela had filed a certification with the FDA under 21 C.F.R. § 314.50(i)(1)(i)(A)(4) in conjunction with ANDA No. 78-590 filed by Exela for approval of a generic version of Allergan's ALPHAGAN® P product. The Paragraph IV Letter stated that Defendants' generic version of Allergan's ALPHAGAN® P product allegedly would not infringe the Listed Patents and/or that the Listed Patents are invalid.

Answer: The Defendants admit only that Exela's Paragraph IV notice-of-certification letter served as statutory notice to Allergan that Exela had filed ANDA No. 78-590 with the FDA under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) to obtain approval to engage in the commercial manufacture, use, or sale of a 0.15% brimonidine tartrate ophthalmic solution. The Defendants also admit that Exela stated that the 0.15% brimonidine tartrate ophthalmic solution covered by ANDA No. 78-590 (1) would not infringe United States Patents Nos. 5,424,078 ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), the '834 patent, and 6,673,337 ("the '337 patent"), and/or (2) that the '078, '873, '210, '834, and '337 patents are invalid.

Paragraph 24: The Paragraph IV Letter contains very limited information about the generic formulation for which Defendants filed ANDA 78-590. For example, the Paragraph IV Letter does not identify all of the ingredients in the product. One or more of the Listed Patents contain claims covering brimonidine tartrate or an alpha-2-agonist such as brimonidine tartrate in combination with other excipients that could be in Defendants' product.

Answer: The Defendants deny the allegations in paragraph 24.

Paragraph 25: Since receiving the Paragraph IV Letter, Allergan has attempted several times to procure a copy of ANDA 78-590 from Exela. Exela has been unwilling to provide ANDA 78-590 except under conditions that would not

allow Allergan to meaningfully process the information contained in the ANDA. In addition, Exela stated in its original offer to provide the ANDA that it would "make no representation or warranty of any kind, whether express or implied, about the accuracy or completeness of the Information" it might provide.

Answer: The Defendants admit only that Exela: (1) offered Allergan access to ANDA No. 78-590 pursuant to an Offer of Confidential Access and Confidentiality Agreement ("OCA") with reasonable confidentiality restrictions as specifically authorized by the Hatch-Waxman Act; (2) that Allergan refused to review the ANDA but nonetheless filed this action; and (3) that Exela's original OCA contained standard contractual language stating that it would "make no representation or warranty of any kind, whether express or implied, about the accuracy or completeness of the Information." The Defendants deny the remaining allegations in paragraph 25.

Paragraph 26: Because it has been unable to obtain a copy of ANDA 78-590, Allergan alleges its causes based primarily on the representations contained in the Paragraph IV Letter and the other facts alleged herein.

Answer: The Defendants deny that Allergan has been unable to obtain a copy of the ANDA since Exela made the ANDA available under the OCA but Allergan refused to review it. The Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 26, and therefore deny them.

Paragraph 27: On information and belief, Exela India performed formulation and development work for Defendants' generic version of Allergan's ALPHAGAN® P product at the request of Exela U.S.

Answer: Defendants admit only that Exela Pvt. performed some formulation work relating to a 0.15% brimonidine tartrate ophthalmic solution under contract from Exela. Defendants deny the remaining allegations in paragraph 27.

Paragraph 28: On information and belief, Exela U.S. took the work Exela India performed and entered into a license agreement with Paddock.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Answer: The Defendants admit that Exela entered into a license, manufacturing and distribution agreement with Paddock but deny the remaining allegations in paragraph 28.

Paragraph 29: On information and belief, as part of the agreement, Paddock agreed to indemnify and insure Exela against all liabilities that might result from the filing of an ANDA for Defendants' generic version of Allergan's ALPHAGAN® P product, including any liabilities or costs associated with this litigation.

Answer: The Defendants admit that Exela and Paddock entered into a license, manufacturing and distribution agreement whereby Paddock has agreed to pay for Exela's litigation expenses and, subject to certain conditions, pay for certain liabilities. The Defendants deny the remaining allegations in paragraph 29.

Paragraph 30: On information and belief, Paddock enlisted PharmaForce to perform additional formulation and development work for Defendants' generic version of Allergan's ALPHAGAN® P product, manufacture the product, and prepare the ANDA.

Answer: The Defendants admit that, under a contract with Paddock, PharmaForce: (1) performed some formulation and development work relating to Exela's 0.15% brimonidine tartrate ophthalmic solution; and (2) prepared some of the documents relating to ANDA No. 78-590; and (3) has agreed to, subject to certain conditions, to manufacture a 0.15% brimonidine tartrate ophthalmic solution consistent with ANDA No. 78-590. The Defendants deny the remaining allegations in paragraph 30.

Paragraph 31: On information and belief, PharmaForce, acting as agent for Exela and/or Paddock, drafted the ANDA and delivered the ANDA to the FDA's offices in Maryland.

Answer: The Defendants admit that PharmaForce prepared some of the documents relating to ANDA No. 78-590 and that PharmaForce sent ANDA No. 78-

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-10-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

590 to the FDA for filing. The Defendants deny the remaining allegations in paragraph 31.

Paragraph 32: In filing their ANDA, Defendants requested the FDA's approval to market a generic version of Allergan's ALPHAGAN® P product throughout the entire United States, including California.

Answer: The Defendants admit only that with Exela's filing of ANDA No. 78-590, Exela seeks the FDA's approval to market a generic version of Allergan's ALPHAGAN® P product in the United States. The Defendants deny the remaining allegations of paragraph 32.

Paragraph 33: On information and belief, under the licensing arrangement between Paddock and Exela, Paddock has the exclusive right to manufacture and market Defendants' generic version of Allergan's ALPHAGAN® P product once the FDA approves ANDA 78-590.

Answer: The Defendants admit that Exela and Paddock entered into a license, manufacturing, and distribution agreement whereby Paddock or its affiliates have, subject to certain conditions, the exclusive right to manufacture and market a 0.15% brimonidine tartrate ophthalmic solution consistent with ANDA No. 78-590. The Defendants deny the remaining allegations in paragraph 33.

Paragraph 34: On information and belief, Exela and/or Paddock have entered into an agreement with PharmaForce under which PharmaForce will manufacture Defendants' generic version of Allergan's ALPHAGAN® P product once the FDA approves ANDA 78-590.

Answer: The Defendants admit that Paddock and PharmaForce have entered in an agreement whereby PharmaForce has agreed, subject to certain conditions, to manufacture a 0.15% brimonidine tartrate ophthalmic solution consistent with ANDA No. 78-590. The Defendants deny the remaining allegations in paragraph 34.

**COUNT I**
**(Infringement of the '834 Patent Under 35 U.S.C. § 271(e)(2))**

Paragraph 35: Paragraphs 1 to 34 are incorporated herein as set forth above.

Answer: The Defendants repeat and incorporate by reference, as if fully set forth herein, the answers contained in paragraphs 1 through 34 above.

Paragraph 36: Defendants, acting jointly, submitted ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United States. By submitting the application, Defendants, individually and collectively, committed an act of infringement under 35 U.S.C. § 271(e)(2)(A).

Answer: The Defendants deny the allegations in paragraph 36.

Paragraph 37: Exela, acting in concert with the other Defendants, submitted ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United States. By submitting the application, Exela has committed an act of infringement under 35 U.S.C. § 271(e)(2)(A).

Answer: The Defendants admit that Exela submitted ANDA No 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to market Exela's 0.15% brimonidine tartrate ophthalmic solution in the United States but deny the remaining allegations in paragraph 37.

Paragraph 38: When Exela submitted ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United States, it was acting jointly with Paddock and/or acting as Paddock's agent. By acting jointly with Exela to submit the application

and/or causing its agent to submit the application, Paddock has committed an act of infringement under 35 U.S.C. § 271(e)(2)(A).

Answer: The Defendants deny the allegations in paragraph 38.

Paragraph 39: When PharmaForce delivered ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United States, it was acting as agent for Exela and/or Paddock. By acting as agent for Exela and/or Paddock to submit the application, PharmaForce has committed an act of infringement under 35 U.S.C. § 271(e)(2)(A).

Answer: The Defendants admit that PharmaForce submitted ANDA No. 78-590 to FDA on behalf of Exela, acting in a capacity as Exela's regulatory agent. The Defendants deny the remaining allegations in paragraph 39.

Paragraph 40: The commercial manufacture, use, offer for sale, sale, and/or importation of Defendants' proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% product will infringe the '834 patent.

Answer: The Defendants deny the allegations in paragraph 40.

**COUNT II**
**(Infringement of the '834 Patent Under 35 U.S.C. § 271(b))**

Paragraph 41: Paragraphs 1 to 34 are incorporated herein as set forth above.

Answer: The Defendants repeat and incorporate by reference, as if fully set forth herein, the answers contained in paragraphs 1 through 34 above.

Paragraph 42: Exela, acting in concert with the other Defendants, submitted ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

States. By submitting the application, Exela has committed an act of infringement under 35 U.S.C. § 271(e)(2)(A).

Answer: The Defendants admit that Exela submitted ANDA No 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to market Exela's 0.15% brimonidine tartrate ophthalmic solution in the United States but deny the remaining allegations in paragraph 42.

Paragraph 43: Paddock actively induced Exela to submit ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United States. By actively inducing submission of the ANDA, Paddock has committed an act of indirect infringement under 35 U.S.C. § 271(b).

Answer: The Defendants deny the allegations in paragraph 43.

Paragraph 44: PharmaForce actively induced Exela to submit ANDA No. 78-590 to the FDA to obtain approval under the Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, or sale of a proposed Brimonidine Tartrate Ophthalmic Solution 0.15% product throughout the United States. By actively inducing submission of the ANDA, PharmaForce has committed an act of indirect infringement under 35 U.S.C. § 271(b).

Answer: The Defendants deny the allegations in paragraph 44.

Paragraph 45: The commercial manufacture, use, offer for sale, sale, and/or importation of Defendants' proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% product will infringe the '834 patent.

Answer: The Defendants deny the allegations in paragraph 45.

**COUNT III**
**(Declaratory Judgment of Infringement of the '834 Patent Under 35 U.S.C. § 271(a))**

Paragraph 46: Paragraphs 1 to 34 are incorporated herein as set forth above.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Answer: The Defendants repeat and incorporate by reference, as if fully set forth herein, the answers contained in paragraphs 1 through 34 above.

Paragraph 47: These claims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

Answer: The Defendants deny the allegations in paragraph 47.

Paragraph 48: There is an actual case or controversy such that the Court may entertain Allergan's request for declaratory relief consistent with Article III of the United States Constitution, and that actual case or controversy requires a declaration of rights by this Court.

Answer: The Defendants deny the allegations in paragraph 48.

Paragraph 49: Defendants have made, and will continue to make, substantial preparation in the United States to manufacture, sell, offer to sell, and/or import Defendants' proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% product.

Answer: The Defendants admit that Exela, in accordance with the safe-harbor provision in the Hatch-Waxman Act (i.e., 35 U.S.C. § 271(e)(1)) has made substantial preparation to market its 0.15% brimonidine tartrate ophthalmic solution in the United States before expiration of the five patents Allergan listed with the FDA. The Defendants deny the remaining allegations in paragraph 49.

Paragraph 50: Defendants' actions indicate a refusal to change the course of their actions in the face of acts by Allergan.

Answer: The Defendants do not understand what is meant by "acts of Allergan," and are therefore without information sufficient to form a belief as to the truth of the allegations of paragraph 50, and therefore deny them.

Paragraph 51: The commercial manufacture, use, offer for sale, sale, and/or importation of Defendants' proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% product will infringe the '834 patent.

Answer: The Defendants deny the allegations in paragraph 51.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

Paragraph 52: Allergan is entitled to a declaratory judgment that future commercial manufacture, use, offer for sale, sale, and/or importation of Defendants' proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% product by any or all of Defendants will infringe the '834 patent

Answer: The Defendants deny the allegations in paragraph 52.

**FIRST AFFIRMATIVE DEFENSE**

Exela's proposed 0.15% brimonidine tartrate ophthalmic solution that is the subject of ANDA No. 78-590 has not infringed and would not infringe, if marketed, any valid and enforceable claim of the '834 patent.

**SECOND AFFIRMATIVE DEFENSE**

The Defendants have not infringed, contributed to, or induced infringement of, and are not infringing, contributing to, or inducing infringement of the '834 patent.

**THIRD AFFIRMATIVE DEFENSE**

The '834 patent and all its claims are invalid, void or unenforceable for, among other things, failure to comply with the requirements of the Patent Laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and/or 116.

**FOURTH AFFIRMATIVE DEFENSE**

Allergan's Amended Complaint fails to state a claim upon which relief may be granted.

**FIFTH AFFIRMATIVE DEFENSE**

Allergan's claims and requested relief are barred by the doctrine of estoppel.

**SIXTH AFFIRMATIVE DEFENSE**

Allergan's claims and requested relief are barred by the doctrine of unclean hands.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-16-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

Counterclaim Plaintiffs Exela, Exela Pvt., Paddock, and PharmaForce (collectively "Counterclaim Plaintiffs") allege:

## STATEMENT OF THE CASE

1. This is a declaratory-judgment action seeking a declaration of noninfringement, unenforceability, or invalidity of United States Patents Nos. 5,424,078 ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), 6,641,834 ("the '834 patent"), and 6,673,337 ("the '337 patent"). The '078, '873, '210, and '337 patents are attached as Exhibits 1-4. The '834 patent is attached as Exhibit A to the Amended Complaint, which is incorporated herein by reference.

2. Allergan listed these five patents with the FDA in the publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (herein "the Orange Book"), as patents that could reasonably be asserted against anyone marketing or seeking to market a generic product in competition with Allergan's 0.15% brimonidine tartrate ophthalmic solution, which Allergan sells under the brand name Alphagan® P.

3. Exela has filed an ANDA with the FDA, seeking approval to market a 0.15% brimonidine tartrate ophthalmic solution. As part of that application, Exela certified that it did not infringe any of these five patents and that the patents were unenforceable or invalid. Exela also provided Allergan with notice of its certification.

4. On March 26, 2007, Allergan sued Exela and Exela Pvt. alleging infringement of the '834 patent in the above-captioned action in the Central District of California. By suing on the '834 patent within 45 days after receiving Exela's notice, Allergan invoked statutory provisions that prevent the FDA from approving Exela's ANDA for up to 30 months under certain conditions. 21 U.S.C. § 355(j)(5)(B)(iii).

5. Because Allergan did not sue on the remaining four patents listed in the Orange Book and the Counterclaim Plaintiffs remain faced with the threat of suit on those patents. Thus, they have a reasonable apprehension that Allergan will sue on

the remaining patents listed in the Orange Book, and a justiciable controversy exists under the Declaratory Judgment Act.

6. Allergan's conduct impairs Exela's ability to bring its brimonidine drug product to market. The Counterclaim Plaintiffs thus seek a declaratory judgment that they do not infringe the '078, '873, '210, '834, and '337 patents, and that those patents are invalid and/or unenforceable.

## PARTIES

7. Exela is a Virginia corporation, and has its principal place of business at 11710 Plaza America Drive, Suite 2000, Reston, Virginia 20190. Among other things, Exela develops generic pharmaceutical products for distribution and sale in the United States.

8. Exela Pvt. is a corporation organized under the laws of the country of India with headquarters at # 139/1 Saptagiri, Sarwabowma Nagar, Bilekahalli, Bannerghatta Road, Bangalore, Karnataka, India, 560076.

9. Paddock is a corporation organized and existing under the laws of the State of Minnesota, with its headquarters and principal place of business at 3940 Quebec Avenue North, Minneapolis, Minnesota 55427.

10. PharmaForce is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business at 960 Crupper Avenue, Columbus, Ohio 43229.

11. On information and belief, Allergan is a Delaware corporation with its principal place of business at 2525 Dupont Drive, Irvine, California 92612.

## JURISDICTION AND VENUE

12. These claims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and 21 U.S.C. § 355(j)(5)(C)(i)(II).

13. This Court has subject-matter jurisdiction based on 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and 21 U.S.C. § 355(j)(5)(C)(i)(II).

14. This Court has personal jurisdiction over Allergan because, for example, Allergan resides in and is doing within this district, and has consented to jurisdiction by bringing suit against Counterclaim Plaintiffs in this district.

15. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

**ALLERGAN'S NDA AND EXELA'S ANDA**

16. On information and belief, Allergan is the current holder of New Drug Application ("NDA") No. 21-262 for 0.15% brimonidine tartrate ophthalmic solution, which Allergan markets under the brand name Alphagan® P in the United States. Alphagan® P is indicated to treat glaucoma.

17. On information and belief, in 2001 the FDA approved Allergan's NDA 21-262. This permitted Allergan to market its 0.15% brimonidine tartrate ophthalmic solution.

18. Brimonidine has been approved by the FDA as an ophthalmic solution since 1996 and has been sold by several drug companies, including Alcon, Inc. ("Alcon"), Akorn, Inc., Bausch and Lomb, Inc., and Ivax Pharmaceuticals, Inc.

19. On information and belief, the FDA has approved Alcon's NDA No. 21-764 for 0.15% brimonidine tartrate ophthalmic solution, but Alcon may not market its product until September 30, 2009, due to a settlement agreement with Allergan, unless certain market conditions occur, the primary condition being a trigger based on the extent to which prescriptions of Allergan's 0.15% brimonidine tartrate ophthalmic solution have been converted to other brimonidine-containing products.

20. The FDA rated Alcon's NDA 21-764 product with an "AT" Therapeutic Evaluation Code, which means that it is considered therapeutically equivalent (same active ingredient) but not pharmaceutically equivalent (not generically substitutable). As a result, there is currently no generic product that can be sold in competition with Allergan's 0.15% brimonidine product.

21. The Federal Food, Drug and Cosmetic Act ("FFDCA") authorizes a pharmaceutical company to file an ANDA, which the FDA will approve if the pharmaceutical company shows that its product has the same active ingredient as, and is bioequivalent to, a product that the FDA has already approved. Typically, the ANDA applicant submits data showing that its product is bioequivalent to a product that has been the subject of an approved NDA.

22. The FFDCA requires NDA holders to submit to the FDA the patent number and expiration date of any patent(s) that the NDA holder believes "a claim of patent infringement could reasonably be asserted if a person not licensed by the [NDA] owner engaged in the manufacture, use or sale of the drug." 21 U.S.C. § 355(b)(1). The FDA—with no substantive review of the patents—lists the patent number(s) and expiration date(s) in the Orange Book.

23. If an ANDA applicant seeks approval to market its generic product before the patents listed in the Orange Book expire, the applicant must include in its ANDA a certification that its proposed product would not infringe those patents, and/or that the patents are invalid or unenforceable. The applicant must then send a notice letter to the NDA holder and patent owner that includes a detailed statement of the factual and legal bases of the applicant's opinion that the patent is invalid, unenforceable, or would not be infringed.

24. If the patent owner sues the ANDA applicant for infringement within 45 days of receiving the notice letter, on that basis alone the FDA is prohibited by statute from approving the ANDA for 30 months or until the infringement action is over, absent a court order shortening the period.

25. Upon information and belief, Allergan, as the NDA holder for Alphagan® P (NDA 21-262), filed with the FDA a patent certification pursuant to 21 U.S.C. § 355(b)(1) requesting that five patents be listed by the FDA in the Orange Book, namely the '078, '873, '210, '834, and '337 patents.

26. Allergan's listing of these five patents means that Allergan asserts that any one of these patents is a "patent which claims the drug for which the application was submitted [i.e., Alphagan® P, NDA No. 21-262] . . . and in response to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." *See* 21 U.S.C. § 355(b)(1).

27. All patents covering the active ingredient, brimonidine, expired long ago. The Orange Book patents all relate to formulations of brimonidine.

28. To engage in the commercial manufacture, use, or sale of 0.15% brimonidine tartrate ophthalmic solution, Exela filed with the FDA an ANDA for Exela's product, and the FDA assigned Exela's application ANDA No. 78-590.

29. Exela's ANDA seeks approval to market generic 0.15% brimonidine tartrate ophthalmic solution based on Allergan's NDA No. 21-262. By preparing and filing this ANDA, Exela has made substantial preparation to make, use, import, offer to sell, and sell generic 0.15% brimonidine tartrate ophthalmic solution in the United States before expiration of the patents Allergan listed in the Orange Book. Exela certified to the FDA, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (hereinafter "Paragraph IV certification(s)"), that Exela's 0.15% brimonidine tartrate ophthalmic solution will not infringe any claim of the patents listed in the Orange Book, and that those patents are invalid and unenforceable.

30. On February 8, 2007, Exela, in accordance with 21 U.S.C. § 355(j)(2)(B)(i) and (ii), mailed Allergan a notice that it had filed an ANDA for its 0.15% brimonidine tartrate ophthalmic solution informing Allergan that its ANDA contained Paragraph IV certifications regarding the '078, '873, '210, '834, and '337 patents. The notice provided the factual and legal bases as to why the '078, '873, '210, '834, and '337 patents were invalid, unenforceable, and/or will not be infringed, by the commercial manufacture, use, or sale of Exela's 0.15% brimonidine tartrate ophthalmic solution before expiration of the '078, '873, '210, '834, and '337 patents.

The notice also included an offer of confidential access to Exela's ANDA, as provided for in 21 U.S.C. § 355 (j)(5)(C)(I)(cc), (j)(5)(C)(III).

31. Upon information and belief, Allergan has stated that it received notice on February 12, 2007, that Exela had filed an ANDA for 0.15% brimonidine tartrate ophthalmic solution with Paragraph IV certifications as to the five listed Orange Book patents, as provided by § 505(j)(2)(B)(ii) of the FFDCA and 21 C.F.R. § 314.95.

32. On March 26, 2007, Allergan sued Exela and Exela Pvt. alleging that "Exela's proposed generic Brimonidine Tartrate Ophthalmic Solution 0.15% will infringe the '834 patent."

33. On April 26, 2007, Allergan filed an Amended Complaint and added two new parties, Paddock and PharmaForce, but again asserted infringement of only the '834 patent.

34. Allergan has not sued the Counterclaim Plaintiffs for infringement of the '078, '873, '210, and '337 patents. Because those patents are listed in the Orange Book for 0.15% brimonidine tartrate ophthalmic solution, Counterclaim Plaintiffs remain faced with the threat of litigation concerning these four patents, and that threat is impairing Exela's ability to bring to market its brimonidine drug product. The statutory 45-day period after the date Allergan received Exela's notice that Exela had filed an ANDA containing Paragraph IV certifications as to the five listed Orange Book patents has expired. Counterclaim Plaintiffs thus seek a declaratory judgment of noninfringement, invalidity, and/or unenforceability of the '078, '873, '210, and '337 patents, under the Declaratory Judgment Act and 21 U.S.C. § 355(j)(5)(C)(i)(II).

35. Allergan did not accept Exela's offer of access to Exela's ANDA before Allergan filed its complaint on March 26, 2007.

36. Allergan has not provided Counterclaim Plaintiffs with a covenant not to sue based on the five Orange Book patents, nor any other assurance that it would not assert a case for infringement for the remaining four patents listed in the Orange Book against Exela.

37. Allergan has demonstrated an intention to prevent generic competition for its products by attempting to enforce Orange Book-listed patents against one or more generic companies in numerous instances. With regard to 0.15% brimonidine tartrate ophthalmic solution, Allergan sued Alcon Laboratories for its brimonidine drug product (under § 355(b)(2) of the FFDCA), based on the '834 and '337 patents and settled this case on or about March 9, 2006. *See Allergan, Inc. v. Alcon Labs.*, No. 04-968 (D. Del. filed Aug. 24, 2004).

38. The four other Orange Book patents include claims that are closely related to the formulation claims in the '834 patent and involve the same technology. The '834 patent, moreover, is a continuation patent of the '210 patent. The '873, '210 and '337 patents all share a history to the same original patent application (Provisional Application No. 60/218,200) and share many common components in their substantive specifications.

39. Allergan's selection of the '834 patent to initiate its infringement suit creates uncertainty as to Counterclaim Plaintiffs legal rights under Exela's ANDA.

40. Counterclaim Plaintiffs suffer a direct legal injury from the actions Allergan has already taken—Allergan's listing of the five Alphagan® P patents in the Orange Book and Allergan's suit against them alleging that Exela's ANDA product infringes—which requires judicial relief. *See* 21 U.S.C. § 355(j)(5)(C).

41. Counterclaim Plaintiffs suffer from the possibility of future litigation created by Allergan electing to challenge Exela's ANDA on only one of the five listed Orange Book patents for Alphagan® P. The possibility that the Counterclaim Plaintiffs will be subject to multiple infringement suits from Allergan on the submission of a single ANDA containing five Paragraph IV certifications is an injury relevant to finding a justiciable controversy.

42. Counterclaim Plaintiffs, therefore, have a reasonable apprehension and justiciable controversy under the Declaratory Judgment Act that Allergan will likely

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-23-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

assert the five listed Orange Book patents against the Counterclaim Plaintiffs if Exela commercially markets its generic 0.15% brimonidine tartrate ophthalmic solution.

## THE PRESENCE OF A CASE OR CONTROVERSY

43. Under 35 U.S.C. § 271(e)(2)(A), Exela's submission of an ANDA to the FDA constitutes a "technical" act of infringement to create subject-matter jurisdiction on each of the patents listed in the Orange Book. Moreover, 35 U.S.C. § 271(e)(5) provides that the Court has subject-matter jurisdiction under 28 U.S.C. § 2201 for a declaratory judgment that any unasserted Orange Book patents are invalid or not infringed. *See also Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, No. 06-1181, 2007 WL 942201 (Fed. Cir. Mar. 30, 2007).

44. Because Allergan filed a complaint alleging that the Counterclaim Plaintiffs are infringing or will infringe the '834 patent, Allergan has demonstrated its intent to enforce its patents concerning 0.15% brimonidine tartrate ophthalmic solution.

45. Allergan's complaint gives rise to an actual controversy with respect to the '834 patent.

46. Allergan has never disavowed, in its complaint or elsewhere, its intent to assert that the Counterclaim Plaintiffs infringe the '078 patent.

47. Allergan has never disavowed, in its complaint or elsewhere, its intent to assert that the Counterclaim Plaintiffs infringe the '873 patent.

48. Allergan has never disavowed, in its complaint or elsewhere, its intent to assert that the Counterclaim Plaintiffs infringe the '210 patent.

49. Allergan has never disavowed, in its complaint or elsewhere, its intent to assert that the Counterclaim Plaintiffs infringe the '337 patent.

50. Exela has made, and will continue to make, substantial preparation in the United States to manufacture, sell, and offer to sell Exela's 0.15% brimonidine tartrate ophthalmic solution.

51. Allergan caused the FDA to list the '078, '873, '210, and '337 patents in the Orange Book but did not assert those patents in its complaint, even though those patents involve the same technology and share substantial content with the '834 patent.

52. The totality of the circumstances support that a case or controversy exists with respect to the infringement, invalidity, and/or unenforceability of the '078, '873, '210, '834 and '337 patents.

53. To avoid legal uncertainty and to protect its substantial investment (and anticipated future investment) in Exela's 0.15% brimonidine tartrate ophthalmic solution, Counterclaim Plaintiffs seek declaratory-judgment relief with respect to the '078, '873, '210, '834 and '337 patents.

**COUNT I**
**(Declaratory Judgment of Noninfringement of the '078 Patent)**

49. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

50. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the noninfringement of the '078 patent, which requires a declaration of rights by this Court.

51. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '078 patent.

52. Counterclaim Plaintiffs are entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '078 patent.

**COUNT II**
**(Declaratory Judgment of Invalidity of the '078 Patent)**

53. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

54. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the invalidity of the '078 patent, which requires a declaration of rights by this Court.

55. The '078 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, et seq.

56. Counterclaim Plaintiffs are entitled to a declaratory judgment that the '078 patent is invalid.

**COUNT III**
**(Declaratory Judgment of Noninfringement of the '873 Patent)**

57. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

58. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the noninfringement of the '873 patent, which requires a declaration of rights by this Court.

59. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '873 patent.

60. Counterclaim Plaintiffs are entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '873 patent.

**COUNT IV**
**(Declaratory Judgment of Invalidity of the '873 Patent)**

61. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

62. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the invalidity of the '873 patent, which requires a declaration of rights by this Court.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

63. The '873 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, et seq.

64. Counterclaim Plaintiffs are entitled to a declaratory judgment that the '873 patent is invalid.

**COUNT V**
**(Declaratory Judgment of Noninfringement of the '210 Patent)**

65. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

66. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the noninfringement of the '210 patent, which requires a declaration of rights by this Court.

67. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '210 patent.

68. Counterclaim Plaintiffs are entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '210 patent.

**COUNT VI**
**(Declaratory Judgment of Invalidity of the '210 Patent)**

69. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

70. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the invalidity of the '210 patent, which requires a declaration of rights by this Court.

71. The '210 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, et seq.

72. Counterclaim Plaintiffs are entitled to a declaratory judgment that the '210 patent is invalid.

**COUNT VII**
**(Declaratory Judgment of Noninfringement of the '834 Patent)**

73. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

74. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the noninfringement of the '834 patent, which requires a declaration of rights by this Court.

75. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '834 patent.

76. Counterclaim Plaintiffs are entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '834 patent.

**COUNT VIII**
**(Declaratory Judgment of Invalidity of the '834 Patent)**

77. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

78. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the invalidity of the '834 patent, which requires a declaration of rights by this Court.

79. The '834 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, et seq.

80. Counterclaim Plaintiffs are entitled to a declaratory judgment that the '834 patent is invalid.

**COUNT IX**
**(Declaratory Judgment of Noninfringement of the '337 Patent)**

81. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

82. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the noninfringement of the '337 patent, which requires a declaration of rights by this Court.

83. Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '337 patent.

84. Counterclaim Plaintiffs are entitled to a declaratory judgment that the commercial manufacture, use, offer for sale, sale, or importation of Exela's 0.15% brimonidine tartrate ophthalmic solution does not infringe any valid or enforceable claim of the '337 patent.

## COUNT X
## (Declaratory Judgment of Invalidity of the '337 Patent)

85. Counterclaim Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint for Declaratory Judgment.

86. A case or controversy exists between Counterclaim Plaintiffs and Allergan concerning the invalidity of the '337 patent, which requires a declaration of rights by this Court.

87. The '337 patent is invalid for failure to meet the patentability requirements under 35 U.S.C. § 101, et seq.

88. Counterclaim Plaintiffs are entitled to a declaratory judgment that the '337 patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs respectfully request that the Court enter a Judgment and Order declaring that:

A. Counterclaim Plaintiffs do not infringe claims 1-18 of United States Patent No. 5,424,078;

B. the claims of United States Patent No. 5,424,078 are invalid;

C. the claims of United States Patent No. 5,424,078 are unenforceable;

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

D. Counterclaim Plaintiffs do not infringe claims 1-49 of United States Patent No. 6,562,873;

E. the claims of United States Patent No. 6,562,873 are invalid;

F. the claims of United States Patent No. 6,562,873 are unenforceable;

G. Counterclaim Plaintiffs do not infringe claims 1-34 of United States Patent No. 6,627,210;

H. the claims of United States Patent No. 6,627,210 are invalid;

I. the claims of United States Patent No. 6,627,210 are unenforceable;

J. Counterclaim Plaintiffs do not infringe claims 1-22 of United States Patent No. 6,641,834;

K. the claims of United States Patent No. 6,641,834 are invalid;

L. the claims of United States Patent No. 6,641,834 are unenforceable;

M. Counterclaim Plaintiffs do not infringe claims 1-10 of United States Patent No. 6,673,337;

N. the claims of United States Patent No. 6,673,337 are invalid;

O. the claims of United States Patent No. 6,673,337 are unenforceable;

P. this case is an exceptional case pursuant to 35 U.S.C. § 285 and the thus the Counterclaim Plaintiffs are entitled to their attorneys' fees, costs, and expenses; and

Q. Counterclaim Plaintiffs are entitled to any further relief that this Court may deem just, proper, and equitable.

DATED: May 10, 2007

Respectfully submitted,

HENNIGAN BENNETT & DORMAN LLP
FROMMER LAWRENCE & HAUG LLP

By [signature]
Mieke K. Malmberg
Attorneys for Defendants EXELA PHARMSCI, INC.; EXELA PHARM SCI PVT., LTD.; PADDOCK LABORATORIES, INC.; AND PHARMAFORCE, INC.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-30-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

## DEMAND FOR JURY TRIAL

Counterclaim Plaintiffs demand a jury trial of all issues in this action so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: May 10, 2007

Respectfully submitted,

HENNIGAN BENNETT & DORMAN LLP
FROMMER LAWRENCE & HAUG LLP

By [signature]
Mieke K. Malmberg
Attorneys for Defendants
EXELA PHARMSCI, INC.; EXELA PHARM SCI PVT., LTD.; PADDOCK LABORATORIES, INC.; and PHARMAFORCE, INC.

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

-31-

CV07-01967 R (RCX)

DEFENDANTS' ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

# EXHIBIT 1



US005424078A

# United States Patent [19]

Dziabo et al.

[11] Patent Number: 5,424,078

[45] Date of Patent: Jun. 13, 1995

[54] AQUEOUS OPHTHALMIC FORMULATIONS AND METHODS FOR PRESERVING SAME

[75] Inventors: **Anthony J. Dziabo**, El Toro; **Paul S. Ripley**, Irvine, both of Calif.

[73] Assignee: **Allergan, Inc.**, Irvine, Calif.

[21] Appl. No.: **694,640**

[22] Filed: **May 2, 1991**

**Related U.S. Application Data**

[63] Continuation-in-part of Ser. No. 277,791, Nov. 29, 1988.

[51] Int. Cl.[6] .................... **A61K 33/14**; A61K 31/19

[52] U.S. Cl. .................... **424/661**; 514/557; 514/912

[58] Field of Search .................... 424/661; 514/557, 912

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 32,672 | 5/1988 | Huth et al. | 252/95 |
| 2,436,134 | 2/1948 | Aston | 23/152 |
| 2,477,631 | 8/1949 | Levy | 8/105 |
| 3,123,521 | 3/1964 | Wentworth | 167/17 |
| 3,278,447 | 10/1966 | McNicholas | 167/17 |
| 3,591,515 | 7/1971 | Lovely | 252/187 |
| 3,819,828 | 6/1974 | McCoy | 424/71 |
| 3,910,296 | 10/1975 | Karageozian et al. | 134/2 |
| 4,084,747 | 3/1978 | Alliger | 424/65 |
| 4,104,190 | 8/1978 | Hartshorn | 252/187 R |
| 4,123,376 | 10/1978 | Gray | 252/99 |
| 4,456,510 | 6/1984 | Murakami | 204/101 |
| 4,459,217 | 7/1984 | Bogie | 252/174.14 |
| 4,499,077 | 2/1985 | Stockel et al. | 424/149 |
| 4,568,517 | 2/1986 | Kaspar et al. | 422/30 |
| 4,614,549 | 9/1986 | Ogunbuyi et al. | 134/19 |
| 4,618,444 | 10/1986 | Hudson et al. | 252/92 |
| 4,654,208 | 3/1987 | Stockel et al. | 424/78 |
| 4,689,215 | 8/1987 | Ratcliff | 424/53 |
| 4,690,773 | 9/1987 | Ogunbuyi et al. | 252/174.12 |
| 4,696,811 | 9/1987 | Ratcliff | 424/53 |
| 4,786,492 | 11/1988 | Ratcliff | 424/53 |
| 4,788,053 | 11/1988 | Ratcliff | 424/53 |
| 4,792,244 | 12/1988 | Ratcliff | 424/53 |
| 4,793,989 | 12/1988 | Ratcliff | 424/53 |
| 4,837,009 | 6/1989 | Ratcliff | 424/53 |
| 4,851,213 | 7/1989 | Ratcliff | 424/53 |
| 4,855,135 | 8/1989 | Ratcliff | 424/127 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0168253 | 1/1986 | European Pat. Off. . |
| 0196075 | 10/1986 | European Pat. Off. . |
| 0199385 | 10/1986 | European Pat. Off. . |
| 0279401 | 2/1988 | European Pat. Off. . |
| 1269677 | 4/1982 | United Kingdom . |
| 2139260 | 11/1984 | United Kingdom . |
| 2187748 | 9/1987 | United Kingdom . |
| WO8504107 | 9/1985 | WIPO . |
| WO8605695 | 10/1986 | WIPO . |

*Primary Examiner*—Zohreh Fay
*Attorney, Agent, or Firm*—Frank J. Uxa

[57] **ABSTRACT**

Stabilized chlorine dioxide is a preservative for ophthalmic formulations. The stabilized chlorine dioxide, when employed as a preservative ophthalmic formulations is preferably present in an amount of from about 0.0002 or about 0.002 to about 0.02 weight/volume percent. The aqueous ophthalmic formulations, in addition to the stabilized chlorine dioxide and the water which functions as a vehicle for the formulations, contains an ophthalmically acceptable tonicity component effective to maintain the osmolality of the formulation at least about 200 mOsmol/kg, and a buffer to maintain the pH of the ophthalmic formulation within an acceptable physiological range. A method for preserving aqueous ophthalmic formulations utilizing stabilized chlorine dioxide is also set forth.

**18 Claims, No Drawings**



# AQUEOUS OPHTHALMIC FORMULATIONS AND METHODS FOR PRESERVING SAME

## Related Application

This application is a continuation-in-part of application Ser. No. 277,791, filed Nov. 29, 1988. The disclosure of this prior application is hereby incorporated in its entirety herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to preserving ophthalmic formulations or compositions, such as solutions. More particularly it relates to the use of stabilized chlorine dioxide to preserve ophthalmic formulations.

The use of contact lens has become widespread as a replacement for conventional eye glasses because of the improved vision obtained by the wearer or for aesthetic reasons. Contact lenses accumulate microorganisms and cellular debris from the eye. Thus, the lenses must be periodically removed and cleaned to prevent irritation of the eye or infection. Formulations used in lens care must be preserved by some means to interdict introducing microbial contaminants onto contact lenses or into the eye. Disinfecting preparations are part of the regimen indicated for contact lens care.

Numerous ophthalmic formulations have heretofore been used with lenses. The composition of the ophthalmic formulation will often be dictated by the polymeric materials employed in the fabrication of the contact lens. Because of the chemical composition of most ophthalmic formulations, the contact lenses treated, e.g., disinfected, cleaned, soaked, and the like, in such formulations must be rinsed prior to placement in the wearer's eye to prevent irritation of the eye.

Problems have also been encountered in the use of the prior art ophthalmic formulations for the treatment of contact lenses in that such formulations often become contaminated or deteriorate when exposed to the atmosphere once the seal of he formulation container has been broken. Microorganisms and/or other impurities often contaminate the formulation which requires that the formulation be discarded. Thus, there exists a need for aqueous ophthalmic compositions having extended lives. In other words, there is a need for ophthalmic formulations which are effectively preserved without being irritating or otherwise damaging to the eye. It is to such preserved ophthalmic formulations and methods for preserving ophthalmic formulations that the present invention is directed.

Ratcliff U.S. Pat. Nos. 4,696,811 and 4,689,215 disclose the use of stabilized chlorine dioxide for the treatment and prevention of oral disease, for the reduction of malodor, as an anti-plaque agent, an anti-gingivitis and anti-peridontitis agent, as well as a denture soak. These two patents disclose the use of 0.005 percent to 0.02 percent stabilized chlorine dioxide in sterilized water as a contact lens soaking formulation. However, the patents are void of any teaching or suggestion that stabilized chlorine dioxide can be incorporated into an ophthalmic formulation as a preservative for such a formulation. In addition, the patents do not disclose the use of buffer or tonicity components.

Stockel et al U.S. Pat. No. 4,499,077 discloses an antimicrobial composition for soft contact lenses including an oxidizing agent such as an oxyhalogen compound, e.g., stabilized chlorine dioxide, or hydrogen peroxide, and a polymeric germicide, e.g., a quaternary ammonium polymer or an amino and/or imino polymer or salts thereof. Stockel et al U.S. Pat. No. 4,654,208 discloses an antimicrobial composition for contact lenses including an aqueous solution of a germicidal polymeric nitrogen compound and an oxidizing agent, e.g., chlorine dioxide, stabilized chlorine dioxide or hydrogen peroxide, to potentiate the activity of the germicidal polymeric nitrogen compound at low concentrations. The Stockel et al patents characterize the "polymeric germicides" and the "germicidal polymeric nitrogen compounds" as positively charged, nitrogen-containing cationic polymers, such as certain quaternary ammonium polymers and polymeric amino and/or imino compounds, e.g., polydiguanides. Neither of these Stockel et al patents relate to ophthalmic compositions without such positively charged, nitrogen-containing cationic polymers.

## SUMMARY OF THE INVENTION

Broadly, the present invention relates to aqueous ophthalmic formulations containing an effective minor amount of stabilized chlorine dioxide to effectively preserve the ophthalmic formulation; a buffer component and a tonicity component. The present ophthalmic formulations are effectively preserved and can be used, e.g., in the contact lens care context, without causing irritation or discomfort to the eyes of the user of the formulations.

In one aspect, the present invention relates to aqueous ophthalmic formulations or compositions, for example, solutions, comprising water, e.g., as a vehicle; an amount, preferably from about 0.0002 or about 0.002 to about 0.02 weight/volume percent, of stabilized chlorine dioxide effective to act as the sole preservative in the formulation; at least one buffer component in an amount effective to maintain the pH of the formulation in the range of about 6.8 to about 8; and at least one tonicity component in an amount effective to maintain the formulation at an osmolality of at least about 200 mOsmol/kg, especially at a tonicity value substantially corresponding to the tonicity value of fluids of an eye. The present ophthalmic formulations preferably include substantially no, i.e., are substantially free of, germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers, for example, the quaternary ammonium polymers, the polymeric amino and/or imino compounds and their salts disclosed in the above-noted Stockel et al patents. More preferably, the present ophthalmic formulations are substantially free of any such positively charged, nitrogen-containing cationic polymers. To provide the ophthalmic formulations with a pH substantially corresponding to the pH of the fluids of the eye, the pH of the ophthalmic formulation can be adjusted, if required, by addition of an acid or a base.

Methods for preserving ophthalmic formulations are also disclosed.

## DETAILED DESCRIPTION

Stabilized chlorine dioxide has been found to be effective as a sole preservative in preserving ophthalmic formulations or compositions. Thus, the present formulations include stabilized chlorine dioxide in an amount effective to act as the sole preservative in the formulations. Although one or more other preservatives may be present, it is preferred that the formulations include no other effective preservatives. In a particularly useful

embodiment, the present formulations preferably include no germicidally effective amount of any positively charged, nitrogen-containing cationic polymers, such as those disclosed in the above-noted Stockel et al patents. Still more preferably, the present formulations are substantially free of any quaternary ammonium compounds. Since stabilized chlorine dioxide has been found to be effective as the sole preservative for ophthalmic formulations, the presence of such nitrogen-containing cationic polymers and quaternary ammonium compounds, which can result in eye irritation or discomfort, is not needed.

The preserving amount of stabilized chlorine dioxide incorporated into an ophthalmic formulation (that is, to prevent microbial growth in the formulation) can vary widely but will generally be an amount sufficient to preserve the composition, for example, the physical and/or chemical integrity of the formulation. The presence of stabilized chlorine dioxide enhances, even greatly enhances, or prolongs the useful or shelf life of the present ophthalmic formulations.

The present formulations preserved with stabilized chlorine dioxide can be used in treating or caring for contact lenses made of a wide variety of different materials, such as different polymeric materials, without any substantial degradation of the lenses.

The thus treated or cared for contact lenses, such as lenses cleansed and soaked using an ophthalmic formulation in accordance with the present invention, can often be placed directly into the wearer's eye without the additional requirement of rinsing to remove residual formulation therefrom. Thus, contamination of the treated or cared for lenses can be substantially eliminated prior to placement in the wearer's eye.

Further, an effective disinfectant can be provided which effectively kills microorganisms which may be present on ophthalmic devices, for example, contact lenses. The disinfectant comprises at least 0.02 weight/volume percent stabilized chlorine dioxide as the disinfecting agent, for example, as the sole disinfecting agent.

The term "stabilized chlorine dioxide" is well known in the industry and by those skilled in the art. Stabilized chlorine dioxide includes one or more chlorine dioxide precursors such as one or more chlorine dioxide-containing complexes and/or one or more chlorite-containing components and/or one or more other entities capable of decomposing or being decomposed in a liquid, preferably aqueous, medium to form chlorine dioxide. U.S. Pat. No. No. 2,271,242 discloses a form of stabilized chlorine dioxide and a method for producing same which can be used as a preservative for aqueous ophthalmic solutions or as a disinfectant for ophthalmic devices. The disclosure of this patent is hereby incorporated in its entirety by reference herein. The manufacture or production of certain stabilized chlorine dioxide products is described in McNicholas U.S. Pat. No. 3,278,447, the disclosure of which is hereby incorporated in its entirety by reference herein. A commercially available stabilized chlorine dioxide which can be utilized in the practice of the present invention is the proprietary stabilized chlorine dioxide of BioCide International, Inc. of Norman, Okla., sold under the trademark Purogene. Other suitable stabilized chlorine dioxide products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Antheium Dioxide by International Dioxide, Inc.

One aspect of the present invention resides in the use of a preserving amount of stabilized chlorine dioxide in aqueous ophthalmic formulations. It has been found that ophthalmic devices contacted with an aqueous ophthalmic formulation containing a preserving amount of stabilized chlorine dioxide and effective amounts of at least one of each of buffer and tonicity components often do not have to be rinsed to remove residual formulation prior to use, e.g., in the eye. Similarly, when such formulations are employed in a regimen of contact lens care, the contact lenses can often be placed in a wearer's eye, without rinsing, without irritation or adverse effects occurring to the tissue of the eye, and without discomfort.

The amount of stabilized chlorine dioxide incorporated in the ophthalmic formulation as a preservative can vary widely provided that such amount effectively prevents microbial growth in the formulation. The amount of stabilized chlorine dioxide included in the formulation is preferably in the range of about 0.0002 or about 0.002 to about 0.02, more preferably about 0.004 to about 0.01, weight/volume percent of the formulation.

In order to provide that the aqueous ophthalmic formulation containing a preserving amount of stabilized chlorine dioxide does not irritate one's eye, it is important that the ophthalmic formulation have a pH value in the range of about 6.8 to about 8, preferably about 7 to about 7.5, and still more preferably so that the pH of the ophthalmic formulation substantially corresponds to the pH value of the fluids in the eye, in particular, the human eye.

To stabilize or maintain the ophthalmic formulation at the desired pH, an effective minor amount of at least one buffer component is incorporated into the ophthalmic formulation. The effective minor amount of buffer component employed to buffer or maintain the formulation at the desired pH can vary widely and depends to a large degree on the particular buffer component employed, as well as the chemical composition of the ophthalmic formulation. However, desirable results have been obtained when the amount of buffering component incorporated into the aqueous ophthalmic formulation to stabilize the formulation at an acceptable physiological pH is in the range of about 0.05 to about 1 weight/volume percent of the formulation.

Any suitable buffer component can be employed which is compatible with the other ingredients of the ophthalmic formulation, and which does not have deleterious or toxic properties which could harm the eye. Examples of suitable ophthalmically acceptable buffer components include acetate buffers, citrate buffers, phosphate buffers, borate buffers and mixtures thereof. Specific buffer components useful in the present invention include boric acid, sodium borate, sodium phosphates, including mono, di- and tri-basic phosphates, such as sodium phosphate monobasic monohydrate and sodium phosphate dibasic heptahydrate, and mixtures thereof. It should be noted that any other suitable ophthalmically acceptable buffer components can be employed to maintain the pH of the ophthalmic formulation so that the ophthalmic formulation is provided with an acceptable pH, and the before-mentioned buffer components are merely examples of such buffer components.

When it is determined that the buffered ophthalmic formulation does not have the desired pH value, the pH of the aqueous buffered ophthalmic formulation can be

adjusted by the addition of an effective amount of either a base or an acid, as the case may be. Any suitable base or acid can be employed to adjust the pH of the aqueous buffered ophthalmic formulation which does not provide the ophthalmic formulation with toxic or deleterious properties which could harm either ophthalmic devices or the eye. An example of a base which can be used to adjust the pH of the aqueous buffered ophthalmic formulation is 1N sodium hydroxide; and an example of an acid which can be used to adjust the pH of the aqueous buffered ophthalmic formulation is 1N hydrochloric acid.

Further, in order to provide that the present ophthalmic formulations do not irritate the eye, e.g., the eye of the wearer of the contact lens treated using such formulations, it is important that the ophthalmic formulations have an osmolality (a measure of tonicity) of at least about 200 mOsmol/kg, preferably in the range of about 200 to about 350 or about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the formulation substantially corresponds to the tonicity of the fluids of the eye, in particular the human eye.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the ophthalmic formulation and do not have deleterious or toxic properties which could harm the eye. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The amount of ophthalmically acceptable tonicity component utilized can vary widely. In one embodiment, the tonicity component is preferably present in the ophthalmic formulation in an amount in the range of about 0.5 to about 0.9 weight/volume percent of the formulation.

Typical of ophthalmically acceptable inorganic salt tonicity components are alkali metal chlorides and alkaline earth metal chlorides, such as sodium chloride, potassium chloride, calcium chloride and magnesium chloride.

The formulations of the present invention include an ophthalmically acceptable medium, preferably an ophthalmically acceptable liquid aqueous medium. This medium often acts as a vehicle or carrier, e.g., as a solvent, for the other components in the formulation. A material is "ophthalmically acceptable" if the material can be placed into a mammalian eye without causing any substantial damage or harm to the eye. One particularly useful ophthalmically acceptable medium is water. Preferably, the medium, and in fact the entire formulation, is sterile.

As previously set forth, the stabilized chlorine dioxide can also be utilized as a disinfecting agent in a disinfectant composition. When formulating such a disinfectant composition a suitable vehicle, such as sterilized water, is employed and at least about 0.02 weight/volume percent stabilized chlorine dioxide is incorporated as the disinfecting agent. While the amount of stabilized chlorine dioxide employed as the disinfecting agent can vary widely, desirable results can be obtained when the stabilized chlorine dioxide utilized as the disinfecting agent is present in the disinfectant composition in an amount of from about 0.02 to 2.0 weight/volume percent, desirably from about 0.04 to about 0.1 weight/volume percent, and more desirably from about 0.05 to about 0.08 weight/volume percent.

One or more additional components can be included in the present formulations based on the particular application for which the formulations are made. Thus, the present formulations can be made up as disinfecting compositions, cleaning compositions, wetting compositions, conditioning compositions, soaking compositions and the like. Also, the present formulations can be made up to be useful in performing two or more contact lens caring operations. For example, a disinfecting/cleaning formulation, or a cleaning/conditioning composition or even an all purpose lens care formulation can be made up and such multi-functional formulations are included within the scope of the present invention.

The additional component or components included in the present formulation are chosen to impart or provide at least one beneficial or desired property to the formulations. Such additional components may be selected from components which are conventionally used in one or more contact lens care compositions. Examples of such additional components include cleaning agents, wetting agents, nutrient agents, sequestering agents, viscosity builders, contact lens conditioning agents, antioxidants, and the like. These additional components are each included in the present formulations in an amount effective to impart or provide the beneficial or desired property to the compositions. For example, such additional components may be included in the present formulations in amounts similar to the amounts of such components used in other, e.g., conventional, contact lens care products.

Examples of useful wetting agents include polyvinyl alcohol, polyoxamers, polyvinyl pyrrolidone, hydroxypropyl methyl cellulose and mixtures thereof.

Examples of useful sequestering agents include disodium ethylene diamine tetraacetate, alkali metal hexametaphosphate, citric acid, sodium citrate and mixtures thereof.

Examples of useful viscosity builders include hydroxyethyl cellulose, hydroxymethyl cellulose, polyvinyl pyrrolidone, polyvinyl alcohol and mixtures thereof.

Examples of useful antioxidants include sodium metabisulfite, sodium thiosulfate, N-acetylcysteine, butylated hydroxyanisole, butylated hydroxytoluene and mixtures thereof.

The present formulations may be used in the care of a contact lens, e.g., to disinfect the lens, to preserve the lens, to otherwise treat the lens and/or to make wearing the lens more safe and comfortable. The present formulations, made up appropriately by blending or combining the various components of the formulation together, may be used in conventional contact lens care regimens by using the present formulations, in place of prior conventional compositions. In many instances, these contact lens care regimens involve contacting the lens with the present formulation in an amount, and at conditions, effective to obtain the beneficial or desired contact lens care result.

For example, a contact lens to be disinfected may be contacted with a disinfecting composition, e.g., aqueous solution, according to the present invention, preferably at a temperature in the range of about 0° C. to about 100° C., more preferably in the range of about 10° C. to about 60° C. and still more preferably in the range of about 15° C. to about 30° C. Contacting at or about ambient temperature is very convenient and useful. The contacting preferably occurs at or about atmospheric

pressure. The contacting preferably occurs for a time to substantially disinfect the lens being treated. Such contacting times can be in the range of about 1 minute to about 12 hours or more.

After this contacting, the disinfected contact lens can be taken from the composition and placed directly in an eye, e.g., a human eye, for safe and comfortable wear. Alternately, after being disinfected, the contact lens can be contacted with a second medium, e.g., a liquid aqueous medium such as a preserved isotonic saline solution in accordance with the present invention, prior to being placed in the eye of the wearer of the disinfected contact lens.

The contact lens care formulations disclosed herein are adaptable for use in most types of contact lens care equipment, such as ultrasonic cleaners and the like.

In order to more fully describe the present invention the following examples are set forth. However, the examples are merely illustrative in purpose and are not intended to be limiting upon the inventive concept as set forth in the appended claims.

## EXAMPLE I

A series of experiments were performed to determine the antimicrobial properties of a borate buffered saline solution preserved with stabilized chlorine dioxide. The stabilized chlorine dioxide employed was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Oklahoma, sold under the trademark Purogene. The concentration of the stabilized chlorine dioxide added to the borate buffered saline solution was varied.

The borate buffered saline solution had the following composition.

| Ingredients | Percent (Weight/Volume) |
|---|---|
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified water USP* | To 100 ml |

*Quantity sufficient (Q.S.) to provide 100 ml of solution.

The pH of the buffered solution was adjusted by the addition of either hydrochloric acid NF or sodium hydroxide NF so that the pH of the saline solution was within the range of about 7.7 to 7.9.

The stabilized chlorine dioxide was added to the borate buffered saline solution in the following concentrations:

| Percent (weight/volume) |
|---|
| 0.005 |
| 0.004 |
| 0.003 |
| 0.002 |

Each of the above concentrations of stabilized chlorine dioxide exhibited the desired preservative properties for the borate buffered saline solution. Further, all four concentrations of the stabilized chlorine dioxide exhibited good antimicrobial activity, with the three highest concentrations achieving total bacterial kill after 24 hours. Tests indicated that total kill of bacteria was achieved by the solution containing 0.002 weight/volume percent stabilized chlorine dioxide after seven days.

## EXAMPLE II

To compare the preservative efficacy of stabilized chlorine dioxide on a borate buffered ophthalmic solution, a preserving amount of stabilized chlorine dioxide having a raw material age of 54 months was utilized in one sample; and a similar preserving amount of stabilized chlorine dioxide having a raw material age of about 2 months was utilized in a second sample. Each of the samples of stabilized chlorine dioxide was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Okla., sold under the trademark Purogene. No aging effect was detected between the two samples and their use as a preservative for borate buffered saline solutions. However, the aged stabilized chlorine dioxide (54 month age) possessed a slightly superior activity against the yeast *C. albicans.*

## EXAMPLE III

A preservative efficacy test was performed on a borate buffered saline solution having a composition similar to that of Example I wherein 0.005 weight/volume percent stabilized chlorine dioxide was added to the borate buffered solution and the resulting mixture stored for 90 days at 45° C. At the end of the storage period, the sample was examined and it was determined that the stabilized chlorine dioxide was an effective preservative for a borate buffered saline solution.

## EXAMPLE IV

An experiment was conducted to determine if a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide met the USP Efficacy criteria for ophthalmics as set forth in the U.S. Pharmacopeia (USP XXI, 1985). The stabilized chlorine dioxide employed was the proprietary stabilized chlorine dioxide of Bio-Cide International, Inc. of Norman, Okla., sold under the trademark Purogene. The criteria for preservatives requires that a 99.9% reduction of microbes challenge occur within 14 days of contact with the product being tested; and that no growth of yeast and fungi occur.

The borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide met the before-mentioned criteria for preservatives. However, a control solution of the borate buffered saline solution which did not contain the stabilized chlorine dioxide present did not meet this USP Efficacy criteria for ophthalmics.

## EXAMPLE V

A 21 day subacute eye toxicity study in rabbits was conducted using a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide. The stabilized chlorine dioxide was as identified in Example I. The borate buffered saline solution containing the stabilized chlorine dioxide had the following composition:

| Ingredients | Percent (weight/volume) |
|---|---|
| Stabilized Chlorine Dioxide | 0.005 |
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified Water USP* | To 100 ml |

*Quantity sufficient (Q.S.) to provide 100 ml solution.



The pH of the above buffered saline solution was adjusted so that the pH of the solution was between 7.7 and 7.9.

The ocular effects of the buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide were evaluated in rabbit eyes in conjunction with Permalens soft contact lenses. Test eye lenses were subjected to daily cleaning, rinsing, and overnight soaking with the borate buffered saline solution containing stabilized chlorine dioxide. Control eye lenses were subjected to the same regimen using preserved normal saline solution. Lenses were fit directly to the eye and worn daily for a minimum of 8 hours for 21 consecutive days.

Eyes were observed daily for discomfort at lens insertion and for gross ocular reactions at lens removal. Slit lamp biomicroscopy was performed weekly. Pachometry and rose bengal staining were performed at the conclusion of the experiment. Histopathological evaluation was performed on eyes from three animals. No significant ocular reactions were noted.

The following is a summation of the results of the experiments set forth above:

A. Discomfort: No ocular discomfort was noted at lens insertion throughout the study.

B. Gross Observations: At the time of lens removal, +1 hyperemia was noted in one control eye on Day 17. No other ocular reactions were noted.

C. Slit Lamp Examinations (Days 7, 14 and 21): No ocular reactions were noted in any rabbit.

D. Corneal Metabolism (Days 7, 14 and 21).: No test related changes in corneal metabolism, as measured by corneal thickness, were noted throughout the study.

E. Cytotoxicity (Day 21): Rose bengal staining appeared normal in both eyes of all rabbits, indicating that corneal epithelial cell vitality was not affected by the solution tested.

F. Histopathological Evaluation: No microscopic changes which can be specifically related to the test regimen were apparent among the eyes and extraocular tissues examined. There were no predictable microscopic differences observed when comparing the test eyes and extraocular tissues with the control eyes and extraocular tissues.

The above data indicates that a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide, in conjunction with Permalens soft contact lenses, is not discomforting, irritating, toxic or cytotoxic to rabbit eyes following 21 consecutive days of testing.

## EXAMPLE VI

A 1 day acute eye toxicity and cytotoxicity study in rabbits was conducted using a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide. The stabilized chlorine dioxide was as identified in Example I. The borate buffered saline solution containing the stabilized chlorine dioxide had the following composition:

| Ingredients | Percent (weight/volume) |
|---|---|
| Stabilized Chlorine Dioxide | 0.005 |
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified Water USP* | To 100 ml |

*Quantity Sufficient (Q.S.) to provide 100 ml solution.

The pH of the above buffered saline solution was adjusted so that the pH of the solution was between 7.7 and 7.9.

The ocular effects of the buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide were evaluated in rabbit eyes in conjunction with Permalens soft contact lenses and multiple topical instillations. Test eye lenses were subjected to overnight soaking in the borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide followed by direct fit to the eye and 8 hours of wear with topical instillations of the test solution performed at a rate of one drop every one-half hour. Eyes were observed for discomfort and/or gross ocular reactions at lens fit, at each instillation and at lens removal. Slip lamp biomicroscopy was performed following lens removal. Control eyes were subjected to the same regimen using preserved normal saline.

The following is a summation of the results of the experiments set forth above:

A. Discomfort: No ocular discomfort was noted at lens fit or at any instillation period throughout the study.

B. Gross Observations: No ocular reactions were noted at any instillation period or at lens removal.

C. Slip Lamp Examinations: No ocular reactions were noted in any rabbit.

D. Cytotoxicity Rose bengal staining appeared normal in both eyes of all rabbits, indicating that epithelia cell vitality was not affected by the solutions tested.

The above data indicates that a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide, in conjunction with Permalens soft contact lenses, is not discomforting, irritating, toxic or cytotoxic to rabbit eyes following this exaggerated method of testing.

## EXAMPLE VII

An acute eye toxicity and cytotoxicity study in rabbits was conducted using a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide. The stabilized chlorine dioxide was that identified in Example I. The borate buffered saline solution containing the stabilized chlorine dioxide had the following composition:

| Ingredients | Percent (weight/volume) |
|---|---|
| Stabilized Chlorine Dioxide | 0.005 |
| Sodium Chloride USP | 0.85 |
| Boric Acid NF | 0.10 |
| Purified water USP* | To 100 ml |

*Quantity Sufficient (Q.S.) to provide 100 ml solution.

The pH of the above buffered saline solution was adjusted so that the pH of the solution was between 7.7 and 7.9.

The ocular effects of the buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide were evaluated in rabbit eyes following 1 day of multiple topical instillations performed at a

rate of one drop every one-half hour for 8 hours. Test eyes were treated with the borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide and control eyes were treated with a preserved normal saline solution.

Eyes were observed for discomfort and/or gross ocular reactions at each instillation. Slit lamp biomicroscopy was performed following the last instillation period. No ocular reactions were noted in the test eyes.

The following is a summation of the results of the experiments set forth above:

A. Discomfort: +1 discomfort, lasting up to 30 seconds, was noted in the control eye at 3 of 48 instillations involving two of three rabbits.

B. Gross Observations: No ocular reactions were noted at any instillation period.

C. Slit Lamp Examinations: No ocular reactions were noted in any rabbit.

D. Cytotoxicity: Rose bengal staining appeared normal in both eyes of all rabbits, indicating that epithelial cell vitality was not affected by the preparations tested.

The above data indicates that a borate buffered saline solution containing 0.005 weight/volume percent stabilized chlorine dioxide is not discomforting, irritating, toxic or cytotoxic to rabbit eyes following this exaggerated method of testing.

## EXAMPLE VIII (COMPARATIVE)

A series of compositions were prepared using sterilized distilled water and varying concentrations of the proprietary stabilized chlorine dioxide sold by Bio-Cide International, Inc. of Norman, Okla., under the trademark Purogene.

Each of these compositions was tested to determine its pH and osmolality. After the compositions were prepared, they were allowed to equilibrate overnight before the pH and osmolality were determined.

Results of these tests were as follows:

| Concentration of Stabilized Chlorine Dioxide, (w/v) % | pH | Osmolality, mOsmol/kg |
|---|---|---|
| 0.005 | 6.4 | 5 |
| 0.02 | 6.8 | 13 |
| 0.1 | 8.6 | 55 |
| 0.2 | 9.0 | 105 |

These results indicate that simple solutions of stabilized chlorine dioxide in sterilized water have varying pHs, which are often outside the range of about 6.8 to about of the present compositions. Also, such simple solutions have tonicity values or osmolalities substantially outside the range of at least about 200 mOsmol/kg of the present compositions. Put another way, such simple aqueous stabilized chlorine solutions are not effective to provide preserved compositions which are ophthalmically acceptable or compatible with the eye so as to be used without eye discomfort or irritation.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced within the scope of the following claims.

What is claimed is:

1. A method for preserving an aqueous ophthalmic formulation so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic formulation stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic formulation, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality of at least about 200 mOsmol/kg, provided that said aqueous ophthalmic formulation is ophthalmically acceptable and no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic formulation.

2. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.

3. The method of claim 1 wherein said stabilized chlorine dioxide is present in said aqueous ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.

4. The method of claim 1 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said aqueous ophthalmic formulation at a pH in the range of about 7 to about 7.5.

5. The method of claim 1 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said aqueous ophthalmic formulation at an osmolality in the range of about 200 to about 400 mOsmol/kg.

6. The method of claim 1 wherein said aqueous ophthalmic formulation is a solution.

7. A method for preserving an aqueous ophthalmic solution so as to enhance the shelf life thereof comprising incorporating into said aqueous ophthalmic solution stabilized chlorine dioxide in an amount effective to act as the sole preservative in said aqueous ophthalmic solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said aqueous ophthalmic solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said aqueous ophthalmic solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said aqueous ophthalmic solution is ophthalmically acceptable and substantially no germicidally effective amounts of any positively charged, nitrogen-containing cationic polymers are incorporated into said aqueous ophthalmic solution.

8. A preserved ophthalmic formulation comprising an ophthalmically acceptable aqueous medium and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically acceptable aqueous medium, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality of at least about 200 mOsmol/kg, provided that said preserved ophthalmic formulation is ophthalmically acceptable and is free of germicidally effective

amounts of any positively charged, nitrogen-containing cationic polymers.

9. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.0002 to about 0.02 weight/volume percent.

10. The preserved ophthalmic formulation of claim 8 wherein said stabilized chlorine dioxide is present in said preserved ophthalmic formulation in an amount in the range of about 0.004 to about 0.01 weight/volume percent.

11. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is selected from the group consisting of alkali metal chlorides and alkaline earth metal chlorides and mixtures thereof.

12. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises sodium chloride.

13. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component comprises an alkaline earth metal salt selected from the group consisting of calcium chloride and magnesium chloride and mixtures thereof.

14. The preserved ophthalmic formulation of claim 8 wherein said at least one buffer component is selected from the group consisting of potassium phosphates, boric acid, sodium borate, sodium phosphates and mixtures thereof.

15. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable buffer component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at a pH in the range of about 7 to about 7.5.

16. The preserved ophthalmic formulation of claim 8 wherein said at least one ophthalmically acceptable tonicity component is present in an amount effective to maintain said ophthalmically acceptable aqueous medium at an osmolality in the range of about 200 to about 400 mOsmol/kg.

17. The preserved ophthalmic formulation of claim 8 which is a solution.

18. A preserved ophthalmic solution comprising an ophthalmically acceptable aqueous solution and, included therein, stabilized chlorine dioxide in an amount effective to act as the sole preservative in said ophthalmically aqueous acceptable solution in the range of about 0.002 to about 0.02 weight/volume percent, at least one ophthalmically acceptable buffer component in an amount effective to maintain said ophthalmically acceptable aqueous solution at a pH in the range of about 6.8 to about 8, and at least one ophthalmically acceptable tonicity component in an amount effective to maintain said ophthalmically acceptable aqueous solution at an osmolality in the range of about 200 to about 400 mOsmol/kg, provided that said preserved ophthalmic solution is ophthalmically acceptable and is free of germicidally effective amounts of any positively charged, nitrogen-containing polymers.

* * * * *

# EXHIBIT 2



(12) **United States Patent**
**Olejnik et al.**

(10) Patent No.: **US 6,562,873 B2**
(45) Date of Patent: ***May 13, 2003**

(54) COMPOSITIONS CONTAINING THERAPEUTICALLY ACTIVE COMPONENTS HAVING ENHANCED SOLUBILITY

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charleston, MA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/903,962**

(22) Filed: **Jul. 10, 2001**

(65) **Prior Publication Data**

US 2002/0071874 A1 Jun. 13, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/218,206, filed on Jul. 14, 2000

(51) **Int. Cl.**[7] .................... A61K 47/32; A61K 9/00
(52) **U.S. Cl.** .................... 514/772.4; 514/772.6; 424/400
(58) **Field of Search** .................... 514/772.4, 772.6; 424/400

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,278,447 A | 10/1966 | McNicholas | |
| 3,890,319 A | 6/1975 | Danielwicz et al. | |
| 4,530,920 A | 7/1985 | Nestor et al. | |
| 4,806,556 A | 2/1989 | Portoghese | |
| 5,021,416 A | 6/1991 | Gluchowski | |
| 5,202,128 A | 4/1993 | Morella et al. | |
| 5,352,796 A | 10/1994 | Hoeger et al. | |
| 5,459,133 A | 10/1995 | Neufeld | |
| 5,703,077 A | 12/1997 | Burke et al. | |
| 5,719,197 A * | 2/1998 | Kanios et al. | 514/772.6 |
| 5,725,887 A | 3/1998 | Martin et al. | |
| 5,814,638 A | 9/1998 | Lee et al. | |
| 5,834,502 A | 11/1998 | Cheng et al. | |
| 5,994,110 A | 11/1999 | Mosbach et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2048315 | 2/1992 |
| EP | 0609961 | 8/1994 |
| WO | 94/16685 | 8/1994 |
| WO | 98/47878 | 10/1998 |
| WO | 99/43299 | 9/1999 |
| WO | 99/51273 | 10/1999 |
| WO | 0012137 | 3/2000 |
| WO | 0019981 | 4/2000 |

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Blessing Fubara
(74) *Attorney, Agent, or Firm*—Stout, Uxa, Buyan & Mullins LLP; Frank J. Uxa

(57) **ABSTRACT**

Compositions which include therapeutically active components, solubility enhancing components other than cyclodextrins, and oxy-chloro components, wherein the oxy-chloro components are substantially effective as preservatives. In one embodiment, the oxy-chloro components are useful for preserving the therapeutically active components. In one embodiment, the oxy-chloro components include chlorite components. In a useful embodiment, the solubility enhancing components include carboxymethylcellulose.

**49 Claims, 1 Drawing Sheet**



U.S. Patent May 13, 2003 US 6,562,873 B2

SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
4000
3500
3000
2500
2000
1500
1000
500
0
7
7.5
8
8.5
9
9.5
10
10.5
pH
0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC

-41- Exhibit 2

# COMPOSITIONS CONTAINING THERAPEUTICALLY ACTIVE COMPONENTS HAVING ENHANCED SOLUBILITY

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application No. 60/218,206 filed Jul. 14, 2000.

## BACKGROUND OF THE INVENTION

The present invention relates to compositions containing therapeutically active components having enhanced solubility. More particularly, the invention relates to compositions which include therapeutically active components (TACs) and components effective to enhance the solubility of the TACs at therapeutically effective concentrations.

TACs in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration. Additionally, the dispensed or administered TACs should be soluble in the biological system or environment into which they are administered, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Furthermore, solubilized TACs provide other benefits, for example, reduced irritation to tissues that interact with TACs.

It is sometimes necessary to include solubilizing agents in the compositions to solubilize the TACs. However, the inclusion of solubilizing agents may reduce the effectiveness of the preservatives in the compositions.

For example, cyclodextrins are widely known in the literature to increase the solubility of poorly water soluble therapeutically active components. However, typical preservatives are rendered relatively ineffective by cyclodextrins at normal concentrations in these compositions.

There continues to be a need to provide new compositions containing TACs.

## BRIEF SUMMARY OF THE INVENTION

New TAC-containing compositions have been discovered. The present compositions provide for enhanced TAC solubility substantially without detrimentally affecting the effectiveness of the preservative or preservatives being employed. Solubility enhancing components (SECs) have been found which very effectively increase the solubility of the TACs in the present compositions, and preferably in the biological systems or environments into which the components are introduced. Also, preferably, such solubilization allows the provision of more reliable and reproducible dosage forms of the drugs. This solubility enhancement in accordance with the present invention is achieved substantially without degrading preservative effectiveness. In addition, TAC-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the TAC's and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions include oxy-chloro components which are effective in at least assisting in preserving the compositions without detrimentally affecting the TACs and substantially without being detrimentally affected by the SECs. Moreover, the present oxy-chloro components provide preservative action with reduced or even substantially no harm or irritation to the tissues to which the present compositions are administered.

The present SEC's preferably are effective in solubilizing the TACs in the environment to which they are introduced, for example, a biological environment. Such solubilization preferably facilitates the advantageous transport of TACs across lipid membranes.

Soluble TACs for use in the present compositions include those components, e.g., compounds, mixtures of compounds, mixtures of other materials, useful to provide a therapeutic benefit or effect when administered to a patient, e.g. a human patient. The TACs useful in this invention include, without limitation, antibacterials, antihistamines, decongestants, antiinflammatories, antiparasitics, miotics, anticholinergics, adrenergics, antivirals, local anesthetics, antifungals, amoebicidals, trichomonocidals, analgesics, mydriatics, antiglaucoma drugs, carbonic anhydrase inhibitors, ophthalmic diagnostic agents, ophthalmic agents used as adjuvants in surgery, chelating agents, antineoplastics, antihypertensives, muscle relaxants, diagnostics and the like and mixtures thereof. Specific examples of such TACs are conventional and well known in the art.

In one embodiment, the TACs include adrenergic agonists, precursors thereof, metabolites thereof and combinations thereof. Preferably, the TACs include alpha-2-adrenergic agonists, for example, imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. In one embodiment, the TACs include quinoxlaine components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Preferably, the quinoxaline components, including the quinoxaline derivatives, are alpha-2-adrenergic agonists. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a useful embodiment, the SEC is other than cyclodextrin and includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like and mixtures thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

X

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the TAC. This interaction preferably is sufficient to render the TAC substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The oxy-chloro components included in the present compositions are effective to at least assist in preserving the compositions. Any suitable oxy-chloro component effective to at least assist in preserving the compositions may be employed. Such oxy-chloro components include, without limitation, hypochlorite components, perchlorate components, chlorite components and the like and mixtures thereof.

In one useful embodiment, the oxy-chloro component includes a chlorite component. Preferably, the chlorite component includes stabilized chlorine dioxides, alkali metal chlorites and the like and mixtures thereof. Chlorite components are very effective in the present compositions and provide preservative effectiveness, often at a relatively reduced concentration, with little or no detrimental effect on the tissue to which the composition is administered. In addition, the oxy-chloro components, e.g., the chlorite components, substantially maintain preservative effectiveness in the presence of the SECs, for example, the polyanionic components. Without wishing to limit the invention to any particular theory or mechanism of operation, it is believed that such oxy-chloro components are substantially free in the presence of the SECs or do not substantially interact the SECs.

The oxy-chloro components may be effective in the compositions in the amount of less than about 1% (w/v) or about 0.8% (w/v). In a useful embodiment, the oxy-chloro components may be in the compositions in the range of about 500 ppm (w/v) or less, preferably about 10 ppm (w/v) to about 200 ppm (w/v).

In one embodiment, additional preservatives other than the oxy-chloro components are used in the compositions. Any suitable additional preservative component may be employed in accordance with the present invention, provided that it is compatible with the oxy-chloro component, the TAC and the SEC. Preservative components which are well known and/or conventionally used in the pharmaceutical field may be employed. Examples include, without limitation, sorbic acids, benzalkonium chlorides, chlorbutols and alkyl esters of p-hydroxybenzoic acids and the like and mixtures thereof. If additional preservative component is included, it preferably is present in an amount, together with the oxy-chloro component, to effectively preserve the composition.

The compositions include a liquid carrier component, for example, an aqueous liquid carrier component. Preferably, the compositions have pH's of about 7 or greater, more preferably about 7 to about 9.

In one broad aspect of the present invention, compositions are provided which comprise a TAC, a SEC, a chlorite component and an aqueous liquid carrier. Preferably the TAC is Brimonidine tartrate. The SEC is preferably an anionic cellulose derivative, more preferably a carboxymethylcellulose, for example, in an amount in the range of about 0.2% to about 0.6% (w/v).

In another broad aspect of the present invention, compositions are provided which comprise a Brimonidine tartrate, a SEC, a chlorite component and an aqueous liquid carrier component. The Brimonidine tartrate is present in an amount effective to provide a desired effect to a human or an animal after the composition is administered to the human or animal, and the SEC is preferably a carboxymethylcellulose.

In another broad aspect of the present invention, compositions are provided which comprise a TAC and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the TACs in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrin.

The present compositions preferably are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising TACs, SECs and oxy-chloro components are provided. The TACs in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. Suitable SECs for solubilizing TACs may be used concurrently with oxy-chloro components in the present compositions to increase the solubility of the TACs substantially without detrimentally affecting the preservative effectiveness of the oxy-chloro components. In other words, SECs employed in the present compositions may effectively increase the solubility of TACs without substantially interfering with the functions of other components in the compositions. The SECs employed in the present compositions may be effective in the solubilization of ionized TACs, unionized TACs or both.

Oxy-chloro components are included in the present compositions to assist in preserving the compositions. Particularly, the oxy-chloro components are not substantially detrimentally affected by the SECs present in the compositions. Moreover, the oxy-chloro components in the compositions are effective substantially without causing undue harm or irritation to the tissue to which the present compositions are administered.

The present compositions may, and preferably do, include liquid carrier components. For example, the components often have the characteristics of a liquid, for example, a liquid solution.

The presently useful TACs preferably are chosen to benefit from the presence of the SECs and the oxy-chloro components. In general, the TACs are provided with

increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Preferably, the TACs have increased solubility in the present compositions at pH's greater than 7, as compared to identical TACs, at comparable concentrations in similar compositions, without the SECs. More preferably, the TACs have increased solubility in the present compositions at pH's in the range of about 7 to about 10, as compared to TACs in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized TACs are better able to cross the lipid membranes relative to unsolubilized TACs. It is further believed that the solubilized TACs are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the TACs in the environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and a TAC may be administered to the cornea of a human eye, which has a pH of about 7, wherein the TAC is substantially solubilized at the administered area. Furthermore, in one embodiment, the TACs solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than TACs which are not solubilized by SECs. The solubilization of TACs preferably reduces irritation to sensitive tissues in contact or interacting with the TACs.

Examples of the therapeutically active components which may be included in the present compositions include, but are not limited to, antibacterial substances such as beta-lactam antibiotics, such as cefoxitin, n-formamidoylthienamycin and other thienamycin derivatives, tetracyclines, chloramphenicol, neomycin, carbenicillin, colistin, penicillin G, polymyxin B, vancomycin, cefazolin, cephaloridine, chibrorifamycin, gramicidin, bacitracin and sulfonamides; aminoglycoside antibiotics such as gentamycin, kanamycin, amikacin, sisomicin and tobramycin; nalidixic acid and its analogs such as norfloxacin and the antimicrobial combination fluoroalanine/pentizidone, nitrofurazones and analogs thereof; antihistaminics and decongestants such as pyrilamine, chlorpheniramine, tetrahydrazoline, antazoline and analogs thereof; mast-cell inhibitors of histamine release, such as cromolyn; anti-inflammatories such as cortisone, hydrocortisone, hydrocortisone acetate, betamethasone, dexamethasone, dexamethasone sodium phosphate, prednisone, methylprednisolone, medrysone, fluorometholone, prednisolone, prednisolone sodium phosphate, triamcinolone, indomethacin, sulindac, its salts and its corresponding sulfides, and analogs thereof; miotics and anticholinergics such as echothiophate, pilocarpine, physostigmine salicylate, diisopropylfluorophosphate, epinephrine, dipivaloylepinephrine, neostigmine echothiopate iodide, demecarim bromide, carbamoyl choline chloride, methacholine, bethanechol, and analogs thereof; mydriatics such as atrophine, homatropine, scopolamine, hydroxyamphetamine, ephedrine, cocaine, tropicamide, phenylephrine, cyclopentolate, oxyphenonium, eucatropine; and the like and mixtures thereof.

Other TACs are: antiglaucama drugs, for example, timalol, and especially its maleic salt and R-timolol and a combination of timolol or R-timolol with pilocarpine; other adrenergic agonists and/or antagonists such as epinephrine and an epinephrine complex, or prodrugs such as bitartrate, borate, hydrochloride and dipivefrine derivatives; carbonic anhydrase inhibitors such as acetazolamide, dichlorphenamide, 2-(p-hydroxyphenyl)-thiothiophenesulfonamide, 6-hydroxy-2-benzothiazolesulfonamide, and 6-pivaloyloxy-2-benzothiazolesulfonamide; antiparasitic compounds and/or anti-protozoal compounds such as ivermectin, pyrimethamine, trisulfapidimidine, clindamycin and corticosteroid preparations; compounds having antiviral activity such as acyclovir, 5-iodo-2'-deoxyuridine (IDU), adenosine arabinoside (Ara-A), trifluorothymidine, interferon, and interferon-inducing agents such as poly I:C; antifungal agents such as amphotericin B, nystatin, flucytosine, natamycin and miconazole; anesthetic agents such as etidocaine cocaine, benoxinate, dibucaine hydrochloride, dyclonine hydrochloride, naepaine, phenacaine hydrochloride, piperocaine, proparacaine hydrochloride, tetracaine hydrochloride, hexylcaine, bupivacaine, lidocaine, mepivacaine and prilocaine; ophthalmic diagnostic agents, such as: (a) those used to examine the retina such as sodium fluorescein, (b) those used to examine the conjunctiva, cornea and lacrimal apparatus, such as fluorescein and rose bengal and (c) those used to examine abnormal pupillary responses such as methacholine, cocaine, adrenaline, atropine, hydroxyamphetamine and pilocarpine; ophthalmic agents used as adjuncts in surgery, such as alpha-chymotrypsin and hyaluronidase; chelating agents such as ethylenediaminetetraacetic acid (EDTA) and deferoxamine; immunosuppressants and anti-metabolites such as methotrexate, cyclophosphamide, 6-mercaptopurine and azathioprine and combinations of the compounds mentioned above, such as antibiotics/antiinflammatories combinations such as the combination of neomycin sulfate and dexamethasone sodium phosphate and combinations concomitantly used for treating glaucoma, for example, a combination of timolol maleate and aceclidine; and the like and mixtures thereof.

In a preferred embodiment, the useful TACs include adrenergic agonists. The adrenergic agonists preferably are molecules containing amines. Also, the adrenergic agonists preferably are amine-containing molecules with pKa's of greater than 7, preferably about 7 to about 9.

More preferably, the useful TACs include alpha-adrenergic agonists. Examples of alpha-adrengergic agonists include, but not limited to, adrafinil, adrenolone, amidephrine, apraclonidine, budralazine, clonidine, cyclopentamine, detomidine, dimetofrine, dipivefrin, ephedrine, epinephrine, fenoxazoline, guanabenz, guanfacine, hydroxyamphetamine, ibopamine, indanazoline, isometheptene, mephentermine, metaraminol, methoxamine, methylhexaneamine, metizolene, midodrine, naphazoline, norepinephrine, norfenefrine, octodrine, octopamine, oxymetazoline, phenylephrine, phenylpropanolamine, phenylpropylmethylamine, pholedrine, propylhexedrine, pseudoephedrine, rilmenidine, synephrine, tetrahydrozoline, tiamenidine, tramazoline, tuaminoheptane, tymazoline, tyramine, xylometazoline, and the like and mixtures thereof.

In a still more preferred embodiment, the useful TACs include alpha-2-adrenergic agonists. As used herein, the term "alpha-2 adrenergic agonist" includes chemical entities, such as compounds, ions, complexes and the like, that produces a net sympatholytic response, resulting in increased accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or, for example, to postsynaptic alpha-2

X

receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha 2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidezolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4,5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines and the like.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline. The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating one or more of alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

Other useful TACs include ocular hypotensive agents (Woodward et al U.S. Pat. No. 5,688,819), cyclosporins (Ding et al U.S. Pat. No. 5,474,979), androgen tears (Sullivan U.S. Pat. No. 5,620,921), pyranoquinolinone derivatives (Cairns et al U.S. Pat. No. 4,474,787), compounds having retinoid-like activities (Chandraratna U.S. Pat. No. 5,089,509), ketorolac/pyrrole-1-carboxylic acids (Muchowski et al U.S. Pat. No. 4,089,969), ofloxacins/benzoxazine derivatives (Hayakawa et al U.S. Pat. No. 4,382,892), memantines (Lipton et al U.S. Pat. No. 5,922,773), RAR antagonists (Klein et al U.S. Pat. No. 5,952,345), RAR-alpha agonists (Teng et al U.S. Pat. No. 5,856,490). Each of the disclosures referred to in the above patents is incorporated in its entirety herein by reference.

In one embodiment, the TACs, for example Brimonidine tartrate, are substantially unionized in the composition. In another embodiment, the TACs are substantially unionized in the environment to which they are administered, for example the cornea of the human eye. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the TACs facilitate their permeation across membrane lipid bilayers.

Any suitable SEC, other than cyclodextrin, may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones, derivatives thereof and mixtures thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble TACs and/or enhance the stability of the TACs and/or reduce unwanted side effects of the TACs. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the polyanionic component and chlorite component.

The polyanionic component is preferably sufficiently anionic to interact with the TAC. Such interaction is believed to be desirable to solubilize the TAC and/or to maintain such TAC soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges. Examples include:

- metal carboxymethylstarchs
- metal carboxymethylhydroxyethylstarchs
- hydrolyzed polyacrylamides and polyacrylonitriles
- heparin
- homopolymers and copolymers of one or more of:
  - acrylic and methacrylic acids
  - metal acrylates and methacrylates
  - alginic acid
  - metal alginates
  - vinylsulfonic acid
  - metal vinylsulfonate
  - amino acids, such as aspartic acid, glutamic acid and the like
  - metal salts of amino acids
  - p-styrenesulfonic acid
  - metal p-styrenesulfonate
  - 2-methacryloyloxyethylsulfonic acids

metal 2-methacryloyloxethylsulfonates
3-methacryloyloxy-2-hydroxypropylsulonic acids
metal 3-methacryloyloxy-2-hydroxypropylsulfonates
2-acrylamido-2-methylpropanesulfonic acids
metal 2-acrylamido-2-methylpropanesulfonates
allylsulfonic acid
metal allylsulfonate and the like.

In one embodiment, the polyanionic components include anionic polysaccharides, other than cyclodextrins, which tend to exist in ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1–3 and beta 1–4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merck & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or triethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

A particularly useful class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than H+and metal cations can be employed in the present invention.

In a preferred embodiment, the polyanionic polymers are cyclized. More preferably, the cyclized anionic polymers include less than ten monomer units. Even more preferably, the cyclized polyanionic polymers include less than six monomer units.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the TAC in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present composition is about 0.5%.

In one embodiment, carboxymethylcellulose may help solubilize ionized TACs. In another embodiment, carboxymethylcellulose may help solubilize unionized TACs. In a preferred embodiment, the carboxylmethylcellulose help solubilize ionized Brimonidine tartrate. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate.

In one broad embodiment, the preservative components are selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of SECs, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components effective in aiding to preserve the compositions are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm (w/v) or less to about 200 ppm (w/v). Preservative components or components effective in aiding to preserve the compositions in accor-

dance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Examples of the components effective in aiding to preserve the compositions, preferably the TACs therein, include, but are not limited to, oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component. The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite® by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1, 1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

In a broad embodiment of the invention, additional preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and the like and mixtures thereof, such as the mixture of methyl, ethyl, propyl and butyl esters which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise a TAC, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the TACs in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise a TAC, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier components substantially correspond to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the TACs, SECs and preservatives may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps, even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate.

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring

agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

The following non-limiting examples illustrate certain aspects of the present invention.

EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.) The formulation vehicle was prepared by first

dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days; a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 μm filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 μm) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine

tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8

| | STUDY 1 | | STUDY 2 | |
|---|---|---|---|---|
| Sample | pH[a] | Solubility[e] | pH[a] | Solubility[e] |
| 1 | 5.55 | ≤164.4[b] | 5.50 | ≤200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 50.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control (untreated) | — | 0.486[c] | — | — |
| Control (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate had dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v

EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™), Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 |
|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% (w/v) |
| CMC | 0.0% | 0.056% | 0.17% | 0.5% | 1.5% (w/v) |
| Stabilized chlorine dioxide[a] | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% (w/v) |
| magnesium chloride, hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% (w/v) |

TABLE III-continued

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 |
|---|---|---|---|---|---|
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% (w/v) |

[a]Sold under the trademark Purite™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

Solubility of Brimonidine tartrate (%)

| pH | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
|---|---|---|---|---|---|
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 9.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.056% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.5%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

While this invention has been described with respect to various specific examples and embodiments, it is to be

understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A composition comprising:

a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof, and being present in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered;

a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component;

an oxy-chloro component in an effective amount to at least aid in preserving the composition; and

a liquid carrier component.

2. The composition of claim 1 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.

3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.

4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.

5. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.

6. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

7. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition without the solubility enhancing component.

8. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.

9. The composition of claim 1 wherein the solubility enhancing component comprises a polyanionic component.

10. The composition of claim 9 wherein said polyanionic components is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.

11. The composition of claim 1 wherein the solubility enhancing component comprises an anionic cellulose derivative.

12. The composition of claim 1 wherein the solubility enhancing component comprises a carboxymethylcellulose.

13. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).

14. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10 (w/v).

15. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

16. The composition of claim 1 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.

17. The composition of claim 1 wherein the oxy-chloro component comprises a chlorite component.

18. The composition of claim 1 wherein the oxy-chloro component comprises stabilized chlorine dioxide.

19. The composition of claim 1, wherein the oxy-chloro component is present in an amount of about 500 ppm (w/v) or less.

20. The composition of claim 1 wherein the oxy-chloro component is present in an amount in a range of about 10 ppm (w/v) to about 200 ppm (w/v).

21. The composition of claim 1 which further comprises an additional preservative component other than the oxy-chloro component in an amount effective to at least aid in preserving the composition.

22. The composition of claim 21, wherein the additional preservative component is selected from the group consisting of sorbic acid, benzalkonium chloride, chlorbutol and alkyl esters of p-hydroxybenzoic acid and mixtures thereof.

23. The composition of claim 1 wherein the liquid carrier is an aqueous liquid carrier component.

24. The composition of claim 1 which is a solution.

25. The composition of claim 1 which has a pH of about 7 or greater.

26. The composition of claim 1 which has a pH in a range of about 7 to about 9.

27. The composition of claim 1 which is ophthalmically acceptable.

28. A composition comprising:

a therapeutically active component selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered;

an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component;

a chlorite component in an effective amount to at least aid in preserving the composition; and

an aqueous liquid carrier component.

29. The composition of claim 28 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

30. The composition of claim 28 wherein the anionic cellulose derivative comprises carboxymethylcellulose.

31. The composition of claim 28 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% to about 0.6% (w/v).

32. A composition comprising:

a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered;

a solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline;

a chlorite component in an effective amount to at least aid in preserving the composition; and

an aqueous liquid carrier component.

33. The composition of claim 32 wherein the solubility enhancing component comprises a carboxymethylcellulose.



34. The composition of claim 32 which is ophthalmically acceptable.

35. A composition comprising:

a therapeutically active component in an amount effective to provide a desired therapeutic benefit to a patient to whom the composition is administered;

an oxy-chloro component in an effective amount to at least aid in preserving the composition; and

a liquid carrier component, wherein the composition is substantially free of cyclodextrins.

36. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of antibacterials, antihistamines, decongestants, antiinflammatories, antiparasitics, miotics, anticholinergics, adrenergics, antivirals, local anesthetics, antifungals, amoebicidals, trichomonocidals, analgesics, mydriatics, antiglaucoma drugs, carbonic anhydrase inhibitors, ophthalmic diagnostic agents, ophthalmic agents used as adjuvants in surgery, chelating agents, antineoplastics, antihypertensives, muscle relaxants, diagnostics, and mixtures thereof.

37. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of adrenergic agonists and mixtures thereof.

38. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of alpha-2-adrenergic agonists and mixtures thereof.

39. The composition of claim 35 wherein the therapeutically active component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoleS, azepines, thiazines, oxazolines, guanidines, catecholamines, and mixtures thereof.

40. The composition of claim 35 wherein the therapeutically active component includes a quinoxaline component.

41. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxalines, quinoxaline derivatives, and mixtures thereof.

42. The composition of claim 40 wherein the quinoxaline component is selected from the group consisting of quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and mixtures thereof.

43. The composition of claim 35 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

44. The composition of claim 35, which further includes a solubility enhancing component, other than a cyclodextrin, in an amount effective to increase the solubility of the therapeutically active component in the composition relative to the solubility of an identical therapeutically active component in a similar composition without the solubility enhancing component.

45. The composition of claim 44 wherein the solubility enhancing component comprises a polyanionic component.

46. The composition of claim 35 wherein the oxy-chloro component is selected from the group consisting of hypochlorite components, perchlorate components, chlorite components and mixtures thereof.

47. The composition of claim 35 wherein the oxy-chloro component comprises a chlorite component.

48. The composition of claim 35 wherein the oxy-chloro component comprises stabilized chlorine dioxide.

49. The composition of claim 35 which is ophthalmically acceptable.

* * * * *

# EXHIBIT 3

US006627210B2

(12) **United States Patent**
Olejnik et al.

(10) **Patent No.: US 6,627,210 B2**
(45) **Date of Patent: *Sep. 30, 2003**

(54) COMPOSITIONS CONTAINING α-2-ADRENERGIC AGONIST COMPONENTS

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charlestown, MA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 8 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/904,018**

(22) Filed: **Jul. 10, 2001**

(65) **Prior Publication Data**

US 2002/0032201 A1 Mar. 14, 2002

**Related U.S. Application Data**

(60) Provisional application No. 60/218,200, filed on Jul. 14, 2000.

(51) **Int. Cl.** ..................... **A61K 33/14**; A61K 9/00; A61K 9/08

(52) **U.S. Cl.** ..................... **424/427**; 424/400; 424/401; 424/466; 424/422; 514/772.4; 514/772.6

(58) **Field of Search** ..................... 424/427, 400, 424/422, 661, 407; 514/772.4, 772.6

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,278,447 A | 10/1966 | McNicholas | |
| 3,890,319 A | 6/1975 | Danielwicz et al. | |
| 4,530,920 A | 7/1985 | Nestor et al. | |
| 4,806,556 A | 2/1989 | Portoghese | |
| 5,021,416 A | 6/1991 | Gluchowski | |
| 5,202,128 A | 4/1993 | Morella et al. | |
| 5,215,991 A * | 6/1993 | Burke | 514/255 |
| 5,352,796 A | 10/1994 | Hoeger et al. | |
| 5,459,133 A * | 10/1995 | Neufeld | 514/211 |
| 5,703,077 A | 12/1997 | Burke et al. | |
| 5,719,197 A | 2/1998 | Kanios et al. | |
| 5,725,887 A | 3/1998 | Martin et al. | |
| 5,814,638 A | 9/1998 | Lee et al. | |
| 5,834,502 A | 11/1998 | Cheng et al. | |
| 5,994,110 A | 11/1999 | Mosbach et al. | |
| 2002/0010202 A1 * | 1/2002 | Gurst | 514/392 |
| 2002/0071874 A1 * | 6/2002 | Olejnik et al. | 424/661 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2048315 | 2/1992 |
| EP | 0609961 | 8/1994 |
| WO | 94/16685 | 8/1994 |
| WO | 98/47878 | 10/1998 |
| WO | 99/43299 | 9/1999 |
| WO | 99/51273 | 10/1999 |
| WO | 0012137 | 3/2000 |
| WO | 0019981 | 4/2000 |

OTHER PUBLICATIONS

Remington's Pharmaceutical Sciences, Eighteenth Edition, 1990, pp. 1304–1305.*
U.S. patent application Ser. No. 09/903,962, Olejnik et al., filed Jul. 10, 2001.

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Rachel M. Bennett
(74) *Attorney, Agent, or Firm*—Carlos A. Fisher; Martin A. Voet; Robert J. Baran

(57) **ABSTRACT**

Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

**34 Claims, 1 Drawing Sheet**



U.S. Patent Sep. 30, 2003 US 6,627,210 B2

0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC
SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
4000
3500
3000
2500
2000
1500
1000
500
0
7
7.5
8
8.5
9
9.5
10
10.5
pH

-53- Exhibit 3



# COMPOSITIONS CONTAINING α-2-ADRENERGIC AGONIST COMPONENTS

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application 60/218,200 filed Jul. 14, 2000.

## BACKGROUND OF THE INVENTION

The present invention relates to compositions containing alpha-2-adrenergic agonist components. More particularly, the invention relates to such compositions in which the alpha-2-adrenergic agonist components have enhanced solubility at the therapeutically effective concentrations.

Alpha-2-adrenergic agonist components include chemical entities, such as compounds, ions, complexes and the like, which are effective to act on or bind to Alpha-2-adrenergic receptors and provide a therapeutic effect. Alpha-2-adrenergic agonist components means the agonists themselves and any and all precursors thereof, metabolites thereof and combinations thereof. One of the continuing challenges of formulating compositions having alpha-2-adrenergic agonist components is to render such components more effective. For example, alpha-2-adrenergic agonist components in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration.

Additionally, the dispensed or administered alpha-2-adrenergic agonist components should advantageously be soluble in biological systems or environments, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Some alpha-2-adrenergic agonist components with higher pKa's, for example, greater than about 7, tend to diffuse very well through lipid membranes at pH valves near their pka, because in such circumstances they are predominantly unionized in neutral to alkaline biological environments. However, some of these alpha-2-adrenergic agonist components become insoluble at neutral to alkaline biological pH's. Such insolubility may decrease membrane diffusion capabilities, rendering the alpha-2-adrenergic agonist components less effective and/or their therapeutic effects more variable at a given dosage. Furthermore, solubilized alpha-2-adrenergic agonist components provide other benefits, for example, reduced irritation to tissues that interact with alpha-2-adrenergic agonist components.

There continues to be a need for new compositions containing alpha-2-adrenergic agonist components.

## SUMMARY OF THE INVENTION

New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

In one embodiment, the alpha-2-adrenergic agonist components include imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. Preferably, the alpha-2-adrenergic agonist components include quinoxaline components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a preferred embodiment, the alpha-2-adrenergic agonist components, such as those listed above, are specific for the alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and/or alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonist components are unionized in the compositions. Preferably, the alpha-2-adrenergic agonist components are also unionized in the biological environment into which the compositions are administered.

In a useful embodiment, the SEC includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges, and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like, and mixtures



thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the alpha-2-adrenergic components. This interaction preferably is sufficient to render the alpha-2-adrenergic components substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The compositions include carrier components, for example, aqueous liquid carrier components. In one embodiment, the compositions have pH's of about 7 or greater, preferably about 7 to about 9, and are ophthalmically acceptable.

In a preferred embodiment, a composition is provided which includes an alpha-2-adrenergic agonist component in an amount effective to provide at least one therapeutic benefit to a patient to whom the composition is administered, an anionic cellulose derivative in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component and an aqueous liquid carrier component. The alpha-2-adrenergic agonist component preferably comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. The anionic cellulose derivative preferably comprises a carboxymethylcellulose. The concentration of the anionic cellulose derivative in the composition should be about 0.2% (w/v) to about 0.6% (w/v).

In a preferred embodiment, the present compositions are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

In one broad aspect of the invention, complexes are formed in the compositions. In one embodiment, the complexes include monomer units derived from at least one quinoxaline component. In a preferred embodiment, the complexes of the present invention are dimers. In a particularly preferred embodiment, the complexes are complexes, especially dimers, of Bromodidine tartrate.

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxychloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the an alpha-2-adrenergic agonist component in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrins in the compositions or the patients to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising alpha-2-adrenergic agonist components and SECs are provided. The alpha-2-adrenergic agonist components in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. The SEC's employed in the present compositions may be effective in the solubilization of ionized alpha-2-adrenergic agonist components, unionized alpha-2-adrenergic agonist components or both. The present compositions include liquid carrier components and have the characteristics of liquid, for example, aqueous liquid, solutions.

Preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's greater than 7, as compared to identical alpha-2-adrenergic agonist components, at comparable concentrations, in similar compositions without the SECs. More preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's in the range of about 7 to about 10 and, as compared to identical alpha-2-adrenergic agonist components in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized alpha-2-adrenergic agonist components are better able to cross the lipid membranes relative to unsolubilized alpha-2-adrenergic agonist components. It is further believed that the solubilized alpha-2-adrenergic agonist components are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the alpha-2-adrenergic agonist components in the biological environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and an alpha-2-adrenergic agonist component may be administered to the cornea of an eye, which has a pH of about 7, wherein the alpha-2-adrenergic agonist component is substantially solubilized at the administered area. Furthermore, in one embodiment, the alpha-2-adrenergic agonist components solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than alpha-2-adrenergic agonist components which are not solubilized by SECs. The solubilization of alpha-2-adrenergic agonist components preferably reduces irritation to sensitive tissues in contact or interacting with the alpha-2-adrenergic agonist components.

The presently useful alpha-2-adrenergic agonist components preferably are chosen to benefit from the presence of the SECs. In general, the alpha-2-adrenergic agonist components are provided with increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Examples of alpha-2-adrenergic agonist components include molecules containing amines. Preferably, the alpha-2-adrenergic agonist components are amine-containing molecules with pKa's of greater than about 7, more preferably about 7 to about 9.

Alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. As used herein, the term alpha-2 adrenergic agonist includes chemical entities, such as compounds, ions, complexes and the like, that produce a net sympatholytic response, resulting in increased

accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or for example, to postsynaptic alpha-2 receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha-2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4.5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines; and the like and derivatives thereof.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline. The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al U.S. Pat. No. 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonists, for example Brimonidine tartrate, are substantially unionized in the compositions. In another embodiment, the adrenergic compounds are substantially unionized in the environment to which they are administered, for example the cornea. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the adrenergic compounds facilitate their permeation across membrane lipid bilayers.

Any suitable SEC may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones and derivatives thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble alpha-2-adrenergic agonist components and/or enhance the stability of the alpha-2-adrenergic agonist components and/or reduce unwanted side effects of the alpha-2-adrenergic agonist components. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the alpha-2-adrenergic components.

The polyanionic component is preferably sufficiently anionic to interact with the alpha-2-adrenergic agonist component. Such interaction is believed to be desirable to solubilize the alpha-2-adrenergic agonist component and/or to maintain such alpha-2-adrenergic agonist component soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges. Examples include:

- metal carboxymethylstarchs
- metal carboxymethylhydroxyethylstarchs
- hydrolyzed polyacrylamides and polyacrylonitriles heparin
- homopolymers and copolymers of one or more of:
  - acrylic and methacrylic acids
  - metal acrylates and methacrylates
  - alginic acid
  - metal alginates
  - vinylsulfonic acid
  - metal vinylsulfonate
  - amino acids, such as aspartic acid, glutamic acid and the like
  - metal salts of amino acids
  - p-styrenesulfonic acid
  - metal p-styrenesulfonate
  - 2-methacryloyloxyethylsulfonic acids
  - metal 2-methacryloyloxethylsulfonates
  - 3-methacryloyloxy-2-hydroxypropylsulonic acids
  - metal 3-methacryloyloxy-2-hydroxypropylsulfonates
  - 2-acrylamido-2-methylpropanesulfonic acids
  - metal 2-acrylamido-2-methylpropanesulfonates
  - allylsulfonic acid
  - metal allylsulfonate and the like.

In another embodiment, the polyanionic components include anionic polysaccharides which tend to exist in

ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1-3 and beta 1-4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other anionic polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merk & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or triethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

Preferably, the anionic polysaccharides are cyclized. More preferably, the cyclized anionic polysaccharides include less than ten monomer units. Even more preferably, the cyclized polysaccharides include less than six monomer units.

In one embodiment, a particularly useful group of cyclized anionic polysaccharides includes the cyclodextrins. Examples of the cyclodextrin group include, but are not limited to: α-cyclodextrin, derivatives of α-cyclodextrin, β-cyclodextrin, derivatives of β-cyclodextrin, γ-cyclodextrin, derivatives of γ-cyclodextrin, carboxymethyl-β-cyclodextrin, carboxymethyl-ethyl-β-cyclodextrin, diethyl-β-cyclodextrin, dimethyl-β-cyclodextrin, methyl-β-cyclodextrin, random methyl-β-cyclodextrin, glucosyl-β-cyclodextrin, maltosyl-β-cyclodextrin, hydroxyethyl-β-cyclodextrin, hydroxypropyl-β-cyclodextrin, sulfobutylether-β-cyclodextrin, and the like and mixtures thereof. Sulfobutylether-β-cyclodextrin is a preferred cyclized anionic polysaccharide in accordance with the present invention. It is advantageous that the SEC's, including the above mentioned cyclodextrins, employed in this invention be, at the concentration employed, non-toxic to the mammal, human, to inhibit the present incorporation is administered. As used herein, the term "derivatives" as it relates to a cyclodextrin means any substituted or otherwise modified compound which has the characteristic chemical structure of a cyclodextrin sufficiently to function as a cyclodextrin component, for example, to enhance the solubility and/or stability of active components and/or reduce unwanted side effects of the active components and/or to form inclusive complexes with active components, as described herein.

Although cyclodextrins and/or their derivatives may be employed as SECs, one embodiment of the invention may include SECs other than cyclodextrins and/or their derivatives.

A particularly useful and preferred class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than $H^+$ and metal cations can be employed in the present invention.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the alpha-2-adrenergic agonist component in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present compositions is about 0.5%.

In one embodiment, the SECs, for example a carboxymethylcellulose, assist in solubilizing the alpha-2-adrenergic agonist components in the compositions. Although the SECs are capable aiding in the solubilization of ionized alpha-2-adrenergic agonist components, it is

preferable that the SECs used in this invention could assist in the solubilization of unionized alpha-2-adrenergic agonist components. For example, in one embodiment, carboxymethylcellulose may help solubilize ionized alpha-2-adrenergic agonist components. In another embodiment, carboxymethylcellulose may help solubilize unionized alpha-2-adrenergic agonist components. In a preferred embodiment, the carboxylmethylcellulose helps solubilize ionized Brimonidine tartrate in the compositions. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate in the compositions.

In one embodiment, the compositions may also include preservative components or components which assist in the preservation of the composition. The preservative components selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of polyanionic components, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives or components which assist in the preservation of the composition which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components which assist in the preservation of the composition, preferably the alpha-2-adrenergic agonist components therein, are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm(w/v) or less to about 200 ppm(w/v). Preservative components in accordance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Very useful examples of the present preservative components include, but are not limited to oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component. The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite™ by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1,1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

Preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and mixtures thereof, such as the mixture of methyl, ethyl, propyl, butyl esters and the like which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the alpha-2-adrenergic agonist components in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise an alpha-2-adrenergic agonist component, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier component substantially

corresponds to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the SECs and the alpha-2-adrenergic agonist components may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps at 25° C., even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate.

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

In one broad aspect of the invention, complexes are formed in the present compositions. In one embodiment, the complexes include at least one monomer unit of a quinoxaline component. Examples of quinoxaline components include quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, salts thereof, esters thereof, other derivatives thereof, and the like and mixtures thereof. For example, in one embodiment, a complex of the present invention may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units. In another embodiment, the complex may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units and Brimonidine tartrate monomer units.

In a preferred embodiment, the complexes of the present invention are dimers. For example, a dimer in accordance with the present invention may include a quinoxaline and a 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Preferably, a dimer in accordance with the present invention includes two Brimonidine tartrate monomer units.

Without wishing to limit the invention to any theory or mechanism of operation, it is believed that any peroxide forming agent or strong oxidizing agent such as the oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof may facilitate the formation of the complexes, preferably complexes of alpha-2-adrenergic agonist components. For example, dimers of Brimonidine tartrate monomer units are believed to be formed in the presence of chlorites, preferably stabilized chlorine dioxide.

Furthermore, it is believed that the interactions between the monomers which serve to hold the monomers or monomer subunits together to form a complex, preferably an oligomer and more preferably a dimer, may include, but not limited to, covalent bonding, ionic bonding, hydrophobic bonding, electrostatic bonding, hydrogen bonding, other chemical and/or physical interactions, and the like and combinations thereof. Such complexes may disassociate in liquid, for example, aqueous liquid, media. In one embodiment, the monomers or monomer subunits are held together by other than covalent bonding. In one embodiment, the monomers or monomer subunits are held together by electrostatic bonding or forces.

The following non-limiting examples illustrate certain aspects of the present invention.

EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.). The formulation vehicle was prepared by first dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days. a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 μm filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 μm) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |

TABLE I-continued

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8.

| | STUDY 1 | | STUDY 2 | |
|---|---|---|---|---|
| Sample | pH[a] | Solubility[e] | pH[a] | Solubility[e] |
| 1 | 5.55 | ≥164.4[b] | 5.50 | ≥200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 30.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control/ (untreated) | — | 0.486[c] | — | — |
| Control/ (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate has dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v

EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™), Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

X

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 | |
|---|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| CMC | 0.0% | 0.058% | 0.17% | 0.5% | 1.5% | (w/v) |
| Stabilized chlorine dioxide[a] | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% | (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% | (w/v) |
| magnesium chloride hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% | (w/v) |
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |

[a] Sold under the trademark Purite™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

| | Solubility of Brimonidine tartrate (%) | | | | |
|---|---|---|---|---|---|
| pH | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 8.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.056% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.5%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

EXAMPLE 3

Brimonidine tartrate dimers.

Brimonidine tartrate is added to a test tube containing a composition including chlorite. The test tube was allowed to equilibrate for ten days. Samples obtained from the test tube is analyzed. It is observed that a portion of the Brimonidine tartrate monomer units conjugated to form dimers.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A therapeutically effective aqueous composition comprising:

a therapeutically active alpha-2-adrenergic agonist component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

a polyanionic solubility enhancing component in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relative to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

2. The composition of claim 1 wherein the therapeutically active component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

3. The composition of claim 1 wherein the therapeutically active component is substantially unionized.

4. The composition of claim 1 wherein the therapeutically active component is substantially unionized in a biological environment to which the composition is administered.

5. The composition of claim 1 wherein the therapeutically active component has increased diffusion through a lipid membrane relative to an identical therapeutically active component in a similar composition the solubility enhancing component.



6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the therapeutically active component relative to the solubility in a biological environment of an identical therapeutically active component in a similar composition without the solubility enhancing component.

7. The composition of claim 1 wherein said polyanionic component is selected from the group consisting of anionic cellulose derivatives, anionic polymers derived from acrylic acid, anionic polymers derived from methacrylic acid, anionic polymers derived from alginic acid, anionic polymers derived from amino acids and mixtures thereof.

8. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of anionic cellulose derivatives and mixtures thereof.

9. The composition of claim 1 wherein the solubility enhancing component is selected from the group consisting of carboxymethylcelluloses and derivatives thereof.

10. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.1% (w/v) to about 30% (w/v).

11. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 10% (w/v).

12. The composition of claim 1 wherein the solubility enhancing component is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

13. The composition of claim 1 which has a pH of about 7 or greater.

14. The composition of claim 1 which has a pH in a range of about 7 to about 9.

15. The composition of claim 1 which is ophthalmically acceptable.

16. A therapeutically effective aqueous composition comprising:

a therapeutically active component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester thereof in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

an anionic cellulose derivative in an amount effective to increase the solubility of the therapeutically active component.

17. The composition of claim 16 wherein the alpha-2-adrenergic agonist component comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

18. The composition of claim 16 wherein the anionic cellulose derivative comprises carboxymethylcellulose.

19. The composition of claim 16 wherein the anionic cellulose derivative is present in an amount in a range of about 0.2% (w/v) to about 0.6% (w/v).

20. A therapeutically effective aqueous composition comprising:

a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

an anionic solubility enhancing component in an amount effective to increase the solubility of the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline.

21. The composition of claim 20 wherein the solubility enhancing component comprises a carboxymethylcellulose.

22. The composition of claim 20 which is ophthalmically acceptable.

23. The composition of claim 1 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

24. The composition of claim 23 in which the preservative comprises benzalkonium chloride.

25. The composition of claim 23 in which the preservative comprises an oxy-chloro component.

26. The composition of claim 23 in which the preservative comprises a chlorite component.

27. The composition of claim 16 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

28. The composition of claim 27 which the preservative comprises benzalkonium chloride.

29. The composition of claim 27 in which the preservative comprises an oxy-chloro component.

30. The composition of claim 27 in which the preservative comprises a chlorite component.

31. The composition of claim 20 which further comprises a preservative selected from the group consisting of an oxy-chloro component and a quaternary ammonium compound in an amount effective to at least assist in preserving the composition.

32. The composition of claim 31 in which the preservative comprises benzalkonium chloride.

33. The composition of claim 31 in which the preservative comprises an oxy-chloro component.

34. The composition of claim 31 in which the preservative comprises a chlorite component.

* * * * *

X

# EXHIBIT 4

US006673337B2

(12) **United States Patent**
**Olejnik et al.**

(10) **Patent No.: US 6,673,337 B2**
(45) **Date of Patent: *Jan. 6, 2004**

(54) **COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS**

(75) Inventors: **Orest Olejnik**, Coto de Coza, CA (US); **Edward D. S. Kerslake**, Charlestown, MA (US)

(73) Assignee: **Allergan, Inc.**, Irvine, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 16 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/299,386**

(22) Filed: **Nov. 19, 2002**

(65) **Prior Publication Data**

US 2003/0087893 A1 May 8, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/904,018, filed on Jul. 10, 2001.

(60) Provisional application No. 60/218,200, filed on Jul. 14, 2000.

(51) Int. Cl.[7] .............. **A61K 31/74**

(52) U.S. Cl. .............. **424/78.04**; 424/400; 514/249

(58) Field of Search .............. 424/661, 427, 424/422, 78.04, 400; 514/58, 249

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,278,447 A | 10/1966 | McNicholas | |
| 3,890,319 A | 6/1975 | Danielwicz et al. | |
| 4,530,920 A | 7/1985 | Nestor et al. | |
| 4,806,556 A | 2/1989 | Portoghese | |
| 5,021,416 A | 6/1991 | Gluchowski | |
| 5,202,128 A | 4/1993 | Morella et al. | |
| 5,215,991 A * | 6/1993 | Burke | 514/255 |
| 5,352,796 A | 10/1994 | Hoeger et al. | |
| 5,459,133 A | 10/1995 | Neufeld | |
| 5,703,077 A | 12/1997 | Burke et al. | |
| 5,719,197 A | 2/1998 | Kanios et al. | |
| 5,725,887 A | 3/1998 | Martin et al. | |
| 5,814,638 A | 9/1998 | Lee et al. | |
| 5,834,502 A | 11/1998 | Cheng et al. | |
| 5,994,110 A | 11/1999 | Mosbach et al. | |
| 6,358,935 B1 * | 3/2002 | Beck et al. | 514/58 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2048315 | 2/1992 |
| EP | 0609961 | 8/1994 |
| WO | 94/16685 | 8/1994 |
| WO | 98/47878 | 10/1998 |
| WO | 99/43299 | 9/1999 |
| WO | 99/51273 | 10/1999 |
| WO | 0012137 | 3/2000 |
| WO | 0019981 | 4/2000 |

OTHER PUBLICATIONS

U.S. patent application Ser. No. 09/903,962, Olejnik et al., filed Jul. 10, 2001.

* cited by examiner

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—Rachel M. Bennett
(74) *Attorney, Agent, or Firm*—Frank J. Uxa; Carlos A. Fisher; Martin A. Voet

(57) **ABSTRACT**

Compositions useful for improving effectiveness of alpha-2-adrenergic agonist components include carrier components, alpha-2-adrenergic agonist components, solubility enhancing components which aid in solubilizing the alpha-2-adrenergic agonist components. In one embodiment, the alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. In another embodiment, the solubility enhancing components include carboxymethylcellulose.

**10 Claims, 1 Drawing Sheet**



U.S. Patent Jan. 6, 2004 US 6,673,337 B2

FIG. 1

0% CMC
0.058% CMC
0.17% CMC
0.5% CMC
1.5% CMC
SOLUBILITY OF BRIMONIDINE TARTRATE (ppm)
4000
3500
3000
2500
2000
1500
1000
500
0
7
7.5
8
8.5
9
9.5
10
10.5
pH



## COMPOSITIONS CONTAINING ALPHA-2-ADRENERGIC AGONIST COMPONENTS

### CROSS REFERENCE TO RELATED APPLICATION

This application is a division of application Ser. No.: 09/904,018, filed Jul. 10, 2001, which application claims the benefit of U.S. Provisional Application Serial No. 60/218,200 filed Jul. 14, 2000, the disclosure of each of these applications is hereby incorporated herein in its entirety by reference.

### BACKGROUND OF THE INVENTION

The present invention relates to compositions containing alpha-2-adrenergic agonist components. More particularly, the invention relates to such compositions in which the alpha-2-adrenergic agonist components have enhanced solubility at the therapeutically effective concentrations.

Alpha-2-adrenergic agonist components include chemical entities, such as compounds, ions, complexes and the like, which are effective to act on or bind to Alpha-2-adrenergic receptors and provide a therapeutic effect. Alpha-2-adrenergic agonist components means the agonists themselves and any and all precursors thereof, metabolites thereof and combinations thereof. One of the continuing challenges of formulating compositions having alpha-2-adrenergic agonist components is to render such components more effective. For example, alpha-2-adrenergic agonist components in liquid compositions often benefit from being soluble in the liquid carriers of such compositions. Such solubility promotes uniform and accurate administration.

Additionally, the dispensed or administered alpha-2-adrenergic agonist components should advantageously be soluble in biological systems or environments, for example, for effective or enhanced in vivo diffusion through cell membranes or lipid bilayers. Some alpha-2-adrenergic agonist components with higher pKa's, for example, greater than about 7, tend to diffuse very well through lipid membranes at pH valves near their pka, because in such circumstances they are predominantly unionized in neutral to alkaline biological environments. However, some of these alpha-2-adrenergic agonist components become insoluble at neutral to alkaline biological pH's. Such insolubility may decrease membrane diffusion capabilities, rendering the alpha-2-adrenergic agonist components less effective and/or their therapeutic effects more variable at a given dosage. Furthermore, solubilized alpha-2-adrenergic agonist components provide other benefits, for example, reduced irritation to tissues that interact with alpha-2-adrenergic agonist components.

There continues to be a need for new compositions containing alpha-2-adrenergic agonist components.

### SUMMARY OF THE INVENTION

New alpha-2-adrenergic agonist component-containing compositions have been discovered. The present compositions contain certain materials which are effective in at least aiding or assisting in solubilizing the alpha-2-adrenergic agonist components in the compositions, and preferably in environments to which the compositions are administered or introduced, for example, biological environments, such as the human eye. Preferably, solubilization of the alpha-2-adrenergic agonist components in accordance with the present invention facilitates transport of such components across lipid membranes. Also, preferably such solubilization allows the provision of more reliable and reproducible dosage forms of the drug. In addition, alpha-2-adrenergic agonist component-containing compositions have been discovered which include preservatives which provide substantial advantages, for example, reduced adverse interactions with the alpha-2-adrenergic agonist components and/or with the patients to whom the compositions are administered, while maintaining preservative effectiveness.

The present compositions preferably enhance the effectiveness of alpha-2-adrenergic agonist components by increasing the apparent water solubility of the alpha-2-adrenergic agonist components, preferably at pH's higher than neutral. The present compositions include, in addition to the adrenergic agonist components, solubility enhancing components (SECs) in amounts effective to enhance the solubility of the alpha-2-adrenergic agonist components. Preferably, the alpha-2-adrenergic agonist components are more soluble in the present compositions having, for example, pH's of about 7 or greater, relative to similar compositions without the SECs. In another embodiment, the alpha-2-adrenergic agonist components of the present compositions are more soluble in neutral, preferably alkaline, biological environments into which the compositions are administered relative to alpha-2-adrenergic agonist components in similar compositions without the SECs.

In one embodiment, the alpha-2-adrenergic agonist components include imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, biologically compatible salts and esters and mixtures thereof. Preferably, the alpha-2-adrenergic agonist components include quinoxaline components. Quinoxaline components include quinoxaline, biologically compatible salts thereof, esters thereof, other derivatives thereof and the like, and mixtures thereof. Non-limiting examples of quinoxaline derivatives include (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and biologically compatible salts thereof and esters thereof, preferably the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, and the like and mixtures thereof. Hereinafter, the tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is referred to as "Brimonidine tartrate."

In a preferred embodiment, the alpha-2-adrenergic agonist components, such as those listed above, are specific for the alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and/or alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonist components are unionized in the compositions. Preferably, the alpha-2-adrenergic agonist components are also unionized in the biological environment into which the compositions are administered.

In a useful embodiment, the SEC includes a polyanionic component. As used herein, the term "polyanionic component" refers to a chemical entity, for example, an ionically charged species, such as an ionically charged polymeric material, which includes more than one discrete anionic charge, that is multiple discrete anionic charges. Preferably, the polyanionic component is selected from polymeric materials having multiple anionic charges, and mixtures thereof.

Particularly useful polyanionic components are selected from anionic polymers derived from acrylic acid (meaning to include polymers from acrylic acid, acrylates and the like and mixtures thereof), anionic polymers derived from methacrylic acid (meaning to include polymers from methacrylic acid, methacrylates, and the like and mixtures thereof), anionic polymers derived from alginic acid (meaning to

include alginic acid, alginates, and the like and mixtures thereof), anionic polymers of amino acids (meaning to include polymers of amino acids, amino acid salts, and the like and mixtures thereof), and the like, and mixtures thereof. Very useful polyanionic components are those selected from anionic cellulose derivatives and mixtures thereof, especially carboxymethylcelluloses.

The polyanionic component preferably is sufficiently anionic to interact with or otherwise affect, in particular increase, the solubility of the alpha-2-adrenergic components. This interaction preferably is sufficient to render the alpha-2-adrenergic components substantially completely soluble at therapeutically effective concentrations. The amount of SEC in the composition preferably is in the range of about 0.1% (w/v) to about 30% (w/v), more preferably about 0.2% (w/v) to about 10% (w/v), and even more preferably about 0.2% (w/v) to about 0.6% (w/v).

The compositions include carrier components, for example, aqueous liquid carrier components. In one embodiment, the compositions have pH's of about 7 or greater, preferably about 7 to about 9, and are ophthalmically acceptable.

In a preferred embodiment, a composition is provided which includes an alpha-2-adrenergic agonist component in an amount effective to provide at least one therapeutic benefit to a patient to whom the composition is administered, an anionic cellulose derivative in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component and an aqueous liquid carrier component. The alpha-2-adrenergic agonist component preferably comprises a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. The anionic cellulose derivative preferably comprises a carboxymethylcellulose. The concentration of the anionic cellulose derivative in the composition should be about 0.2% (w/v) to about 0.6% (w/v).

In a preferred embodiment, the present compositions are ophthalmically acceptable, e.g. the compositions do not have deleterious or toxic properties which could harm the eye of the human or animal to whom the compositions are administered.

In one broad aspect of the invention, complexes are formed in the compositions. In one embodiment, the complexes include monomer units derived from at least one quinoxaline component. In a preferred embodiment, the complexes of the present invention are dimers. In a particularly preferred embodiment, the complexes are complexes, especially dimers, of Bromodidine tartrate.

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component and a preservative component in an effective amount to at least aid in preserving the compositions. Preferably, the preservative components include oxychloro components, such as compounds, ions, complexes and the like which are biologically acceptable, chemically stable and do not substantially or significantly detrimentally affect the an alpha-2-adrenergic agonist component in the compositions or the patients to whom the compositions are administered. Such compositions preferably are substantially free of cyclodextrins in the compositions or the patients to whom the compositions are administered.

Any feature or combination of features described herein are included within the scope of the present invention provided that the features included in any such combination are not mutually inconsistent as will be apparent from the context, this specification, and the knowledge of one of ordinary skill in the art.

Additional advantages and aspects of the present invention are apparent in the following detailed description and claims.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a graph of soluble Brimonidine tartrate verses pH at various carboxymethylcellulose concentrations.

## DETAILED DESCRIPTION OF THE INVENTION

Compositions comprising alpha-2-adrenergic agonist components and SECs are provided. The alpha-2-adrenergic agonist components in the present compositions are made more soluble and may be more effectively utilized as therapeutic agents. The SECs employed in the present compositions may be effective in the solubilization of ionized alpha-2-adrenergic agonist components, unionized alpha-2-adrenergic agonist components or both. The present compositions include liquid carrier components and have the characteristics of liquid, for example, aqueous liquid, solutions.

Preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's greater than 7, as compared to identical alpha-2-adrenergic agonist components, at comparable concentrations, in similar compositions without the SECs. More preferably, the alpha-2-adrenergic agonist components have increased solubility in the present compositions at pH's in the range of about 7 to about 10 and, as compared to identical alpha-2-adrenergic agonist components in similar compositions, at comparable concentrations, without the SECs.

Without wishing to be limited by any theory or mechanism of operation, it is believed that solubilized alpha-2-adrenergic agonist components are better able to cross the lipid membranes relative to unsolubilized alpha-2-adrenergic agonist components. It is further believed that the solubilized alpha-2-adrenergic agonist components are physically smaller and are therefore more able to physically permeate or diffuse through the lipid membranes.

In one embodiment, the SECs of this invention are capable of solubilizing the alpha-2-adrenergic agonist components in the biological environments into which they are introduced at therapeutically effective concentrations. Preferably, the biological environments into which the present compositions are introduced have pH's ranging from about 7 to about 9. For example, a composition comprising a SEC and an alpha-2-adrenergic agonist component may be administered to the cornea of an eye, which has a pH of about 7, wherein the alpha-2-adrenergic agonist component is substantially solubilized at the administered area. Furthermore, in one embodiment, the alpha-2-adrenergic agonist components solubilized by SECs at the administered area diffuse through biological lipid membranes more readily than alpha-2-adrenergic agonist components which are not solubilized by SECs. The solubilization of alpha-2-adrenergic agonist components preferably reduces irritation to sensitive tissues in contact or interacting with the alpha-2-adrenergic agonist components.

The presently useful alpha-2-adrenergic agonist components preferably are chosen to benefit from the presence of the SECs. In general, the alpha-2-adrenergic agonist components are provided with increased apparent solubility, preferably increased apparent water solubility, by the presence of the SECs.

Examples of alpha-2-adrenergic agonist components include molecules containing amines. Preferably, the alpha-

2-adrenergic agonist components are amine-containing molecules with pKa's of greater than about 7, more preferably about 7 to about 9.

Alpha-2-adrenergic agonist components include alpha-2-adrenergic agonists. As used herein, the term alpha-2 adrenergic agonist includes chemical entities, such as compounds, ions, complexes and the like, that produce a net sympatholytic response, resulting in increased accommodation, for example, by binding to presynaptic alpha-2 receptors on sympathetic postganglionic nerve endings or for example, to postsynaptic alpha-2 receptors on smooth muscle cells. A sympatholytic response is characterized by the inhibition, diminishment, or prevention of the effects of impulses conveyed by the sympathetic nervous system. The alpha-2 adrenergic agonists of the invention bind to the alpha-2 adrenergic receptors presynaptically, causing negative feedback to decrease the release of neuronal norepinephrine. Additionally, they also work on alpha-2 adrenergic receptors postsynaptically, inhibiting beta-adrenergic receptor-stimulated formation of cyclic AMP, which contributes to the relaxation of the ciliary muscle, in addition to the effects of postsynaptic alpha-2 adrenergic receptors on other intracellular pathways. Activity at either pre- or postsynaptic alpha-2 adrenergic receptors will result in a decreased adrenergic influence. Decreased adrenergic influence results in increased contraction resulting from cholinergic innervations. Alpha-2 adrenergic agonists also include compounds that have neuroprotective activity. For example, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline is an alpha-2-adrenergic agonist which has a neuroprotective activity through an unknown mechanism.

Without limiting the invention to the specific groups and compounds listed, the following is a list of representative alpha-2 adrenergic agonists useful in this invention: imino-imidazolines, including clonidine, apraclonidine; imidazolines, including naphazoline, xymetazoline, tetrahydrozoline, and tramazoline; imidazoles, including detomidine, medetomidine, and dexmedetomidine; azepines, including B-HT 920 (6-allyl-2-amino-5,6,7,8 tetrahydro-4H-thiazolo[4,5-d]-azepine and B-HT 933; thiazines, including xylazine; oxazolines, including rilmenidine; guanidines, including guanabenz and guanfacine; catecholamines; and the like and derivatives thereof.

Particularly useful alpha-2-adrenergic agonists include quinoxaline components. In one embodiment, the quinoxaline components include quinoxaline, derivatives thereof and mixtures thereof. Preferably, the derivatives of quinoxaline include (2-imidozolin-2-ylamino) quinoxaline. More preferably, the derivatives of quinoxaline include 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline The "halide" of the 5-halide-6-(2-imidozolin-2-ylamino) quinoxaline may be a fluorine, a chlorine, an iodine, or preferably, a bromine, to form 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline . Even more preferably, the derivatives of quinoxaline to be used in accordance with this invention include a tartrate of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline , or Brimonidine tartrate.

Other useful quinoxaline derivatives are well known. For example, useful derivatives of a quinoxaline include the ones disclose by Burke et al U.S. Pat. No. 5,703,077. See also Danielwicz et al U.S. Pat. No. 3,890,319. Each of the disclosures of Burke et al and Danielwicz et al is incorporated in its entirety by reference herein.

The quinoxaline and derivatives thereof, for example Brimonidine tartrate, are amine-containing and preferably have pKa's of greater than 7, preferably about 7.5 to 9.

Analogs of the foregoing compounds that function as alpha-2 adrenergic agonists also are specifically intended to be embraced by the invention.

Preferably, the alpha-2-adrenergic agonists, for example the ones listed above, are effective toward activating alpha-2A-adrenergic receptors, alpha-2B-adrenergic receptors and alpha-2D-adrenergic receptors.

In one embodiment, the alpha-2-adrenergic agonists, for example Brimonidine tartrate, are substantially unionized in the compositions. In another embodiment, the adrenergic compounds are substantially unionized in the environment to which they are administered, for example the cornea. Without wishing to be limited by any theory or mechanism of action, it is believed that the unionized forms of the adrenergic compounds facilitate their permeation across membrane lipid bilayers.

Any suitable SEC may be employed in accordance with the present invention. In one embodiment, the SECs include pyrrolinidone components. Examples of pyrrolinidone components are polyvinylpyrrolinidones and derivatives thereof. In a preferred embodiment, the SECs include polyanionic components. The useful polyanionic components include, but are not limited to, those materials which are effective in increasing the apparent solubility, preferably water solubility, of poorly soluble alpha-2-adrenergic agonist components and/or enhance the stability of the alpha-2-adrenergic agonist components and/or reduce unwanted side effects of the alpha-2-adrenergic agonist components. Furthermore, the polyanionic component is preferably ophthalmically acceptable at the concentrations used. Additionally, the polyanionic component preferably includes three (3) or more anionic (or negative) charges. In the event that the polyanionic component is a polymeric material, it is preferred that each of the repeating units of the polymeric material include a discrete anionic charge. Particularly useful anionic components are those which are water soluble, for example, soluble at the concentrations used in the presently useful liquid aqueous media, such as a liquid aqueous medium containing the alpha-2-adrenergic components.

The polyanionic component is preferably sufficiently anionic to interact with the alpha-2-adrenergic agonist component. Such interaction is believed to be desirable to solubilize the alpha-2-adrenergic agonist component and/or to maintain such alpha-2-adrenergic agonist component soluble in the carrier component, for example a liquid medium.

Polyanionic components also include one or more polymeric materials having multiple anionic charges. Examples include:

metal carboxymethylstarchs

metal carboxymethylhydroxyethylstarchs

hydrolyzed polyacrylamides and polyacrylonitriles

heparin

homopolymers and copolymers of one or more of:
- acrylic and methacrylic acids
- metal acrylates and methacrylates
- alginic acid
- metal alginates
- vinylsulfonic acid
- metal vinylsulfonate
- amino acids, such as aspartic acid, glutamic acid and the like
- metal salts of amino acids
- p-styrenesulfonic acid

metal p-styrenesulfonate
2-methacryloyloxyethylsulfonic acids
metal 2-methacryloyloxethylsulfonates
3-methacryloyloxy-2-hydroxypropylsulonic acids
metal 3-methacryloyloxy-2-hydroxypropylsulfonates
2-acrylamido-2-methylpropanesulfonic acids
metal 2-acrylamido-2-methylpropanesulfonates
allylsulfonic acid
metal allylsulfonate and the like.

In another embodiment, the polyanionic components include anionic polysaccharides which tend to exist in ionized forms at higher pH's, for example, pH's of about 7 or higher. The following are some examples of anionic polysaccharides which may be employed in accordance with this invention.

Polydextrose is a randomly bonded condensation polymer of dextrose which is only partially metabolized by mammals. The polymer can contain a minor amount of bound sorbitol, citric acid, and glucose.

Chondroitin sulfate also known as sodium chondroitin sulfate is a mucopolysaccharide found in every part of human tissue, specifically cartilage, bones, tendons, ligaments, and vascular walls. This polysaccharide has been extracted and purified from the cartilage of sharks.

Carrageenan is a linear polysaccharide having repeating galactose units and 3,6 anhydrogalactose units, both of which can be sulfated or nonsulfated, joined by alternating 1–3 and beta 1–4 glycosidic linkages. Carrageenan is a hydrocolloid which is heat extracted from several species of red seaweed and irish moss.

Maltodextrins are water soluble glucose polymers which are formed by the reaction of starch with an acid and/or enzymes in the presence of water.

Other anionic polysaccharides found useful in the present invention are hydrophilic colloidal materials and include the natural gums such as gellan gum, alginate gums, i.e., the ammonium and alkali metal salts of alginic acid and mixtures thereof. In addition, chitosan, which is the common name for deacetylated chitin is useful. Chitin is a natural product comprising poly-(N-acetyl-D-glucosamine). Gellan gum is produced from the fermentation of pseudomonas elodea to yield an extracellular heteropolysaccharide. The alginates and chitosan are available as dry powders from Protan, Inc., Commack, N.Y. Gellan gum is available from the Kelco Division of Merk & Co., Inc., San Diego, Calif.

Generally, the alginates can be any of the water-soluble alginates including the alkali metal alginates, such as sodium, potassium, lithium, rubidium and cesium salts of alginic acid, as well as the ammonium salt, and the soluble alginates of an organic base such as mono-, di-, or tri-ethanolamine alginates, aniline alginates, and the like. Generally, about 0.2% to about 1% by weight and, preferably, about 0.5% to about 3.0% by weight of gellan, alginate or chitosan ionic polysaccharides, based upon the total weight of the composition, are used to obtain the gel compositions of the invention.

Preferably, the anionic polysaccharides are cyclized. More preferably, the cyclized anionic polysaccharides include less than ten monomer units. Even more preferably, the cyclized polysaccharides include less than six monomer units.

In one embodiment, a particularly useful group of cyclized anionic polysaccharides includes the cyclodextrins. Examples of the cyclodextrin group include, but are not limited to: α-cyclodextrin, derivatives of α-cyclodextrin, β-cyclodextrin, derivatives of β-cyclodextrin, γ-cyclodextrin, derivatives of γ-cyclodextrin, carboxymethyl-β-cyclodextrin, carboxymethyl-ethyl-β-cyclodextrin, diethyl-β-cyclodextrin, dimethyl-β-cyclodextrin, methyl-β-cyclodextrin, random methyl-β-cyclodextrin, glucosyl-β-cyclodextrin, maltosyl-β-cyclodextrin, hydroxyethyl-β-cyclodextrin, hydroxypropyl-β-cyclodextrin, sulfobutylether-β-cyclodextrin, and the like and mixtures thereof. Sulfobutylether-β-cyclodextrin is a preferred cyclized anionic polyasaccharide in accordance with the present invention. It is advantageous that the SEC's, including the above mentioned cyclodextrins, employed in this invention be, at the concentration employed, non-toxic to the mammal, human, to inhibit the present incorporation is administered. As used herein, the term "derivatives" as it relates to a cyclodextrin means any substituted or otherwise modified compound which has the characteristic chemical structure of a cyclodextrin sufficiently to function as a cyclodextrin component, for example, to enhance the solubility and/or stability of active components and/or reduce unwanted side effects of the active components and/or to form inclusive complexes with active components, as described herein.

Although cyclodextrins and/or their derivatives may be employed as SECs, one embodiment of the invention may include SECs other than cyclodextrins and/or their derivatives.

A particularly useful and preferred class of polyanionic component includes anionic cellulose derivatives. Anionic cellulose derivatives include metal carboxymethylcelluloses, metal carboxymethylhydroxyethylcelluloses and hydroxypropylmethylcelluloses and derivatives thereof.

The present polyanionic components often can exist in the unionized state, for example, in the solid state, in combination with a companion or counter ion, in particular a plurality of discrete cations equal in number to the number of discrete anionic charges so that the unionized polyanionic component is electrically neutral. For example, the present unionized polyanionic components may be present in the acid form and/or in combination with one or more metals. Since the polyanionic components are preferably ophthalmically acceptable, it is preferred that the metal associated with the unionized polyanionic component be ophthalmically acceptable in the concentrations used. Particularly useful metals include the alkali metals, for example, sodium and potassium, the alkaline earth metals, for example, calcium and magnesium, and mixtures thereof. Sodium is very useful to provide the counter ion in the unionized polyanionic component. Polyanionic components which, in the unionized states, are combined with cations other than $H^+$ and metal cations can be employed in the present invention.

The amount of SEC in the present compositions is not of critical importance so long as solubility at the alpha-2-adrenergic agonist component is at least somewhat increased and is present in a biologically acceptable amount. Such amount should be effective to perform the desired function or functions in the present composition and/or after administration to the human or animal. In one embodiment, the amount of SEC, preferably the polyanionic component, is sufficient to complex at least in a major amount, and more preferably substantially all, of the alpha-2-adrenergic agonist component in the present composition. In one useful embodiment, the amount of polyanionic component in the present composition is in the range of about 0.1% to about 30% (w/v) or more of the composition. Preferably, the amount of polyanionic component is in the range of about 0.2% (w/v) to about 10% (w/v). More preferably, the amount of polyanionic component is in the range of about 0.2%

(w/v) to about 0.6% (w/v). Even more preferably, the polyanionic component is carboxymethylcellulose and is present in the composition in the range of about 0.2% (w/v) to about 0.6% (w/v). A particularly useful concentration of carboxymethylcellulose in the present compositions is about 0.5%.

In one embodiment, the SECs, for example a carboxymethylcellulose, assist in solubilizing the alpha-2-adrenergic agonist components in the compositions. Although the SECs are capable aiding in the solubilization of ionized alpha-2-adrenergic agonist components, it is preferable that the SECs used in this invention could assist in the solubilization of unionized alpha-2-adrenergic agonist components. For example, in one embodiment, carboxymethylcellulose may help solubilize ionized alpha-2-adrenergic agonist components. In another embodiment, carboxymethylcellulose may help solubilize unionized alpha-2-adrenergic agonist components. In a preferred embodiment, the carboxylmethylcellulose helps solubilize ionized Brimonidine tartrate in the compositions. More preferably, the carboxylmethylcellulose helps solubilize unionized Brimonidine tartrate in the compositions.

In one embodiment, the compositions may also include preservative components or components which assist in the preservation of the composition. The preservative components selected so as to be effective and efficacious as preservatives in the present compositions, that is in the presence of polyanionic components, and preferably have reduced toxicity and more preferably substantially no toxicity when the compositions are administered to a human or animal.

Preservatives or components which assist in the preservation of the composition which are commonly used in pharmaceutical compositions are often less effective when used in the presence of solubilizing agents. In certain instances, this reduced preservative efficacy can be compensated for by using increased amounts of the preservative. However, where sensitive or delicate body tissue is involved, this approach may not be available since the preservative itself may cause some adverse reaction or sensitivity in the human or animal, to whom the composition is administered.

Preferably, the present preservative components or components which assist in the preservation of the composition, preferably the alpha-2-adrenergic agonist components therein, are effective in concentrations of less than about 1% (w/v) or about 0.8% (w/v) and may be 500 ppm (w/v) or less, for example, in the range of about 10 ppm(w/v) or less to about 200 ppm(w/v). Preservative components in accordance with the present invention preferably include, but are not limited to, those which form complexes with the polyanionic component to a lesser extent than does benzalkonium chloride.

Very useful examples of the present preservative components include, but are not limited to oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof. Specific examples of oxy-chloro components useful as preservatives in accordance with the present invention include hypochlorite components, for example hypochlorites; chlorate components, for example chlorates; perchlorate components, for example perchlorates; and chlorite components. Examples of chlorite components include stabilized chlorine dioxide (SCD), metal chlorites, such as alkali metal and alkaline earth metal chlorites, and the like and mixtures therefor. Technical grade (or USP grade) sodium chlorite is a very useful preservative component. The exact chemical composition of many chlorite components, for example, SCD, is not completely understood. The manufacture or production of certain chlorite components is described in McNicholas U.S. Pat. No. 3,278,447, which is incorporated in its entirety herein by reference. Specific examples of useful SCD products include that sold under the trademark Dura Klor by Rio Linda Chemical Company, Inc., and that sold under the trademark Anthium Dioxide by International Dioxide, Inc. An especially useful SCD is a product sold under the trademark Purite™ by Allergan, Inc. Other examples of oxidative preservative components includes peroxy components. For example, trace amounts of peroxy components stabilized with a hydrogen peroxide stabilizer, such as diethylene triamine penta(methylene phosphonic acid) or 1-hydroxyethylidene-1,1-diphosphonic acid, may be utilized as a preservative for use in components designed to be used in the ocular environment. Also, virtually any peroxy component may be used so long as it is hydrolyzed in water to produce hydrogen peroxide. Examples of such sources of hydrogen peroxide, which provide an effective resultant amount of hydrogen peroxide, include sodium perborate decahydrate, sodium peroxide and urea peroxide. It has been found that peracetic acid, an organic peroxy compound, may not be stabilized utilizing the present system. See, for example, Martin et al U.S. Pat. No. 5,725,887, the disclosure of which is incorporated in its entirety herein by reference.

Preservatives other than oxidative preservative components may be included in the compositions. The choice of preservatives may depend on the route of administration. Preservatives suitable for compositions to be administered by one route may possess detrimental properties which preclude their administration by another route. For nasal and ophthalmic compositions, preferred preservatives include quaternary ammonium compounds, in particular the mixture of alkyl benzyl dimethyl ammonium compounds and the like known generically as "benzalkonium chloride." For compositions to be administered by inhalation, however, the preferred preservative is chlorbutol and the like. Other preservatives which may be used, especially for compositions to be administered rectally, include alkyl esters of p-hydroxybenzoic acid and mixtures thereof, such as the mixture of methyl, ethyl, propyl, butyl esters and the like which is sold under the trade name "Nipastat."

In another broad aspect of the present invention, compositions are provided which comprise an alpha-2-adrenergic agonist component, a preservative component in an effective amount to at least aid in preserving, preferably in an amount effective to preserve, the compositions and a liquid carrier component. Preferably, the preservative components include oxy-chloro components, such as compounds, ions, complexes and the like which (1) do not substantially or significantly detrimentally affect the alpha-2-adrenergic agonist components in the compositions or the patients to whom the compositions are administered, and (2) are substantially biologically acceptable and chemically stable. Such compositions in accordance with the present invention comprise an alpha-2-adrenergic agonist component, an oxy-chloro component, and a liquid carrier component, and preferably are substantially free of cyclodextrins.

The carrier components useful in the present invention are selected to be non-toxic and have no substantial detrimental effect on the present compositions, on the use of the compositions or on the human or animal to whom the compositions are administered. In one embodiment, the carrier component is a liquid carrier. In a preferred embodiment, the carrier component is a liquid aqueous carrier component. A

particularly useful aqueous liquid carrier component is that derived from saline, for example, a conventional saline solution or a conventional buffered saline solution. The aqueous liquid carrier preferably has a pH in the range of about 6 to about 9 or about 10, more preferably about 6 to about 8, and still more preferably about 7.5. The liquid medium preferably has an ophthalmically acceptable tonicity level, for example, of at least about 200 mOsmol/kg, more preferably in the range of about 200 to about 400 mOsmol/kg. In an especially useful embodiment, the osmolality or tonicity of the carrier component substantially corresponds to the tonicity of the fluids of the eye, in particular the human eye.

In one embodiment, the carrier components containing the SECs and the alpha-2-adrenergic agonist components may have viscosities of more than about 0.01 centipoise (cps) at 25° C., preferably more than about 1 cps at 25° C., even more preferably more than about 10 cps at 25° C. In a preferred embodiment, the composition has a viscosity of about 50 cps at 25° C. and comprises a conventional buffer saline solution, a carboxymethylcellulose and a Brimonidine tartrate

In order to insure that the pH of the aqueous liquid carrier component, and thus the pH of the composition, is maintained within the desired range, the aqueous liquid carrier component may include at least one buffer component. Although any suitable buffer component may be employed, it is preferred to select such component so as not to produce a significant amount of chlorine dioxide or evolve significant amounts of gas, such as $CO_2$. It is preferred that the buffer component be inorganic. Alkali metal and alkaline earth metal buffer components are advantageously used in the present invention.

Any suitable ophthalmically acceptable tonicity component or components may be employed, provided that such component or components are compatible with the other ingredients of the liquid aqueous carrier component and do not have deleterious or toxic properties which could harm the human or animal to whom the present compositions are administered. Examples of useful tonicity components include sodium chloride, potassium chloride, mannitol, dextrose, glycerin, propylene glycol and mixtures thereof. In one embodiment, the tonicity component is selected from inorganic salts and mixtures thereof.

The present compositions may conveniently be presented as solutions or suspensions in aqueous liquids or non-aqueous liquids, or as oil-in-water or water-in-oil liquid emulsions. The present compositions may include one or more additional ingredients such as diluents, flavoring agents, surface active agents, thickeners, lubricants, and the like, for example, such additional ingredients which are conventionally employed in compositions of the same general type.

The present compositions in the form of aqueous suspensions may include excipients suitable for the manufacture of aqueous suspensions. Such excipients are suspending agents, for example, sodium carboxymethylcellulose, methylcellulose, hydroxypropylmethylcellulose, sodium alginate, polyvinylpyrrolidone, gun tragacanth and gun acacia; dispersing or wetting agents may be a naturally occurring phosphatide, for example, lecithin, or condensation products of ethylene oxide with long chain aliphatic alcohols, for example, heptadecaethyleneoxycetanol, or condensation products of ethylene oxide with partial esters derived from fatty acids and a hexitol such as polyoxyethylene sorbitol mono-oleate, or condensation products of ethylene oxide with partial esters derived from fatty acids and hexitol anhydrides, for example, polyoxyethylene sorbitan mono-oleate, and the like and mixtures thereof. Such aqueous suspensions may also contain one or more coloring agents, one or more flavoring agents and one or more sweetening agents, such as sucrose, saccharin, and the like and mixtures thereof.

The present compositions in the form of oily suspensions may be formulated in a vegetable oil, for example, olive oil, sesame oil or coconut oil, or in a mineral oil such as liquid paraffin. Such suspensions may contain a thickening agent, for example beeswax, hard paraffin or cetyl alcohol. Sweetening agents, such as those set forth above, and flavoring agents may be added to provide a palatable oral preparation.

The present compositions may also be in the form of oil-in-water emulsions. The oily phase may be a vegetable oil, for example, olive oil or arachis oil, or a mineral oil, for example, liquid paraffin, and the like and mixtures thereof. Suitable emulsifying agents may be naturally-occurring gums, for example, gum acacia or gun tragacanth, naturally-occurring phosphatides, for example, soya bean lecithin, and esters or partial esters derived from fatty acids and hexitol anhydrides, for example, sorbitan mono-oleate, and condensation products of the said partial esters with ethylene oxide, for example, polyoxyethylene sorbitan mono-oleate. The emulsions may also contain sweetening and flavoring agents.

The present compositions in the form of syrups and elixirs may be formulated with sweetening agents, for example, as described elsewhere herein. Such formulations may also contain a demulcent, and flavoring and coloring agents.

The specific dose level for any particular human or animal depends upon a variety of factors including the activity of the active component employed, the age, body weight, general health, sex, diet, time of administration, route of administration, rate of excretion, drug combination and the severity of the particular condition undergoing therapy.

In one broad aspect of the invention, complexes are formed in the present compositions. In one embodiment, the complexes include at least one monomer unit of a quinoxaline component. Examples of quinoxaline components include quinoxaline, (2-imidozolin-2-ylamino) quinoxaline, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline , salts thereof, esters thereof, other derivatives thereof, and the like and mixtures thereof. For example, in one embodiment, a complex of the present invention may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units. In another embodiment, the complex may include a conjugation of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline monomer units and Brimonidine tartrate monomer units.

In a preferred embodiment, the complexes of the present invention are dimers. For example, a dimer in accordance with the present invention may include a quinoxaline and a 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline. Preferably, a dimer in accordance with the present invention includes two Brimonidine tartrate monomer units.

Without wishing to limit the invention to any theory or mechanism of operation, it is believed that any peroxide forming agent or strong oxidizing agent such as the oxidative preservative components, for example oxy-chloro components, peroxides, persalts, peracids, and the like, and mixtures thereof may facilitate the formation of the complexes, preferably complexes of alpha-2-adrenergic agonist components. For example, dimers of Brimonidine tartrate monomer units are believed to be formed in the presence of chlorites, preferably stabilized chlorine dioxide.

Furthermore, it is believed that the interactions between the monomers which serve to hold the monomers or mono-

mer subunits together to form a complex, preferably an oligomer and more preferably a dimer, may include, but not limited to, covalent bonding, ionic bonding, hydrophobic bonding, electrostatic bonding, hydrogen bonding, other chemical and/or physical interactions, and the like and combinations thereof. Such complexes may disassociate in liquid, for example, aqueous liquid, media. In one embodiment, the monomers or monomer subunits are held together by other than covalent bonding. In one embodiment, the monomers or monomer subunits are held together by electrostatic bonding or forces.

The following non-limiting examples illustrate certain aspects of the present invention.

EXAMPLE 1

Brimonidine tartrate has a pKa of about 7.78. The pH-solubility profile of 0.5% (w/v) Brimonidine tartrate in a formulation, Ophthalmic Solution, was established in the pH range of about 5 to about 8 at 23° C. Table 1. It will be understood that concentrations of adrenergic agonists other than 0.5% may be used, so long as they have therapeutic activity. Likewise, the temperature may be varied, for example, solubility curves may be performed at 37° C. (98.6° F.). The formulation vehicle was prepared by first dissolving polyvinyl alcohol (PVA) in water. The PVA was added to approximately ⅓ of the required total amount of purified water with constant stirring. The slurry was stirred for 20–30 minutes and then heated to 80–95° C. with constant stirring. The mixture was removed from the heat source within 1 hour after having reached the temperature of 80–90° C. and stirred for an additional 10 minutes to ensure homogeneity (Part I). The other ingredients of the Ophthalmic Solution, except for Brimonidine tartrate, were dissolved in a separate container with an additional ⅓ of the required total amount of purified water (Part II). The PVA mixture (Part I) was then quantitatively transferred to Part II using several rinse volumes of purified water. The solution was adjusted to final volume with purified water without pH adjustment.

Brimonidine tartrate was weighed and transferred to a 10 mL test tube containing 5 mL of the formulation vehicle described above. The pH of each sample was then adjusted to a desired value using dilute sodium hydroxide and/or dilute hydrochloric acid. The samples were placed in a rack on a stir plate and stirred at high speed to achieve uniform mixing for 2 days; a partition was placed between the rack and the stir plate to prevent any heat diffusion from the stir plate to the samples. The temperature of the laboratory was monitored throughout the study and was found to be 23±1° C.

At the end of two days of stirring, the pH value of each sample was measured, and then approximately 1 mL of each sample was placed in a micro centrifuge tube (polypropylene) and centrifuged at 4,000 rpm for 10 minutes. The supernatant was filtered through a 1 $\mu$m filter unit (Whatman, 13 mm, PTFE). The first 3–4 drops of the filtrate were discarded; the rest of the filtrate was received and diluted quantitatively with HPLC mobile phase. The dilute sample was then injected directly on the HPLC column (Dupont Zorbax, 250 mm×4.6 mm, 5 $\mu$m) for Brimonidine tartrate assay in order to quantify the amount of Brimonidine tartrate. A control of 10.05% Brimonidine tartrate was prepared in the formulation vehicle at pH 6.3–6.5 and assayed before (untreated) and after (treated) centrifugation and filtration. This was done to evaluate the potential loss of Brimonidine tartrate in these two steps of the sample preparation. To ensure reproducibility, the study was repeated on consecutive days.

TABLE I

0.5% Brimonidine tartrate in Ophthalmic Solution.

| Ingredient | Percent (w/v) |
|---|---|
| Brimonidine tartrate | 0.50 |
| Benzalkonium Chloride, NF | 0.0050 |
| Polyvinyl Alcohol, USP | 1.4 |
| Sodium Chloride, USP | 0.66 |
| Sodium Citrate, Dihydrate, USP | 0.45 |
| Hydrochloric Acid, NF or Sodium Hydroxide, NF for pH adjustment | 5–8 |
| Purified Water, USP | QS |

The solubility data for Brimonidine tartrate in the formulation vehicles are presented in Table II. The results show that the solubility of Brimonidine tartrate is highly pH-dependent and spans more than two orders of magnitude over the pH range of 5–8. The solubility decreases sharply as the pH increases. The results for the treated and untreated controls are very close, suggesting that centrifugation and filtration does not cause any significant loss of Brimonidine tartrate. The two solubility profiles obtained on consecutive days agree with each other.

TABLE II

Solubility of Brimonidine tartrate in the Ophthalmic Solution Over pH Range of 5 to 8.

| | STUDY 1 | | STUDY 2 | |
|---|---|---|---|---|
| Sample | pH[a] | Solubility[e] | pH[a] | Solubility[e] |
| 1 | 5.55 | ≧164.4[b] | 5.50 | ≧200.6[b] |
| 2 | 5.92 | 132.6 | 5.92 | 160.8 |
| 3 | 6.14 | 30.4 | 6.06 | 50.1 |
| 4 | 6.57 | 7.55 | 6.90 | 3.19 |
| 5 | 7.00 | 2.69 | 7.40 | 1.19 |
| 6 | 7.45 | 1.17 | 7.77 | 0.63 |
| 7 | 7.83 | 0.62 | 7.86 | 0.58 |
| 8 | — | — | 7.88 | 0.54 |
| Control/ (untreated) | — | 0.486[c] | — | — |
| Control/ (treated) | — | 0.484[d] | — | — |

[a]Measured after stirring for two-days before sample withdrawal for centrifugation and filtration.
[b]Represents theoretical concentration based on sample weight. The sample solution was clear indicating that all of the Brimonidine tartrate had dissolved.
[c]Concentration of Brimonidine tartrate in control before centrifugation and filtration step.
[d]Concentration of Brimonidine tartrate in control after centrifugation and filtration step.
[e]% w/v.

EXAMPLE 2

The pH-solubility profiles of Brimonidine tartrate in compositions (solutions) containing SECs and oxy-chloro components were determined. Particularly, the effects of sodium carboxymethylcellulose (CMC), an SEC, on the solubility of Brimonidine tartrate at various pH conditions were determined. The various concentrations of CMC tested with Brimonidine tartrate were 0%, 0.056%, 0.17%, 0.5%, 1.5% (w/v), Table III.

The samples tested also contained isotonic components, buffer components, and stabilized chlorine dioxide (Purite™), Table III. Sodium carboxymethyl-cellulose, sodium chloride, potassium chloride, calcium chloride

dihydrate, and magnesium chloride hexahydrate were USP grade. Boric acid and sodium borate decahydrate were NF grade.

TABLE III

| | Sample 1 | Sample 2 | Sample 3 | Sample 4 | Sample 5 | |
|---|---|---|---|---|---|---|
| Brimonidine tartrate | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| CMC | 0.0% | 0.056% | 0.17% | 0.5% | 1.5% | (w/v) |
| Stabilized chlorine dioxide* | 0.005% | 0.005% | 0.005% | 0.005% | 0.005% | (w/v) |
| Sodium chloride | 0.58% | 0.58% | 0.58% | 0.58% | 0.58% | (w/v) |
| Potassium chloride | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |
| Calcium chloride, dihydrate | 0.02% | 0.02% | 0.02% | 0.02% | 0.02% | (w/v) |
| magnesium chloride hexahydrate | 0.006% | 0.006% | 0.006% | 0.006% | 0.006% | (w/v) |
| boric acid | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | (w/v) |
| sodium tetraborate, decahydrate | 0.14% | 0.14% | 0.14% | 0.14% | 0.14% | (w/v) |

*Sold under the trademark Purite™ by Allergan, Inc.

Each sample (1 through 5) was subjected to a range of pH's from about 7 to about 10. The vials containing the sample solutions were placed on a laboratory rotator and left for equilibration for fifteen days at room temperature (~21° C.). The sample solutions were filtered using a 25 mm diameter polysulfone cellulose acetate syringe type filter with 0.45 μm pore size. The filtered solutions were assayed for Brimonidine.

Conventional HPLC and detection techniques were used to detect and determine the concentrations of soluble Brimonidine tartrate. Table IV. The solubility is plotted against pH for each CMC concentration. The experimental data points were fitted to a modified Henderson-Hasselbalch equation using a nonlinear least squares routine (Deltagraph version 4.0 DeltaPoint, Inc.), FIG. 1. The $R^2$ values show the goodness of fit between the experimental values and the theoretical equation to be better than 0.991.

TABLE IV

| | Solubility of Brimonidine tartrate (%) | | | | |
|---|---|---|---|---|---|
| | 0% CMC | 0.056% CMC | 0.17% CMC | 0.5% CMC | 1.5% CMC |
| pH | | | | | |
| 6.67 | | 0.9302 | | 1.4464 | |
| 6.68 | 1.4256 | | 1.4200 | | |
| 6.93 | | | 0.7302 | | |
| 7.10 | | | | 0.3693 | |
| 7.11 | 0.2064 | 0.2828 | | | |
| 7.35 | | | | | 0.1904 |
| 7.56 | | | | 0.1451 | |
| 7.68 | 0.0786 | | | | |
| 7.77 | | 0.0721 | | | |
| 7.81 | | | 0.0735 | | |
| 8.10 | | | | | 0.0498 |
| 8.46 | | | | 0.0313 | |
| 8.50 | 0.0286 | | | | |
| 8.55 | | | 0.0328 | | |
| 8.67 | | | | | 0.0311 |
| 9.93 | | 0.0234 | | | |
| 9.94 | | | | 0.0250 | |
| 10.05 | | | 0.0241 | | |
| 10.09 | 0.0218 | | | | |
| 10.11 | | | | | 0.0222 |

FIG. 1 clearly shows that the solubility of Brimonidine tartrate tends to increase with increasing CMC concentrations. For example, at pH 7.5, the sample with 0% CMC resulted in 1000 ppm of Brimonidine tartrate; 0.0560% CMC, 1300 ppm; 0.17% CMC, 1300 ppm; and 0.50%, 1600 ppm. At pH 7.5, the sample with 1.5% CMC resulted in about 1400 ppm, which is less than that of a similar solution with CMC at 0.5%. It is unclear at this point what the cause of this observation may be. Nonetheless, Brimonidine tartrate is more soluble in solution with a 1.5% CMC than with no CMC.

CMC is also effective to solubilize Brimonidine tartrate in a biological environment, for example the biological environment of the cornea.

## EXAMPLE 3

Brimonidine Tartrate Dimers

Brimonidine tartrate is added to a test tube containing a composition including chlorite. The test tube was allowed to equilibrate for ten days. Samples obtained from the test tube is analyzed. It is observed that a portion of the Brimonidine tartrate monomer units conjugated to form dimers.

While this invention has been described with respect to various specific examples and embodiments, it is to be understood that the invention is not limited thereto and that it can be variously practiced with the scope of the following claims.

What is claimed is:

1. A therapeutically effective ophthalmic composition comprising:

an alpha-2-adrenergic agonist component in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered; and

a solubility enhancing component other than a cyclodextrin in an amount effective to increase the solubility of the alpha-2-adrenergic agonist component in the composition relataive to the solubility of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

2. The composition of claim 1 wherein the alpha-2-adrenergic component is selected from the group consisting of imino-imidazolines, imidazolines, imidazoles, azepines, thiazines, oxazolines, guanidines, catecholamines, derivatives thereof, and mixtures thereof.

3. The composition of claim 1 wherein the therapeutically active component includes a quinoxaline component.

4. The composition of claim 3 wherein the quinoxaline component is selected from the group consisting of quinoxaline, derivatives thereof, and mixtures thereof.

5. The composition of claim 1 wherein said solubility enhancing component comprises an anionic polymer.

6. The composition of claim 1 wherein the solubility enhancing component is effective to increase the solubility in a biological environment of the alpha-2-adrenergic ago

nist component relative to the solubility in a biological environment of an identical alpha-2-adrenergic agonist component in a similar composition without the solubility enhancing component.

7. The composition of claim 6 wherein the solubility enhancing component comprises an anionic polymer.

8. The composition of claim 3 wherein said solubility enhancing component comprisers an anionic polymer.

9. The composition of claim 1 which further comprises an effective amount of a preservative.

10. The composition of claim 6 which further comprises an effective amount of a preservative.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,673,337 B2
DATED : January 6, 2004
INVENTOR(S) : Olejnik et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 16,
Line 15, delete "0.0560" and insert in place thereof -- 0.056 --
Line 16, delete "0.50" and insert in place thereof -- 0.5 --

Signed and Sealed this

Sixteenth Day of March, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

## PROOF OF SERVICE-UNITED STATES DISTRICT COURT

STATE OF CALIFORNIA, )
) ss.
COUNTY OF LOS ANGELES )

I declare as follows:

I am a resident of the State of California and over the age of eighteen years and not a party to the within action; my business address is 865 South Figueroa Street, Suite 2900, Los Angeles, California 90017. On **May 10, 2007**, I served the foregoing document(s) described as **DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND DEFENDANTS' COUNTERCLAIMS JURY TRIAL DEMANDED** on the interested parties in this action as follows:

☒ by transmitting via facsimile the document(s) listed above to the fax number(s) set fourth below on this date. This transmission was reported as complete without error by a transmission report issued by the facsimile machine upon which the said transmission was made immediately following the transmission.

☐ by placing the document(s) listed above in sealed envelope(s) with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below

☒ by placing the document(s) listed above in sealed envelope(s) and affixing a pre-paid air bill and causing the envelope to be delivered to a Federal Express agent for delivery.

Juanita R. Brooks
brooks@fr.com
Craig E. Countryman
countryman@fr.com
W. Chad Shear
shear@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, California 92130-2081
Tele: (858) 678-5070/Fax: (858) 678-5099

Jonathan Singer
singer@fr.com
Fish & Richardson P.C.
3300 Dain Rauscher plaza
60 S. Sixth St., Ste 3300
Minneapolis, MN 55402
Tele: (612) 337-2534/Fax: (612) 288-9696

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the United States. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postal meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **May 10, 2007**, at Los Angeles, California.

Sylvia A. Berson

HENNIGAN, BENNETT & DORMAN LLP
LAWYERS
LOS ANGELES, CALIFORNIA

# Exhibit M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALLERGAN, INC., and ALLERGAN SALES, LLC,

Plaintiffs,

v.

ALCON INC., ALCON LABORATORIES, INC., and ALCON RESEARCH, LTD.,

Defendants.

Civil Action No. 04-968 (GMS)

**ORDER CONSTRUING THE TERMS OF U.S. Patent Nos. 6,673,337 and 6,641,834**

After considering the submissions of the parties and hearing oral argument on the matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted claims of U.S. Patent No. 6,673,337 (the "'637 patent") and U.S. Patent No. 6,641,834 (the "'834 patent"),

1. The term "solubility enhancing component other than a cyclodextrin" in clam 1 of the '337 patent is construed as "a component that enhances the solubility of the alpha-2-adrenergic agonist component other than a cyclodextrin."

2. The term "similar composition" in claims 1 and 6 of the '337 patent is construed to have its plain and ordinary meaning.

3. The term "about" in claims 1, 3, 10 and 12 of the '834 patent is construed as "approximately."

Dated: July 26, 2005

UNITED STATES DISTRICT JUDGE

FILED
JUL 26 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

# Exhibit N

# DELAWARE LAW REVIEW

VOLUME 7 2004 NUMBER 2

**Solving the Mystery of Patentees' "Collective Enthusiasm" for Delaware**

*Donald F. Parsons, Jr., Jack Blumenfeld, Mary B. Graham, and Leslie Polizoti*

Published by the Delaware State Bar Association

# SOLVING THE MYSTERY OF PATENTEES' "COLLECTIVE ENTHUSIASM" FOR DELAWARE

Donald F. Parsons, Jr., Jack B. Blumenfeld,
Mary B. Graham, and Leslie A. Polizoti*

Although Delaware has long garnered attention for its disproportionate influence in matters of corporation law and its primacy as a forum for corporate disputes, only recently has attention been focused on its prominent role in patent litigation. In fact, the federal bench in Delaware has more experience in resolving patent disputes than any other district in the nation, a fact that has led commentators elsewhere to ask, why Delaware?

In 2001, Professor Kimberly Moore of the George Mason University School of Law published a seminal article reporting on patent litigation in the ninety-four federal judicial districts around the country.[1] She focused on "forum shopping" and the reasons litigants choose to sue where they do. Professor Moore generated a "top ten" list of popular patent venues and found that Delaware ranked sixth. She was surprised by Delaware's stature and was unable from her statistics to find a legitimate reason for "plaintiffs' collective enthusiasm" for Delaware: "[E]ither patent holders are selecting Delaware simply for its convenience (an unlikely answer in light of the size of the state and dearth of industry headquartered there) or patent holders are inaccurately perceiving Delaware to be more favorable to them than it is."[2] Further refinement of her statistics, however, and experience in the District of Delaware yield the mystery's solution.

Delaware's experience in patent litigation reaches back to the beginning of the last century. In the 1920s, Judge Hugh Morris — then the sole federal judge in Delaware

* Vice Chancellor Parsons, prior to his appointment to the Delaware Court of Chancery on October 22, 2003, was a partner at Morris, Nichols, Arsht & Tunnell in Wilmington, Delaware. Mr. Blumenfeld and Ms. Graham are partners at Morris Nichols. All three have specialized in patent litigation and other intellectual property matters for over twenty years each. Ms. Polizoti is an associate in the intellectual property group at Morris Nichols. The authors would especially like to thank Magistrate Judge Mary Pat Thynge, Maria Moore, and Robert Butts at the United States District Court for the District of Delaware and Melissa Stone Myers for their assistance in providing information for this article.

1. Kimberly A. Moore, *Forum Shopping in Patent Cases: Does Geographic Choice Affect Innovation?*, 79 N.C. L. Rev. 889 (2001). The district courts in the ninety-four judicial districts are the exclusive trial courts for "any civil action arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a).

2. Moore, *Forum Shopping*, *supra* note 1, at 918.

— decided many of the country's most important patent cases. In the 1960s and 1970s, Chief Judge Caleb Wright presided over numerous patent cases (involving technologies such as the manufacture of synthetic rubber and polyurethane foam insulation, the zeolite cracking of petroleum to produce gasoline, and the manufacture of transistors), thereby helping "to establish on a national scale the reputation of the District of Delaware as a forum for the expeditious and knowledgeable resolution of patent disputes."[3] This history offers the first clue to patent plaintiffs' choice of Delaware.

Another clue comes from the predictability Delaware offers. Delaware's four district court judges now manage over fifty active patent cases each. This caseload results in a bench with extensive practical experience and a rich collection of rulings that enhance the predictability of patent law as applied in Delaware. As companies have appreciated in bringing their corporate disputes to Delaware's Court of Chancery, predictability can be as important as end results.

Procedural aspects in the Delaware District Court's handling of cases are also attractive to litigants. Delaware offers a stable forum where transfer occurs only in specific circumstances. There is a great likelihood of getting to trial, and predictable case schedules are set.

The final clue comes from the fact that, at the end of the day, there is a high patentee win rate, with juries awarding some of the highest damages in the country.

This article relies on empirical data, complemented by the authors' experience in litigating patent suits in Delaware. The primary source of our data is the Cornell Judicial Statistics Database.[4] The Cornell Database uses data from the Administrative Office of the Courts, the government agency responsible for keeping statistics on federal litigation.[5] Other sources include the District of Delaware Pacer[6] and the U.S. Party/Case Index,[7] which are docketing systems that allow the user to obtain information such as case name, civil action number, filing date, termination date, and docket sheets.

---

3. *See, e.g.*, Arthur G. Connolly, Sr. & Donald F. Parsons, Jr., *Senior Judge Caleb M. Wright's Contributions to the Trial of Complex Patent Cases*, 7 DEL. LAWYER 6 (Mar. 1989).

4. Cornell Judicial Statistics Database, http://teddy.law.cornell.edu:8090/questata.htm (last visited November 29, 2004). This database was created by Theodore Eisenberg and Kevin M. Clermont.

5. *See generally* http://www.uscourts.gov/adminoff.html (last visited November 29, 2004).

6. http://pacer.ded.uscourts.gov (last visited November 29, 2004).

7. http://pacer.uspci.uscourts.gov (last visited November 29, 2004).

## I. DELAWARE'S HISTORICAL PROMINENCE IN PATENT LITIGATION

Delaware has been a popular forum for patent lawsuits for decades.[8] Before the 1989 amendments to the general venue statute, a corporate defendant could be sued where it committed allegedly infringing acts and had an established place of business, or where it was incorporated.[9] As the leading state for incorporation, Delaware often presented an attractive venue to plaintiffs in patent cases, particularly compared to a defendant's own "backyard."

Delaware retained its popularity, however, even after the 1989 venue amendment allowed plaintiffs to bring a patent suit in any judicial district where the defendant was subject to personal jurisdiction — almost anywhere in today's commercial environment.[10] Table 1 shows Delaware's popularity, as measured by the number of patent cases filed, during fiscal years 1987-2004, based on data from the U.S. Party/Case Index. The number of patent cases filed in Delaware has increased steadily.

---

8. *See, e.g.*, Connolly & Parsons, *supra* note 3.

9. The patent venue statute allows suit "in the judicial district where the defendant resides or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). Prior to the 1989 amendment, the Supreme Court defined "resides" narrowly to refer only to the defendant's state of incorporation. David D. Siegel, *Venue In Patent Infringement Suits: Expanded By The New 'Residence' Definition of* 28 U.S.C.A. § 1391(c)?, 1 ALB. L.J. SCI. & TECH. 271, 273 (1991).

10. Congress amended the general venue statute to make venue proper in any district where a corporation is subject to personal jurisdiction, and deemed that district to be the corporation's residence for purposes of the patent venue statute. Siegel, *Venue in Patent Infringement Suits, supra* note 9, at 274. The Federal Circuit, in *VE Holding*, confirmed that the general venue statute's definition of "resides" is applicable to the patent venue statute. VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1583 (Fed. Cir. 1990), *cert. denied*, 499 U.S. 922 (1991).

**Table 1: Number of Patent Cases Filed in Delaware**

| Fiscal Year | Total Number of Patent Cases Filed in Delaware | Number of Patent Cases Filed in Delaware Per Judge |
|---|---|---|
| 1987 | 9 | 2.3 |
| 1988 | 13 | 3.3 |
| 1989 | 15 | 3.8 |
| 1990 | 23 | 5.8 |
| 1991 | 34 | 8.5 |
| 1992[11] | 27 | 6.8 |
| 1993 | 29 | 7.3 |
| 1994 | 35 | 8.8 |
| 1995 | 56 | 14.0 |
| 1996 | 48 | 12.0 |
| 1997 | 65 | 16.3 |
| 1998 | 91 | 22.8 |
| 1999 | 84 | 21.0 |
| 2000 | 97 | 24.3 |
| 2001 | 131 | 32.8 |
| 2002 | 125 | 31.3 |
| 2003 | 122 | 30.5 |
| 2004 | 161 | 40.3 |

In short, this district has remained a popular forum for patent litigation, resulting in significant institutional experience with patent cases.

## II. UNMATCHED JUDICIAL EXPERIENCE

There are four judges and one magistrate judge on Delaware's district court: Chief Judge Sue L. Robinson; Judges Joseph J. Farnan, Gregory M. Sleet, and Kent A.

11. In 1992, the Judicial Conference changed the end of the reporting period for judicial statistics from June 30 to September 30 to correspond to the federal fiscal year. ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, 1992 FEDERAL COURT MANAGEMENT STATISTICS (1992). Therefore, statistics for 1992 cover a fifteen-month period.

Jordan; and Magistrate Judge Mary Pat Thynge. Judge Farnan has been on the bench the longest, having been sworn in on July 26, 1985. Chief Judge Robinson was a magistrate judge from February 1, 1988 until December 15, 1991, when she became a district judge. She was appointed chief judge in 2000. Judge Sleet was appointed as a district judge on September 23, 1998; and Judge Jordan, the newest member of the bench, was appointed on November 27, 2002. Judge Jordan replaced Judge Roderick R. McKelvie, who retired on June 28, 2002 after ten years as a district judge. Magistrate Judge Mary Pat Thynge was appointed on June 17, 1992 and, in effect, filled the half-year vacancy in 2002 left by Judge McKelvie until Judge Jordan's appointment.

As noted above, because of the expansive venue statute, a plaintiff generally can bring a patent case in a number of districts. The number of patent complaints filed per district, therefore, is a reflection of plaintiffs' preferences. We found that Delaware ranks fourth of the ninety-four districts in terms of the number of patent complaints filed since 1994, accounting for about 4.5% of the patent complaints. Consistent with Professor Moore's results, we also found, based on data from 1995-1999, that Delaware ranks seventh of the ninety-four judicial districts in terms of number of patent cases terminated, i.e., resolved.[12]

Adjusting these statistics for the number of judges in each district, however, is a better proxy for the experience that each judge develops with patent cases. Table 2 shows that, during the last ten years, the Delaware district judges have averaged over twenty-three patent complaints filed per judge, per year. The Northern District of California came in a distant second with almost eleven patent cases filed per judge, per year — less than half of Delaware's average.

---

12.    As noted in the introduction, Professor Moore listed the "top ten" patent districts based on the number of patent cases terminated from 1995-1999. From greatest to least terminations, those districts are: Central District of California, Northern District of California, Northern District of Illinois, Southern District of New York, District of Massachusetts, District of Delaware, Southern District of Florida, Eastern District of Virginia, District of New Jersey, and the District of Minnesota. Professor Moore ranked Delaware sixth and the Southern District of Florida seventh. Moore, *Forum Shopping, supra* note 1, at 903. The number of terminations in these jurisdictions is almost identical, so the margins of error in Moore's data and our data easily account for the difference in rank.

**Table 2: Number of Patent Complaints Filed Per Judgeship Per Year 1/1/94-9/30/04**

| Rank | District | Number of Patent Complaints Filed Per Judgeship Per Year |
|---|---|---|
| 1 | Del., D. | 23.4 |
| 2 | Cal., N.D. | 10.4 |
| 3 | Wis., W.D. | 10.1 |
| 4 | Minn., D. | 9.3 |
| 5 | Utah, D. | 7.1 |
| 6 | Cal., S.D. | 6.9 |
| 7/8 | Ill., N.D. | 6.0 |
| 7/8 | Wash., W.D. | 6.0 |
| 9 | Fla., M.D. | 5.8 |
| 10 | Mass., D. | 5.3 |

The number of patent complaints filed per judgeship is derived from the U.S. Party/Case Index.[13] We determined the number of judgeships per district using the ADMINISTRATIVE OFFICE OF THE U.S. COURTS, FEDERAL COURT MANAGEMENT STATISTICS publication for 2000.

Of all the districts, Delaware also resolves the most patent cases per judge. Using Cornell's Judicial Statistics Database, we analyzed the number of terminations with court involvement per district for fiscal years 1998-2000.[14] The top ten districts are shown in Table 3.

---

13. The authors have been informed by the PACER Service Center that the district courts update statistics on PACER from time to time. Therefore, cases may have been filed in the district courts that are not reflected in these numbers. This observation is true for all of the data herein that relies on the U.S. Party/Case Index.

14. Year 2000 is the last year for which information is available on the Cornell Judicial Statistics website. Although it is possible to get pre-1998 data, we chose to focus on the most recent three years of data. Note that these are terminations with court involvement.

**Table 3: Patent Cases Terminated With Court Involvement Per Judge Per Year, 1998-2000**

| Rank | District | Number of Patent Cases Terminated Per Judge Per Year |
|---|---|---|
| 1 | Del., D. | 13.3 |
| 2 | Wis., W.D. | 8.7 |
| 3 | Minn., D. | 5.4 |
| 4 | Mich., W.D. | 5.1 |
| 5 | Wash., W.D. | 3.9 |
| 6 | Cal., S.D. | 3.7 |
| 7 | Tex., N.D. | 3.4 |
| 8 | Utah, D. | 3.3 |
| 9 | Cal., N.D. | 3.2 |
| 10 | Ill., N.D. | 3.1 |

On average, Delaware district judges resolve more cases per year than any other district judges in the country. Of the top ten districts in Table 3, district judges in Delaware resolve, on average, three times more patent cases than judges in the bottom half of the top ten and about one and a half times more than the judges in the second-highest ranking district.

Unquestionably, Delaware's judges can rightfully claim first place in experience with patent litigation.

## III. PREDICTABLE CASE MANAGEMENT

Patent cases brought in Delaware have a high likelihood of staying in Delaware. The court employs predictable case scheduling practices, while, at the same time, the court is open to new ideas for better case management.

### A. Rare Transfer

Transfer motions in Delaware are rarely granted. This factor may be important to patentees who wish to avoid suit in the defendant's backyard, given that a likely forum for transfer is the defendant's home turf. Since 1990, only 3.8% of all patent cases filed in

Delaware have been transferred. Of the transfer motions granted, more than half involved related litigation in another forum.

### B. Early Scheduling Conference and Predictable Dates

The District of Delaware distinguishes itself by holding a scheduling conference early on, where all dates in the litigation — including a trial date — are set. Although the exact timing depends on the judge, scheduling conferences are usually held within three months of filing. Trial dates are set at the scheduling conference and are usually slated for sixteen to twenty-two months after filing. Barring unforeseen circumstances or agreement of the parties, that date usually holds. Thus, unlike in many other districts where the trial date may be uncertain, far off, or subject to last-minute scheduling or deferral, litigants in Delaware have predictability about when they will get to trial.

The Delaware judges resolve patent cases quickly. Table 4 shows the total number of patent cases pending, terminated, and filed in Delaware as of December 31 each year from 1991-2002.

**Table 4: Number of Patent Cases in Delaware Pending, Terminated, and Filed as of 12/31**

| Year | Pending as of 12/31 | Terminated as of 12/31 | Filed as of 12/31 |
|---|---|---|---|
| 1991 | 84 | 40 | 18 |
| 1992 | 60 | 31 | 32 |
| 1993 | 40 | 43 | 25 |
| 1994 | 48 | 30 | 37 |
| 1995 | 78 | 33 | 60 |
| 1996 | 82 | 48 | 51 |
| 1997 | 99 | 44 | 61 |
| 1998 | 134 | 66 | 99 |
| 1999 | 151 | 69 | 83 |
| 2000 | 177 | 72 | 97 |
| 2001 | 203 | 115 | 144 |
| 2002 | 188 | 135 | 117 |



The number of patent cases pending and terminated are data provided to us by the Delaware District Court. The number of cases filed as of December 31 is from the U.S. Party/Case Index.

The Delaware judges take about 1.35 years (about 16 months), on average, to resolve a patent case. To calculate this statistic, we documented the date filed and the date closed of the patent suits filed in 1999, 2000, and 2001 in Delaware using the U.S. Party/Case Index and calculated the time from filing until closing:

| Year | Number of Patent Cases Filed | Number of Patent Cases Closed | Average Time to Termination |
|---|---|---|---|
| 1999 | 83 | 81 | 1.49 |
| 2000 | 97 | 93 | 1.35 |
| 2001 | 144 | 131 | 1.2 |

Because there are still cases pending for each of these years, we can expect the average time from filing to closing to rise slightly.

Professor Moore categorized Delaware as a "slow" district, which was one reason she was unable to explain "plaintiffs' collective enthusiasm" for Delaware.[15] From her data, Professor Moore concluded that the average time from filing to closing of patent cases filed in 1995-1999 in all jurisdictions was 1.12 years, with the quickest districts with fifty or more patent cases having average terminations of .43-.77 years.[16] Delaware's average time of resolution for cases filed during that time was 1.68 years. The fact that Delaware has so many patent trials (*see infra* Part IV) but takes only eight months longer, on average, than the average time of disposition indicates that most of its patent cases (including those that reach trial) are resolved relatively quickly.

### C. Flexible Approaches

The Delaware judges experiment with procedures to resolve patent cases efficiently and effectively, with frequent consultation with litigants about best practices. For example, Chief Judge Robinson and an ad hoc committee have established a default standard for discovery of electronic documents to be used in cases pending before her (and which is available for use by the other Delaware district judges) if the parties are unable to agree on procedures for electronic discovery. Judge Jordan has revitalized the District of Delaware Intellectual Property Advisory Committee, consisting of experienced patent litigators from Delaware and around the country, as a means for the court to discuss efforts to continue to improve the administration of justice in intellectual property cases in Delaware.

The court is now experimenting with the use of special masters for discovery disputes in patent cases. On September 15, 2004, the court established a Special Master Panel for Intellectual Property Cases:

> [G]iven this Court's significant docket of complex intellectual property cases and given that this Court's Magistrate Judge is routinely scheduling hearings and mediation calendars six to eight months out, the need to appoint Special Masters to achieve these stated goals [of effective case management and prompt disposition] is clear.

When judges appoint a special master in an intellectual property case, the matter will be referred to the panel, which will assign a special master from the panel. Judge

---

15. Moore, *Forum Shopping, supra* note 1, at 909.

16. *Id.* at 908.

Farnan was the first to make a referral to the panel in the *St. Clair v. Canon* case, when he appointed a special master to resolve a dispute regarding St. Clair's assertion of privilege for documents sought by the defendants.[17] Chief Judge Robinson recently appointed a special master in three of her patent cases.[18]

Even before the court's September 15th order, special masters were occasionally appointed to handle a variety of issues, such as pre-trial matters, claim construction, and discovery disputes. Notwithstanding the creation of the Special Master Panel, members of the court have emphasized that special masters will be appointed only on those few occasions where circumstances warrant their use.

## IV. FREQUENT PATENT TRIALS

Patentees can appreciate that prospects are good for their patent cases reaching trial in Delaware and know that their trials will be handled by an experienced trial judge.

### A. A High Number of Trials

More patent trials are held in Delaware than in any other district. Since the beginning of 1997 (to September 30, 2004), there have been at least seventy patent jury trials and thirty-eight patent bench trials in Delaware.[19] During this time, Judge Farnan has presided over twenty-three patent jury trials and at least thirteen patent bench trials. Chief Judge Robinson has conducted twenty-two jury and at least thirteen bench trials. Judge Sleet, since joining the bench in 1998, has held five jury trials and at least two bench trials. Judge Jordan has presided over one patent bench trial and four patent jury trials, including one that settled before the trial concluded. Magistrate Thynge has presided over two jury trials and one bench trial.

Indicative of how many patent trials Delaware judges conduct, only one *district* held more patent jury trials than Judge Farnan, and only ten of the ninety-four *districts* held more than Chief Judge Robinson, based on data from 1997-2000.

---

17.    C.A. No. 03-241-JJF (D.I. 843).

18.    British Telecom. v. Qwest Comm'ns, C.A. No. 03-527-SLR (D.I. 96); British Telecom. v. Level 3 Comm'ns, C.A. No. 03-530-SLR (D.I. 161); Amco Corp. v. British Telecom., C.A. No. 04-222-SLR (D.I. 94).

19.    The bench trials include trials of equitable issues, where infringement or invalidity were tried to a jury.

Over 16% of patent cases in Delaware reach trial:

**Table 5: Percentage of Patent Cases Reaching Trial (Bench and Jury) in Districts Trying at Least Ten Patent Cases During 1995-2000**

| District | Number of Patent Trials 1995-2000 | Number of Patent Cases Filed 1995-2000 | Percent Patent Cases Actually Tried |
|---|---|---|---|
| Del., D. | 73 | 451 | 16.2% |
| Wis., W.D. | 13 | 118 | 11.0% |
| Wis., E.D. | 13 | 137 | 9.5% |
| Tex., W.D. | 10 | 115 | 8.7% |
| Or., D. | 10 | 129 | 7.8% |
| Fla., M.D. | 18 | 234 | 7.7% |
| Colo., D. | 14 | 188 | 7.4% |
| Va., E.D. | 22 | 345 | 6.4% |
| Minn., D. | 13 | 356 | 3.7% |
| Ill., N.D. | 27 | 740 | 3.6% |
| N.Y., S.D. | 17 | 470 | 3.6% |
| Ohio, N.D. | 10 | 282 | 3.5% |
| Tex., N.D. | 11 | 317 | 3.5% |
| Cal., N.D. | 28 | 842 | 3.3% |
| Mass., D. | 11 | 405 | 2.7% |
| Cal., C.D. | 14 | 1166 | 1.2% |

The number of patent trials is based on the Cornell Judicial Statistics Database; the number of patent cases filed is from the U.S. Party/Case Index; and the percent of patent cases actually tried is the district's historical percentage, calculated by dividing the number of trials by the number of cases filed.

As shown by Table 5, Delaware has the highest percentage of patent cases reaching trial.

### B. Infrequent Summary Judgment

Trials presumably occur so frequently in Delaware in part because summary judgment motions disposing of the entire case are rarely granted. For example, in 2003 there were sixty-four rulings on summary judgment motions. The vast majority (70.3%) were denied.

Of those granted, none disposed of the entire case. Similarly, from January to September 2004, there were forty-seven rulings on summary judgment motions. About 60% were denied, and none of the motions that were granted disposed of the entire case.

In particular, the judges rarely grant summary judgment in patent bench trials. It is the practice of some of the judges not to entertain summary judgment motions or claim construction hearings prior to a patent bench trial.[20] This type of schedule virtually ensures a trial, absent settlement, which can make settlement look more attractive to a defendant, who knows it cannot easily avoid trial or delay the case by the device of an inappropriate summary judgment motion. Such scheduling orders, however, are always subject to the parties' ability to convince the court that a case could be disposed of by motion before trial.

For patent jury trials, Judges Farnan and Sleet have put in place screening procedures for summary judgment motions. Judge Farnan, for example, requires a party filing a motion for summary judgment to include a "statement certifying that no genuine issues of material fact exist with regard to the facts argued in support of the motion." In lieu of an answering brief, the party opposing the motion may file a counter-statement "certifying that genuine issues of material fact exist and setting forth the material facts the party contends are disputed." The movant then files a response to the counter-statement. If the court decides that there are no factual disputes, the parties then submit answering and reply briefs.

Judge Sleet's procedures require submittal of short letter-briefs seeking permission to file a motion for summary judgment. Answering and reply letter-briefs are permitted. The court then holds a status conference to determine whether any of the proposed motions will be allowed. If so, briefing commences pursuant to the district's local rules. As with the prohibitions on summary judgment and claim construction in bench trials described above, these screening procedures for case-dispositive motions increase the likelihood that a case will reach trial.

## V. HIGH WIN RATES AND HIGH DAMAGES

One reason Professor Moore expressed an inability to explain Delaware's popularity as a patent forum was her conclusion that patentees prevailed at trial (as opposed

20. *See, e.g.*, KAO Corp. v. Unilever U.S. Inc., C.A. No. 01-680-SLR (D.I. 65) (disallowing summary judgment motions and claim construction hearing); Original Creatine Patent Co. v. Muscletech Research & Development, Inc., C.A. No. 02-366-SLR (D.I. 29) (same); Astrazeneca AB v. Andrx Pharmaceuticals, LLC, C.A. No. 04-080-SLR (D.I. 21) (same); Merck & Co. v. Teva Pharms. USA, Inc., C.A. No. 00-035-JJF (D.I. 121) (disallowing claim construction hearing); Bayer AG v. Sony Electronics, Inc., C.A. No. 95-8-JJF (D.I. 494) (same); C.A. No. 01-294-RRM (D.I. 146), published in 209 F. Supp. 2d 348 (D. Del. 2002) (same).

to win rates based on pre-trial disposition) only 46% of the time. This percentage placed Delaware ninth among her top ten districts. She found that the highest-ranking district was the Northern District of California, at 68%.[21] Thus, Professor Moore concluded that Delaware is among the least favorable of her top ten districts for patentees[22] and that "either patent holders are selecting Delaware simply for its convenience ... or patent holders are inaccurately perceiving Delaware to be more favorable to them than it is."[23]

Professor Moore's calculation of a win rate, which comprises verdicts from both bench and jury trials, warrants careful examination. Generally, consistent with anecdotal data, the win rate for bench trials is lower than the win rate for jury trials.[24] Because patentees typically have the option to demand a jury trial, we recalculated win rate based on the number of jury verdicts where damages were awarded to the patentee. Our statistics show that Delaware is a more favorable forum for patentees who demand a jury trial than indicated by Professor Moore. Of the patent jury trials with verdicts occurring between 1997 and September 30, 2004 in which the jury was asked to award damages, thirty-eight of fifty-seven juries — or 67% — awarded damages to the patentee. Of the patent jury trials with verdicts in 2002 through September 30, 2004, about 80% of the juries awarded damages to the patentee.

The significance to litigants of the patentee win rate at trial may also depend on the probability that a case will reach trial in that jurisdiction, given the general view that summary judgment is a device for defendants. Thus, the probability of reaching trial should also be considered in determining how favorable a district is for patentees. A district with a lower win rate at trial (the measure used by Professor Moore) may in fact be more favorable to patentees if patent cases in that district have a higher probability of surviving summary judgment and reaching trial. Conversely, a district's apparently high win rate at trial may reflect a less patentee-friendly forum if patent cases in that district are rarely tried.[25]

---

21. Moore, *Forum Shopping, supra* note 1, at 917.

22. *Id.*

23. *Id.* at 918.

24. *See generally* Kimberly A. Moore, *Judges, Juries and Patent Cases — An Empirical Peek Inside the Black Box*, 99 MICH. L. REV. 365 (2000).

25. For example, suppose District X has a low 40% win rate at trial and a high 20% chance of getting to trial. The chance of a patentee getting to trial and winning is 8%. Alternatively, suppose District Y has a high 60% win rate at trial but a low 5% probability of getting to trial. The chance of getting to trial and winning is 3%.

In Table 6, we used Professor Moore's win rates from 1983-1999 and reordered her top ten jurisdictions based on the probability that a patentee will get to trial and win:

**Table 6: Professor Moore's Top Ten Districts Ordered By Probability of Getting to Trial and Winning**

| District | Number of Patent Cases Filed 1983-1999 | Number of Patent Trials 1983-1999 | Percent of Patent Cases Going to Trial | Moore's Win Rate for Bench and Jury Trials | Probability of Getting to Trial and Winning |
|---|---|---|---|---|---|
| Del., D. | 571 | 116 | 20.3% | 46% | 9.3% |
| Va., E.D. | 445 | 41 | 9.2% | 58% | 5.3% |
| Ill., N.D. | 1036 | 87 | 8.4% | 48% | 4.0% |
| Minn., D. | 553 | 32 | 5.8% | 67% | 3.9% |
| Cal., N.D. | 1191 | 67 | 5.6% | 68% | 3.8% |
| N.Y., S.D. | 780 | 43 | 5.5% | 63% | 3.5% |
| Cal., C.D. | 1511 | 77 | 5.1% | 63% | 3.2% |
| Fla., S.D. | 516 | 25 | 4.8% | 63% | 3.0% |
| N.J., D. | 632 | 30 | 4.7% | 61% | 2.9% |
| Mass., D. | 657 | 35 | 5.3% | 30% | 1.6% |

The probability that a patent case will get to trial is based on historical data of the number of patent cases that went to trial in the district. To determine the number of patent suits filed, we used the U.S. Party/Case Index. The number of patent trials is from the Cornell Judicial Statistics Database.

*Even using Professor Moore's win rate at trial,* the probability of a patentee's reaching trial and winning during 1983-1999 in Delaware is almost twice that of any of her top ten patent districts. Thus, there is a far higher probability of reaching trial and winning a patent case in this district than in any of Professor Moore's top ten patent districts.

We also extended Professor Moore's analysis by calculating the size of damages awards in patent cases, which provides another potential explanation for Delaware's popularity as a patent forum. Using the Cornell Judicial Statistics Database, we sampled the

damages awarded in patent jury trials over three time periods.[26] The District of Delaware consistently ranks in the top three jurisdictions having the highest damages awarded.

We first analyzed the average amounts awarded in patent jury trials between 1978-2000 in districts with at least ten jury trials. Delaware ranks second to the Western District of Texas. A more recent sample of the seventeen districts that held at least ten patent jury trials between 1990-2000 produced the same result: Delaware is second to the Western District of Texas for highest average amount awarded. Of Professor Moore's top ten patent jurisdictions, Delaware has the highest average amount awarded in patent jury trials from 1995-1999 (the time period Professor Moore used to generate her top ten districts).

That damages awards in Delaware are, on average, among the highest in the country may help to explain why plaintiffs file patent litigation there, particularly when one considers that patentees who sue in Delaware have the highest probability of getting to trial and winning in patent cases of any jurisdiction.

## VI. THE MEDIATION BONUS

Most patent cases in the District of Delaware are referred to Magistrate Judge Mary Pat Thynge for mediation. Indeed, Chief Judge Robinson's, Judge Sleet's, and Judge Jordan's standard patent scheduling orders all contain a referral to Judge Thynge. Mediation provides an opportunity to settle a case without the full expense and risks of litigation. Mediation in Delaware with Judge Thynge has the additional benefit of mediating before someone who is sophisticated with patent matters and is well respected.

In the ten years starting January 1, 1993, Judge Thynge mediated 893 cases. As of January 2003, twelve of these cases were still in various stages of mediation.[27] Of 893 cases, 203 were patent matters. Of those 203 cases, 136.5 (67.2%) settled at or after the mediation. About twenty-three patent matters settled before mediation.

According to the magistrate judge:

> [I]t seems that it was more common for non-patent matters to settle before mediation when it was first introduced in our jurisdiction. Now

26. Although Administrative Office of the Courts' data is widely used, it should be understood that there are certain limitations to the data's accuracy. For example, only damages awards up to $9,999,000 are recorded. So, a $200 million damage award is reported as a $10 million award. *See, e.g.*, Moore, *Judges, Juries and Patent Cases*, *supra* note 24, at 381.

27. As of January 2003, the magistrate judge had mediated 690 non-patent matters, of which 567.5, or 82%, settled via mediation.

> counsel appear to have more of a comfort level with our process. Local counsel's familiarity with mediation at that time had been limited to mediation in the state court, which due to the larger number of cases is more like a settlement conference with time limitations (usually 2-3 hours) and no follow up meetings, [telephone conferences] or emails.

From January 2002 to January 9, 2003, Judge Thynge mediated fifty-eight cases, in addition to handling former Judge McKelvie's caseload. Twenty of the fifty-eight were patent matters, and almost all of those settled (87.5%). Judge Thynge also presided as trial judge, by consent of the parties, over at least two patent cases — *Genzyme v. Atrium*[28] and *Honeywell v. Universal Avionics*[29] — and is expected to hear at least three more in 2004.[30]

## CONCLUSION

Delaware has long been a top patent venue. Patentees continue to choose this district for several reasons relating to all aspects of their cases. The Delaware district judges have a history of receptivity to patent cases and have unparalleled experience given the district's record of having the most patent trials, both per district and per judge. The judges set predictable case schedules within the first few months of a complaint being filed, including a trial date, which is rarely moved. Patent cases are rarely transferred except in predictable circumstances and are infrequently disposed of by summary judgment. The Delaware judges experiment with new ways to handle patent litigation more efficiently and effectively. Of Professor Moore's top ten districts, Delaware has the highest probability of a patentee's reaching trial and winning. Moreover, patent juries in Delaware award higher damages, on average, than patent juries in most other districts in the country. Finally, patent litigants in Delaware can mediate with Magistrate Judge Thynge and take advantage of her patent litigation experience.

All of these reasons taken together, which comport with the authors' experience, demonstrate that the reasons for patentees' choice of the District of Delaware are rational, fully understandable, and legitimate. The mystery is solved.

---

28. C.A. No. 00-958 (D.I. 213).

29. C.A. No. 02-359.

30. Inline Connection v. AOL Time Warner, Inc., C.A. No. 02-272 (D.I. 23); Inline Connection v. Earthlink, C.A. No. 02-477 (D.I. 14); Honeywell Int'l Inc. v. Universal Avionics, C.A. No. 03-242 (D.I. 10).

# Exhibit O

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

IN RE: )
)
ELECTRONIC CASE FILING )
POLICIES AND PROCEDURES )
)

**O R D E R**

Effective March 1, 2005, all documents submitted for filing in both new and pending civil and criminal cases, except those documents specifically exempted, shall be filed either electronically using the Federal Judiciary's case management and electronic filing system known as CM/ECF, or on a properly labeled 3.5" floppy or compact disk. CM/ECF permits electronic filing, signing and verification of pleadings and other papers with the Clerk of Court through the Court's public web site, allows parties to use the Court's transmission facilities to make service when appropriate, and authorizes the Clerk of Court to serve notice of orders and judgments electronically.

At Wilmington this 8th day of February, 2005,

IT IS ORDERED THAT:

1. The Court adopts the attached Administrative Procedures Governing Filing and Service by Electronic Means and directs that

they be applied and interpreted in connection with the Court's CM/ECF User's Manual.

2. The Clerk of Court may amend the CM/ECF User's Manual from time to time as appropriate, and shall make copies of this Order and the User's Manual available to the bar and public in the Clerk's Office and on the Court's public web site.

Chief Judge

Judge

Judge

Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

# *REVISED* ADMINISTRATIVE PROCEDURES GOVERNING FILING AND SERVICE BY ELECTRONIC MEANS

## ELECTRONIC FILING and PDF

Electronic Filing is the process of uploading a document from a user's computer, utilizing the Court's Internet-based Case Management and Electronic Case Filing (CM/ECF) system, to file the document in the Court's case file. CM/ECF accepts documents in a portable document format (PDF).

Electronically converted PDF's are created from word processing documents (MS Word, WordPerfect, etc) using Adobe Acrobat or similar software. They are text searchable and their file size is small. Scanned PDF's are created from paper documents run through an optical scanner. Scanned PDF's are not searchable and have a large file size.

***PDF documents filed electronically shall not exceed 4 megabytes in size.***

---

## ADMINISTRATIVE PROCEDURES

### (A) General Information

(1) **Effective March 1, 2005, all documents submitted for filing in both new and pending civil and criminal cases,** except those documents specifically exempted in subsection (G) of these procedures, shall be filed either electronically using CM/ECF or on a properly labeled 3.5" floppy or compact disk in PDF so that the document can be added to the electronic case file.

(2) The official Court record in CM/ECF cases shall be the electronic file maintained on the Court's servers, together with any paper attachments and exhibits filed in accordance with these procedures.

(3) In instances where the Local Rules or Scheduling Orders provide for the filing of an additional copy, a courtesy paper copy of an electronically filed document shall be delivered to the Clerk's Office by the next business day. Motions for admission *pro hac vice* shall not require a courtesy paper copy.

(4) The Clerk's Office may discard the PDF disk after it has been uploaded to CM/ECF.

(5)     All documents filed by electronic means must comply with technical standards, if any, established by the Judicial Conference of the United States or by this Court.

**(B)     Registration**

(1)     All users of CM/ECF must register with the Court to receive a log-in and password.  Registration information is available on the Court's web page at www.ded.uscourts.gov.

(2)     Attorneys admitted to the bar of this Court, including those authorized to represent the United States, shall register as users of CM/ECF prior to filing any pleadings.  Prior to registration, attorneys must attend a training session sponsored by the Court.  Registration shall continue to be effective provided the user remains a bar member in good standing.

(3)     An attorney retained in a criminal case who is not admitted to the bar of this Court shall register as a user of CM/ECF solely for purposes of the criminal action.   Registration requires identification of the case as well as the name, address, telephone number and Internet e-mail address of the attorney.  Familiarity with Delaware's CM/ECF practices and procedures will be required.

(4)     Upon approval of the judge, a party to a case who is not represented by an attorney may register as a user of CM/ECF solely for purposes of the action.  Registration requires completion of a court-provided training course, identification of the case as well as the name, address, telephone number and Internet e-mail address of the party.  If, during the course of the case, the party retains an attorney who appears on the party's behalf, the attorney must advise the Clerk of Court to terminate the party's registration as a user upon the attorney's appearance.

(5)     A user registered in CM/ECF shall not allow another person to file a document using his or her log-in and password, except as an authorized agent of the user.  Use of a user's log-in and password by an authorized agent shall be deemed to be the act of the user.  Attorneys who are not admitted to the bar of this Court or admitted solely pro hac vice shall not be considered authorized agents.

(6)     Registration constitutes consent to service of all documents by electronic means as provided in these procedures.

**(C)     Filing and Service of Civil Case Opening Documents**

(1)     Civil case opening documents, such as a complaint, petition, or notice of removal, together with a summons, civil cover sheet and any applicable Rule 7.1 disclosure, shall be filed both in paper format and on a properly labeled 3.5" floppy or compact disk in PDF, so that the documents can be added to CM/ECF.

(2) The Clerk's Office will return to counsel for the plaintiff a signed and sealed summons for service of process. A party may not electronically serve a civil complaint, but shall effect service in the manner consistent with Fed.R.Civ.P.4.

**(D) Electronic Filing**

(1) Electronic transmission of a document to CM/ECF, together with the transmission of a Notice of Electronic Filing (NEF) from the Court, constitutes filing of the document for all purposes of the Federal Rules of Civil Procedure and constitutes entry of the document on the docket maintained by the Clerk pursuant to Fed.R.Civ.P.58, Fed.R.Civ.P.79 and Fed.R.Crim.P.55.

(2) Before filing a scanned document with the Court, a user must verify its legibility.

(3) A document filed electronically shall be deemed filed at the time and date stated on the NEF received from the Court.

(4) All pleadings filed electronically shall be titled in accordance with the approved dictionary of civil or criminal events listed in CM/ECF.

**(E) Service of Electronically Filed Documents**

(1) Whenever a pleading or other document is filed electronically, CM/ECF will automatically generate and send a NEF to the user and to all other attorneys or parties of record who are registered as users in CM/ECF. The user(s) shall retain a paper or digital copy of the NEF, which shall serve as the Court's datestamp and proof of filing.

(2) Transmission of the NEF shall constitute service of the filed document and shall be deemed to satisfy the requirements of Fed.R.Civ.P.5(b)(2)(D), Fed.R.Civ.P.77(d) and Fed.R.Crim.P.49(b).

(3) Attorneys who have not yet registered as users with CM/ECF, as well as pro se litigants not registered with CM/ECF, shall be served a paper copy of any electronically filed pleading or other document in accordance with the provisions of Fed.R.Civ.P.5.

***(4) In cases involving pro se parties, all documents filed using CM/ECF shall include a certificate of service identifying the manner in which the service on each party was accomplished. A sample certificate of service form is attached as Form A.***

***(5) In cases in which all parties and/or counsel are registered as users with CM/ECF, the NEF shall serve as the certificate of service of the filed document, and a separate certificate of service shall not be filed.***

(6) Service by electronic means shall be treated the same as service by mail for the purpose of adding three (3) days to the prescribed period to respond.

**(F) Deadlines**

Filing documents electronically does not in any way alter any filing deadlines. All electronic transmissions of documents must be completed prior to midnight, Eastern Time, in order to be considered timely filed that day. Where a specific time of day deadline is set by Court order or stipulation, the electronic filing must be completed by that time.

**(G) Special Filing Requirements and Exceptions**

(1) Documents ordered to be placed under seal must be filed in hard copy in the traditional manner, rather than electronically. However, for civil cases, redacted versions of the sealed documents shall be filed electronically within 5 business days of the filing of the sealed document. **Unless otherwise ordered, courtesy copies of redacted versions of sealed documents shall not be filed**. A motion to file documents under seal may be filed electronically unless prohibited by law. The order of the Court authorizing the filing of documents under seal may be filed electronically unless prohibited by law. A paper copy of the order must be attached to the documents under seal and be delivered to the Clerk of Court.

(2) The following documents **shall be filed only on paper**:

(a) Administrative records in social security cases and in other administrative review proceedings;
(b) The State Court record and other Rule 5 materials in habeas corpus cases filed in 28 U.S.C. §2254 proceedings;
(c) ***Documents exceeding 4 megabytes;***
***(d) Medical records (shall be filed under seal with no redacted version);***
(e) Initial papers of a criminal nature such as the indictment, information, criminal complaint, application for search warrant, as well as any superseding indictment or information.

(3) The following documents **may be scanned by counsel** and filed using CM/ECF, **or filed on paper:**

(a) Rule 4 executed service of process documents; and
(b) Attachments to filings (See subsection (J)).

(4) A notice of appeal may be filed using CM/ECF. The applicable filing fee must be remitted to the Clerk's Office within 24 hours (excluding weekends, holidays, and days the Court is closed) of filing the notice of appeal. ***As an alternative, counsel***

***may elect to pay the filing fee by credit card using CM/ECF.*** A motion for leave to proceed in forma pauperis may be filed using CM/ECF at the time that the notice of appeal is filed.

(5) An attorney may apply to the Court for permission to file paper documents.

**(H) Signature**

(1) Attorneys

The user log-in and password required to submit documents to CM/ECF shall serve as that user's signature for purposes of Fed.R.Civ.P.11 and for all other purposes under the Federal Rules of Civil Procedure and the Local Rules of this Court. All electronically filed documents must include a signature block and must set forth the attorney's name, address, telephone number and e-mail address. The name of the CM/ECF user under whose log-in and password the document is submitted must be preceded by a "/s/" and typed in the space where the signature would otherwise appear.

(2) Multiple Signatures

The filer of any document requiring more than one signature (e.g., stipulations, joint status reports) must list thereon all the names of other signatories by means of a "/s/"_____block for each. By submitting such a document, the filing attorney certifies that each of the other signatories has expressly agreed to the form and substance of the document and that the filing attorney has their actual authority to submit the document electronically. The filing attorney shall retain any records evidencing this concurrence for future production, if necessary, until two (2) years after the expiration of the time for filing a timely appeal. A non-filing signatory or party who disputes the authenticity of an electronically filed document containing multiple signatures must file an objection to the document within ten days of the date on the NEF.

(3) Affidavits

Affidavits shall be filed electronically; however, the electronically filed version must contain a "/s/_____" block indicating that the paper document bears an original signature. By submitting such a document, the filing attorney certifies that each of the other signatories has expressly agreed to the form and substance of the document and that the filing attorney has their actual authority to submit the document electronically. The filing attorney shall retain the original for future production, if necessary, for two (2) years after the expiration of the time for filing a timely appeal.

**(I) Privacy**

To address the privacy concerns created by Internet access to Court documents, unless otherwise ordered by the Court, certain personal data identifiers in pleadings and other papers shall be redacted as follows:

(1) Names of minor children - only initials shall be used;

(2) Social security numbers - only the last four digits shall be used;

(3) Dates of birth - only the year shall be used;

(4) Financial account numbers - only the last four digits shall be used;

(5) Home addresses - only the city and state shall be used in criminal cases.

A sealed and otherwise identical document containing the un-redacted personal data identifiers may be filed in paper format along with the required redacted document. The sealed document will be retained by the Court as a part of the record.

**NOTE:** It is not the responsibility of the Clerk's Office to review each document to determine if pleadings have been modified and are in the proper form. The responsibility for redacting personal identifiers rests solely with counsel and the parties.

Caution shall also be exercised when filing documents that contain the following:

- Personal identifying numbers, such as driver's license numbers;
- Medical records, treatment and diagnosis ***(shall be filed under seal with no redacted version)***;
- Employment history;
- Individual financial information;
- Proprietary or trade secret information;
- Information regarding cooperation with the government;
- Victim information; and
- National security information.

**(J) Attachments to Filings and Exhibits (other than hearing and trial exhibits)**

(1) Attachments to filings and exhibits must be filed in accordance with the Court's CM/ECF User Manual, unless otherwise ordered by the Court.

(2) Users shall not attach as an exhibit any pleading or other paper already on file with the Court in that case, but shall merely refer to that document by file date and docket item number when applicable.

(3) Attachments and exhibits larger than ***4 megabytes*** may be filed electronically in separate ***4 megabyte*** segments or may be bound and submitted in conventional format. The filing party must serve copies on all other parties in the manner in which the documents were filed with the Court.

**(K) Orders and Judgments**

(1) Proposed orders may be submitted electronically in PDF. All proposed orders must be either attached as an exhibit to a motion or stipulation, or contained within the body of a stipulation.

(2) A judge or deputy clerk, if appropriate, may grant routine orders by a text-only entry upon the docket. In such instances, no PDF document will be issued; the text-only entry shall constitute the Court's only order on the matter and counsel will receive a system-generated NEF.

(3) All orders, decrees, judgments, and proceedings of the Court filed electronically will constitute entry on the docket kept by the Clerk under Fed.R.Civ.P. 58 and 79.

**(L) Facsimile Transmissions**

No pleadings or other documents shall be submitted to the Court for filing by facsimile transmission without prior leave of Court.

**(M) Technical Failures**

A user whose filing is made untimely as the result of a technical failure may seek appropriate relief from the Court.

**(N) Pro Se Litigation**

A party to a case who is not represented by an attorney may file and serve all pleadings and other documents on paper. Upon approval of the judge, a pro se party may register as a user of CM/ECF in accordance with subsection (B) of these procedures.

**(O) Access to Electronically Stored Documents**

A person may review at the Clerk's Office filings that have not been sealed by the Court. A person also may access CM/ECF at the Court's Internet site, www.ded.uscourts.gov, by obtaining a PACER log-in and password. A person who has PACER access may retrieve docket sheets and documents. Only a user under subsection (B) of these procedures may file documents.

# Form A

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CERTIFICATE OF SERVICE

I hereby certify that on , I electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following: . I hereby certify that on ,I have mailed by United States Postal Service, the document(s) to the following non-registered participants:

/s/Name of Attorney
Law Firm Name & Address
Law Firm Phone Number
Attorney's E-mail Address

# Exhibit E

**BEFORE THE**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE BRIMONIDINE PATENTS LITIGATION | ) ) | MDL Docket No. ________________ |

---

**CORPORATE DISCLOSURE STATEMENT OF ALLERGAN, INC.**

---

Pursuant to Rule 5.3 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Allergan, Inc. discloses the following:

Allergan, Inc. is a non-governmental corporate party in the above-captioned action. There is no parent corporation for Allergan, Inc. There is no publicly held corporation that owns 10% or more of Allergan, Inc.

Dated: May 24, 2007

FISH & RICHARDSON P.C., P.A.

By: /s/ Juanita R. Brooks

Juanita R. Brooks
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Counsel for Plaintiffs/Declaratory Judgment Defendant
ALLERGAN, INC.

10737988.doc

# Exhibit F

# FISH & RICHARDSON P.C.

12390 El Camino Real
San Diego, California
92130

Telephone
858 678-5070

Facsimile
858 678-5099

Web Site
www.fr.com

**Juanita R. Brooks**
858 678-4377

Email
brooks@fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

FR

ATLANTA
AUSTIN
BOSTON
DALLAS
DELAWARE
NEW YORK
SAN DIEGO
SILICON VALLEY
TWIN CITIES
WASHINGTON, DC

***VIA FEDERAL EXPRESS***

May 25, 2007

Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judical Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, DC 20002-8004

Re: *In re Brimonidine Patents Litigation*

Dear Clerk of the Panel:

I am counsel of record for movant Allergan, Inc. Enclosed under cover of this letter for filing with the Judicial Panel on Multidistrict Litigation (the "Panel") are an original and four copies of the following documents, in accordance with the Panel's Rules of Procedures (the "MDL Rules"):

1. Allergan, Inc.'s Motion for Transfer of Actions to the District of Delaware Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (With Attached Schedule of Actions) [MDL Rules 7.1 and 7.2];

2. Brief in Support of Allergan, Inc.'s Motion for Transfer of Actions to the District of Delaware Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings [MDL Rule 7.2(a)(i)];

3. Declaration of Juanita R. Brooks in Support of Plaintiff and Declaratory Judgment Defendant Allergan, Inc.'s Motion for Transfer of Actions to the District of Delaware Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings [MDL Rules 7.1 and 7.2];

4. Exhibits to Declaration of Juanita R. Brooks in Support of Plaintiff and Declaratory Judgment Defendant Allergan, Inc.'s Motion for Transfer of Actions to the District of Delaware Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings [MDL Rule 7.1(g)];

5. Allergan, Inc.'s Corporate Disclosure Statement [MDL Rule 5.3];

6. Proof of Service [MDL Rules 5.2(a) and (b)];

7. A 3 1/2 inch diskette in Microsoft Word format of the foregoing documents [MDL Rule 5.13]; and

8. Courtesy copies of complaints in all 3 actions and their current docket sheets.

The cases subject to Allergan Inc.'s Motion to Transfer under 28 U.S.C. § 1407 are set forth the Schedule of Actions attached to the Motion, as required under MDL Rule 7.2(a)(ii).

In accordance with MDL Rule 5.2(c), the Panel may serve me with any pleadings, notices, orders or other papers relating to this matter before the Panel.

Very truly yours,

Juanita R. Brooks

Fish & Richardson P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099
E-mail: brooks@fr.com

Attorneys for ALLERGAN, INC.

Enclosures

cc: Counsel to All Parties in All Actions, with Enclosures

10740100.doc

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| IN RE BRIMONIDINE PATENTS LITIGATION | ) ) | MDL Docket No. _______________ |
|---|---|---|

---

**PROOF OF SERVICE**

---

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On May 25, 2007, I caused a copy of the following document(s):

1. ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS (WITH ATTACHED SCHEDULE OF ACTIONS);

2. BRIEF IN SUPPORT OF ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE, PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS;

3. DECLARATION OF JUANITA R. BROOKS IN SUPPORT OF ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS;

4. EXHIBITS TO DECLARATION OF JUANITA R. BROOKS IN SUPPORT OF ALLERGAN, INC.'S MOTION FOR TRANSFER OF ACTIONS TO THE DISTRICT OF DELAWARE PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS;

5. CORPORATE DISCLOSURE STATEMENT OF ALLERGAN, INC.;

6. PROOF OF SERVICE

to be served on the interested parties in this action as follows:

| **Case:**<br><br>*Allergan, Inc., v. Apotex, Inc. and Apotex Corp.*<br>Case No. 07-278 (D. Delaware) | |
|---|---|
| Clerk<br>USDC, District of Delaware<br>J. Caleb Boggs Federal Bldg<br>844 North King Street<br>Wilmington, DE 19801-3519 | |

| X | **BY CM/ECF:** | I caused the documents listed above to be sent via electronic mail through the Case Management/Electronic Case File System with the U.S. District Court for the District of Delaware. |
|---|---|---|

| **Counsel** | **Party Represented** |
|---|---|
| Robert B. Breisblatt<br>Welsh & Katz, Ltd.<br>120 S. Riverside Plaza, Ste 2200<br>Chicago, IL 60606 | Counsel for Defendant<br>APOTEX, INC. |
| APOTEX CORP.<br>c/o The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801 | Agent for Service of Process<br>APOTEX CORP. |

**BY FEDERAL EXPRESS:** The above documents were deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express.

**<u>Case</u>:**

*Allergan, Inc. v. Exela Pharmsci, Inc., Exela Pharmsci Pvt., Ltd., Paddock Laboratories, Inc., and PharmaForce, Inc.*
Case No. CV07-01967 R (RCx) (C.D.California) (Western Division)

| Clerk<br>USDC Central District of California<br>312 North Spring Street<br>Los Angeles, CA 90012-4701 | |
|---|---|
| **<u>Counsel</u>** | **<u>Parties Represented</u>** |
| Roderick G. Dorman<br>Mieke Malmberg<br>Hennigan, Bennett & Dorman LLP<br>865 South Figueroa Street, Suite 2900<br>Los Angeles, CA 90017 | Counsel for Attorneys for Defendants/Counterclaim Plaintiffs/Counterclaim Defendants EXELA PHARMSCI, INC., EXELA PHARMSCI PVT., LTD., PADDOCK LABORATORIES and PHARMAFORCE, INC. |
| Daniel G. Brown<br>Arthur L. Hoag<br>Barry S. White<br>David A. Zwally<br>Brian J. Malkin<br>Frommer Lawrence & Haug LLP<br>745 Fifth Avenue<br>New York, New York 10151 | Counsel for Attorneys for Defendants/Counterclaim Plaintiffs/Counterclaim Defendants EXELA PHARMSCI, INC., EXELA PHARMSCI PVT., LTD., PADDOCK LABORATORIES and PHARMAFORCE, INC. |

[ X ] **BY FEDERAL EXPRESS:** The above documents were deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express.

| **Case:**<br><br>*Exela PharmSci, Inc., v. Allergan, Inc.*<br>Case No. 1:07-cv-00338-TSE-TCB (E.D. Virginia) (Alexandria Division) | |
|---|---|
| Clerk<br>USDC - Eastern District of Virginia<br>Albert V. Bryan U.S. Courthouse<br>401 Courthouse Square<br>Alexandria, VA 22314 | |

[X] **BY CM/ECF:** I caused the documents listed above to be sent via electronic mail through the Case Management/Electronic Case File System with the U.S. District Court for the Eastern District of Virgina (Alexandria).

| **Counsel** | **Party(ies) Represented** |
|---|---|
| Conrad M. Shumadine<br>Willcox & Savage, P.C.<br>One Commercial Place, Suite 1800<br>Norfolk, VA 23510 | Counsel for Plaintiff EXELA PHARMSCI, INC. |
| Daniel G. Brown<br>Barry S. White<br>David A. Zwally<br>Brian J. Malkin<br>Frommer Lawrence & Haug LLP<br>745 Fifth Avenue<br>New York, New York 10151 | Counsel for Plaintiff EXELA PHARMSCI, INC. |

[X] **BY FEDERAL EXPRESS:** The above documents were deposited on the same day in the ordinary course of business with a facility regularly maintained by Federal Express.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the above is true and correct. Executed on May 25, 2007, at San Diego, California.

Nancy P. Johnson

10740125.doc