## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 07-278-GMS |
| | ) |
| APOTEX, INC. and APOTEX CORP., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendants. | ) |

### DEFENDANTS APOTEX INC.'S AND APOTEX CORP.'S ANSWER, DEFENSES, AND COUNTERCLAIMS.

Defendants Apotex Inc. and Apotex Corp., for their Answer, Defenses, and Counterclaims, to the Complaint of Allergan, Inc. ("Allergan" or "Plaintiff"), state and allege as follows:

### THE NATURE OF THE ACTION

1.     This is an action for infringement of United States Patents Nos. 5,424,078, ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), 6,673,337 ("the '337 patent"), and 6,641,834 ("the '834 patent") under 35 U.S.C. §271(e)(2).

**ANSWER:**     Apotex Inc. and Apotex Corp. admit that the Complaint alleges

infringement of United States Patents Nos. 5,424,078, ("the '078 patent"), 6,562,873

("the '873 patent"), 6,627,210 ("the '210 patent"), 6,673,337 ("the '337 patent"), and

6,641,834 ("the '834 patent") under 35 U.S.C. §271(e)(2); otherwise denied.

### THE PARTIES

2.     Plaintiff Allergan, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2525 Dupont Drive, Irvine, California 92612.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. are without knowledge

or information sufficient to form a belief as to the truth of the averments in this

paragraph, and therefore deny the same.

3.    On information and belief, defendant Apotex, Inc. is a corporation organized and existing under the laws of Canada, with a place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9.

**ANSWER:**    Admitted that Apotex Inc. is a Canadian corporation with a place

of business in Ontario Canada, all other allegations are denied.

4.    On information and belief, defendant Apotex, Inc. manufactures numerous generic drugs for sale and use throughout the United States, including this judicial district.

**ANSWER:**    Admitted.

5.    On information and belief, defendant Apotex Corp. is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida, 33326.

**ANSWER:**    Admitted.

6.    On information and belief, Apotex Corp. sells numerous generic drugs manufactured and supplied by Apotex, Inc. throughout the United States, including this judicial district.

**ANSWER:**    Apotex Inc. and Apotex Corp. admit that Apotex Corp. sells

generic drug products manufactured by Apotex Inc. throughout the United States,

including this judicial district; otherwise denied.

## JURISDICTION AND VENUE

7.    This action arises under the patent laws of the United States of America, United States Code, Title 35, Section 1, et seq. This Court has subject matter jurisdiction over the action under 28 U.S.C. §1331 and 1338.

**ANSWER:**    Apotex Inc. and Apotex Corp. admit that Allergan purports to bring this action under the patent laws of the United States, Title 35, Section 1, et seq. Apotex Inc. and Apotex Corp. admit that this Court has subject matter jurisdiction over the action under 28 U.S.C. §1331 and 1338(a).  Except where specifically admitted, the allegations in this paragraph are otherwise denied.

8.    Based on the facts and causes alleged herein, this Court has personal jurisdiction over Defendants.

**ANSWER:**    Admitted that the Court has personal jurisdiction over Apotex Inc. and Apotex Corp.; otherwise denied.

9.    Venue is proper in this Court under 28 U.S.C. §1391 and 1400(b).

**ANSWER:**    Admitted.

## BACKGROUND

10.    The '078 patent, entitled "Aqueous Ophthalmic Formulations and Methods for Preserving Same," issued to Anthony Dziabo and Paul Ripley on June 13, 1995. A copy of the '078 patent is attached to this complaint as Exhibit A.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that the cover page of the '078 patent includes a title of "Aqueous Ophthalmic Formulations and Methods for Preserving Same," lists the inventors as Anthony Dziabo and Paul Ripley, and lists an issue date of June 13, 1995.  Defendants Apotex Inc. and Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

11.    Allergan, Inc., as the assignee, owns the entire right, title, and interest in the '078 patent.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that Allergan is identified as assignee on the cover page of the '078 patent. Defendants Apotex Inc. and Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

12.    The '873 patent, entitled "Compositions Containing Therapeutically Active Components Having Enhanced Solubility," issued to Orest Olejnik and Edward D.S. Kerslake on May 13, 2003. A copy of the '873 patent is attached to this complaint as Exhibit B.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that the cover page of the '873 patent includes a title of "Compositions Containing Therapeutically Active Components Having Enhanced Solubility," lists the inventors as Orest Olejnik and Edward D.S. Kerslake, and lists an issue date of May 13, 2003. Defendants Apotex Inc. and Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

13.    Allergan, Inc., as the assignee, owns the entire right, title, and interest in the '873 patent.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that Allergan is identified as assignee on the cover page of the '873 patent. Defendants Apotex Inc. and Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

14.    The '210 patent, entitled "Compositions Containing α-2-Adrenergic Agonist Components," issued to Orest Olejnik and Edward D.S. Kerslake on September 30, 2003. A copy of the '210 patent is attached to this complaint as Exhibit C.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that the cover page of the '210 patent includes a title of " Compositions Containing α-2-Adrenergic

Agonist Components," lists the inventors as Orest Olejnik and Edward D.S. Kerslake,

and lists an issue date of September 30, 2003. Defendants Apotex Inc. and Apotex Corp.

are without knowledge or information sufficient to form a belief as to the truth of the

remaining averments in this paragraph, and therefore deny the same.

15.    Allergan, Inc., as the assignee, owns the entire right, title, and interest in the '210
patent.

  **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that Allergan is

identified as assignee on the cover page of the '210 patent. Defendants Apotex Inc. and

Apotex Corp. are without knowledge or information sufficient to form a belief as to the

truth of the remaining averments in this paragraph, and therefore deny the same.

16.    The '337 patent, entitled "Compositions Containing Alpha-2-Adrenergic Agonist
Components," issued to Orest Olejnik and Edward D.S. Kerslake on January 6, 2004. A
copy of the '337 patent is attached to this complaint as Exhibit D.

  **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that the cover

page of the '337 patent includes a title of " Compositions Containing Alpha-2-Adrenergic

Agonist Components," lists the inventors as Orest Olejnik and Edward D.S. Kerslake,

and lists an issue date of January 6, 2004. Defendants Apotex Inc. and Apotex Corp. are

without knowledge or information sufficient to form a belief as to the truth of the

remaining averments in this paragraph, and therefore deny the same.

17.    Allergan, Inc., as the assignee, owns the entire right, title, and interest in the '337
patent.

  **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. admit that Allergan is

identified as assignee on the cover page of the '337 patent. Defendants Apotex Inc. and

Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

18.   The '834 patent, entitled "Compositions Containing Alpha-2-Adrenergic Agonist Components," issued to Orest Olejnik and Edward D.S. Kerslake on November 4, 2003. A copy of the '834 patent is attached to this complaint as Exhibit E.

   **ANSWER:**   Defendants Apotex Inc. and Apotex Corp. admit that the cover page of the '834 patent includes a title of " Compositions Containing Alpha-2-Adrenergic Agonist Components," lists the inventors as Orest Olejnik and Edward D.S. Kerslake, and lists an issue date of November 4, 2003. Defendants Apotex Inc. and Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

19.   Allergan, Inc., as the assignee, owns the entire right, title, and interest in the '834 patent.

   **ANSWER:**   Defendants Apotex Inc. and Apotex Corp. admit that Allergan is identified as assignee on the cover page of the '834 patent. Defendants Apotex Inc. and Apotex Corp. are without knowledge or information sufficient to form a belief as to the truth of the remaining averments in this paragraph, and therefore deny the same.

20.   Allergan is the holder of approved New Drug Applications ("NDAs") No. 21-262 and 21-770 for 0.15% and 0.10% brimonidine tartrate ophthalmic solutions, respectively, sold under the ALPHAGAN® P trademark.

   **ANSWER:**   Admitted.

21.   In conjunction with those NDAs, Allergan has listed with the FDA five patents (the "Listed Patents") that cover various aspects of the approved formulations of ALPHAGAN® P 0.15% and 0.10%. The Listed Patents are the '078, '873, '210, '337 and '834 patents.

**ANSWER:**     Admitted that in conjunction with NDA No. 21-262 and 21-770,

Allergan listed the '078, '873, '210, '337 and '834 patents. Defendants Apotex Inc. and

Apotex Corp. are without knowledge or information sufficient to form a belief as to the

truth of the averments in this paragraph, and therefore deny the same.

22.     ALPHAGAN® P 0.15% and 0.10% are covered by at least one claim of each of
the Listed Patents.

**ANSWER:**     Defendants Apotex Inc. and Apotex Corp. are without knowledge

or information sufficient to form a belief as to the truth of the averments in this

paragraph, and therefore deny the same.

23.     On April 30,2007, Allergan received a letter, dated April 26,2007, signed on
behalf of Apotex, Inc. The letter stated that Apotex had filed Abbreviated New Drug
Application Nos. 78-479 and 78-480 ("ANDAs") with the United States Food and Drug
Administration ("FDA") under section 505('j) of the Federal Food, Drug, and Cosmetic
Act ("FDCA") seeking approval to market generic versions of Allergan's ALPHAGAN®
P products, both the 0.15% and 0.10% formulations, before the expiration of the Listed
Patents.

**ANSWER:**     Admitted that Apotex Inc. sent a letter to Allegan on April 26,

2007; that the letter stated that Apotex Inc. had submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Products, Brimonidine Tartrate Ophthalmic Solution, 0.15% and Brimonidine Tartrate

Ophthalmic Solution, 0.1%, as defined in ANDA applications 78-479 and 78-480, before

the expiration of the listed patents; otherwise denied.

24.     The purpose of the April 26, 2007 letter was to notify Allergan that Apotex had
filed a certification with the FDA under 21 C.F.R. § 314.50(i)(l)(i)(A)(4) ("Paragraph IV

certification") in conjunction with its ANDAs. The letter alleged: (1) that the Listed Patents were invalid or unenforceable and (2) that, even if valid and enforceable, some claims of the Listed Patents would not be infringed by Apotex's generic versions of Allergan's ALPHAGAN® P products.

      **ANSWER:**    Admitted that the April 26, 2007 letter provided Allergan with

notice that Apotex Inc. had filed a Paragraph IV certification with the FDA in

conjunction with ANDA application nos. 78-479 and 78-480, admitted that the April 26,

2007 letter stated that the listed patents are invalid, unenforceable, and/or will not be

infringed by Apotex's manufacture, use, or sale of the Apotex Brimonidine Products,

otherwise denied.

25.    In filing its ANDAs, Apotex has requested the FDA's approval to market generic versions of Allergan's ALPHAGAN® P products throughout the United States, including Delaware.

      **ANSWER:**    Admitted that Apotex Inc. had submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Products, Brimonidine Tartrate Ophthalmic Solution, 0.15% and Brimonidine Tartrate

Ophthalmic Solution, 0.1%, as defined in ANDA applications 78-479 and 78-480,

throughout the United States, including Delaware; otherwise denied.

26.    On information and belief, following FDA approval of its ANDAs, Apotex, Inc., through Apotex Corp., will sell the approved generic versions of Allergan's ALPHAGAN® P products throughout the United States, including Delaware.

      **ANSWER:**    Admitted that if the FDA approves Apotex Inc.'s ANDA

applications, it will seek to sell its approved Brimonidine Tartrate products throughout

the United States, and that it would be expected that such approved products would be sold by Apotex Inc., otherwise denied.

## COUNT I

(Infringement of the '078 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product)

27.    Paragraphs 1 to 26 are incorporated herein as set forth above.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference their answers to Paragraphs 1 to 26 as set forth above.

28.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.15% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271 (e)(2)(A).

**ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug Administration (FDA) has received, an Abbreviated New Drug Application (ANDA) under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed Product, Brimonidine Tartrate Ophthalmic Solution, 0.15% as defined in ANDA application 78-479. The remainder of the allegations are denied.

29.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '078 patent.

**ANSWER:**    Denied.

## COUNT II

(Infringement of the '873 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product)

30.    Paragraphs 1 to 26 are incorporated herein as set forth above.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference their answers to Paragraphs 1 to 26 as set forth above.

31.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.15% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271(e)(2)(A).

**ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.15% as defined in ANDA

application 78-479. The remainder of the allegations are denied.

32.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '873 patent.

**ANSWER:**    Denied.

## COUNT III

(Infringement of the '210 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product)

33.    Paragraphs 1 to 26 are incorporated herein as set forth above.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference their answers to Paragraphs 1 to 26 as set forth above.

34.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.1 5% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271 (e)(2)(A).

**ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.15% as defined in ANDA

application 78-479.  The remainder of the allegations are denied.

35.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '210 patent.

**ANSWER:**    Denied.

### COUNT IV

(Infringement of the '337 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product)

36.    Paragraphs 1 to 26 are incorporated herein as set forth above.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference

their answers to Paragraphs 1 to 26 as set forth above.

37.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.15% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271 (e)(2)(A).

**ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.15% as defined in ANDA

applications 78-479. The remainder of the allegations are denied.

38.     The commercial manufacture, use, offer for sale, sale, and/or importation of
Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product will
constitute an act of infringement of the '337 patent.

    **ANSWER:**   Denied.

## COUNT V

(Infringement of the '834 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed
generic 0.15% brimonidine tartrate ophthalmic solution product)

39.     Paragraphs 1 to 26 are incorporated herein as set forth above.

    **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference

their answers to Paragraphs 1 to 26 as set forth above.

40.     Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to
obtain approval to engage in the commercial manufacture, use, or sale of a proposed
0.15% brimonidine tartrate ophthalmic solution product throughout the United States. By
submitting the application, Apotex has committed an act of infringement under 35 U.S.C.
§271 (e)(2)(A).

    **ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.15% as defined in ANDA

application 78-479. The remainder of the allegations are denied.

41.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.15% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '834 patent.

ANSWER:    Denied.

## COUNT VI

(Infringement of the '078 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product)

42.    Paragraphs 1 to 26 are incorporated herein as set forth above.

ANSWER:    Defendants Apotex Inc. and Apotex Corp. incorporate by reference their answers to Paragraphs 1 to 26 as set forth above.

43.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.1% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271(e)(2)(A).

ANSWER:    Admitted that Apotex Inc. has submitted, and the Food and Drug Administration (FDA) has received, an Abbreviated New Drug Application (ANDA) under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed Product, Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA application 78-480. The remainder of the allegations are denied.

44.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '078 patent.

ANSWER:    Denied.

## COUNT VII

(Infringement of the '873 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product)

45.    Paragraphs 1 to 26 are incorporated herein as set forth above.

    **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference

their answers to Paragraphs 1 to 26 as set forth above.


46.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.1% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. 9 271 (e)(2)(A).

    **ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA

application 78-480.  The remainder of the allegations are denied.


47.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '873 patent.

    **ANSWER:**    Denied.

### COUNT VIII

(Infringement of the '210 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product)

48.    Paragraphs 1 to 26 are incorporated herein as set forth above.

    **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference

their answers to Paragraphs 1 to 26 as set forth above.

49.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.1% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271(e)(2)(A).

**ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA

application 78-480.  The remainder of the allegations are denied.

50.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '210 patent.

**ANSWER:**    Denied.

### COUNT IX

(Infringement of the '337 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product)

51.    Paragraphs 1 to 26 are incorporated herein as set forth above.

**ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference

their answers to Paragraphs 1 to 26 as set forth above.

52.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to obtain approval to engage in the commercial manufacture, use, or sale of a proposed 0.1% brimonidine tartrate ophthalmic solution product throughout the United States. By submitting the application, Apotex has committed an act of infringement under 35 U.S.C. §271 (e)(2)(A).

**ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA

application 78-480. The remainder of the allegations are denied.

53.    The commercial manufacture, use, offer for sale, sale, and/or importation of
Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product will
constitute an act of infringement of the '337 patent.

   **ANSWER:**    Denied.

## COUNT X

(Infringement of the '834 Patent Under 35 U.S.C. §271(e)(2) by Apotex's proposed
generic 0.1% brimonidine tartrate ophthalmic solution product)

54.    Paragraphs 1 to 26 are incorporated herein as set forth above.

   **ANSWER:**    Defendants Apotex Inc. and Apotex Corp. incorporate by reference

their answers to Paragraphs 1 to 26 as set forth above.

55.    Apotex submitted an ANDA to the FDA under section 505(j) of the FDCA to
obtain approval to engage in the commercial manufacture, use, or sale of a proposed
0.1% brimonidine tartrate ophthalmic solution product throughout the United States. By
submitting the application, Apotex has committed an act of infringement under 35 U.S.C.
§271 (e)(2)(A).

   **ANSWER:**    Admitted that Apotex Inc. has submitted, and the Food and Drug

Administration (FDA) has received, an Abbreviated New Drug Application (ANDA)

under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the

commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed

Product, Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA

application 78-480. The remainder of the allegations are denied.

56.    The commercial manufacture, use, offer for sale, sale, and/or importation of Apotex's proposed generic 0.1% brimonidine tartrate ophthalmic solution product will constitute an act of infringement of the '834 patent.

**ANSWER:**    Denied.

## DEFENSES

### FIRST DEFENSE: INVALIDITY

The '078, '873, '210, '337 and '834 patents are invalid and/or unenforceable on grounds specified in United States Code, Title 35, including the failure to comply with one or more of the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112.

### SECOND DEFENSE: FAILURE TO JOIN INVENTORS

The '078 patent is invalid under 35 U.S.C. §116 and §256 for failure to join all proper inventors.

### THIRD DEFENSE: UNENFORCEABILITY OF '078 PATENT

For the reasons set forth in more detail in Count III of the Counterclaims below, the '078 patent is unenforceable due to inequitable conduct.

### FOURTH DEFENSE: UNENFORCEABILITY OF THE '210, '337 AND '834 PATENTS

For the reasons set forth in more detail in Count IV of the Counterclaims below, the '210, '337 and '834 patents are unenforceable due to inequitable conduct.

### FIFTH DEFENSE: MISUSE

The '078 '210, '337 and '834 patents are invalid and were obtained improperly and by inequitable conduct.   Knowing that the '078, '210, '337 and '834 patents are invalid and unenforceable, Allergan commenced this infringement action against Apotex Inc. and Apotex Corp. Allergan's efforts to enforce the '078, '210, '337 and '834 patents,

by suing for infringement and by maintaining the patents' listings in the Approved Drug Products With Therapeutic Equivalence Evaluation (also known as the "Orange Book"), constitute patent misuse.

## SIXTH DEFENSE: NON-INFRINGEMENT

Neither Apotex Inc. nor Apotex Corp. infringes, either directly or indirectly, any valid claim of the '078, '873, '210, '337 and '834 patents. ANDA applications 78-479 and 78-480 do not infringe any valid claim of the '078, '873, '210, '337 and '834 patents. The proposed drug products for which approval is sought under ANDA applications 78-479 and 78-480 do not directly or indirectly infringe any valid claim of the '078, '873, '210, '337 and '834 patents.

## COUNTERCLAIMS

Counterclaimants Apotex Inc. and Apotex Corp. for their counterclaim against counter-defendant Allergan Inc. ("Allergan") allege as follows:

## PARTIES AND JURISDICTION

1.      Apotex, Inc. is a Canadian corporation having a place of business at 380 Elgin Mills Road East, Richmond Hill, Ontario, Canada L4C 5H2.

2.      Apotex Corp. is a Delaware corporation having a place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.

3.      On information and belief, Allergan, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2525 Dupont Drive, Irvine, California 92612.

4.      Allergan purports to own the entire right, title, and interest of United States Patents Nos. 5,424,078, ("the '078 patent"), 6,562,873 ("the '873 patent"),

6,627,210 ("the '210 patent"), 6,673,337 ("the '337 patent"), and 6,641,834 ("the '834 patent").

5.     Apotex Inc. has submitted, and the Food and Drug Administration (FDA) has received, an Abbreviated New Drug Application (ANDA) under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed Products, Brimonidine Tartrate Ophthalmic Solution, 0.15% and Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA applications 78-479 and 78-480.

6.     Pursuant to 21 U.S.C. § 355 (j)(2)(A)(vii) and 21 C.F.R. § 314.95, Apotex Inc. certified to Allergan that the '078, '873, '210, '337 and '834 patents are invalid, unenforceable, and/or will not be infringed by the manufacture, use, or sale of the proposed products for which ANDA applications 78-479 and 78-480 are submitted.

7.     Allergan has commenced this civil action against Apotex Inc. and Apotex Corp. alleging patent infringement.

8.     This case arises under the Constitution, laws, or treaties of the United States, viz., 35 U.S.C. §§ 1-376, which is an Act of Congress relating to patents, and 21 U.S.C. § 355, which provides subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §271(e)(5).

9.     Venue and personal jurisdiction are proper in this district because Allergan, inter alia, is subject to personal jurisdiction in this judicial district and has submitted itself to the jurisdiction of this Court.

10.     A real, actual, and justiciable controversy exists between Apotex Inc. and Apotex Corp. on the one hand and Allergan on the other hand regarding the invalidity of

the '078, '873, '210, '337 and '834 patents and Apotex's non-infringement thereof,

constituting a case of actual controversy within the jurisdiction of this Court under the

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2005).

## COUNT I—DECLARATION OF INVALIDITY

11.     Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by

reference each of the allegations of paragraphs 1 through 10 as though set forth fully

herein.

12.     The '078, '873, '210, '337 and '834 patents are invalid and/or

unenforceable on grounds specified in United States Code, Title 35, including failure to

comply with one or more of the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112.

## COUNT II—DECLARATION OF INVALIDITY

13.     Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by

reference each of the allegations of paragraphs 1 through 10 as though set forth fully

herein.

14.     The '078 patent is invalid and/or unenforceable for failure to join all

proper inventors as specified in 35 U.S.C. §116 and §256.

## COUNT III--UNENFORCEABILITY OF '078 PATENT.

15.     Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by

reference each of the allegations of paragraphs 1 through 10 as though set forth fully

herein.

16.     On November 29, 1988, Bill McCarthy ("McCarthy"), as agent of

Allergan, filed a patent application, eventually designated as U.S. Patent Application No.

07/277,791 (the '791 application).  The '791 application was assigned to Allergan.

17.    On January 25, 1998, Dziabo and Ripley declared that they were the original, first, and joint inventors of the subject matter claimed in the '791 application.

18.    The '078 patent at issue in this lawsuit is a continuation in part of the '791 application, and also names Dziabo and Ripley as inventors.

19.    On the same day that the '791 application was filed, November 29, 1988, McCarthy filed another patent application, eventually designated as U.S. Patent Application No. 07/277,790. The '790 application was assigned to Bio-Cide International Inc. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the '790 application names Bobby Danner as a sole inventor. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Bobby Danner declared, under penalty of perjury, himself to be the original, first, and sole inventor of the subject matter of the '790 application.

20.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the complete written descriptions and drawings of the '790 application and the '791 application as filed are nearly or exactly identical.

21.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that claims from the '790 application overlapped in scope with the '791 application. For example, claims of the '791 application were originally directed to solutions with "about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide as a preservative", while the '790 application claimed compositions with "at least 0.02 weight/volume percent stabilized chlorine dioxide as a disinfectant". There is no material difference in the '790 and '791 applications between

disinfection and preservation- both require the same compound do the same thing- kill contaminating microbes.

22.    Claims in both the '790 and '791 applications covered exactly the same composition, that is, a solution having a concentration of stabilized chlorine dioxide of 0.02% weight/volume.

23.    The fact that one or more persons other than the inventors named in the '791 application declared under penalty of perjury that they were the first, original inventors of a solution that was covered by the claims of the '791 application would have been material to the prosecution of the '791 application.

24.    Allergan's agent McCarthy knew of the existence of both the '790 and '791 patent applications at the time they were both pending in the U.S. Patent Office. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that McCarthy knew of the overlap in scope of the claims of the '790 and '791 applications.

25.    In connection with the '791 application, McCarthy never disclosed the '790 application to the United States Patent and Trademark Office.

26.    On June 14, 1990, PCT application no. WO 90/06126 was published ('126 application). The published '126 application names Danner as the sole inventor.    The published '126 application does not name either Dziabo or Ripley as an inventor.    The published '126 application claims priority to the '790 application.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the '126 application includes the disclosure of the '790 application.

27.    The application for the '078 patent was filed on May 2, 1991. The application for the '078 patent added new matter (e.g., "Example VIII (Comparative)") and claimed that new matter. The claims in the '078 patent that claim the new matter are entitled to a filing date no earlier than May 2, 1991.

28.    The published '126 application is prior art to the '078 patent, and, in particular, is prior art to the claims of the '078 application that incorporate the new matter.

29.    The published '126 application is material to the patentability of the '078 patent.

30.    Neither Allergan, nor any applicant for the patent (as defined in 37 C.F.R. §1.56) disclosed the '790 application to the United States Patent and Trademark Office in connection with the application for the '078 patent.

31.    Neither Allergan, nor any applicant for the patent (as defined in 37 C.F.R. §1.56) disclosed the published '126 application to the United States Patent and Trademark Office in connection with the application for the '078 patent.

32.    A reasonable opportunity for further investigation or discovery is likely to provide evidentiary support that the foregoing misrepresentations and failure to disclose material prior art as set forth above were done with intent to mislead the United States Patent and Trademark Office.

33.    The facts and circumstances set forth in this Count III constitute inequitable conduct on the part of the applicants, making the '078 patent unenforceable.

34.    A reasonable opportunity for further investigation or discovery is likely to provide evidentiary support for other and further circumstances constituting inequitable conduct by the applicants.

## COUNT IV—INEQUITABLE CONDUCT

35.    Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 10 as though set forth fully herein.

36.    The '834 and '337 patents both claim benefit to Application Serial No. 09/904,018 ("the Parent Application"), which matured into the '210 patent. The '834 patent matured from a continuation application of the Parent Application. The '337 patent matured from a divisional application of the Parent Application.

37.    The '210, '834 and '337 patents contain the same specification (but for, understandably, differences in the claims and the section entitled "Cross Reference to Related Application").

38.    The '210, '834 and '337 patents each claim therapeutically effective compositions.

39.    The '210, '834 and '337 patents each name Orest Olejnik and Edward D.S. Kerslake as their inventors, who are, and/or were, employed by Allergan. The '210, '834 and '337 patents were each prosecuted by, or on behalf of, Allergan.

40.    The '210, '834 and '337 patents were each examined by Rachel M. Bennett (hereinafter "Patent Examiner") for the United States Patent and Trademark Office (hereinafter "PTO").

41.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that during prosecution of the applications that matured into '210, '834 and '337 patents, each claim of each application was rejected as obvious under 35 U.S.C. § 103 over, inter. alia, the prior art Burke reference (United States Patent No. 5,215,991) and subsequently amended prior to issuance.

42.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Carlos A. Fisher, then an Allergan employee, was an attorney of record in connection with the prosecution of the applications that matured into the '210, '834 and '337 patents on behalf of Allergan after the claims in those applications were rejected over Burke.

43.    The subject matter and prosecution of the '210, '834 and '337 patents are intertwined.

44.    Allergan filed the Parent Application' which matured into the '210 patent, on July 10, 2001. That application, naming Orest Olejnik as the first inventor, claimed, *inter alia*, a composition comprising an alpha-2-adrenergic agonist in a therapeutically effective amount and a solubility enhancing component.

45.    The application that matured into the '834 patent was filed on September 6, 2002. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the application was accompanied by a Preliminary Amendment that cancelled all pending claims and added claims to a composition containing, *inter alia*, "up to about 0.15% (wlv)" of brimonidine tartrate.

46.    The application that matured into the '337 patent was filed on November 19, 2002, as a divisional application of the Parent Application, and was directed to

compositions containing an oxy-chloro preservative. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the application was accompanied by a Preliminary Amendment that cancelled all pending claims and added claims to a composition containing, inter alia, an alpha-2-adrenergic agonist in a therapeutically effective amount and an oxy-chloro preservative component.

47.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that: in the only Office Action during prosecution of the '834 patent, mailed on December 18, 2002, the Examiner rejected all pending claims as obvious over the Burke (U.S. Patent No. 5,215,991) in view of Beck et al. (U.S. Patent No. 6,358,935); that the Patent Examiner noted that Burke disclosed: (1) the claimed compound, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, among its most preferred alpha-2-adrenergic compounds; (2) at a concentration from about 0.001% to about 1.0% (wlv), which encompassed the concentration range in the claims ("up to about 0.15% (wlv)"); and (3) that it was well known in the art how to determine the most efficacious ophthalmically acceptable dose (e.g., 0.15%); and that Beck was cited for its disclosure of a chlorite preservative component.

48.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that: in the only substantive Office Action during prosecution of the Parent Application (from which the '210 patent matured), mailed on January 15, 2003, the Patent Examiner rejected all pending claims as obvious over Burke in view of Remington's Pharmaceutical Sciences; that the wording of the Examiner's rejection with respect to Burke was identical to that in the '834 patent's prosecution except that, rather than noting Burke failed to disclose a chlorite preservative component,

the Examiner stated (erroneously) that Burke did not disclose the solubility enhancing agent to be carboxymethylcellulose (hereinafter "CMC") or the pH of its composition; and that Remington was cited for its disclosure of CMC.

49.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that on February 25, 2003, Allergan's attorney, Carlos A. Fisher, held a telephonic interview(s) with the Patent Examiner regarding the applications that matured into the '210 and '834 patents; that with respect to the pending claims in the Parent Application (which matured into the '210 patent), Allergan "explained the instant invention was an invention of selection" and "agreed to file a declaration showing unexpected results with regards to the anionic solubility enhancing agent [i.e. CMC];" and that with respect to the pending claims in the application that matured into the '834 patent, Allergan "explained the advantages of the composition comprising up to about 0.15% (wlv) of 5-bromo-6-(2-imidozolin-2-ylamino) quinozaline tartrate, wherein the composition has a pH of about 7.0 or greater were unexpected" and "agreed to file a declaration showing the unexpected results."

50.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that in the only Office Action during prosecution of the '337 patent, dated March 3, 2003 and mailed March 13, 2003, the Patent Examiner rejected all pending claims as obvious over Burke in view of Beck and that the wording of the Examiner's rejection with respect to Burke was largely identical to that in the applications that matured into the '210 and '834 patents, except that the Examiner stated (correctly) that Burke disclosed CMC.  Beck was cited for its disclosure of a chlorite preservative component.

51.     After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that on March 12, 2003, Allergan submitted a "Reply to Office Action" in the Parent Application, and that the Reply, executed by Carlos Fisher, was accompanied by a "Declaration of Orest Olejnik, Ph.D." These documents were received by the Examiner's technology center at the PTO on March 24, 2003.

52.     After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the Reply to Office Action amended the pending claims to require, *inter alia*, that the claimed composition be a "therapeutically effective aqueous composition," comprising a 5- bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or a salt or ester thereof, in a therapeutically effective amount and a "polyanionic" or "anionic" solubility enhancing component, and that the applicants also added several new dependent claims to compositions further comprising oxy-chloro preservative components. None of the claims contained a limitation regarding the adherence or adsorption of the compositions to cell surfaces.

53.     After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the March 12, 2003 Reply argued, in response to the outstanding obviousness rejection, that anionic solubility enhancing components such as CMC have "surprising" properties in the solubilization of brimonidine as compared to non-ionic or cationic polymers, stating, in part, that (p.7):

> In light of Dr. Olejnik's Declaration, the patent specification and the state of the art, the Applicants therefore submit that, alone or in combination with Remington, Burke contains no disclosure that would direct or motivate the person of ordinary skill in the art to select or want to select an anionic polymeric solubility enhancing component such as CMC from the list of optional viscous "vehicles" contained in the '991 patent.

54.    After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that in the accompanying Declaration of Orest Olejnik,

Ph.D., Dr. Orest Olejnik, Allergan's Director of Pharmaceutical Development, stated, in

part, that (776-8):

> Neither Burke nor Remington discloses that CMC
> would have any characteristics that would motivate a person or
> ordinary skill in the art to choose it over the other polymers in
> formulating a brimonidine solution.
>
> Unlike the other listed polymers (polyvinyl alcohol,
> povidone (polyvinylpyrrolidone), hydroxypropylcellulose,
> poloxarners, and hydroxyethylcellulose), CMC is anionic at
> pH7 or greater. The other listed polymers are non-ionic
> polymers. I have discovered as a result of work done and/or
> directed by me at Allergan that CMC possesses the surprising
> advantages of both increasing the solubility in solution, as
> shown in Table 1, and causing such solutions to have superior
> adherence to cell surfaces, including ocular surfaces such as
> the cornea. Polyvinyl alcohol was found not to possess both of
> these properties. Increased adherence of the CMC solution is
> particularly surprising given the fact that the corneal surface is
> negatively charged; one would expect less adherence in such a
> solution due to electrostatic repulsion, rather than increased
> adherence. . . .
>
> It is also my belief that brimonidine solutions made
> using the other "vehicles" mentioned in the Burke patent
> would not possess this surprising combination of advantages.
> Therefore, the disclosures of Burke and Remington's [sic] in
> so way would render the presently claimed compositions
> obvious to the worker of ordinary (or even extraordinary)
> skill in the art.

55.    After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that five days after mailing the Reply and Declaration

in the Parent Application, Allergan mailed a "Reply to Office Action" in the prosecution

of the application that matured into the '834 patent on March 17, 2003. The March 17,

2003 Reply, executed by Carlos Fisher, was accompanied by a "Declaration of Amy

Batoosingh." These documents were received by the Patent Examiner's technology center on March 28, 2003.

56. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the March 17, 2003 Reply amended the pending claims to require, *inter alia*, that the claimed composition be a "therapeutically effective aqueous composition," and that Allergan also argued, with respect to the outstanding obviousness rejection, in part, that (p. 4-5):

> The present invention is the result of the surprising finding that increasing the pH of a brimonidine solution to a pH of greater than about 7.0 leads to similar efficacy at a 25% lower concentration (0.2% (w\v) to about 0.15% (w\v) or less) than is seen in a brimonidine solution at a pH of about 6.6-6.8. This appears to be due to the fact that at a pH closer to the pKa of brimonidine (which has a pKa of about 7.4) than pH 6.3-6.5, a larger proportion of the molecules are electrostatically neutral, and thus less lipophobic than the polarized molecule. As such, a greater amount of the active drug is able to enter the cornea of the eye at a given solution concentration; this effect counters the effects of decreased brimonidine solubility at the higher pH. See specification at e.g., paragraph bridging pages 1 and 2.
>
> However, it is particularly surprising that such a therapeutically effective dosage of brimonidine could be formulated in aqueous solution at a pH greater than about 7.0. Figure 1 of the present specification shows that brimonidine's solubility decreases precipitously at pH values above 7.0. The fact that a therapeutically effective dosage could be provided by a composition containing about 0.15% or less of brimonidine at such pH values is truly unexpected.
>
> \*     \*     \*
>
> The advantages of this invention are manifest. Among others, it can be seen that although ophthalmic hypotensive therapeutic efficacy of the 0.15% solution is the same as for the 0.2% solution, the reduced concentration (and thus the reduced dosage) results in a lower potential for systemic side effects . . . A

reduction in the dosage by 25% reduces the likelihood
and severity of such side-effects.

Thus, the present invention is drawn to
surprising new therapeutic compositions comprising at
least a 25% lower concentration of brimonidine than
previous ophthalmic formulations, at pH closer both to
the solubility limits of brimonidine, and to the pKa of
the compound.

57.    After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that in the accompanying "Declaration of Amy

Batoosingh," Amy Batoosingh, Allergan's Director of Ophthalmological Clinical

Research, stated, in part, with respect to Katz *et al.*, 2002, *J. Glaucoma* 11:119, that (¶4):

The conclusion reached as a result of the studies referenced
in the Katz et al., article was that brimonidine 0.2% and
brimonidine- Purite 0.15% showed comparable efficacy
when each was used for treatment of ocular hypertension in
glaucoma and/or ocular hypotensive human patients over a
12 month period of time, despite a significant reduction in
the concentration of the active ingredient in the latter
formulation.

58.    After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that on June 3, 2003, the Patent Examiner sent Allergan

Notices of Allowance with respect to the claims of the '210 and '834 patents. After a

reasonable opportunity for further investigation or discovery, there is likely to be

evidentiary support that the '210 and '834 patents issued on September 30, 2003 and

November 4, 2003, respectively, without further prosecution.

59.    After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that Allergan mailed its Reply to Office Action in the

prosecution of the '337 patent on June 13, 2003, ten days after the Patent Examiner

issued Notices of Allowance with respect to the '210 and '834 patents; that the Reply was

executed by Allergan's attorney, Carlos Fisher; that Allergan amended the pending

claims to require, inter alia, that the claimed composition be "therapeutically effective"

and contain an SEC other than a cyclodextrin; and that Allergan did not underline the

requirement for "a solubility enhancing component" to indicate that it had been added in

the amendment. Allergan also deleted the oxy-chloro limitation, which had been its

purported reason for filing the divisional application. After a reasonable opportunity for

further investigation or discovery, there is likely to be evidentiary support that in

response to the Examiner's obviousness rejection, Allergan argued, in part, that (p. 5):

> Applicants respectfully maintain that for all its
> discussion of possible formulations, nothing in Burke
> discloses or suggests the use of a solubility enhancing
> component in combination with an alpha adrenergic
> agonist. The present application, which also discloses the
> advantages of using such a component (such as greater
> flexibility with the concentration and pH at which such
> composition is formlated [sic: formulated)], is, to the
> Applicants' knowledge, the first reference to do so.

60.     After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that on October 4, 2003, the Patent Examiner sent

Allergan a Notice of Allowance with respect to the '337 patent. The '337 patent issued on

January 6, 2004 without further substantive prosecution.

61.     After a reasonable opportunity for further investigation or discovery, there

is likely to be evidentiary support that at the time of filing, and during the prosecution of

'210 patent application, Allergan made misrepresentations and/or omissions of material

facts to the Patent Examiner and the United States Patent Office, including, but not

limited to, the following:

        a.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that it had conducted comparative experiments with respect to solubility and/or adherence to cell surfaces. That representation and/or implication was false.

        b.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that polyvinyl alcohol, povidone, hydroxypropyl methyl cellulose, poloxamers, and/or hydroxyethyl cellulose were not solubility enhancing agents, not adhesive agents, and/or not solubility enhancing agents and not adhesive agents. The inventor(s), prosecuting attorney(s) and/or others substantively involved in the prosecution of the '210 patent believed that representation and/or implication to be false.

        c.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that CMC had "surprising" properties as a solubility enhancing agent, an adhesive agent, and/or a solubility enhancing and an adhesive agent. That representation and/or implication was false.

        d.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that its alleged invention was patentable as an "invention of selection." That representation and/or implication was false and/or misleading because the invention of selection argument was inapplicable.

e.      After a reasonable opportunity for further investigation or
discovery, there is likely to be evidentiary support that Allergan represented
and/or clearly implied that the other "vehicles" disclosed in Burke did not have
solubility enhancing properties, when it believed otherwise.

f.      After a reasonable opportunity for further investigation or
discovery, there is likely to be evidentiary support that Allergan suppressed, and
failed to disclose to the PTO, the best mode contemplated by the inventor(s) of
carrying out the invention. Among other things, Allergan had filed a New Drug
Application ("NDA") for a commercial product, which reflected the subject
matter claimed by the '210 patent, shortly before filing the earliest application
giving rise to the '210 patent. Whereas the NDA disclosed, inter alia, a
"therapeutically effective aqueous composition" with brimonidine "in an amount
effective to provide a therapeutic effect" and a polyanionic SEC "in an amount
effective to increase the solubility of the brimonidine, that composition was not
disclosed in the '210 patent.

g.      After a reasonable opportunity for further investigation or
discovery, there is likely to be evidentiary support that Allergan suppressed, and
failed to disclose to the PTO, the existence of prior published information
contradicting its representations with respect to adhesive properties of the
"vehicles" disclosed in Burke, including: but not limited to:

i.      Greaves et al., 1992, *STP Pharma Sci.*, 2: 13-33

ii.     J.D. Smart, 1984, *J. Pharmacol.*, 36:295-299

iii.    M.F. Saettone, 1984, *Int'l J Pharmaceutics*, 20: 187-202

h.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, information contradicting its representations with respect to the solubilizing properties of the "vehicles" disclosed in Burke.

i.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, other information contradicting its representations with respect to adhesive properties of the "vehicles" disclosed in Burke.

62.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that at the time of filing, and during the prosecution of '834 patent application, Allergan made misrepresentations and/or omissions of material facts to the Patent Examiner and the United States Patent Office: including, but not limited to:

a.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that it was "surprising" that the concentration of active ingredient in a therapeutically effective composition could be reduced by adjusting the composition's pH closer to the pKa of the active ingredient. That representation and/or implication was false.

b.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented that it was "truly unexpected" that "a therapeutically effective dosage could be provided

by a composition containing about 0.15% or less of brimonidine" at a pH greater than about 7.0. That representation was false.

      c.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the best mode contemplated by the inventor(s) (whether named on the '834 patent or not) of carrying out the invention. Among other things, Allergan had filed an NDA for a commercial product, which reflected the subject matter claimed by the '834 patent, shortly before filing the earliest application giving rise to the '834 patent. Whereas the NDA disclosed, *inter alia*, a therapeutically effective aqueous ophthalmic composition with 0.15% brimonidine, that composition was not disclosed in the '834 patent.

      d.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the existence of prior published information demonstrating the efficacy of brimonidine at concentrations of "up to about 0.1596," including, but not limited to:

            i.    Derick et al., 1997, *Ophthalmol.*, 104:131-136

           ii.    Walters T, 1996, *Survey of Ophthalmol.*, 41:S19-S26

      e.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the existence of prior published information demonstrating the effect of pH on drug bioavailability, including, but not limited to:

       i.     Olejnik, O., 1992, *Ophthalmic Drug Delivery Systems* (Ashim Mitra, ed.) pp. 177-198.

       ii.    Wilson et al., 1981, *J. Pharm. Pharmacol.*, 31:749-53.

       iii.   Small et al., 1997, *Int'l J. Pharmaceutics*, 149:195-201.

       iv.   Chien et al., 1990, *Current Eye Res.*, 9:1051-1059.

63.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that at the time of filing, and during the prosecution of the '337 patent application, Allergan made misrepresentations and/or omissions of material facts to the Patent Examiner and the United States Patent Office, including, but not limited to:

    a.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented that "nothing in Burke discloses or suggests the use of a solubility enhancing component in combination with an alpha adrenergic agonist." Allergan clearly understood that Burke disclosed an alpha adrenergic agonist in combination with a "vehicle," and failed to disclose its belief that nearly all of the "vehicles" disclosed in Burke functioned as solubility enhancing components (albeit not labeled as such).

    b.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that its patent application was, to the Applicants' knowledge, the first reference to disclose the advantages of using a solubility enhancing component, "such as greater flexibility with the concentration and pH

37

at which such composition is formulated." That representation and/or implication was false.

c.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the best mode contemplated by the inventor(s) of carrying out the invention. Among other things, Allergan had filed an NDA for a commercial product, which reflected the subject matter claimed by the '337 patent, shortly before filing the earliest application giving rise to the '337 patent. Whereas the NDA disclosed, inter alia, a "therapeutically effective aqueous composition" with brimonidine "in an amount effective to provide a therapeutic effect" and an SEC "in an amount effective to increase the solubility of" the brimonidine, that composition was not disclosed in the '337 patent.

d.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO prior published information contradicting its representation that, to the Applicants' knowledge, the '337 patent's specification was the first reference to disclose the advantages of using a solubility enhancing component, "such as greater flexibility with the concentration and pH at which such composition is formulated," including, but not limited to, the references identified in paragraphs 61 and 62.

64.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61, 62 and 63 were false and/or misleading.

65.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61, 62 and 63 were material to the prosecution of the '210, '834 and/or '337 patents.

66.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraph 61 were material to the prosecution of the '210, '834 and '337 patents.

67.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraph 62 were material to the prosecution of the '210, '834 and '337 patents.

68.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraph 63 were material to the prosecution of the '337 patent.

69.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61, 62 and 63 were known, or should have been known, by Allergan to be false and/or misleading prior to the issuance of the '210, '834 and/or '337 patents.

70.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan knew, or should have known, that the representations and/or omissions set forth in paragraphs 70, 71 and 72 were material to the prosecution of the '210, '834 and/or '337 patents.

71.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in

paragraphs 61, 62 and 63 were made with the intent to, and/or did, deceive the PTO, and were intended to, and/or did, induce the issuance of the '210, '834 and/or '337 patents.

72. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan (including, without limitation, its inventors, attorneys, and/or others involved in the filing and/or prosecution of the '210, '834 and/or '337 patents) owed a duty of candor and good faith to the United States Patent and Trademark Office.

73. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the first named inventor of the '210, '834 and '337 patents, Orest Olejnik, owed a duty of candor and good faith to the United States Patent and Trademark Office.

74. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that an attorney who prosecuted the '210, '834 and '337 patents for Allergan, Carlos A. Fisher, owed a duty of candor and good faith to the United States Patent and Trademark Office.

75. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan (including, without limitation, its inventors, attorneys, and/or others involved in the filing and/or prosecution of the '210, '834 and/or '337 patents) breached that duty of candor and good faith.

76. After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the first named inventor of the '210, '834 and '337 patents, Orest Olejnik, breached his duty of candor and good faith to the United States Patent and Trademark Office.

77.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that an attorney who prosecuted the '210, '834 and '337 patents for Allergan, Carlos A. Fisher, breached his duty of candor and good faith to the United States Patent and Trademark Office.

## COUNT V—MISUSE

88.    Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 87 as though set forth fully herein.

89.    The '078, '873, '210, '337 and '834 patents are invalid and/or were obtained improperly and by inequitable conduct.   Knowing that the '078, '873, '210, '337 and '834 patents are invalid and/or unenforceable, Allergan commenced this infringement action against Apotex Inc. and Apotex Corp. Allergan's efforts to enforce the '078, '873, '210, '337 and '834 patents, by suing for infringement and by maintaining the patents' listings in the Approved Drug Products With Therapeutic Equivalence Evaluation (also known as the "Orange Book"), constitute patent misuse.

## COUNT V—NON-INFRINGEMENT

90.    Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 89 as though set forth fully herein.

91.    Neither Apotex Inc. nor Apotex Corp. infringes, either directly or indirectly, any valid, enforceable claim of the '078, '873, '210, '337 and '834 patents. ANDA applications 78-479 and 78-480 do not infringe, either directly or indirectly, any valid, enforceable claim of the '078, '873, '210, '337 and '834 patents.  The proposed

41

products for which approval is sought under ANDA applications 78-479 and 78-480 do not directly or indirectly infringe any valid claim of the '078, '873, '210, '337 and '834 patents.

## DEMAND FOR JUDGEMENT AND PRAYER FOR RELIEF

WHEREFORE, Apotex Inc. and Apotex Corp. pray for judgment:

a.      Finding that the '078, '873, '210, '377 and '834 patents are invalid and unenforceable;

b.      Finding that the '078, '873, '210, '377 and '834 patents are not infringed in any manner by either Apotex Inc. or Apotex Corp.;

c.      Finding that this is an exceptional case under 35 U.S.C. § 285;

d.      Awarding to Apotex Inc. and Apotex Corp. their costs, expenses, and reasonable attorney's fees and other relief the Court deems just.

## DEMAND FOR JURY TRIAL

Apotex Inc. and Apotex Corp. demand a trial by jury on all issues appropriately tried to a jury.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

A. Sidney Katz
Robert B. Breisblatt
James P. White
Walter J. Kawula, Jr.
Michael A. Krol
Sherry L. Rollo
WELSH & KATZ, LTD.
120 S. Riverside Plaza, 22nd Floor
Chicago, IL 60606
Tel: (312) 655-1500

Dated: June 11, 2007
800700 / 31920

By: /s/ Richard L. Horwitz
       Richard L. Horwitz (#2246)
       Kenneth L. Dorsney (#3726)
       Hercules Plaza 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       kdorsney@potteranderson.com

Attorneys for Defendants
Apotex Inc. and Apotex Corp.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on June 11, 2007, the attached

document was hand delivered on the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

William J. Marsden, Jr.
Fish & Richardson P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899
marsden@fr.com

I hereby certify that on June 11, 2007, I have Electronically Mailed the

foregoing document(s) to the following non-registered participants:

Jonathan E. Singer                         Juanita Brooks
Michael J. Kane                            Fish & Richardson P.C.
Deanna J. Reichel                          12390 El Camino Real
Fish & Richardson P.C.                     San Diego, CA 92130
300 Dain Rauscher Plaza                    brooks@fr.com
60 South Sicth Street
Minneapolis, MN 55402
singer@fr.com
kane@fr.com
reichel@fr.com

                                  /s/ Richard L. Horwitz
                                  Richard L. Horwitz
                                  Kenneth L. Dorsney
                                  Potter Anderson & Corroon LLP
                                  Hercules Plaza – Sixth Floor
                                  1313 North Market Street
                                  Wilmington, DE 19801
                                  (302) 984-6000
                                  rhorwitz@potteranderson.com
                                  kdorsney@potteranderson.com

800744 / 31920