IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALLERGAN, INC., | |
| Plaintiff, | Civil Action No. 07-278-GMS |
| v. | |
| APOTEX, INC. and APOTEX CORP., | JURY TRIAL DEMANDED |
| Defendants. | |

## REPLY TO DEFENDANTS' COUNTERCLAIMS

Plaintiff Allergan, Inc. ( "Allergan" or "Plaintiff"), by its attorneys, Fish & Richardson P.C., reply to the Counterclaims of Defendants Apotex, Inc. and Apotex Corp. (collectively, "Apotex" or "Defendants").  Except as expressly admitted below, Plaintiff denies each and every allegation in Defendants' Counterclaims.  Specifically, Plaintiff replies as follows:

## COUNTERCLAIMS

Counterclaimants Apotex Inc. and Apotex Corp. for their counterclaim against counter-defendant Allergan Inc. ("Allergan") allege as follows:

## PARTIES AND JURISDICTION

1.      Apotex, Inc. is a Canadian corporation having a place of business at 380 Elgin Mills Road East, Richmond Hill, Ontario, Canada L4C 5H2.

<u>Answer:</u>      Allergan admits that Apotex, Inc. is a Canadian corporation but is without knowledge or sufficient information to form a belief as to the remaining averments in this paragraph, and therefore denies them.

2.      Apotex Corp. is a Delaware corporation having a place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.

<u>Answer:</u>      Admitted.

3.      On information and belief, Allergan, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 2525 Dupont Drive, Irvine, California 92612.

Answer:      Admitted.

4.      Allergan purports to own the entire right, title, and interest of United States Patents Nos. 5,424,078, ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), 6,673,337 ("the '337 patent"), and 6,641,834 ("the '834 patent").

Answer:      Allergan admits that it owns the entire right, title, and interest of United States Patents Nos. 5,424,078, ("the '078 patent"), 6,562,873 ("the '873 patent"), 6,627,210 ("the '210 patent"), 6,673,337 ("the '337 patent"), and 6,641,834 ("the '834 patent").

5.      Apotex Inc. has submitted, and the Food and Drug Administration (FDA) has received, an Abbreviated New Drug Application (ANDA) under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed Products, Brimonidine Tartrate Ophthalmic Solution, 0.15% and Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA applications 78-479 and 78-480.

Answer:      Allergan admits that Apotex Inc. has informed Allergan that Apotex Inc. has submitted to the FDA an Abbreviated New Drug Application (ANDA) under section 505(j) of the Federal Food, Drug, and Cosmetic Act to engage in the commercial manufacture, use, importation, offer for sale, and sale of Apotex's Proposed Products, Brimonidine Tartrate Ophthalmic Solution, 0.15% and Brimonidine Tartrate Ophthalmic Solution, 0.1%, as defined in ANDA applications 78-479 and 78-480.  Allergan is without knowledge or sufficient information to form a belief as to the remaining averments in this paragraph, and therefore denies them.

6.      Pursuant to 21 U.S.C. § 355(j)(2)(A)(vii) and 21 C.F.R. § 314.95, Apotex Inc. certified to Allergan that the '078, '873, '210, '337 and '834 patents are invalid, unenforceable,

2

and/or will not be infringed by the manufacture, use, or sale of the proposed products for which ANDA applications 78-479 and 78-480 are submitted.

    <u>Answer:</u>    Allergan admits that on April 30, 2007, Allergan received a letter, dated April 26, 2007, signed on behalf of Apotex, Inc. The stated purpose of the letter was to notify Allergan that Apotex had filed a certification with the FDA under 21 C.F.R. § 314.50(i)(l)(i)(A)(4) in conjunction with its ANDAs. The letter alleged that: (1) that the '078, '873, '210, '337 and '834 patents were invalid or unenforceable, and (2) that, even if valid and enforceable, some of the claims of those patents would not be infringed by Apotex's generic versions of Allergan ALPHAGAN® P products. Allergan is without knowledge or sufficient information to form a belief as to the remaining averments in this paragraph, and therefore denies them.

    7.    Allergan has commenced this civil action against Apotex Inc. and Apotex Corp. alleging patent infringement.

    <u>Answer:</u>    Admitted.

    8.    This case arises under the Constitution, laws, or treaties of the United States, viz., 35 U.S.C. §§ 1-376, which is an Act of Congress relating to patents, and 21 U.S.C. § 355, which provides subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §271(e)(5).

    <u>Answer:</u>    Allergan admits that the case arises under 35 U.S.C. §§ 1-376, which is an Act of Congress relating to patents, and that the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), but denies that Apotex is entitled to any relief. Allergan denies the remaining allegations of paragraph 8.

    9.    Venue and personal jurisdiction are proper in this district because Allergan, inter alia, is subject to personal jurisdiction in this judicial district and has submitted itself to the jurisdiction of this Court.

    <u>Answer:</u>    Admitted.

10.    A real, actual, and justiciable controversy exists between Apotex Inc. and Apotex Corp. on the one hand and Allergan on the other hand regarding the invalidity of the '078, '873, '210, '337 and '834 patents and Apotex's non-infringement thereof, constituting a case of actual controversy within the jurisdiction of this Court under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2005).

Answer:    Allergan admits that an actual justiciable controversy exists between Apotex, Inc. and Apotex Corp. on the one hand and Allergan on the other regarding the infringement and validity of the '078, '873, '210, '337 and '834 patents. Allergan denies the remaining allegations of paragraph 10.

## COUNT I - DECLARATION OF INVALIDITY

11.    Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 10 as though set forth fully herein.

Answer:    Allergan repeats, realleges and incorporates by reference each of its responses to paragraphs 1 through 10 as though set forth fully herein.

12.    The '078, '873, '210, '337 and '834 patents are invalid and/or unenforceable on grounds specified in United States Code, Title 35, including failure to comply with one or more of the requirements of 35 U.S.C. §§ 101, 102, 103, and/or 112.

Answer:    Denied.

## COUNT II - DECLARATION OF INVALIDITY

13.    Apotex Inc. and Apotex Cop. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 10 as though set forth fully herein.

Answer:    Allergan repeats, realleges and incorporates by reference each of its responses to paragraphs 1 through 10 as though set forth fully herein.

14.    The '078 patent is invalid and/or unenforceable for failure to join all proper inventors as specified in 35 U.S.C. §116 and §256.

Answer:    Denied.

4

## COUNT III - UNENFORCEABILITY OF '078 PATENT.

15.    Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 10 as though set forth fully herein.

Answer:    Allergan repeats, realleges and incorporates by reference each of its responses to paragraphs 1 through 10 as though set forth fully herein.

16.    On November 29,1988, Bill McCarthy ("McCarthy"), as agent of Allergan, filed a patent application, eventually designated as U.S. Patent Application No. 07/277,791 (the '791 application).  The '791 application was assigned to Allergan.

Answer:    Allergan admits that on November 29, 1988, Bill McCarthy transmitted to the United State Patent and Trademark Office ("PTO") a patent application titled "Aqueous Ophthalmic Solutions and Method for Preserving Same."  Allergan further admits that the application was assigned Application Serial No. 07/277,791 and that the application was assigned to Allergan.  Allergan denies the remaining allegations of paragraph 16.

17.    On January 25, 1998, Dziabo and Ripley declared that they were the original, first, and joint inventors of the subject matter claimed in the '791 application.

Answer:    Allergan admits that on January 25, 1988, Anthony J. Dziabo, Jr. and Paul S. Ripley signed a document entitled "Declaration and Power of Attorney-Original Application" which states that "I believe I am the original, first and sole inventor (if only one name is listed below) or a joint inventor (if plural inventors are named below) of the subject matter which is claimed and for which a patent is sought on the invention entitled AQUEOUS OPHTHALMIC SOLUTIONS AND METHOD FOR PRESERVING SAME, the specification of which is attached hereto."  Allergan denies the remaining allegations of paragraph 17.

18.    The '078 patent at issue in this lawsuit is a continuation in part of the '791 application, and also names Dziabo and Ripley as inventors.

Answer:    Admitted.

19.    On the same day that the '791 application was filed, November 29, 1988, McCarthy filed another patent application, eventually designated as U.S. Patent Application No.

07/277,790.  The '790 application was assigned to Bio-Cide International Inc.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the '790 application names Bobby Danner as a sole inventor.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Bobby Danner declared, under penalty of perjury, himself to be the original, first, and sole inventor of the subject matter of the '790 application.

Answer:    Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

20.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the complete written descriptions and drawings of the '790 application and the '791 application as filed are nearly or exactly identical.

Answer:    Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

21.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that claims from the '790 application overlapped in scope with the '791 application.  For example, claims of the '791 application were originally directed to solutions with "about 0.0002 to about 0.02 weight/volume percent stabilized chlorine dioxide as a preservative", while the '790 application claimed compositions with "at least 0.02 weight/volume percent stabilized chlorine dioxide as a disinfectant".  There is no material difference in the '790 and '791 applications between disinfection and preservation- both require the same compound do the same thing- kill contaminating microbes.

Answer:    Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

22.    Claims in both the '790 and '791 applications covered exactly the same composition, that is, a solution having a concentration of stabilized chlorine dioxide of 0.02% weight/volume.

6

Answer:        Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

23.        The fact that one or more persons other than the inventors named in the '791 application declared under penalty of perjury that they were the first, original inventors of a solution that was covered by the claims of the '791 application would have been material to the prosecution of the '791 application.

Answer:        Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

24.        Allergan's agent McCarthy knew of the existence of both the '790 and '791 patent applications at the time they were both pending in the U.S. Patent Office.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that McCarthy knew of the overlap in scope of the claims of the '790 and '791 applications.

Answer:        Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

25.        In connection with the '791 application, McCarthy never disclosed the '790 application to the United States Patent and Trademark Office.

Answer:        Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

26.        On June 14, 1990, PCT application no. WO 90/06126 was published ('126 application).  The published '126 application names Danner as the sole inventor.  The published '126 application does not name either Dziabo or Ripley as an inventor.  The published '126 application claims priority to the '790 application.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the '126 application includes the disclosure of the '790 application.

Answer:        Allergan admits that on June 14, 1990, International Application WO 90/06126 ("the '126 application") entitled "Disinfectant Compositions for Ophthalmic Devices," was published pursuant to the Patent Cooperation Treaty.  Allergan admits that the '126

application purports to claim priority to United States Application 277,790 filed on November 29, 1988.  Allergan also admits that the '126 application purports to list Bobby C. Danner as an inventor and does not name Dziabo and Ripley as inventors.  Allergan is without knowledge or sufficient information to form a belief as to the remaining averments in this paragraph, and therefore denies them.

27.     The application for the '078 patent was filed on May 2,1991.  The application for the '078 patent added new matter (e.g., "Example VIII (Comparative)") and claimed that new matter.  The claims in the '078 patent that claim the new matter are entitled to a filing date no earlier than May 2, 1991.

Answer:     Allergan admits that on May 2, 1991, United States Application No. 07/694,640 ("the '640 application") entitled "Aqueous Ophthalmic Formulations and Methods of Preserving Same" was filed with the PTO.  Allergan further admits that the '640 application is a continuation in part of Serial No. 277,791, filed November 29, 1988.  Allergan denies the remaining allegations of paragraph 27.

28.     The published '126 application is prior art to the '078 patent, and, in particular, is prior art to the claims of the '078 application that incorporate the new matter.

Answer:     Denied.

29.     The published '126 application is material to the patentability of the '078 patent.

Answer:     Denied.

30.     Neither Allergan, nor any applicant for the patent (as defined in 37 C.F.R. §1.56) disclosed the '790 application to the United States Patent and Trademark Office in connection with the application for the '078 patent.

Answer:     Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

31.     Neither Allergan, nor any applicant for the patent (as defined in 37 C.F.R. §1.56) disclosed the published '126 application to the United States Patent and Trademark Office in connection with the application for the '078 patent.

Answer:        Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

32.     A reasonable opportunity for further investigation or discovery is likely to provide evidentiary support that the foregoing misrepresentations and failure to disclose material prior art as set forth above were done with intent to mislead the United States Patent and Trademark Office.

Answer:        Allergan is without knowledge or sufficient information to form a belief as to the averments in this paragraph, and therefore denies them.

33.     The facts and circumstances set forth in this Count III constitute inequitable conduct on the part of the applicants, making the '078 patent unenforceable.

Answer:        Denied.

34.     A reasonable opportunity for further investigation or discovery is likely to provide evidentiary support for other and further circumstances constituting inequitable conduct by the applicants.

Answer:        Denied.

## COUNT IV - INEQUITABLE CONDUCT

35.     Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 10 as though set forth fully herein.

Answer:        Allergan repeats, realleges and incorporates by reference each of its responses to paragraphs 1 through 10 as though set forth fully herein.

36.     The '834 and '337 patents both claim benefit to Application Serial No. 09/904,018 ("the Parent Application"), which matured into the '210 patent.  The '834 patent matured from a continuation application of the Parent Application.  The '337 patent matured from a divisional application of the Parent Application.

Answer:        Allergan admits that the '834 patent entitled "Compositions Containing Alpha-2-Adrenergic Agonist Components" issued November 4, 2003.  Allergan further admits

that the '834 patent is a continuation application of United States Application No. 09/904,018 filed on July 10, 2001.

Allergan admits that the '337 patent entitled "Compositions Containing Alpha-2-Adrenergic Agonist Components" issued January 6, 2004. Allergan further admits that the '337 patent is a divisional application of United States Application No. 09/904,018 filed on July 10, 2001.

Allergan admits that Application 09/904,018 matured into United States Patent 6,627,210.

Allergan denies the remaining allegations of paragraph 36.

37.     The '210, '834 and '337 patents contain the same specification (but for, understandably, differences in the claims and the section entitled "Cross Reference to Related Application").

      <u>Answer:</u>        Admitted.

38.     The '210, '834 and '337 patents each claim therapeutically effective compositions.

      <u>Answer:</u>        Allergan admits that the preamble of the independent claims of the '210, patent states "A therapeutically effective aqueous composition."

Allergan admits that the preamble of the independent claims of the'834 patent states "A therapeutically effective aqueous ophthalmic composition."

Allergan admits that the preamble of the independent claim of the'337 patent states "A therapeutically effective ophthalmic composition."

Allergan denies the remaining allegations of paragraph 38.

39.     The '210, '834 and '337 patents each name Orest Olejnik and Edward D.S. Kerslake as their inventors, who are, and/or were, employed by Allergan. The '210, '834 and '337 patents were each prosecuted by, or on behalf of, Allergan.

      <u>Answer:</u>        Admitted.

40.    The '210, '834 and '337 patents were each examined by Rachel M. Bennett (hereinafter "Patent Examiner") for the United States Patent and Trademark Office (hereinafter "PTO").

<u>Answer:</u>    Allergan admits that the '210, '834 and '337 patents were examined by at least Rachel M. Bennett and Thurman K. Page at the PTO.

41.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that during prosecution of the applications that matured into '210, '834 and '337 patents, each claim of each application was rejected as obvious under 35 U.S.C. § 103 over, inter. alia, the prior art Burke reference (United States Patent No. 5,215,991) and subsequently amended prior to issuance.  Allergan denies the remaining allegations of paragraph 41.

<u>Answer:</u>    Allergan admits that the then pending claims of the application that would later mature into the '210 patent, claims 1-30, were "rejected under 35 U.S.C. 103(a) as being unpatentable over Burke (US 5215991) and in further view of Remington's Pharmaceutical Sciences."  Allergan further admits that at least claims 1, 7-9, 11, 13, 24, 28 were later amended prior to issuance.

Allergan admits that the then pending claims of the application that would later mature into the '337 patent, claims 40-46, were "rejected under 35 U.S.C. 103(a) as being unpatentable over Burke (US 5215991) in further view of Beck et al. (US 6358935)."  Allergan further admits that at least claim 40 was later amended.

Allergan admits that the then pending claims of the application that matured into the '834 patent, claims 47-66, were "rejected under 35 U.S.C. 103(a) as being unpatentable over Burke (US 5215991)."  Allergan further admits that at least independent claims 47 and 57 were later amended.

42.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Carlos A. Fisher, then an Allergan employee, was an attorney of record in connection with the prosecution of the applications that matured into the

'210, '834 and '337 patents on behalf of Allergan after the claims in those applications were
rejected over Burke.

> Answer:        Allergan admits that Carlos A. Fisher was an attorney of record on each of
the applications that would later mature into the '210, '834 and '337 patents.  Allergan denies the
remaining allegations of paragraph 42.

43.     The subject matter and prosecution of the '210, '834 and '337 patents are
intertwined.

> Answer:        Because Defendants' allegation is unclear, Allergan is without sufficient
information or knowledge to form a belief as to the averments of this paragraph and therefore
denies the same.

44.     Allergan filed the Parent Application' which matured into the '210 patent, on July
10, 2001.  That application, naming Orest Olejnik as the first inventor, claimed, *inter alia,* a
composition comprising an alpha-2-adrenergic agonist in a therapeutically effective amount and
a solubility enhancing component.

> Answer:        On July 10, 2001, Allergan filed United States Patent Application Serial
No. 09/904,018 naming Orest Olejnik and Edward D. S. Kerslake as inventors.  The '018
application later matured into the '210 patent.  Claim 1 of the '210 patent reads:

> > A therapeutically effective aqueous composition comprising:
> > a therapeutically active alpha-2-adrenergic agonist
> > component selected from the group consisting of 5-bromo-6-(2-
> > imidozolin-2-ylamino) quinoxaline, a salt thereof, and an ester
> > thereof in an amount effective to provide a therapeutic benefit to a
> > patient to whom the composition is administered; and
> > a polyanionic solubility enhancing component in an amount
> > effective to increase the solubility of the alpha-2-adrenergic
> > agonist component in the composition relative to the solubility of
> > an identical alpha-2-adrenergic agonist component in a similar
> > composition without the solubility enhancing component.

Allergan denies the remaining allegations of paragraph 44.

45.     The application that matured into the '834 patent was filed on September 6, 2002.
After a reasonable opportunity for further investigation or discovery, there is likely to be

evidentiary support that the application was accompanied by a Preliminary Amendment that cancelled all pending claims and added claims to a composition containing, *inter alia,* "up to about 0.15% (wlv)" of brimonidine tartrate.

    <u>Answer:</u>      Allergan admits that United States Application Serial No. 10/236,566 which later matured into the '834 patent was filed on September 6, 2002.  Allergan further admits that a document entitled "Preliminary Amendment" was filed with the PTO canceling claims 1-46 and adding claims 47-66.  Independent claim 47 read:

> A composition comprising:
>     water; and
>     up to about 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate, the composition having a pH of about 7.0 or greater, and the 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline tartrate being soluble in the composition at 21° C.

Independent claim 57 read:

> A composition comprising:
> water; and
>     up to about 0.15% (w/v) of a component selected from the group consisting of 5-bromo-6-(2-imidozolin-2-ylamino)quinoxaline, salts of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, esters of 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline and mixtures thereof,   the composition having a pH of about 7.0 or greater, and the component being soluble in the composition at 21° C.

Allergan denies the remaining allegations of paragraph 45.

    46.    The application that matured into the '337 patent was filed on November 19, 2002, as a divisional application of the Parent Application, and was directed to compositions containing an oxy-chloro preservative.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the application was accompanied by a Preliminary Amendment that cancelled all pending claims and added claims to a composition containing, inter alia, an alpha-2-adrenergic agonist in a therapeutically effective amount and an oxy-chloro preservative component.

13

<u>Answer:</u>        Allergan admits that United States Application Serial No. 10/299,386 was filed on November 19, 2002, and was a divisional application of United States Application Serial No. 09/904,018.  Allergan further admits that a document entitled "Preliminary Amendment" was filed canceling claims 1-39 and adding claims 40-46.  Independent claim 40 read:

> A composition comprising:
>         an alpha-2-adrenergic agonist component in an amount effective to provide a therapeutic benefit to a patient to whom the composition is administered;
>         an oxy-chloro component in an effective amount to at least aid in preserving the composition; and
>         a liquid carrier component, wherein the composition is substantially free of cyclodextrin.

Allergan denies the remaining allegations of paragraph 46.

47.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that: in the only Office Action during prosecution of the '834 patent, mailed on December 18, 2002, the Examiner rejected all pending claims as obvious over the Burke (U.S. Patent No. 5,215,991) in view of Beck et al. (U.S. Patent No. 6,358,935); that the Patent Examiner noted that Burke disclosed: (1) the claimed compound, 5-bromo-6-(2-imidozolin-2-ylamino) quinoxaline, among its most preferred alpha-2-adrenergic compounds; (2) at a concentration from about 0.001% to about 1.0% (wlv), which encompassed the concentration range in the claims ("up to about 0.15% (wlv)"); and (3) that it was well known in the art how to determine the most efficacious ophthalmically acceptable dose (e.g., 0.15%); and that Beck was cited for its disclosure of a chlorite preservative component.

<u>Answer:</u>        Allergan admits that on December 18, 2002, the Examiner of United States Application No. 10/236,566 mailed an Office Action where claims 47-66 were "rejected under 35 U.S.C. 103(a) as being unpatentable over Burke (US 5215991)."  Allergan further admits that the Office Action states, inter alia:

> Burke discloses pharmaceutical compositions of alpha 2 agonists and Na+/H+ exchange inhibitors which are useful in lowering intraocular pressure (IOP) and treatment of intraocular hypertension (see abstract). Preferred imidazoline-derived alpha 2

agonists or pharmaceutically acceptable salts thereof are disclosed in col. 3 (see formula). The most preferred imidazoline-derived alpha 2 agonist compounds include 5-bromo-6-(2-imidazolidine-2-y1amino) quinoaxaline. Doses of alpha 2 agonist in an ophthalmic preparation effective, nontoxic amount of the agonist in a pharmaceutically acceptable liquid, gel, cream or aqueous or nonaqueous liquid suspension or solution are preferably from about 0.001% to about 1.0% weight/volume. Regardless of the preferred range stated herein, one can determine the most efficacious dose for a particular alpha 2 agonist by carrying out a dose response curve as is well known in the art (see col. 4 lines 34-44). Various buffers and means for adjusting pH may be used as long as the resulting preparation is ophthalmically acceptable. Benzalkonium choride [sic] may be used as a preservative. Burke does not disclose the preservative to be a chlorite component.

Beck discloses compositions including a liquid medium, a cylodextrin [sic] component and a preservative component which has a reduced tendency of being complexed with the cyclodextrin component. In one embodiment, the preservative component is a chlorite component. Active compounds, such as pharmaceutically active components or drugs, preferably are included in the compositions (see abstracts). For example, the present compositions may include a pharmaceutically effective in providing a therapeutic effect when administered to the eyes of a human or animal. The preservative employed is preferably ophthalmically acceptable at the concentration employed so that the human or animal is effectively treated without significant harm caused by the presence of the preservative (see col. 1). Preferably, the preservative component has in increased or greater preservative efficacy in the composition relative to an identical amount (wlv) of benzalkonium chloride.

Absent unexpected results, it would have been obvious to one of ordinary skill in the art t the time the invention was made to have modified the composition of Burke by substituting the preservative, chlorite as taught by Beck for the benzalkonium choride because of the expectation of increased or greater preservative efficacy as taught by Beck.

Allergan denies the remaining allegations of paragraph 47.

48.     After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that: in the only substantive Office Action during prosecution of the Parent Application (from which the '210 patent matured), mailed on January 15, 2003, the Patent Examiner rejected all pending claims as obvious over Burke in view of Remington's

Pharmaceutical Sciences; that the wording of the Examiner's rejection with respect to Burke was identical to that in the '834 patent's prosecution except that, rather than noting Burke failed to disclose a chlorite preservative component, the Examiner stated (erroneously) that Burke did not disclose the solubility enhancing agent to be carboxymethylcellulose (hereinafter "CMC") or the pH of its composition; and that Remington was cited for its disclosure of CMC.

<u>Answer:</u>    Allergan admits that on January 15, 2003, the Examiner of United States Application No. 09/904,018 mailed an Office Action, where "[c]laims 1-30 [were] rejected under 35 U.S.C. 103(a) as being unpatentable over Burke (US 521991) and in further view of Remington's Pharmaceutical Sciences."  Allergan further admit that the Office Action states, inter alia:

> Burke discloses pharmaceutical compositions of alpha 2 agonists and Na+/H+ exchange inhibitors which are useful in lowering intraocular pressure (IOP) and treatment of intraocular hypertension (see abstract). Preferred imidazoline-derived alpha 2 agonists or pharmaceutically acceptable salts thereof are disclosed in col. 3 (see formula). The most preferred imidazoline-derived alpha 1 agonist compounds include S-bromo-6-(2-imidazolidine-2-ylamino) quinoaxaline. Doses of alpha 2 agonist in an ophthalmic preparation effective, non-toxic amount  of the agonist in a pharmaceutically acceptable liquid, gel, cream or aqueous or nonaqueous liquid suspension or solution are preferably from about 0.001% to about 1 0% weight/volume.  Regardless of the preferred range stated herein, one can determine the most efficacious dose for a particular alpha 2 agonist by carrying out a dose response curve as is well known in the art (see col 4 lines 34-44).  Various buffers and means for adjusting pH may be used as long as the resulting preparation is ophthalmically acceptable. Burke does not disclose the solubility enhancing agent to be carboxymethylcellulose or the pH of the composition.
>
> Remington discloses carboxymethylcellulose sodium as a known pharmaceutic aid for use as a suspending agent or viscosity-increasing agent (see page 1305).
>
> Absent unexpected results, it is the position of the examiner it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the composition of Burke by adding carboxymethylcellulose in order to achieve the desired viscosity as taught by Remington. Burke teaches topical ophthalmic preparations, for example ocular drops, gels or creams, are preferred because of ease of application, ease of dose delivery

and fewer systemic side effects. Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to add a suitable amount of carboxymethylcellulose achieve the desired viscosity in order to ease the application, as taught by Burke. Furthermore, Burke desires the formulation to ophthalmically acceptable. Thus, one of ordinary skill in the art would determine a pH that is suitable for a composition, which is administration into the eye.

Allergan denies the remaining allegations of paragraph 48.

49.     After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that on February 25, 2003, Allergan's attorney, Carlos A. Fisher, held a telephonic interview(s) with the Patent Examiner regarding the applications that matured into the '210 and '834 patents; that with respect to the pending claims in the Parent Application (which matured into the '210 patent), Allergan "explained the instant invention was an invention of selection" and "agreed to file a declaration showing unexpected results with regards to the anionic solubility enhancing agent [i.e. CMC];" and that with respect to the pending claims in the application that matured into the '834 patent, Allergan "explained the advantages of the composition comprising up to about 0.15% (wlv) of 5-bromo-6-(2-imidozolin-2-ylamino) quinozaline tartrate, wherein the composition has a pH of about 7.0 or greater were unexpected" and "agreed to file a declaration showing the unexpected results."

    Answer:     Allergan admits that the prosecution histories of the '210 and '834 patents state that an interview took place on February 25, 2003 between Rachel M. Bennett and Carlos A. Fisher. Allergan further admits that the "Interview Summary" from that interview in the '834 patent prosecution history states, inter alia:

    The attorney explained the advantages of the composition comprising up to about 0.15% (w/v) of 5-bromo-6-(2-imidozolin-2-ylaminol quinozaline tartate, wherein the composition has a pH of about 7.0 or greater were unexpected. The attorney agreed to file a declaration showing the unexpected results. Furthermore, the attorney agreed to file a Terminal Disclaimer when allowable subject matter is indicated in the instant application.

Allergan further admits that the "Interview Summary" from the February 25, 2003, interview in the '210 patent prosecution history states, inter alia:

> The attorney explained the instant invention was an invention of selection. The attorney agreed to file a declaration showing unexpected results with regards to the anionic solubility enhancing agent. The attorney also indicated support for "substantially unionized" is found on pages 1-2 of the specification. It was agreed upon that a terminal disclaimer would be filed when allowable subject matter was indicated in the instant application.

Allergan denies the remaining allegations of paragraph 49.

50.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that in the only Office Action during prosecution of the '337 patent, dated March 3, 2003 and mailed March 13, 2003, the Patent Examiner rejected all pending claims as obvious over Burke in view of Beck and that the wording of the Examiner's rejection with respect to Burke was largely identical to that in the applications that matured into the '210 and '834 patents, except that the Examiner stated (correctly) that Burke disclosed CMC. Beck was cited for its disclosure of a chlorite preservative component.

Answer:    Allergan admits that on March 13, 2003, the Examiner of United States Application No. 10/299,386 mailed an Office Action. Allergan further admits that claims 40-46 were "rejected under 35 U.S.C. 103(a) as being unpatentable over Burke (US 521591) in further view of Beck et al. (US 6358935)." Allergan further admits that the Office Action reads, inter alia:

> Burke discloses pharmaceutical compositions of alpha 2 agonists and Na+/H+ exchange inhibitors which are useful in lowering intraocular pressure (IOP) and treatment of intraocular hypertension (see abstract). Preferred imidazoline-derived alpha 2 agonists or pharmaceutically acceptable salts thereof are disclosed in col. 3 (see formula). The most preferred imidazoline-derived alpha 2 agonist compounds include 5-bromo-6-(2-imidazolidine-2y1amino) quinoaxaline. Doses of alpha 2 agonist in an ophthalmic preparation effective, nontoxic amount of the agonist in a pharmaceutically acceptable liquid, gel, cream or aqueous or nonaqueous liquid suspension or solution are preferably from about 0.001% to about 1.0% weight/volume. Regardless of the

preferred range stated herein, one can determine the most efficacious dose for a particular alpha 2 agonist by carrying out a dose response curve as is well known in the art (see col. 4 lines 34-44). Various buffers and means for adjusting pH may be used as long as the resulting preparation is ophthalmically acceptable. Benzalkonium chloride may be used as a preservative. Vehicles include carboxy methyl cellulose. Burke does not disclose the preservative to be a chlorite component.

Beck discloses compositions including a liquid medium, a cyclodextrin component and a preservative component which has a reduced tendency of being complexed with the cyclodextrin component. The cyclodextrin component can be in an amount as little as 0.1%. In one embodiment, the preservative component is a chlorite component. Active compounds, such as pharmaceutically active components or drugs, preferably are included in the compositions (see abstracts). For example, the present compositions may include a pharmaceutically effective in providing a therapeutic effect when administered to the eyes of a human or animal. The preservative employed is preferably ophthalmically acceptable at the concentration employed so that the human or animal is effectively treated without significant harm caused by the presence of the preservative (see col. 1). Preferably, the preservative component has in increased or greater preservative efficacy in the composition relative to an identical amount (w/v) of benzalkonium chloride.

Absent unexpected results, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the composition of Burke by substituting the preservative, chlorite as taught by Beck for the benzalkonium chloride because of the expectation of increased or greater preservative efficacy as taught by Beck.

Allergan denies the remaining allegations of paragraph 50.

51.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that on March 12, 2003, Allergan submitted a "Reply to Office Action" in the Parent Application, and that the Reply, executed by Carlos Fisher, was accompanied by a "Declaration of Orest Olejnik, Ph.D."  These documents were received by the Examiner's technology center at the PTO on March 24, 2003.

    Answer:        Allergan admits that during prosecution of United States Application No. 09/904,018, on March 12, 2003, a document entitled "Reply to Office Action" was filed with the

PTO.  Allergan further admits that on that date, a declaration of Orest Olejnik, Ph.D, was also filed with the PTO.  Allergan also admits that these documents are stamped "Received" on March 24, 2003, by Technology Center 1600/2900.  Allergan denies any remaining allegations of paragraph 51.

52.   After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the Reply to Office Action amended the pending claims to require, *inter alia,* that the claimed composition be a "therapeutically effective aqueous composition," comprising a 5- bromo-6-(2-imidozolin-2-ylamino) quinoxaline, or a salt or ester thereof, in a therapeutically effective amount and a "polyanionic" or "anionic" solubility enhancing component, and that the applicants also added several new dependent claims to compositions further comprising oxy-chloro preservative components.  None of the claims contained a limitation regarding the adherence or adsorption of the compositions to cell surfaces.

Answer:   Allergan admits that the phrase "therapeutically effective aqueous" was added to the preamble of then pending independent claims 1, 24, and 28 of United States Application No. 09/904,018.  Allergan further admits that the term "polyanionic" was added to then pending independent claim 1 and the term "anionic" was added to then pending independent claim 28.  Then pending independent claim 24 required an "anionic cellulose derivative." Allergan further admits that dependent claim(s) were added that contain the phrase "oxy-chloro component."  Because Defendants' allegations regarding adherence or adsorption of the compositions to cell surfaces are unclear, Allergan denies the remaining allegations of paragraph 52.

53.   After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the March 12, 2003 Reply argued, in response to the outstanding obviousness rejection, that anionic solubility enhancing components such as CMC have "surprising" properties in the solubilization of brimonidine as compared to non-ionic or cationic polymers, stating, in part, that (p.7):

In light of Dr. Olejnik's Declaration, the patent specification and the state of the art, the Applicants therefore submit that, alone or in combination with Remington, Burke contains no disclosure that would direct or motivate the person of ordinary skill in the art to select or want to select an anionic polymeric solubility enhancing component such as CMC from the list of optional viscous "vehicles" contained in the '991 patent.

<u>Answer:</u>    Allergan admits that the March 12, 2003 Reply states in part:

Of the "vehicles" specifically disclosed by the Burke patent, all will function to increase viscosity of a liquid aqueous composition. However, of these vehicles only carboxymethylcellulose (CMC) is an anionic polymer. All of the other polymers are nonionic. They may act to increase the solution's viscosity, but they do not have the same characteristics as an anionic polymer such as CMC.

Attached to this communication is a Declaration of Orest Olejnik, Ph.D., Principal Scientist, Pharmaceutical Sciences Department, Allergan Inc. Dr. Graham states in this declaration that anionic solubility enhancing components such as CMC have surprising and beneficial properties in the solubilization of brimonidine as compared to non-ionic or cationic polymers. In particular, the use of an anionic polymer solubility enhancing component such as CMC (as compared to, for example, hydroxypropyl methyl cellulose) has the advantage of adsorbing to cellular surfaces, such as the cornea of the eye, in a manner that retains any drug in solution with the CMC to be retained at the ocular surface far longer (and in a larger volume) than viscous formulations made with other, non-anionic polymers, while simultaneously increasing solubility.

In light of Dr. Olejnik's Declaration, the patent specification and the state of the art, the Applicants therefore submit that, alone or in combination with Remington, Burke contains no disclosure that would direct or motivate the person of ordinary skill in the art to select or want to select an anionic polymeric solubility enhancing component such as CMC from the list of optional viscous "vehicles" contained in the '991 patent.

Only the present patent application provides the necessary direction; and to pick and choose elements from lists within the prior an to "create" a claimed invention based in whole or in part on the patent application within which it is first disclosed is clearly impermissible hindsight reconstruction of the invention. Yet, the Applicants respectfully believe that this must be the conclusion of the current rejection.

Allergan denies the remaining allegations of paragraph 53.

54.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that in the accompanying Declaration of Orest Olejnik, Ph.D., Dr. Orest Olejnik, Allergan's Director of Pharmaceutical Development, stated, in part, that (776-8):

> Neither Burke nor Remington discloses that CMC would have any characteristics that would motivate a person or ordinary skill in the art to choose it over the other polymers in formulating a brimonidine solution.
>
> Unlike the other listed polymers (polyvinyl alcohol, povidone (polyvinylpyrrolidone), hydroxypropylcellulose, poloxamers, and hydroxyethylcellulose), CMC is anionic at pH7 or greater.  The other listed polymers are non-ionic polymers. I have discovered as a result of work done and/or directed by me at Allergan that CMC possesses the surprising advantages of both increasing the solubility in solution, as shown in Table 1, and causing such solutions to have superior adherence to cell surfaces, including ocular surfaces such as the cornea. Polyvinyl alcohol was found not to possess both of these properties. Increased adherence of the CMC solution is particularly surprising given the fact that the corneal surface is negatively charged; one would expect less adherence in such a solution due to electrostatic repulsion, rather than increased adherence.…
>
> It is also my belief that brimonidine solutions made using the other "vehicles" mentioned in the Burke patent would not possess this surprising combination of advantages.  Therefore, the disclosures of Burke and Remington's [sic] in so way would render the presently claimed compositions obvious to the worker of ordinary (or even extraordinary) skill in the art.

Answer:     Because this is both an incomplete and inaccurate quotation from the Declaration of Orest Olejnik, Allergan denies the allegations of paragraph 54.

55.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that five days after mailing the Reply and Declaration in the Parent Application, Allergan mailed a "Reply to Office Action" in the prosecution of the

application that matured into the '834 patent on March 17, 2003. The March 17, 2003 Reply, executed by Carlos Fisher, was accompanied by a "Declaration of Amy Batoosingh." These documents were received by the Patent Examiner's technology center on March 28, 2003.

    <u>Answer:</u>    Allergan admits that on March 17, 2003, documents entitled "Reply to Office Action" and "Declaration of Amy Batoosingh" were mailed to the PTO in the prosecution of the application that matured into the '834 patent. These documents are stamped as received by the PTO on March 24, 2003 and by Technology Center 1600/2900 on March 28, 2003. Allergan denies the remaining allegations of paragraph 55.

    56.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the March 17, 2003 Reply amended the pending claims to require, *inter alia,* that the claimed composition be a "therapeutically effective aqueous composition," and that Allergan also argued, with respect to the outstanding obviousness rejection, in part, that (p. 4-5):

> The present invention is the result of the surprising finding that increasing the pH of a brimonidine solution to a pH of greater than about 7.0 leads to similar efficacy at a 25% lower concentration (0.2% (w/v) to about 0.15% (w/v) or less) than is seen in a brimonidine solution at a pH of about 6.6-6.8. This appears to be due to the fact that at a pH closer to the pKa of brimonidine (which has a pKa of about 7.4) than pH 6.3-6.5, a larger proportion of the molecules are electrostatically neutral, and thus less lipophobic than the polarized molecule. As such, a greater amount of the active drug is able to enter the cornea of the eye at a given solution concentration; this effect counters the effects of decreased brimonidine solubility at the higher pH. See specification at e.g., paragraph bridging pages 1 and 2.

> However, it is particularly surprising that such a therapeutically effective dosage of brimonidine could be formulated in aqueous solution at a pH greater than about 7.0. Figure 1 of the present specification shows that brimonidine's solubility decreases precipitously at pH values above 7.0. The fact that a therapeutically effective dosage could be provided by a composition containing about 0.15% or less of brimonidine at such pH values is truly unexpected.

> \*     \*     \*
>
> The advantages of this invention are manifest. Among others, it can be seen that although ophthalmic hypotensive therapeutic efficacy of the 0.15% solution is the same as for the 0.2% solution, the reduced concentration (and thus the reduced dosage) results in a lower potential for systemic side effects … A reduction in the dosage by 25% reduces the likelihood and severity of such side-effects.
>
> Thus, the present invention is drawn to surprising new therapeutic compositions comprising at least a 25% lower concentration of brimonidine than previous ophthalmic formulations, at pH closer both to the solubility limits of brimonidine, and to the pKa of the compound.

Answer:        Allergan admits the "Reply to Office Action" dated March 17, 2003, adds the phrase "therapeutically effective aqueous ophthalmic" to the preamble of then pending independent claims 47 and 57. Allergan further admits that the reply states, in part:

> The present invention is the result of the surprising finding that increasing the pH of a brimonidine solution to a pH of greater than about 7.0 leads to s d a r efficacy at a 25% lower concentration (from 0.2% (w/v) to about 0.15% (w/v) or less) than is seen in a brimonidine solution at a pH of about 6.6-6.8. this appears to be due to the fact that at a pH closer to the pKa of brimonidine (which has a pKa of about 7.4) than pH 6.3-6.5, a larger proportion of the molecules are electrostatically neutral, and thus less lipophobic than the polarized molecule. As such, a greater amount of the active drug is able to enter the cornea of the eye at a given solution concentration; t h effect counters the effects of decreased brimonidine solubility at the higher pH. See specification at e.g., paragraph bridging pages 1 and 2.
>
> However, it is particularly surprising that such a therapeutically effective dosage of brimonidine could be formulated in aqueous solution at a pH greater than about 7.0. Figure 1 of the present specification shows that brimonidine's solubility decreases precipitously at pH values above 7.0. The fact that a therapeutically effective dosage could be provided by a composition containing about 0.15% or less of brimonidine at such pH values is truly unexpected.
>
> For the Examiner's convenience, Applicants hereby attach a copy of an article Katz, et al., J. Glaucoma 11:119 (April 2002) which shows the comparison of the 0.2% brimonidine formulation having a pH 6.3-6.5 (the "0.2% formulation") with 0.15% brimonidine solution at pH 7.2 (the 0.15% formulation).

Although the Katz paper does not disclose the pH of either solution, Applicants hereby enclose a Declaration of Amy Batoosingh, Director of Ophthalmological Clinical Research at Allergan, Inc.  Ms. Batoosingh, whose work is contained within and acknowledged on page 126 of Katz, indicates in her Declaration that the formulation called "brimonidine 0.2%" in the Katz paper, which used benzalkonium chloride as a preservative, comprised 0.2% brimonidine at pH 6.3-6.5, and that the formulation termed "brimonidine-Purite 0.15%" in Katz, (which used oxy-chloro as a preservative) comprised 0.15% brimonidine at pH 7.2. As can be seen in Figure 1 on page 122 of Katz, topical application of the 0.15% formulation resulted in no statistically significant differences in its ability to lower intraocular pressure (IOP) compared to the 0.2% formulation, despite 25% less active agent in the former formulation. Thus, lowering the concentration, when the pH is above about 7.0 unexpectedly had no significant effect on therapeutic efficacy, when compared to the 0.2% formulation.

The advantages of this invention are manifest. Among others, it can be seen that although ophthalmic hypotensive therapeutic efficacy of the 0.15% solution is the same as for the 0.2% solution, the reduced concentration (and thus the reduced dosage) results in a lower potential for systemic side effects, which are typically caused by drainage of topically applied drugs from the eye to the stomach through the nasolacrimal duct. Although brimonidine's side effects are not as severe as some other glaucoma medications, they can still include sedation, hypotension, and reduction in heat rate in some patients. A reduction in the dosage by 25% reduces the likelihood and severity of such side-effects.

Thus, the present invention is drawn to surprising new therapeutic compositions comprising at least a 25% lower concentration of brimonidine than previous ophthalmic formulations, at pH closer both to the solubility limits of brimonidine, and to the pKa of the compound.

For this reason it can be seen that these results were completely unforeseen and surprising, and could therefore not have been anticipated by a person of skill in the art. For this reason, Applicants respectfully request reconsideration and withdrawal of the outstanding rejection, and ask the Examiner to permit the claims to proceed to issue. Should there be any fee in connection with this communication, the Director is authorized to use the Applicants' Deposit Account 01-0885 for the payment of such fees.

57.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that in the accompanying "Declaration of Amy Batoosingh," Amy Batoosingh, Allergan's Director of Ophthalmological Clinical Research, stated, in part, with respect to Katz *et al.,* 2002, *J. Glaucoma* 11:119, that (¶4):

> The conclusion reached as a result of the studies referenced in the Katz et al., article was that brimonidine 0.2% and brimonidine- Purite 0.15% showed comparable efficacy when each was used for treatment of ocular hypertension in glaucoma and/or ocular hypotensive human patients over a 12 month period of time, despite a significant reduction in the concentration of the active ingredient in the latter formulation.

Answer:    Allergan admits that while Director, Ophthalmological Clinical Research at Allergan, Inc., Amy Batoosingh submitted a declaration to the PTO stating, among other things, that:

> The conclusion reached as a result of the studies referenced in the Katz et al., article was that brimonidine 0.2% and brimonidine- Purite 0.1 5% showed comparable efficacy when each was used for the treatment of ocular hypertension in glaucoma and/or ocular hypertensive human patients over a 12 month period of time, despite a significant reduction in the concentration of the active ingredient in the latter formulation.

Allergan further admits that the Katz et al. article referenced in that paragraph is Katz, et al., *J. Glaucoma* 11:119 (April 2002), entitled *Twelve-Month Evaluation of Brimonidine Purite Versus Brimonidine in Patients with Glaucoma  Ocular Hypertension.*  Allergan denies the remaining allegations of paragraph 57.

58.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that on June 3, 2003, the Patent Examiner sent Allergan Notices of Allowance with respect to the claims of the '210 and '834 patents.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the '210 and '834 patents issued on September 30, 2003 and November 4, 2003, respectively, without further prosecution.

Answer:      Allergan admits that the prosecution history of the '210 patent purports to show that a "Notice of Allowance And Issue Fee(s) Due" was mailed on June 3, 2003, and that the '210 patent issued on September 30, 2003.

Allergan admits that the prosecution history of the '834 patent purports to show that a "Notice of Allowance And Issue Fee(s) Due" was mailed on June 3, 2003, and that the '834 patent issued on November 4, 2003.  Allergan denies the remaining allegations of paragraph 58.

59.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan mailed its Reply to Office Action in the prosecution of the '337 patent on June 13, 2003, ten days after the Patent Examiner issued Notices of Allowance with respect to the '210 and '834 patents; that the Reply was executed by Allergan's attorney, Carlos Fisher; that Allergan amended the pending claims to require, inter alia, that the claimed composition be "therapeutically effective" and contain an SEC other than a cyclodextrin; and that Allergan did not underline the requirement for "a solubility enhancing component" to indicate that it had been added in the amendment.  Allergan also deleted the oxy-chloro limitation, which had been its purported reason for filing the divisional application.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that in response to the Examiner's obviousness rejection, Allergan argued, in part, that (p. 5):

> Applicants respectfully maintain that for all its discussion of possible formulations, nothing in Burke discloses or suggests the use of a solubility enhancing component in combination with an alpha adrenergic agonist. The present application, which also discloses the advantages of using such a component (such as greater flexibility with the concentration and pH at which such composition is fonnlated [sic: formulated)], is, to the Applicants' knowledge, the first reference to do so.

Answer:      Allergan admits that on or about June 13, 2003, Carlos Fisher, as Allergan's attorney, sent a document entitled "Reply to Office Action" to the PTO in the prosecution of the '337 patent.  Allergan further admits that, among other changes, the phrase

"therapeutically effective ophthalmic" was added to the preamble and "other than a cyclodextrin" was added to the body of then-pending independent claim 40.   The phrase "an oxy chloro component in an effective amount to at least aid in preserving the composition" was deleted.

Allergan further admits the quotation above, while not a complete quote as to the entire reply, is accurate.  Allergan denies the remaining allegations of paragraph 59.

60.   After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that on October 4, 2003, the Patent Examiner sent Allergan a Notice of Allowance with respect to the '337 patent.  The '337 patent issued on January 6, 2004 without further substantive prosecution.

<u>Answer:</u>   Allergan admits that the prosecution history of the '337 patent purports to show that on August 4, 2003, a "Notice of Allowance and Fee(s) Due" was mailed by the PTO. Allergan further admits that the '337 patent issued on January 6, 2004.  Allergan denies the remaining allegations of paragraph 60.

61.   After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that at the time of filing, and during the prosecution of '210 patent application, Allergan made misrepresentations and/or omissions of material facts to the Patent Examiner and the United States Patent Office, including, but not limited to, the following:

a.   After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that it had conducted comparative experiments with respect to solubility and/or adherence to cell surfaces.  That representation and/or implication was false.

b.   After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that polyvinyl alcohol, povidone, hydroxypropyl methyl cellulose, poloxamers, and/or hydroxyethyl cellulose were not solubility enhancing agents, not adhesive agents, and/or not solubility enhancing agents and not adhesive agents.  The inventor(s), prosecuting

28

attorney(s) and/or others substantively involved in the prosecution of the '210 patent believed that representation and/or implication to be false.

c.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that CMC had "surprising" properties as a solubility enhancing agent, an adhesive agent, and/or a solubility enhancing and an adhesive agent. That representation and/or implication was false.

d.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that its alleged invention was patentable as an "invention of selection." That representation and/or implication was false and/or misleading because the invention of selection argument was inapplicable.

e.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that the other "vehicles" disclosed in Burke did not have solubility enhancing properties, when it believed otherwise.

f.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the best mode contemplated by the inventor(s) of carrying out the invention. Among other things, Allergan had filed a New Drug Application ("NDA") for a commercial product, which reflected the subject matter claimed by the '210 patent, shortly before filing the earliest application giving rise to the '210 patent. Whereas the NDA disclosed, inter alia, a "therapeutically effective aqueous composition" with brimonidine "in an amount effective to provide a therapeutic effect" and a polyanionic SEC "in an amount effective to increase the solubility of the brimonidine, that composition was not disclosed in the '210 patent.

29

g.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the existence of prior published information contradicting its representations with respect to adhesive properties of the "vehicles" disclosed in Burke, including: but not limited to:

   i.      Greaves et al., 1992, *STP Pharma Sci.*, 2: 13-33

   ii.      J.D. Smart, 1984, *J. Pharmacol.,* 36:295-299

   iii.      M.F. Saettone, 1984, *Int'l J Pharmaceutics,* 20: 187-202

h.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, information contradicting its representations with respect to the solubilizing properties of the "vehicles" disclosed in Burke.

i.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, other information contradicting its representations with respect to adhesive properties of the "vehicles" disclosed in Burke.

Answer:      Denied.

62.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that at the time of filing, and during the prosecution of '834 patent application, Allergan made misrepresentations and/or omissions of material facts to the Patent Examiner and the United States Patent Office: including, but not limited to:

a.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that it was "surprising" that the concentration of active ingredient in a therapeutically effective composition could be reduced by adjusting the composition's pH closer to the pKa of the active ingredient.  That representation and/or implication was false.

b.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented that it was "truly unexpected" that "a therapeutically effective dosage could be provided by a composition containing about 0.15% or less of brimonidine" at a pH greater than about 7.0.  That representation was false.

c.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the best mode contemplated by the inventor(s) (whether named on the '834 patent or not) of carrying out the invention.  Among other things, Allergan had filed an NDA for a commercial product, which reflected the subject matter claimed by the '834 patent, shortly before filing the earliest application giving rise to the '834 patent.  Whereas the NDA disclosed, *inter alia,* a therapeutically effective aqueous ophthalmic composition with 0.15% brimonidine, that composition was not disclosed in the '834 patent.

d.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the existence of prior published information demonstrating the efficacy of brimonidine at concentrations of "up to about 0.1596," including, but not limited to:

       i.      Derick et al., 1997, *Ophthnlmol.,* 104:131-136

      ii.      Walters T, 1996, *Survey of Ophthalmol.,* 41:s 19-S26

e.      After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the existence of prior published information demonstrating the effect of pH on drug bioavailability, including, but not limited to:

       i.      Olejnik, O., 1992, *Ophthalmic Drug Delivery Systems* (Ashim Mitra, ed.) pp. 177-198.

      ii.      Wilson et al., 1981, *J. Pharm. Pharmacol.,* 31:749-53.

     iii.      Small et al., 1997, *Int'l  J. Pharmaceutics,* 149:195-201.

iv.    Chien et al., 1990, *Current Eye Res.,* 9:1051-1059.

<u>Answer:</u>    Denied.

63.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that at the time of filing, and during the prosecution of the '337 patent application, Allergan made misrepresentations and/or omissions of material facts to the Patent Examiner and the United States Patent Office, including, but not limited to:

a.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented that "nothing in Burke discloses or suggests the use of a solubility enhancing component in combination with an alpha adrenergic agonist." Allergan clearly understood that Burke disclosed an alpha adrenergic agonist in combination with a "vehicle," and failed to disclose its belief that nearly all of the "vehicles" disclosed in Burke functioned as solubility enhancing components (albeit not labeled as such).

b.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan represented and/or clearly implied that its patent application was, to the Applicants' knowledge, the first reference to disclose the advantages of using a solubility enhancing component, "such as greater flexibility with the concentration and pH at which such composition is formulated." That representation and/or implication was false.

c.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO, the best mode contemplated by the inventor(s) of carrying out the invention. Among other things, Allergan had filed an NDA for a commercial product, which reflected the subject matter claimed by the '337 patent, shortly before filing the earliest application giving rise to the '337 patent. Whereas the NDA disclosed, inter alia, a "therapeutically effective aqueous composition" with brimonidine "in an amount

effective to provide a therapeutic effect" and an SEC "in an amount effective to increase the solubility of the brimonidine, that composition was not disclosed in the '337 patent.

       d.     After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan suppressed, and failed to disclose to the PTO prior published information contradicting its representation that, to the Applicants' knowledge, the '337 patent's specification was the first reference to disclose the advantages of using a solubility enhancing component, "such as greater flexibility with the concentration and pH at which such composition is formulated," including, but not limited to, the references identified in paragraphs 61 and 62.

<u>Answer:</u>     Denied

64.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61, 62 and 63 were false and/or misleading.

<u>Answer:</u>     Denied.

65.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61, 62 and 63 were material to the prosecution of the '210, '834 and/or '337 patents.

<u>Answer:</u>     Denied.

66.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraph 61 were material to the prosecution of the '210, '834 and '337 patents.

<u>Answer:</u>     Denied.

67.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraph 62 were material to the prosecution of the '210, '834 and '337 patents.

<u>Answer:</u>     Denied.

68.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraph 63 were material to the prosecution of the '337 patent.

Answer:        Denied.

69.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61,62 and 63 were known, or should have been known, by Allergan to be false and/or misleading prior to the issuance of the '210, '834 and/or '337 patents.

Answer:        Denied.

70.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan knew, or should have known, that the representations and/or omissions set forth in paragraphs 70, 71 and 72 were material to the prosecution of the '210, '834 and/or '337 patents.

Answer:        Denied.

71.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the representations and/or omissions set forth in paragraphs 61, 62 and 63 were made with the intent to, and/or did, deceive the PTO, and were intended to, and/or did, induce the issuance of the '210, '834 and/or '337 patents.

Answer:        Denied.

72.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan (including, without limitation, its inventors, attorneys, and/or others involved in the filing and/or prosecution of the '210, '834 and/or '337 patents) owed a duty of candor and good faith to the United States Patent and Trademark Office.

Answer:        Allergan admits that, under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent has a duty of candor and good faith in dealing with the [Patent] Office," and that, therefore, all individuals associated with the filing and prosecution of

the '210, '834, and/or '337 patents had a duty of candor and good faith in dealing with the PTO. Allergan denies any remaining allegations of paragraph 72.

73.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the first named inventor of the '210, '834 and '337 patents, Orest Olejnik, owed a duty of candor and good faith to the United States Patent and Trademark Office.

<u>Answer:</u>    Allergan admits that, under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent has a duty of candor and good faith in dealing with the [Patent] Office," and that, therefore, all individuals associated with the filing and prosecution of the '210, '834, and/or '337 patents had a duty of candor and good faith in dealing with the PTO. Allergan denies any remaining allegations of paragraph 73.

74.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that an attorney who prosecuted the '210, '834 and '337 patents for Allergan, Carlos A. Fisher, owed a duty of candor and good faith to the United States Patent and Trademark Office.

<u>Answer:</u>    Allergan admits that, under 37 C.F.R. § 1.56, "[e]ach individual associated with the filing and prosecution of a patent has a duty of candor and good faith in dealing with the [Patent] Office," and that, therefore, all individuals associated with the filing and prosecution of the '210, '834, and/or '337 patents had a duty of candor and good faith in dealing with the PTO. Allergan denies any remaining allegations of paragraph 74.

75.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that Allergan (including, without limitation, its inventors, attorneys, and/or others involved in the filing and/or prosecution of the '210, '834 and/or '337 patents) breached that duty of candor and good faith.

<u>Answer:</u>    Denied.

76.    After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that the first named inventor of the '210, '834 and '337 patents,

Orest Olejnik, breached his duty of candor and good faith to the United States Patent and Trademark Office.

 <u>Answer:</u>  Denied.

 77.  After a reasonable opportunity for further investigation or discovery, there is likely to be evidentiary support that an attorney who prosecuted the '210, '834 and '337 patents for Allergan, Carlos A. Fisher, breached his duty of candor and good faith to the United States Patent and Trademark Office.

 <u>Answer:</u>  Denied.

## COUNT V - MISUSE

 88.  Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 87 as though set forth fully herein.

 <u>Answer:</u>  Allergan repeats, realleges and incorporates by reference each of its responses to paragraphs 1 through 88 as though set forth fully herein.

 89.  The '078, '873, '210, '337 and '834 patents are invalid and/or were obtained improperly and by inequitable conduct.  Knowing that the '078, '873, '210, '337 and '834 patents are invalid and/or unenforceable, Allergan commenced this infringement action against Apotex Inc. and Apotex Corp.  Allergan's efforts to enforce the '078, '873, '210, '337 and '834 patents, by suing for infringement and by maintaining the patents' listings in the Approved Drug Products With Therapeutic Equivalence Evaluation (also known as the "Orange Book"), constitute patent misuse.

 <u>Answer:</u>  Denied.

## COUNT V [SIC] - NON-INFRINGEMENT

 90.  Apotex Inc. and Apotex Corp. repeat, reallege and incorporate by reference each of the allegations of paragraphs 1 through 89 as though set forth fully herein.

 <u>Answer:</u>  Allergan repeats, realleges and incorporates by reference each of its responses to paragraphs 1 through 89 as though set forth fully herein.

91.     Neither Apotex Inc. nor Apotex Corp. infringes, either directly or indirectly, any valid, enforceable claim of the '078, '873, '210, '337 and '834 patents. ANDA applications 78-479 and 78-480 do not infringe, either directly or indirectly, any valid, enforceable claim of the '078, '873, '210, '337 and '834 patents. The proposed products for which approval is sought under ANDA applications 78-479 and 78-480 do not directly or indirectly infringe any valid claim of the '078, '873, '210, '337 and '834 patents.

<u>Answer:</u>     Allergan repeats, realleges and incorporates by reference its claim for infringement set forth in paragraphs 1 through 56 of its Complaint and denies the allegations of paragraph 91.

Dated:  June 25, 2007                FISH & RICHARDSON P.C.


                                     By:  */s/ William J. Marsden, Jr.*
                                          William J. Marsden, Jr. (#2247)
                                          919 N. Market Street, Suite 1100
                                          P.O. Box 1114
                                          Wilmington, DE 19899-1114
                                          Telephone:  (302) 652-5070
                                          Facsimile:  (302) 652-0607
                                          Email:  marsden@fr.com

                                          Of Counsel:

                                          Jonathan E. Singer
                                          Michael J. Kane
                                          Deanna J. Reichel
                                          FISH & RICHARDSON P.C.
                                          60 South Sixth Street, Suite 3300
                                          Minneapolis, MN 55402
                                          Telephone:  (612) 335-5070
                                          Facsimile:  (612) 288-9696

                                          Juanita Brooks
                                          FISH & RICHARDSON P.C.
                                          12390 El Camino Real
                                          San Diego, CA 92130
                                          Telephone:  (858) 678-5070
                                          Facsimile:  (858) 678-5099

                                     Attorneys for Plaintiff
                                     ALLERGAN, INC.

38

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2007, I electronically filed with the Clerk of Court **Reply To Defendants' Counterclaims** using CM/ECF which will send electronic notification of such filing(s) to the following Delaware counsel.  In addition, the filing will also be sent via hand delivery:

Richard L. Horwitz, Esq.                    Attorneys for Defendant
Kenneth L. Dorsney, Esq.                    Apotex Inc.
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE  19801


I hereby certify that on June 25, 2007, I have mailed by United States Postal Service, the document(s) to the following non-registered participants:

Robert B. Breisblatt, Esq.                   Attorneys for Defendant
Welsh & Katz, Ltd.                           Apotex Inc.
120 South Riverside Plaza, 22nd Floor
Chicago, IL  60606


                                             _/s/ William J. Marsden, Jr._____
                                             William J. Marsden, Jr.


**90227312** (3).doc

1